**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF FLORIDA**
**FORT PIERCE DIVISION**

**CASE NO. 2:25-cv-14261-CANNON-MAYNARD**

| | |
|---|---|
| **THE TOX FRANCHISING GROUP,** **LLC**, a Florida limited liability company, | ) ) ) |
| | ) |
| Plaintiff, Counter-Defendant, | ) |
| | ) |
| **THE TOX IP, LLC**, a Florida limited liability company, | ) ) |
| | ) |
| Plaintiff, | ) |
| | ) |
| **v.** | ) |
| | ) |
| **DARBY HOGGATT**, an individual; **JESSICA HOGGATT**, an individual; and **GENX HOLDINGS, LLC**, a Colorado limited liability company, | ) ) ) ) |
| | ) |
| Defendants, Counter-Plaintiffs, | ) |
| | ) |
| **v.** | ) |
| | ) |
| **FRANCHISE FASTLANE, LLC**, a Nebraska limited liability company, | ) |
| | |
| Additional Counter-Defendant. | |

## DEFENDANTS' AMENDED ANSWER AND COUNTERCLAIMS

Pursuant to this Court's Order dated January 20, 2026 (Doc. No. 73), Defendants/Counterclaimants, Jessica and Darby Hoggatt and GenX Holdings, LLC ("Defendants"), file this Amended Answer to the Complaint of Plaintiffs The Tox Franchising Group, LLC and The Tox IP, LLC (collectively, "Plaintiffs" or "The Tox") and allege their Counterclaims, as follows:

1

1.      Defendants deny Plaintiffs are entitled to relief pursuant to the statutes and/or causes of action referenced but admit that, as alleged, jurisdiction is proper in this Court.

2.      Defendants deny Plaintiffs are entitled to relief pursuant to the statutes and/or causes of action referenced but admit that, as alleged, jurisdiction is proper in this Court.

3.      Defendants admit an actual justiciable controversy between the parties exists. Defendants deny Plaintiffs are entitled to any of the relief they seek.

4.      Defendants deny the allegations in Paragraph 4.

5.      Upon information and belief, Defendants admit the allegations contained in Paragraph 5.

6.      Upon information and belief, Defendants admit the allegations contained in Paragraph 6.

7.      Defendants admit the allegations contained in Paragraph 7.

8.      Defendants admit the allegations contained in Paragraph 8.

9.      Defendants admit the allegations contained in Paragraph 9.

10.     Upon information and belief, Defendants admit that The Tox IP, LLC owns the trademarks at issue and allows The Tox Franchising Group, LLC to use its trademarks. The remaining allegations in the paragraph are denied.

11.     Defendants deny the allegations in Paragraph 11.

12.     Upon information and belief, Defendants admit The Tox has entered into Franchise Agreements at various locations throughout the United States. Defendants deny the allegations to the extent they imply The Tox "licenses" a "System" of any value, and otherwise deny the remaining allegations in Paragraph 12.

13.     Defendants deny the allegations in Paragraph 13.

14. Upon information and belief, Defendants admit that The Tox IP, LLC owns the trademarks at issue and allows The Tox Franchising Group, LLC to use its trademarks. The remaining allegations in Paragraph 14 are denied.

15. Defendants lack knowledge or information sufficient to form a belief as to the truth of the allegations contained in Paragraph 15 and therefore deny the same.

16. Defendants lack knowledge or information sufficient to form a belief as to the truth of the allegations contained in Paragraph 16 and therefore deny the same.

17. Defendants deny the allegations contained in Paragraph 17.

18. Defendants admit that the Individual Defendants executed the Franchise Agreement referenced in Paragraph 18, which is a document that speaks for itself. Defendants assert the agreement is unenforceable and void due to, among other things, fraud. Defendants otherwise deny the allegations in Paragraph 18.

19. Defendants admit that the Individual Defendants executed the Franchise Agreement, which is a document that speaks for itself. Defendants admit that Mr. Darby Hoggatt has been an attorney licensed to practice law in Colorado, Wyoming, and South Dakota since the mid-1990s. Defendants otherwise deny the allegations in Paragraph 19.

20. The allegations in Paragraph 20 refer to the Franchise Agreement, which is a document that speaks for itself. Defendants otherwise deny the allegations in Paragraph 20.

21. Defendants admit the Individual Defendants executed the Multi-Unit Development Agreement (the "MUDA"), which is a document that speaks for itself. Defendants assert the MUDA is unenforceable and void due to, among other things, fraud. Defendants otherwise deny the allegations in Paragraph 21.

22. Defendants admit the allegations contained in Paragraph 22.

23. The allegations in Paragraph 23 refer to the Franchise Agreement, which is a document that speaks for itself. Defendants otherwise deny the allegations contained in Paragraph 23.

24. Defendants deny the allegations contained in Paragraph 24.

25. Defendants deny the allegations contained in Paragraph 25.

26. Defendants admit that Defendant GenX Holdings, LLC entered into a lease agreement with non-party Broadway Investors Group, LLP, which is a document that speaks for itself. Defendants otherwise deny allegations contained in Paragraph 26.

27. Defendants deny the allegations contained in Paragraph 27.

28. Defendants admit the allegations contained in Paragraph 28.

29. Defendants deny the allegations contained in Paragraph 29.

30. The allegations in Paragraph 30 refer to Plaintiffs' Exhibit D, which is a document that speaks for itself. Defendants otherwise deny the allegations in Paragraph 30.

31. The allegations in Paragraph 31 refer to Plaintiffs' Exhibit E, which is a document that speaks for itself. Defendants otherwise deny the allegations in Paragraph 31.

32. The allegations in Paragraph 32 refer to the Notices of Default, which are documents that speak for themselves. Defendants otherwise deny the allegations in Paragraph 32.

33. Defendants admit that Mr. Hoggatt did not object to the First Notice by email. Defendants deny the remaining allegations in Paragraph 33.

34. Defendants admit that Defendants paid the fees referenced. Defendants deny the remaining allegations in Paragraph 34.

35. Defendants deny the allegations contained in Paragraph 35.

36. The allegations in Paragraph 35 refer to Plaintiffs' Exhibit F, which is a document that speaks for itself. Defendants otherwise deny the allegations in Paragraph 36.

37. Defendants admit that Mr. Hoggatt wrote to The Tox's counsel. Defendants deny the remaining allegations in Paragraph 37.

38. Defendants admit that they removed the post at issue. Defendants deny the remaining allegations contained in Paragraph 38.

39. Defendants deny the allegations contained in Paragraph 39.

40. Defendants deny the allegations contained in Paragraph 40.

41. The allegations in Paragraph 41 refer to Plaintiffs' Exhibit G, which is a document that speaks for itself. Defendants otherwise deny the allegations in Paragraph 41.

42. Defendants deny the allegations contained in Paragraph 42.

43. Defendants deny the allegations contained in Paragraph 43.

44. Defendants deny the allegations contained in Paragraph 44.

45. The allegations in Paragraph 45 refer to Plaintiffs' Exhibit H, which is a document that speaks for itself. Defendants otherwise deny the allegations in Paragraph 45.

46. Defendants deny the allegations contained in Paragraph 46.

47. Defendants deny the allegations contained in Paragraph 47.

48. The allegations in Paragraph 48 refer to Plaintiffs' Exhibit I, which is a document that speaks for itself. Defendants otherwise deny the allegations in Paragraph 48.

49. Defendants deny the allegations contained in Paragraph 49.

50. Defendants admit they made the payments referenced. Defendants otherwise deny the allegations in Paragraph 50.

51. Defendants deny the allegations contained in Paragraph 51.

52. Defendants deny the allegations contained in Paragraph 52.

53. The allegations in Paragraph 53 refer to Plaintiffs' Exhibit J, which is a document that speaks for itself. Defendants otherwise deny the allegations in Paragraph 53.

54. Defendants deny the allegations contained in Paragraph 54.

55. Defendants deny the allegations contained in Paragraph 55.

56. The allegations in Paragraph 56 refer to Plaintiffs' Exhibit K, which is a document that speaks for itself. Defendants otherwise deny the allegations in Paragraph 56.

57. Defendants admit that Mr. Hoggatt acknowledged receipt of a document purporting to be a Notice of Termination. Defendants deny the allegations in Paragraph 57 to the extent they imply that the Notice of Termination was proper and/or effective. Defendants otherwise deny the allegations contained in Paragraph 57.

58. Defendants deny the allegations contained in Paragraph 58.

59. The allegations in Paragraph 59 refer to Plaintiffs' Exhibit L, which is a document that speaks for itself. Defendants otherwise deny the allegations contained in Paragraph 59.

60. The allegations in Paragraph 60 refer to Plaintiffs' purported termination notices, which are documents that speak for themselves. Defendants otherwise deny the allegations in Paragraph 60.

61. The allegations in Paragraph 61 refer to the Franchise Agreement, which is a document that speaks for itself. Defendants otherwise deny the allegations in Paragraph 61.

62. The allegations in Paragraph 62 refer to the MUDA, which is a document that speaks for itself. Defendants otherwise deny the allegations in Paragraph 62.

63. The allegations in Paragraph 63 refer to the Franchise Agreement, which is a document that speaks for itself. Defendants otherwise deny the allegations in Paragraph 63.

64. Defendants deny the allegations contained in Paragraph 64.

65. The allegations in Paragraph 65 refer to Plaintiffs' Exhibit M, which is a document that speaks for itself. Defendants otherwise deny the allegations in Paragraph 65.

66. Defendants admit they retained counsel. Defendants deny the remaining allegations contained in Paragraph 66.

67. Defendants deny the allegations contained in Paragraph 67.

68. Defendants deny the allegations contained in Paragraph 68.

69. Defendants deny the allegations contained in Paragraph 69.

70. The allegations in Paragraph 70 refer to a "public post," which is a document that speaks for itself. Defendants deny the allegations contained in Paragraph 70.

71. Defendants deny the allegations contained in Paragraph 71.

72. Defendants deny the allegations contained in Paragraph 72.

73. Defendants deny the allegations contained in Paragraph 73.

74. Paragraph 74 refers to the Franchise Agreement, which is a document that speaks for itself. Defendants otherwise deny the allegations contained in Paragraph 74.

75. Defendants deny the allegations contained in Paragraph 75.

76. Defendants deny the allegations contained in Paragraph 76.

**COUNT I:**
**TRADEMARK INFRINGEMENT, UNFAIR COMPETITION, AND FALSE**
**DESIGNATION OF ORIGIN**
**(15 U.S.C. § 1125(A) and Common Law)**
**(Plaintiffs against all Defendants)**

77. Paragraph 77 requires no response.

78. Defendants deny the allegations contained in Paragraph 78.

79. Defendants deny the allegations contained in Paragraph 79.

80.     Defendants deny the allegations contained in Paragraph 80.

81.     Defendants deny the allegations contained in Paragraph 81.

82.     Defendants deny the allegations contained in Paragraph 82.

83.     Defendants deny the allegations contained in Paragraph 83.

84.     Defendants deny the allegations contained in Paragraph 84.

85.     Defendants deny the allegations contained in Paragraph 85.

86.     Defendants deny the allegations contained in Paragraph 86.

**COUNT II:**
**TRADEMARK INFRINGEMENT**
**(15 U.S.C. § 1114)**
**(Plaintiffs against all Defendants)**

87.     Paragraph 87 requires no response.

88.     Upon information and belief, Defendants admit The Tox owns multiple federal trademarks. Defendants otherwise deny the allegations in Paragraph 88.

89.     Paragraph 89 is a legal conclusion to which no response is required. To the extent a response is required, Defendants deny the allegations contained in Paragraph 89.

90.     Defendants deny the allegations contained in Paragraph 90.

91.     Defendants deny the allegations contained in Paragraph 91.

92.     Defendants deny the allegations contained in Paragraph 92.

93.     Defendants deny the allegations contained in Paragraph 93.

**COUNT III:**
**TRADEMARK DILUTION**
**(15 U.S.C. § 1125(c))**
**(Plaintiffs against all Defendants)**

94.     Paragraph 94 requires no response.

95.     Defendants deny the allegations contained in Paragraph 95.

96.    Defendants deny the allegations contained in Paragraph 96.

97.    Defendants deny the allegations contained in Paragraph 97.

98.    Defendants deny the allegations contained in Paragraph 98.

99.    Defendants deny the allegations contained in Paragraph 99.

**COUNT IV:**
**BREACH OF CONTRACT**
**(Franchise Agreement – Post-Termination Provisions – Injunctive Relief)**
**(by the Tox Franchise Group, LLC against the Individual Defendants)**

100.    Paragraph 100 requires no response.

101.    Defendants deny the allegations contained in Paragraph 101.

102.    Defendants deny the allegations contained in Paragraph 102.

103.    Defendants deny the allegations contained in Paragraph 103.

104.    Defendants deny the allegations contained in Paragraph 104.

105.    The allegations in Paragraph 105 refer to the Franchise Agreement, which is a document that speaks for itself. Defendants otherwise deny the allegations in Paragraph 105.

**COUNT V:**
**BREACH OF CONTRACT**
**(MUDA – Post-Termination Provisions – Injunctive Relief)**
**(by the Tox Franchising Group, LLC against the Individual Defendants)**

106.    Paragraph 106 requires no response.

107.    Defendants deny the allegations contained in Paragraph 107.

108.    Defendants deny the allegations contained in Paragraph 108.

109.    Defendants deny the allegations contained in Paragraph 109.

110.    Defendants deny the allegations contained in Paragraph 110.

**COUNT VI:**
**BREACH OF CONTRACT**
**(Franchise Agreement – Post-Termination Provisions – Monetary Relief)**
**(by The Tox Franchising Group, LLC against the Individual Defendants)**

111.    Paragraph 111 requires no response.

112.    Defendants deny the allegations contained in Paragraph 112.

113.    Defendants deny the allegations contained in Paragraph 113.

114.    Defendants deny the allegations contained in Paragraph 114.

115.    Defendants deny the allegations contained in Paragraph 115.

116.    Defendants deny the allegations contained in Paragraph 116.

117.    Defendants deny the allegations contained in Paragraph 117.

**COUNT VII:**
**UNFAIR COMPETITION**
**(Plaintiffs against All Defendants)**

118.    Paragraph 118 requires no response.

119.    Defendants deny the allegations contained in Paragraph 119.

120.    Defendants deny the allegations contained in Paragraph 120.

121.    Defendants deny the allegations contained in Paragraph 121.

122.    Defendants deny the allegations contained in Paragraph 122.

123.    Defendants deny the allegations contained in Paragraph 123.

**COUNT VIII:**
**DEFEND TRADE SECRETS ACT**
**(Plaintiffs against All Defendants)**

124.    Paragraph 124 requires no response.

125.    Paragraph 125 contains a legal conclusion to which no response is required. To the extent a response is required, Defendants deny the allegations contained in Paragraph 125.

126.    Defendants deny the allegations contained in Paragraph 126.

10

127.    Defendants deny the allegations contained in Paragraph 127.

128.    Defendants deny the allegations contained in Paragraph 128.

129.    Defendants deny the allegations contained in Paragraph 129.

130.    Defendants deny the allegations contained in Paragraph 130.

131.    The allegations in Paragraph 131 refer to agreements, which are documents that speak for themselves. Defendants otherwise deny the allegations contained in Paragraph 131.

132.    Defendants deny the allegations contained in Paragraph 132.

133.    Defendants deny the allegations contained in Paragraph 133.

134.    Defendants deny the allegations contained in Paragraph 134.

135.    Defendants deny the allegations contained in Paragraph 135.

136.    Defendants deny the allegations contained in Paragraph 136.

137.    Defendants deny the allegations contained in Paragraph 137.

138.    Defendants deny the allegations contained in Paragraph 138.

**COUNT IX:**
**TORTIOUS INTERFERENCE WITH CONTRACT**
**(The Tox Franchising Group, LLC against GenX)**

139.    Paragraph 139 requires no response.

140.    Defendants deny the allegations contained in Paragraph 140.

141.    Defendants admit the allegations contained in Paragraph 141.

142.    Defendants deny the allegations contained in Paragraph 142.

143.    Defendants deny the allegations contained in Paragraph 143.

144.    Defendants deny the allegations contained in Paragraph 144.

145.    Defendants deny the allegations contained in Paragraph 145.

146.    Defendants deny the allegations contained in Paragraph 146.

147.    Defendants deny the allegations contained in Paragraph 147.

## PRAYER FOR RELIEF

Defendants deny that Plaintiffs are entitled to any of the relief Plaintiffs seek. Defendants deny any allegations contained in a heading, instruction, or ad damnum clause. Defendants deny any allegation not specifically admitted above.

## FIRST DEFENSE

The Complaint fails to state a claim against Defendants, in whole or in part, upon which relief can be granted.

## SECOND DEFENSE

Plaintiffs' claims are barred as the purported contracts at issue were procured by fraud.

## THIRD DEFENSE

Plaintiffs' claims are barred due to Plaintiffs' violation of state anti-SLAPP statutes.

## FOURTH DEFENSE

Plaintiffs' claims are barred as the purported contracts at issue are unenforceable adhesion contracts.

## FIFTH DEFENSE

Plaintiffs' claims are barred as the purported contracts at issue are unconscionable, illegal, and/or in violation of public policy.

## SIXTH DEFENSE

Plaintiffs' claims are barred as the purported contracts at issue are unenforceable as they were procured by economic duress.

### SEVENTH DEFENSE

Plaintiffs' claims are barred as the purported contracts at issue are unenforceable as Plaintiffs committed the first material breach of these purported contracts.

### EIGHTH DEFENSE

Plaintiffs' claims are barred in whole or in part by the equitable doctrines of estoppel, laches, and/or waiver.

### NINTH DEFENSE

Plaintiffs' claims are barred under the doctrines of mutual and/or unilateral mistake.

### TENTH DEFENSE

Plaintiffs' claims are barred as the purported contracts at issue fail for lack of consideration.

### ELEVENTH DEFENSE

Plaintiffs' claims are barred in whole or in part by the equitable doctrine of unclean hands.

### TWELFTH DEFENSE

Plaintiffs' claims are barred, in whole or in part, by the doctrine of accord and satisfaction.

### THIRTEENTH DEFENSE

Plaintiffs' claims are barred because they are brought in bad faith and with an improper motive.

### FOURTEENTH DEFENSE

Plaintiffs' Complaint is an impermissible "shotgun pleading" as it does not specify which Defendants are responsible for which acts or omissions.

### FIFTEENTH DEFENSE

Plaintiffs' claim for tortious interference with contract against GenX Holdings, LLC fails as GenX Holdings, LLC is owned 50/50 by Jessica Hoggatt and Darby Hoggatt and has a financial

interest in how the business relationship at issue and/or the purported contract is performed and, in addition, has a privilege to act in relation to the purported contract.

## SIXTEENTH DEFENSE

Defendants hereby assert all defenses available under applicable law. Additional facts may be revealed in discovery or otherwise supporting additional defenses presently available, but unknown, to Defendants. Defendants therefore reserve the right to assert additional defenses in the event discovery or investigation reveals additional defenses.

\*       \*       \*

WHEREFORE, having answered Plaintiffs' Complaint, Defendants' request:

1.   That the Court dismiss the Complaint against Defendants, with costs assessed against Plaintiffs;

2.   That the Court award Defendants their reasonable attorneys' fees and costs to the extent permitted; and

3.   For such other, further and general relief as the Court may deem just and equitable.

## AMENDED COUNTERCLAIMS

Counterclaim-Plaintiffs Jessica Hoggatt, Darby Hoggatt, and GenX Holdings, LLC, assert the following claims against Counterclaim-Defendant The Tox Franchising Group, LLC and Additional Counterclaim-Defendant Franchise Fastlane, LLC and state as follows:

### I.       PARTIES

1.       Jessica Hoggatt and Darby Hoggatt (the "Hoggatts" or "Individual Counterclaim Plaintiffs") are residents of the State of Colorado.

2.       GenX Holdings, LLC ("GenX") is a Colorado limited liability company. Jessica Hoggatt and Darby Hoggatt own GenX 50/50.

3.      The Tox Franchising Group, LLC ("The Tox") is a Florida limited liability company. Upon information and belief, all members of The Tox are residents of the State of Florida.

4.      Additional Counterclaim-Defendant Franchise Fastlane, LLC ("FFL") is a limited liability company organized under the laws of the State of Delaware with its principal place of business in Omaha, Nebraska. Its registered agent is the Corporation Service Company, located at 251 Little Falls Drive, Wilmington, Delaware 19808. In a separate lawsuit filed on September 21, 2025 in the U.S. District Court for the Middle District of Florida, FFL attests that it "is authorized and licensed to do business in the State of Florida, and is in fact doing business in Hillsborough County, Florida." (*See Franchise Fastlane, LLC v. Weeter, et al.*, Case No. 8:25-cv-02538 (M.D. Fla. 2025), at Doc. No. 1, ¶ 9). FFL admitted in this separate lawsuit that it was doing business in Florida because one of its Directors of Franchise Development worked remotely from Florida.

## II.      JURISDICTION AND VENUE

5.      This Court has subject matter jurisdiction over this Counterclaim pursuant to Fed. R. Civ. P. 13(a) because the claims herein arise out of the same transaction or occurrence that is the subject matter of the Plaintiffs' claims.

6.      Personal jurisdiction is proper in the courts of the State of Florida as to additional Counterclaim-Defendant FFL.[1] Non-party Gabrielle Sacco is "the Director of Franchise Development for The Tox" at FFL. That means she is in charge of selling The Tox to prospective franchisees. Ms. Sacco was the primary point of contact for the Hoggatts in their communications

---

[1] As this Court knows, FFL has previously taken the position that it is not subject to personal jurisdiction in Florida. Counterclaim Plaintiffs presume that FFL will continue to maintain this untenable position and, as such, allege jurisdictional facts to support FFL's inclusion as a party in this case.

with FFL. Ms. Sacco lives in Florida and works remotely for FFL from Florida. On FFL's website, FFL attests that Ms. Sacco has lived in Florida for the "last 20 years" and that there is "no where [sic] else" Ms. Sacco would rather be than Florida. Ms. Sacco's LinkedIn page notes that she lives in Fort Lauderdale, and, as recently as January 12, 2026, Ms. Sacco posted on LinkedIn and referred to herself as a "Floridian." Ms. Sacco was physically present in Florida when she communicated with the Hoggatts in the communications discussed below.

7.      Further, the business relationship between The Tox and FFL is, according to FFL's "Relationship Disclosure Form for Franchisees," structured as follows: The Tox "engaged [FFL] as an independent sales representative to sell, market and promote [The Tox's] franchises to prospective franchisees pursuant to a sales representative agreement" between The Tox and FFL. "[The Tox] pays commissions and fees to [FFL] for its services. In particular, [FFL] earns a commission when a prospective franchisee has executed a franchise agreement or multi-unit development agreement and paid the initial franchise fee or area development fee."

8.      In its Complaint filed in the U.S. District Court for the Middle District of Florida, FFL describes its business as follows: "FFL is engaged in the business of outsourced franchise development, sales, and marketing services for franchisors. As a franchise sales organization, FFL partners with emerging and established franchisors to manage the entire franchisee sales lifecycle, from initial lead generation and prospect qualification through to deal closure. FFL leverages industry-leading technology, a rigorous diligence and onboarding process, and a team of experienced sales executives to help franchisors grow their brand and sell franchises to prospective franchisees." (*See Franchise Fastlane, LLC v. Weeter, et al.*, Case No. 8:25-cv-02538 (M.D. Fla. 2025), at Doc. No. 1, ¶ 9).

9.      Additionally, in the same matter, FFL's President and Chief Operating Officer states in a sworn declaration that "FFL has developed and maintained, at significant expense, valuable and long-standing working relationships and substantial goodwill with its client's franchisees and prospective franchisees [like the Hoggatts here]. FFL works closely with franchisors to understand their unique needs and tailors its development strategies to ensure that each client receives personalized attention and support throughout the franchise sales process." (*See id.*, at Doc. No. 14-1).

10.     To the extent FFL acts as The Tox's agent (and the Hoggatts do not have enough information to make that determination at this time), "[t]he law is clear that an agent, as well as his principal, is liable for fraud perpetrated by the agent within the course and scope of his agency." *Mannish v. Lacayo*, 496 So. 2d 242, 243 (Fla. Dist. Ct. App. 1986).

11.     Finally, in the same case filed in the U.S. District Court for the Middle District of Florida, one of the Defendants, Candice Weeter, who lives in Hillsborough County, Florida, notes in a sworn declaration that, during the time period that the Hoggatts were considering purchasing a The Tox franchise, she worked as a Director of Franchise Development for FFL and notes that her position was "fully remote." She also notes as follows:

> Not only was I driving revenue growth, I was being asked to play cleanup and turn around struggling brands I was not in charge of. On numerous occasions, FFL management approached me to support and mentor directors who were struggling to sell any franchisees on behalf of various brands. I distinctly remember being approached by a VP at a conference, Jessica McLean, who shared that a director had been on a brand, "The Tox," for four months and had yet to close a single franchisee sale. The VP asked me if I could shadow and support the director. With my help, this director was able to sell one-hundred territories to date.

(*Franchise Fastlane, LLC v. Weeter, et al.*, Case No. 8:25-cv-02538 (M.D. Fla. 2025), at Doc. No. 35-1). That is, FFL and its former employees have submitted sworn statements in which they admit that FFL Directors of Franchise Development conduct their jobs "fully remote" and that Ms.

17

Weeter, another Florida resident, was "support[ing]" Ms. Sacco, a Florida resident, while Ms. Sacco was selling The Tox, a Florida franchise, to franchisees, including the Hoggatts.

12.     The Hoggatts do not dispute venue as to the claims articulated herein.

### III.     FACTS

#### *Introductory Time Period*

13.     The Hoggatts are residents of Fort Collins, Colorado and had been thinking about a plan for retirement, as Mr. Hoggatt is an attorney and has worked hard for over twenty-three years, oftentimes day and night, for his clients.

14.     Sometime in or around February 2024, Ms. Hoggatt came to her husband and asked how he felt about investing in a franchise. He said he had thought about it in the past but had never had the time to explore.

15.     Soon thereafter, Ms. Hoggatt filled out a form online and was almost immediately contacted by Patrick Elsner, a purported "veteran professional consultant in franchising." He provided a questionnaire to the Hoggatts.

16.     After they filled out his questionnaire, Mr. Elsner proposed six possibilities—one of which was The Tox. He told Ms. Hoggatt that The Tox was perfect for her because The Tox employs estheticians (and Ms. Hoggatt had her esthetician's license) and their business aligned with Ms. Hoggatt's intention of serving (mostly) other women.

17.     Mr. Elsner then connected Ms. Hoggatt with FFL and she began working closely with FFL's Director of Franchise Development for The Tox, Gabrielle "Gabby" Sacco. Ms. Sacco told Ms. Hoggatt that The Tox, a Florida-based franchise, was also perfect for her because of her background. The Hoggatts knew at the time that Ms. Sacco lived in Florida; in her first call with Ms. Hoggatt, Ms. Sacco told Ms. Hoggatt that she lived in Florida.

18

18.     Over the course of the next few months, in FFL and The Tox's efforts to sell Ms. Hoggatt a franchise, they provided Ms. Hoggatt with numerous false statements about The Tox.

### *False Statements Related to the Number of Other Franchisees in Existence*

19.     One of the first false statements FFL pitched aggressively to the Hoggatts was that The Tox had a large franchisee base.

20.     In early communications with Mr. Hoggatt, Ms. Sacco stated that The Tox began in 2019 and began selling franchises in 2021.

21.     In a separate video sent to Ms. Hoggatt by Ms. Sacco on February 27, 2024, the presentation states that there were thirty franchise locations open in February 2024:



None of these statements was true.

22.     In Item 19 of the 2023 The Tox FDD, The Tox states that, as of February 28, 2022, there was actually only one franchised outlet. In Item 20 of the same 2023 The Tox FDD, The Tox

states that the first franchised outlet actually came on board in 2023—not 2022. So, despite FFL's statement that The Tox "started franchising" in 2021, according to Item 20 of the 2023 The Tox FDD, The Tox did not actually sell a single franchise until 2023, and even then it sold just one. (Whether or not this was actually "sold" or just a corporate-owned location that was transferred to a purported franchisee model is unclear.)

23.     Further, Item 19 of the 2024 The Tox FDD states that there were two franchised outlets as of February 29, 2024, but that one of the two franchised outlets "operates without adhering to the recommended professional licensing standards, and as such, does not function as a standard Tox franchise." That is, one of the alleged franchisees is not actually a franchisee or at least not a franchisee operating under the same model sold to the Hoggatts. So, according to the FDD, as of February 29, 2024, The Tox still only has **one** franchised location that operated in a manner similar to those being sold—not thirty as FFL falsely represented.

24.     Item 20 of the same 2024 The Tox FDD appears to confirm that, at the end of 2024, there was *still* only one franchised outlet.

25.     FFL's statements that The Tox had a number of different franchises already open were material in convincing the Hoggatts to sign up for The Tox. Indeed, they were designed to convince the Hoggatts (and other prospective franchisees) that they would not be alone, that The Tox had a history with franchisees, and had systems in place to assist a large number of franchisees in being successful.

26.     Ms. Hoggatt later found out that the Hoggatts' Boulder, Colorado location was one of the first non-corporate studios to open out of 100 allegedly sold as of early 2025 and the first location to open in Colorado.

27. Despite all these facts, during this time period, FFL actively falsely advertised to prospective franchisees that, as part of the process, a prospective franchisee would have calls with pre-existing franchisees to answer "any questions the candidates might have":



Given there were no pre-existing franchisees, such calls obviously could not take place.

### *The Tox's Push for Multi-Unit Owners*

33.     After this initial consultation with Ms. Sacco, Ms. Hoggatt was introduced to The Tox's CEO and founder, Courtney Yeager, via Zoom, where Ms. Yeager told the Hoggatts that she was only interested in working with "multi-unit" buyers.

34.     The initial franchise fee for one unit of The Tox is approximately $50,000. But The Tox and FFL wanted to make more money off the Hoggatts on the front end, because FFL's compensation is a large cut of the initial fees paid by the franchisee. Thus, The Tox and FFL pushed the sale of multiple "territories" on the Hoggatts.

35.     The multiple "territories" scheme works as follows: The Tox sells a purportedly exclusive territory by zip code or zip codes—so, for instance, The Tox and FFL show the franchisee (here, the Hoggatts) a map that leads the franchisee to believe she would acquire an entire series of zip codes in a city. Then, once the franchisee lands on a studio location and opens the studio, the "territory" transforms into a small, limited three-mile radius around the studio location—and that is it. The Tox then attempts to cram-down an amendment to the Franchise Agreement that amends the "territory" as referenced in the Franchise Agreement from referring to one (or multiple) zip codes to simply a circle with a tiny radius. At that point, The Tox and FFL then purport to have the ability to sell additional franchises just outside the franchisee's three-mile radius.

36.     In addition, for a franchise that has no record or history of new franchisees being able to successfully open and operate multiple franchise locations—and The Tox had no such record or history here—the sale of additional territories is based on a false premise, *i.e.* that The Tox can support new franchisees opening and operating multiple The Tox studios in a condensed time frame. This is not true.

*__False Statements Related to Turnkey Marketing and Junk Fees__*

37.     In addition, throughout this process, FFL and The Tox consistently represented to the Hoggatts one major selling point for The Tox as a franchise—something they represented as unique and unheard of in the industry: "turnkey[2] marketing." That is, The Tox handles **all** the marketing for its franchisees. As described further below, the representations of "turnkey marketing" were false.

38.     As FFL CEO Carey Gille notes in one promotional video:

> Pair that with something <u>we have never seen</u> in the "fast lane" before. Listen to this. The Tox corporate team provides turnkey done-for-you, influencer and social media marketing with strong corporate experience and a dedicated social media manager. Franchisees focus on their business while The Tox corporate team drives <u>all the marketing efforts</u> from posting on social media platforms such as Instagram and TikTok to cultivating email marketing, text campaigns and more.

(Emphasis added).

39.     The marketing communiques were draped in the same promise:

---

[2] That is, "built, supplied, or installed complete and ready to operate." https://www.merriam-webster.com/dictionary/turnkey.











40.     And FFL told the Hoggatts that this marketing would be individualized for each franchisee's specific market. Ms. Sacco noted: "And before we move on from this point I know you may be thinking 'Will this work in all markets? Are there different strategies a franchisee should be executing from a local advertising standpoint?' And the answer is YES…."

41.     Relatedly, The Tox falsely stated that this social media marketing handled by its "dedicated social media managers" drives 95% of The Tox franchisees' studio revenue:



42.     Indeed, The Tox falsely stated that "[o]ur social media management platform **that brings in 95% of our business** is handled entirely by corporate." According to The Tox, the

franchisee's "dedicated social media manager" "does all the marketing & advertising for you **so you don't have to**":



43.     Again, these statements were pivotal in inducing the Hoggatts to sign up for The Tox franchise, and this is unsurprising because they were designed to do just that. Unfortunately, though, the statements were not true and the Hoggatts found this out the hard way.

44.     First, The Tox never actually assigned a dedicated social media manager to the Hoggatts (and The Tox certainly did not have 33 on staff for the alleged 100 franchises sold). Second, the marketing done by The Tox was not effective and not specific to the Hoggatts' market, as FFL had originally promised. Indeed, The Tox was so ill-equipped to actually handle this marketing when the Hoggatts needed it in early 2025 (as detailed below) that The Tox itself actually referred franchisees to a third party to handle marketing for them.

45.     Ultimately, "turnkey marketing" was just another aspect of The Tox's and FFL's fraudulent scheme. In addition to using these statements to induce the Hoggatts to "invest" in The Tox, The Tox used its purported "turnkey marketing" as a basis for charging the Hoggatts a $2,500 monthly social media management fee.

46.     Related thereto, another issue the Hoggatts began to experience almost immediately were add-on junk fees—virtually at every turn.

47.     For example, the FDD states that there is a $300 monthly "Technology Fee," but The Tox began billing the Hoggatts $698 monthly for MindBody (which was billing software) on top of the $300 technology fee. This MindBody fee was not disclosed within the Franchise Agreement.

48.     Later, The Tox even began charging a $100 monthly "music" fee! This was another charge not disclosed within the Franchise Agreement.

29

49.     In addition, as noted, as the Hoggatts moved forward, The Tox told franchisees that The Tox was constructing a new website and its new digital marketing agency would be a third-party company, DOE (Data Over Ego).

50.     At first, Ms. Hoggatt was thrilled at this prospect, because she knew that booking required going to The Tox's main site, looking up a studio location, connecting to MindBody, and then registering with MindBody to make an account, which was extremely cumbersome.

51.     But, The Tox then told the Hoggatts that, on top of the $2,500 monthly social media management fee, they would need to pay DOE a $500 monthly management fee for each channel (Meta, Google, and/or TikTok) plus the Google ad spend. As such, using DOE ended up costing the Hoggatts an extra $2,500-$3,000/month, in addition to the $2,500 charged by The Tox, to pay for supposedly "all" necessary marketing.

52.     The Hoggatts felt obliged to run ads with DOE because, as discussed below, The Tox ran no ads and its social media engagement was non-existent.

53.     When Ms. Hoggatt had her initial meeting with DOE, she was told that The Tox would be paying for half of the fees; she was later informed that this was not true. Upon information and belief, The Tox has a deal with DOE and gets a cut of whatever its franchisees paid to DOE.

54.     Ultimately, DOE told Ms. Hoggatt that all ads had to be designed by corporate and approved by corporate and that, despite paying DOE, Ms. Hoggatt had no say in the ads run by it. So, there was no chance to individualize any marketing.

### *False Statements Related to Low Build-Out Costs*

55.     Yet another false statement that was a material inducement to the Hoggatts' decision to invest in The Tox was the supposedly low build-out costs. Indeed, as part of this

preliminary "due diligence" process, Ms. Hoggatt worked with Ms. Sacco to put together a budgeting sheet for the Boulder market and budget $297,600 for one unit in Boulder. The first paragraph of the FDD provided by The Tox represents that "[t]he total investment necessary to begin operation of a The Tox franchise ranges from $235,000 to $396,500." So, this budgeted amount created by Ms. Sacco lined up with the estimated costs detailed in the FDD.

56. The Tox's representations in the FDD regarding total investment costs were false and not remotely tailored to true build-out costs in other markets. As discussed below, The Boulder location ended up costing the Hoggatts approximately $600,000. These false statements/gross understatements as to build-out costs likewise impact the sale of additional territories, because, if the Hoggatts had known that building out one The Tox studio would cost so much more than The Tox had represented, they obviously never would have bought an additional territory.

### *The Hoggatts, Unaware of the False Statements, Want to Move Forward*

57. Based on The Tox's false representations, Ms. Hoggatt was interested in what The Tox pitched to her. In April, she flew to Austin to visit a The Tox location. The Tox referred to this Texas location as a "franchise" location, even though it was originally corporate-owned before it was flipped to a new franchisee. Ms. Hoggatt enjoyed her The Tox experience. Ms. Hoggatt also visited a The Tox location in Los Angeles as a part of her due diligence process.

58. On June 11, 2024, Ms. Hoggatt flew to New York City for "Confirmation Day." Ms. Yeager (The Tox's CEO and founder) put on a presentation that included graphs of sales related to influencer posts. Within the presentation, she told the group that the Hoggatts would have a dedicated social media manager that would have three franchisees per manager. She told Ms. Hoggatt that corporate would come to franchisee locations for training purposes. She told Ms. Hoggatt that The Tox would handle all the marketing for the franchisee. She said that The Tox

was about to roll out a membership program where clients would be able to use their memberships all over the nation, which Ms. Hoggatt very much valued. (The membership program never happened. Although, as noted in the screenshot above, The Tox continues to advertise it.)

59. Ms. Hoggatt then returned to Colorado and, around mid-June 2024, the Hoggatts created GenX Holdings, LLC with the Colorado Secretary of State and, shortly thereafter, signed the Franchise Agreement and Multi-Unit Development Agreement in which the Hoggatts "secured" Fort Collins and Boulder, Colorado as territories. The Hoggatts paid The Tox $91,500 in initial fees. FFL was paid a substantial portion of these fees.

60. Thereafter, Ms. Hoggatt began looking for real estate and found a location in Boulder. Ms. Yeager told Ms. Hoggatt on Slack more than once that the location looked like an "easy build out." The Hoggatts began taking construction bids and three bids came in at $200,000-$250,000. Ms. Hoggatt was taken aback by the numbers because the FDD stated that the maximum that the franchisee would spend on build-out was $110,000. Ms. Hoggatt reached out to a local contractor and that contractor's bid was $170,000. In addition, the maximum architectural costs were listed as $5,000 in the FDD, and the Hoggatts' architect was $20,000.

61. On November 4, 2024, the Hoggatts applied for a building permit with the City of Boulder. The City estimated the value of the tenant finish improvements at $193,446.40. In addition, the cost of permits drastically exceeded what was listed in the FDD.

62. After obtaining bids from multiple contractors, the Hoggatts ultimately signed a contract with Palmer Construction Services on or around November 15, 2024, to complete the necessary studio renovations for $188,134.49. This expense, again, was significantly higher than the representation in the FDD that "Leasehold Improvements, Construction and/or Remodeling and Signage" would cost between "$50,000 - $110,000." (The Hoggatts also started the process of

developing their second location in Fort Collins, Colorado. Estimates for a potential build-out in Fort Collins were over $300,000.)

63.     Given the high cost to complete studio renovations associated with opening The Tox Boulder studio, the Hoggatts elected to forego entering a lease agreement for their Fort Collins studio until such time as the Boulder studio sustained a positive cash flow.

64.     Palmer Construction Services began renovations in January 2025. Between January and March of 2025, the Hoggatts made payments totaling $167,794.45 to build out the Boulder studio.

65.     In addition to the payments to Palmer Construction Services, the Hoggatts, through GenX, paid $7,337.92 to a vendor named RBJ Glass. They paid another approximately $95,000 for furniture, fixtures, equipment, and supplies, including $34,000 directly to The Tox for custom furniture and other furniture, fixtures, and equipment.

66.     The Hoggatts further invested $55,359.90 to purchase The Tox inventory for the Boulder studio.

67.     As of June 2025, the Hoggatts invested a total of $593,071.56 in their The Tox franchises, with the vast majority attributed to the Boulder location. Prior to investing, the Hoggatts had budgeted $297,600 to spend on the studio location based on information provided by The Tox and FFL.

68.     The current rental rate of the studio space in Boulder (including triple-net expenses) is $8,312 per month.

69.     The Hoggatts caused their closely-held entity, GenX, to enter into the lease in Boulder. As noted above, through all these many communications with The Tox and The Tox

representatives, The Tox was well aware that GenX had entered into a lease in Boulder for purposes of operating the Hoggatts' The Tox franchise location.

### *Timeline of the Deterioration of the Hoggatts' Relationship with The Tox*

70.     The Hoggatts began construction the first week of January 2025. The Tox began posting on the Hoggatts' social media pages in January with absolutely no notice to Ms. Hoggatt. Once she discovered the pages in early February, she reached out to The Tox, because the images were not specific to the Hoggatts' market as promised by FFL. Instead, The Tox was going for "sexy" which does not resonate with the Boulder market:





71.     Boulder is wellness-, fitness-, and community-oriented. The community supports local businesses. Ms. Hoggatt began hearing from other business owners, as well as her staff, that the social media posts were not in alignment with the community.

72.     The marketing was, in fact, the same for all The Tox. The Tox used the same static images and the same videos for all The Tox locations—no matter where they were. As described above, FFL had previously affirmatively represented to the Hoggatts that there would be "different strategies" for franchisees to execute "from a local advertising standpoint." When Ms. Hoggatt confronted Ms. Yeager, Ms. Yeager falsely stated that Ms. Hoggatt knew about these images when she signed up.

73.     An even bigger issue, though, was simply that the social media engagement was so poor. These static corporate images accomplished nothing. That is, the only engagement that The

Tox Boulder had was from the Hoggatts' personal friends, family, employees and the other The

Tox locations.

74.     Meanwhile, The Tox used The Tox Boulder's business Instagram account to

promote selling their franchises within the Hoggatts' territory during this time, which made

absolutely no sense:



75.     Around this time, on March 6, 2025, The Tox attempted to withdraw $3,198 from

the Hoggatts' GenX checking account held at First Bank of Northern Colorado. This amount

included $2,500 for The Tox's purported social media fee. The Tox attempted this withdrawal in

breach of Section 13.5 of the Franchise Agreement, which specifies that the social media fee does

not accrue until two months after the franchise location becomes operational.

76.     The Hoggatts did not understand why this money was being taken out of their account before it was supposed to be. Thus, they stopped the transfer and, thereafter, closed that account; opened a new checking account for GenX; and refused to authorize The Tox to withdraw from the new account via ACH. From that point forward, the Hoggatts wired money to The Tox to pay the many monthly fees.

77.     As all of this was going on, Ms. Hoggatt requested a Zoom with The Tox's founders to discuss the massive discrepancies between the FDD, Franchise Agreement, and the actual costs she had experienced.

78.     On the Zoom call, Ryan Yeager told Ms. Hoggatt that the Hoggatts did not need a general contractor for the construction build-out, which made no sense. Ms. and Mr. Yeager also told Ms. Hoggatt that Boulder was just expensive and that they had not seen those numbers before.

79.     By mid-February, Ms. Hoggatt saw that there were mistakes happening in construction. The curtain track system that Mr. Yeager ordered was not the right size per the plans. This caused the Hoggatts' treatment rooms to be too small. The Tox never replaced the tracks with the proper size, even though it was their mistake.

80.     Instead, Mr. Yeager sent Ms. Hoggatt a text on March 10, 2025, saying he would no longer help the Hoggatts.

81.     At one point, Ms. Hoggatt asked Ms. Yeager if she would consider a Franchise Advisory Council, which had been referenced in Section 9.5 of the Franchise Agreement. Ms. Yeager responded: "It would be like the blind leading the blind."

82.     Eventually, Palmer Construction Services gave the Hoggatts a projected completion date for the Boulder studio of March 14, 2025. Accordingly, in March of 2025, Ms.

Hoggatt requested authorization from The Tox to begin scheduling and booking customers for treatments.

83. The Tox declined the Hoggatts' request over purported concerns regarding when the City of Boulder would authorize the Hoggatts to take over occupancy of the studio following renovations. Instead, The Tox offered to allow the Hoggatts to sell "Founders' Memberships" to generate cash flow. The Founders' Memberships were intended to allow users to visit multiple The Tox locations at-will for a set yearly price. However, because customers were unable to book appointments or make reservations at The Tox Boulder—the only The Tox location in Colorado at the time—the Hoggatts were (unsurprisingly) largely unsuccessful in selling the Founders Memberships.

84. On March 30, 2025, Ms. Hoggatt emailed DOE asking to arrange for geotargeting for the University of Colorado Spring football game that was scheduled to be played on April 19, 2025. Ms. Hoggatt recognized the spring football game presented an ideal opportunity to invite The Tox Boulder's target audience to book sessions as part of the event.

85. On or about March 31, 2025, Ms. Hoggatt accessed the MindBody software and activated The Tox Boulder's ability to book appointments and collect revenues.

86. However, upon discovering this, The Tox immediately shut down the Hoggatts' revenue receipts within MindBody.

87. The Tox purportedly did this because it required staff to be trained and a certificate of occupancy to be issued as conditions to opening. Ms. Hoggatt, however, was constantly asking The Tox when she could have her four esthetician staff members trained, and The Tox refused to answer or gave excuses, even though Ms. Yeager previously told Ms. Hoggatt at Confirmation Day that corporate would come to Colorado for training.

38

88. Ultimately, The Tox informed Ms. Hoggatt she needed to fly her staff to New York City for training. This was going to cost $22,000 total for flights, hotels, and meals, including the $10,000 training fee to be paid to The Tox. The Tox knew how much the Hoggatts were exceeding their budget, yet still demanded that the team go to New York City for training (and The Tox did not offer so much as a complimentary lunch).

89. The Tox then sent a trainer to Boulder to train Ms. Hoggatt the following week for two days (at the cost of $1,400 for the Hoggatts). Mr. Hoggatt was immersed in litigating a large case as part of his law firm activities and was unable to attend the training. The Tox did not give sufficient advanced notice to coordinate Mr. Hoggatt's participation in the training.

90. Upon their staff's completion of the training (and a certificate of occupancy having been issued) and having satisfied all conditions to booking customers and collecting revenue, the Hoggatts again sought authorization from The Tox to begin scheduling customers for appointments.

91. The Tox continued to refuse to allow the Hoggatts to open bookings through the MindBody software and schedule customers. Accordingly, on April 18, 2025, Mr. Hoggatt sent an email to The Tox's counsel and CEO and expressed his concerns regarding both the inability to book customers and issues related to advertising.

92. As a result of what the Hoggatts felt were material misrepresentations made to them by The Tox, Mr. Hoggatt elected to file a complaint with the Federal Trade Commission on April 18, 2025, and promptly provided notice to The Tox of the complaint.

93. The Tox finally authorized the Hoggatts to begin booking customers and collecting revenue through the MindBody software on April 24, 2025, six days after Mr. Hoggatt made his

complaint to the FTC. The Hoggatts opened their The Tox Boulder studio approximately two weeks later, on May 9, 2025.

### *The Tox Retaliates Against the Hoggatts Because of Mr. Hoggatt's FTC Complaint*

94.     Despite the studio being open less than one week, on or around May 14, 2025, The Tox sent a Notice of Default claiming the Hoggatts were in violation of various provisions of the Franchise Agreement, including the payment of various fees. The Hoggatts paid the required fees in an effort to comply with The Tox's Notice.

95.     Shortly thereafter, on May 23, 2025, The Tox sent the Hoggatts a second Notice of Default, claiming the Hoggatts had advertised in a manner inconsistent with The Tox System. This "advertisement" was on Ms. Hoggatt's personal Instagram page and showed her excitement about the construction progress and about finally being able to open. It achieved far more engagement than any of The Tox's weak efforts.

96.     In response to the Notice of Default, though, the Hoggatts removed the allegedly offending post.

97.     On June 5, 2025, The Tox sent the Hoggatts a third Default Notice claiming the Hoggatts were violating the Franchise Agreement due to Mr. Hoggatt's alleged failure to complete the Initial Training Program. (As noted above, The Tox did not provide Mr. Hoggatt with sufficient notice to join the training and had previously promised to perform the training in Colorado. The Tox had also not required other franchisee's spouses to complete the training). The Tox sought no further cure for this alleged default and allowed the Hoggatts to continue to operate their franchise for nearly six more weeks.

98. The following day, on June 6, 2025, The Tox sent the Hoggatts yet another Notice of Default, alleging five additional breaches of the Franchise Agreement related to various junk fees charged by The Tox, many of which, as discussed above, were not disclosed in the FDD.

99. In a good faith effort to resolve the disputed defaults, the Hoggatts paid the full principal amounts allegedly due under The Tox's June 6, 2025, Notice of Default.

100. The Tox asserts it sent the Hoggatts a sixth Notice of Default on July 7, 2025. The Hoggatts never received that Notice of Default until after they had already received the Notice of Termination.

101. On July 13, 2025, the Hoggatts received a Notice of Termination from The Tox advising them that The Tox was terminating their franchise.

102. The Notice of Termination outlined the fees that were allegedly due and owing. One of the fees was the social media fee of $2,500 which allegedly became due on July 9, 2025. The termination notice arrived four days after the social media fee allegedly accrued.

103. Other fees contained in the Notice of Termination included fees not disclosed in the Franchise Agreement, such as the "music fee" and/or fees that were drastically overinflated, like the "MindBody fee." The Notice of Termination also sought payment of a royalty and branding fee.

104. On July 13, 2025, Ms. Hoggatt attempted to log in to her The Tox email account. She was not able to access the account because The Tox had changed the password. Accordingly, the Hoggatts were unable to access the booking schedule, staff time sheets, or customers' merchant processing data on the MindBody software.

105. The Hoggatts attempted to contact counsel for The Tox several times on July 13 to discuss the Notice of Termination but were unable to connect and have a substantive conversation.

41

106.    On July 14, 2025, Mr. Hoggatt reached counsel for The Tox, Evan Goldman, by phone. Mr. Goldman explained that the Notice of Termination was sent following a Notice of Default sent on July 7, which the Hoggatts failed to cure by July 12.

107.    Mr. Hoggatt explained to Mr. Goldman that they had not received that Notice of Default and offered to wire funds to cure the default. Mr. Goldman informed Mr. Hoggatt that The Tox had determined it would terminate the Hoggatts' franchise.

108.    During the July 14, 2025, phone call, Mr. Goldman also represented to Mr. Hoggatt that The Tox would be interested in allowing the Hoggatts to sell their franchise license to allow them to recoup some of their investment. Mr. Goldman offered to prepare a proposed modification to the Franchise Agreement to allow the Hoggatts sixty days to find a new buyer for the franchise.

109.    Pursuant to these representations, the Hoggatts continued to try to comply with The Tox's various demands regarding their Boulder studio with little guidance from The Tox. The Hoggatts were unsure of their status as The Tox franchisees and thus continued to operate the studio in an extremely limited capacity for the purpose of responding to customer inquiries and communicating with staff and customers who had already made reservations.

110.    Counsel for The Tox then sent the Hoggatts a draft "termination" agreement on or around July 15, 2025, which—notably—contained an almost one-page release in which the Hoggatts would purportedly release The Tox from any and all claims against the franchisor:

6.    **Release by Franchisee.** In consideration of the obligations set forth in this Mutual Termination Agreement, Franchisee, on behalf of themselves and their entities, if any (collectively, "Franchisee Releasors") hereby releases, waives, and forever discharge, Franchisor and its present and former, direct and indirect, parents, subsidiaries, affiliates, employees, officers, directors, shareholders, members, officers, owners, agents, representatives, attorneys, successors, and

assigns, including, but not limited to The Tox Franchising Group, LLC (collectively, "The Tox Releasees") of and from any and all actions, causes of action, suits, losses, liabilities, rights, debts, dues, sums of money, accounts, reckonings, obligations, costs, expenses, liens, bonds, bills, specialties, covenants, contracts, controversies, agreements, promises, variances, trespasses, damages, judgments, extents, executions, claims, and demands, of every kind and nature whatsoever, whether now known or unknown, foreseen or unforeseen, matured or unmatured, suspected or unsuspected, in law, or equity (collectively, "Claims"), which any of such Franchisee Releasors ever had, now have, or hereafter can, shall, or may have against any of such The Tox Releasees for, upon, or by reason of any matter, cause, or thing whatsoever from the beginning of time through the Effective Date of this Mutual Termination Agreement, including, without limitation, those arising out of or relating to the Agreements, the Business, the offer and sale of the Business, or the franchise relationship between any of the Franchisee Releasors and any of the The Tox Releasees. Franchisee, on behalf of the Franchisee Releasors, understands that it may later discover Claims or facts that may be different from, or in addition to, those that she or any other Franchisee Party now knows or believes to exist regarding the subject matter of the release contained in this Section 6, and which, if known at the time of signing this Mutual Termination Agreement, may have materially affected this Mutual Termination Agreement and their decision to enter into it and grant the release contained in this Section 6. Nevertheless, Franchisee, on behalf of itself and the other Franchisee Releasors, intends to fully, finally and forever settle and release all Claims that now exist, may exist, or previously existed, as set out in the release contained in this Section 6, whether known or unknown, foreseen or unforeseen, or suspected or unsuspected, and the release given herein is and will remain in effect as a complete release, notwithstanding the discovery or existence of such additional or different facts. The Franchisee Releasors hereby waive any right or Claim that might arise as a result of such different or additional Claims or facts; provided, however, that nothing herein shall affect the rights of the Franchisee to enforce the terms and provisions of this Mutual Termination Agreement.

Franchisee represents and warrants as follows: (a) they are not aware of any Claim that is not covered by the release contained in Section 6, (b) they have not assigned or transferred any of the Claims released herein to any person or entity and no person or entity has subrogated to or has any interest or rights in any Claims, and (c) they have the full right, power, and authority to enter into this Mutual Termination Agreement, to grant on behalf of themselves and the other Franchisee Releasors the releases contained herein, and to perform their obligations hereunder.

Franchisee Releasors covenant not to initiate, prosecute, encourage, assist, or (except as required by law) participate in any civil, criminal, or administrative proceeding or investigation in any court, agency, or any other forum, either affirmatively or by way of cross-claim, defense, or counterclaim, against any The Tox Releasees with respect to any Claims.

That is, the reason for The Tox's harassment of the Hoggatts became clear: through the threat of an oppressive lawsuit, The Tox wanted to induce the Hoggatts to release their claims for fraud against it.

111.    On July 21, 2025, counsel for the Hoggatts proposed revising and/or redlining the proposed "termination" agreement, because requiring the Hoggatts to release any and all claims they had against The Tox just to have a conversation about next steps did not make sense.

112.    On July 22, 2025, The Tox did not respond and, instead, filed this lawsuit.

113. After approximately one year of work and spending approximately $600,000 in their effort to get their The Tox franchise off the ground, the Hoggatts opened their Boulder studio for only two months, and generated total revenue of approximately $33,105.63 before The Tox terminated their Franchise Agreement and sued them.

114. As a result of The Tox's termination of the Hoggatts' franchise, The Tox further caused GenX to purportedly breach its Boulder lease, as one lease obligation is to "use the Premises as a franchisee under The Tox franchise only…and for no other purpose whatsoever."

## COUNT I
### Fraud, as to The Tox and FFL, by Jessica and Darby Hoggatt

115. Individual Counter-Plaintiffs reincorporate and reallege the allegations contained in Paragraphs 1-114 as if set forth fully herein.

116. Counter-Defendants made material misrepresentations to Individual Counter-Plaintiffs as described herein, which they knew to be false, with the intent that the misrepresentations would induce Individual Counter-Plaintiffs to act.

117. Individual Counter-Plaintiffs reasonably relied on these false statements, including the false statements contained in the FDD, such as with respect to the profitability, viability of the model, support that would be provided, and investment amounts required by franchisees, as well as falsely stating that The Tox had a large franchisee base; that The Tox had systems in place to assist franchisees in being successful; that prospective franchisees could have calls with pre-existing franchisees to answer questions (when there were virtually no pre-existing franchisees); that new franchisees could successfully open and operate multiple franchise locations; and that The Tox would provide "turnkey marketing" specific to each franchisees' market.[3]

---

[3] The Court's direction in mandating an Amended Counterclaim, (Doc. No. 73), references that "**each count must identify the particular legal basis for liability; [and] must contain specific**

118.   These false statements were material, and Individual Counter-Plaintiffs would not have entered into a number of different contracts, including the Franchise Agreement, but for these statements.

119.   In addition to the intentional misrepresentations described herein, Counter-Defendants defrauded Individual Counter-Plaintiffs by omitting material information that they had a duty to disclose, including because they made partial disclosures of information related to the franchise model but did not reveal other material facts, which they hid from Individual Counter-Plaintiffs, including, but not limited to, the fact that The Tox did not have a functioning franchise "system" because they had very few operational franchisees who were not previously corporate locations and that The Tox did not have a functional, turnkey marketing system in place.

120.   Counter-Defendants' conduct as described herein has directly and proximately caused Individual Counter-Plaintiffs damages in an amount to be proven.

---

**factual allegations that support each cause of action within each count** . . . " to avoid "shotgun" pleading. (Emphasis in original). Notably, in the U.S. District Court for the Middle District of Florida case referenced above, FFL was similarly accused of a "shotgun" pleading. FFL's response was, in part, that "[t]he Court may consider the 'Factual Allegations' section in support of the claims for relief separated into enumerated counts." (*Franchise Fastlane, LLC v. Weeter, et al.*, Case No. 8:25-cv-02538 (M.D. Fla. 2025), at Doc. No. 44, p. 20 n.44). That is, FFL was rightly noting that, when a court is considering factual allegations in a pleading, a court is not handcuffed to only consider the allegations that are found in the "enumerated counts." The court can consider the "Factual Allegations" or, here, the "Facts" that are found earlier in the pleading. Individual Counter-Plaintiffs agree with FFL's assessment. That is, it would not seem to be consistent with the *Weiland* opinion to require a plaintiff to restate—in their entirety—the factual allegations that provide a basis for a particular claim in the "enumerated counts" section that the plaintiff had already articulated at great length earlier in the "Facts" section of the pleading. Doing so would appear to be inefficient and make for a never-ending complaint (or, here, counterclaim). Instead, it would appear to be consistent with *Weiland* to refer back more generally to the factual allegations that appear earlier in the pleading with enough language specifically referencing which of the facts are relevant (without repeating verbatim the factual allegations previously articulated) so long as the defendant has notice of the facts at issue for each enumerated count. That is what Counter-Plaintiffs—or, here, Individual Counter-Plaintiffs—have attempted to do in the "enumerated counts" section here.

121.    Counter-Defendants' conduct was intentional, fraudulent, willful, and/or reckless, and, as such, Counter-Defendants are liable for punitive damages in an amount to be proven.

## COUNT II
## Aiding and Abetting Fraud (in the alternative)[4], as to Counter-Defendant FFL, by Jessica and Darby Hoggatt

122.    Individual Counter-Plaintiffs reincorporate and reallege the allegations contained in Paragraphs 1-114 as if set forth fully herein.

123.    As described above, The Tox committed fraud.

124.    As described above, Counter-Defendant FFL knew that The Tox was committing fraud.

125.    Yet, Counter-Defendant FFL substantially assisted The Tox in advancing the commission of the fraud by making numerous false statements to the Hoggatts to pitch The Tox to them, including, among others: the false statements contained in the FDD, such as with respect to the profitability, viability of the model, support that would be provided, and investment amounts required by franchisees, as well as falsely stating that The Tox had a large franchisee base; that The Tox had systems in place to assist franchisees in being successful; that prospective franchisees could have calls with pre-existing franchisees to answer questions (when there were virtually no pre-existing franchisees); that new franchisees could successfully open and operate multiple franchise locations; and that The Tox would provide "turnkey marketing" specific to each franchisees' market.

126.    At the very least, Counter-Defendant FFL helped conceal The Tox's fraud and/or failed to act when it was required to do so.

---

[4] As noted above, both The Tox and FFL committed fraud. To the extent it is determined that only The Tox committed fraud—and not FFL—Individual Counter-Plaintiffs bring this count for aiding and abetting fraud against FFL in the alternative.

127.    As such, Counter-Defendant FFL aided and abetted The Tox in committing fraud.

## COUNT III
### Violation of Fla. Stat. Ann. § 501.201, *et seq.*,
### as to The Tox and FFL, by Jessica and Darby Hoggatt

128.    Individual Counter-Plaintiffs reincorporate and reallege the allegations contained in Paragraphs 1-114 as if set forth fully herein.

129.    By engaging in the conduct described herein, which was willful and knowing, Counter-Defendants have violated the Florida Deceptive and Unfair Trade Practice Act, Fla. Stat. Ann. § 501.201, et seq. ("FDUTPA") and engaged in unfair and deceptive acts, including engaging in "[u]nfair methods of competition, unconscionable acts or practices, and unfair or deceptive acts of practices in the conduct of" their sale and management of The Tox franchises, including, but not limited to, the false statements contained in the FDD, such as with respect to the profitability, viability of the model, support that would be provided, and investment amounts required by franchisees, as well as falsely stating that The Tox had a large franchisee base; that The Tox had systems in place to assist franchisees in being successful; that prospective franchisees could have calls with pre-existing franchisees to answer questions (when there were virtually no pre-existing franchisees); that new franchisees could successfully open and operate multiple franchise locations; and that The Tox would provide "turnkey marketing" specific to each franchisees' market.

130.    As a direct and proximate cause of Counter-Defendants' actions, Individual Counter-Plaintiffs have been damaged and are entitled to all remedies and damages permitted under the FDUTPA including actual damages and attorneys' fees.

## COUNT IV
### Breach of Contract and Breach of the Covenant of Good Faith and Fair Dealing (in the alternative)[5], as to The Tox, by Jessica and Darby Hoggatt

131. Individual Counter-Plaintiffs reincorporate and reallege the allegations contained in Paragraphs 1-114 as if set forth fully herein.

132. As detailed above, Individual Counter-Plaintiffs entered into a Franchise Agreement with The Tox, a copy of which was attached to The Tox's Complaint.

133. Assuming *arguendo* that the Franchise Agreement is enforceable (which it is not), The Tox breached the Franchise Agreement in many ways, including by promising to provide a proprietary system to operate the franchise, (*see* Franchise Agreement, p. 1, ¶ 2), when a functioning system does not exist and no such functioning proprietary system was provided, and by promising to provide trade secrets, (¶¶ 14.1.1, 19.2), to help Individual Counter-Plaintiffs operate the franchise when no such trade secrets existed and what was provided did not help Individual Counter-Plaintiffs operate the franchise. The Tox further breached the Franchise Agreement with Individual Counter-Plaintiffs through representations that The Tox would provide "turnkey marketing," which never occurred, and with respect to the total investment amount The Tox represented would be required for Individual Counter-Plaintiffs to get their franchise locations operational. (*See* FDD, as well as Attachment 10 to the Franchise Agreement and the "Relationship Disclosure Form for Franchisees"). In addition, among other provisions, the Tox breached the following Sections of the Franchise Agreement:

---

[5] To the extent it is determined that the Franchise Agreement is enforceable, this claim is brought in the alternative.

- ¶ 3.1 ("Franchisor will not operate, and will not authorize any other franchisees to operate, a The Tox outlet in the Territory using the same Marks as licensed to Franchisee in this Agreement");

- ¶ 6.5 (franchisor will charge franchisee "a technology fee equal to Three Hundred Fifty Dollars ($300.00) [sic] per month");

- ¶ 7.1 (franchisor will provide "initial management training program . . . prior to the opening of the Franchised Business");

- ¶ 7.3 (franchisor shall provide franchisee "with opening assistance by a trained representative of Franchise" within sixty days of opening);

- ¶ 7.4 (franchisee may require additional training by franchisor);

- ¶ 7.5 (franchisor shall "provide Franchisee with additional trained representatives" upon franchisee's request);

- ¶ 7.6 (franchisor shall "upon Franchisee's request and at no charge . . . furnish consultation and assistance to Franchisee . . . with respect to the operation of the Franchised Business");

- ¶ 9.5 (contemplation of Franchisee Advisory Council);

- ¶ 10.5 (franchisor to provide written list of all product requirements and recommendations to franchisee);

- ¶ 10.6 (franchisor to provide franchisee with samples of advertising materials "for use by Franchisee in marketing and conducting local advertising for the Franchised Business);

- ¶ 10.8 (franchisor to provide "training programs" as specified in Article 7);

49

- ¶ 10.9 (franchisor to provide on-going assistance to franchise location post-opening in accordance with Article 7);

- ¶ 12.1.9 (advertising programs "in a manner satisfactory to Franchisor" "will not detract from the reputation of the System or the Marks");

- ¶ 13.1 (franchisor's advertising and sales promotion programs to "promote and enhance the collective success of all Franchised Businesses operating under the System");

- ¶ 13.2.3 (franchisor "shall conduct a grand opening marketing campaign" in franchisee's territory);

- ¶ 13.3.2 (franchisor's "Brand Fund is intended to maximize general public recognition and acceptance of the Marks and enhance the collective success of all Franchised Businesses operating under the System);

- ¶ 13.3.4 (franchisor "does not intend that any part of the Brand Fund will be used for advertising which is principally a solicitation for franchisees");

- ¶ 13.4 (contemplation of franchisor establishing regional advertising cooperative); and

- ¶ 13.5 ("Franchisee shall not be required to pay to Franchisor the Social Media Management Fee during the first two (2) months of operation of the Franchised Business").

134. Additionally, Florida law implies a covenant of good faith and fair dealing in every contract, which The Tox also breached.

135. For example, The Tox breached its duty of good faith and fair dealing pursuant to, among others, Paragraph 17.2 of the Franchise Agreement due to the fact that The Tox, in bad

50

faith, exercised its purported "option" to terminate the Hoggatts' franchise based on pretextual purported defaults, including for not paying numerous junk fees not disclosed in the Franchise Agreement, such as the "music fee" and/or fees that were drastically overinflated, like the "MindBody fee," and in retaliation for the FTC Complaint filed by Mr. Hoggatt.

136. Further, The Tox made numerous representations in the Franchise Agreement in bad faith and of which it had no intention of performing, such as promising: The Tox would not authorize franchisees to operate within the Hoggatts' territory (¶ 3.1); The Tox would provide the Hoggatts with opening assistance and trained representatives at the Hoggatts' request (¶¶ 7.1, 7.3, 7.4, 7.5, 7.6, 10.8, 10.9); The Tox might establish a Franchise Advisory Council (¶ 9.5); the Tox would assist the Hoggatts in local advertising and provide advertising that would not detract from the Marks or System (¶¶ 10.6, 12.1.9, 13.1, 13.2.3. 13.3.4, 13.4); The Tox would provide social media influencers to assist with marketing (¶ 13.2.4); and that The Tox would not require the Hoggatts to pay the social media management fee during the first two months of operations (¶ 13.5).

137. The Tox committed these breaches of contract intentionally, fraudulently, maliciously, and/or recklessly, and in retaliation of Mr. Hoggatt making a complaint to the FTC. The Tox's actions entitle Individual Counter-Plaintiffs to punitive damages.

138. As a direct and proximate result of The Tox's breaches of contract and breaches of the duty of good faith and fair dealing, Individual Counter-Plaintiffs have been damaged in an amount to be proven.

51

## COUNT V
### Negligent Misrepresentation (in the alternative), as to The Tox and FFL, by Jessica and Darby Hoggatt

139. Individual Counter-Plaintiffs reincorporate and reallege the allegations contained in Paragraphs 1-114 as if set forth fully herein.

140. Counter-Defendants negligently supplied false information to Individual Counter-Plaintiffs as detailed above, including with respect to the existence and functionality of The Tox franchise model, the provision of "turnkey marketing" services, the investment cost for The Tox studios, the fees required to open and operate a The Tox studio, and the revenue and profits achievable with the model sold to Individual Counter-Plaintiffs, including in their FDDs.

141. Counter-Defendants, at the least, made the representations without knowledge of their truth or falsity or believed the statements to be true even though they were false.

142. Counter-Defendants should have known the representations were false.

143. Counter-Defendants intended to induce Individual Counter-Plaintiffs to rely on the misrepresentations, and Individual Counter-Plaintiffs did reasonably rely on them.

144. As a direct and proximate result of Counter-Defendants' conduct, Individual Counter-Plaintiffs have been damaged in an amount to be proven.

## COUNT VI
### Unjust Enrichment (in the alternative)[6], as to The Tox and FFL, by Jessica and Darby Hoggatt

145. Individual Counter-Plaintiffs reincorporate and reallege the allegations contained in Paragraphs 1-114 as if set forth fully herein.

---

[6] Individual Counter-Plaintiffs did not have a contract with FFL. As to The Tox, to the extent the Franchise Agreement is determined to be unenforceable and/or void, Individual Counter-Plaintiffs assert this quasi-contractual cause of action in the alternative.

146.     Individual Counter-Plaintiffs conferred benefits on The Tox in the form of franchise fees and other fees. Individual Counter-Plaintiffs understand that, as part of its payment arrangement with The Tox, FFL takes a substantial portion of these fees or a "commission" off of these fees.

147.     Counter-Defendants have knowledge of these benefits and have knowingly and voluntarily accepted and retained these amounts.

148.     It would be inequitable for Counter-Defendants to retain these fees due to Counter-Defendants' conduct as described herein.

**COUNT VII**
**Civil Conspiracy as to Fraud, as to The Tox and FFL,**
**by Jessica and Darby Hoggatt**

149.     Individual Counter-Plaintiffs reincorporate and reallege the allegations contained in Paragraphs 1-114 as if set forth fully herein.

150.     Counter-Defendants conspired and agreed to commit the fraud described herein with the intent of inducing Individual Counter-Plaintiffs to become franchisees in order to enrich themselves. As detailed above, The Tox and FFL had an agreement with one another. The overt acts in furtherance of the conspiracy are the false and misleading statements referenced above, including, but not limited to, the false statements contained in the FDD, such as with respect to the profitability, viability of the model, support that would be provided, and investment amounts required by franchisees, as well as falsely stating that The Tox had a large franchisee base; that The Tox had systems in place to assist franchisees in being successful; that prospective franchisees could have calls with pre-existing franchisees to answer questions (when there were virtually no pre-existing franchisees); that new franchisees could successfully open and operate multiple

franchise locations; and that The Tox would provide "turnkey marketing" specific to each franchisees' market. The underlying wrongs are the other torts alleged herein.

151.    Counter-Defendants' conduct described herein was willful, knowing, intentional, and done with malice.

152.    As a direct and proximate cause of Counter-Defendants' conspiracy, Individual Counter-Plaintiffs have been injured and damaged in an amount to be determined at trial.

153.    Individual Counter-Plaintiffs are also entitled to punitive damages as a result of Counter-Defendants' outrageous intentional, reckless, and fraudulent actions in furtherance of the conspiracy.

154.    Counter-Defendants are jointly and severally liable to Individual Counter-Plaintiffs for these damages.

**COUNT VIII**
**Violation of the Florida Franchise Act, Florida Stat. Ann. § 817.416,**
**as to The Tox, by Jessica and Darby Hoggatt**

155.    Individual Counter-Plaintiffs reincorporate and reallege the allegations contained in Paragraphs 1-114 as if set forth fully herein.

156.    As detailed above, The Tox intentionally misrepresented the prospects or chances of success of The Tox franchise, intentionally misrepresented the known required total investment for such a franchise, and/or intentionally failed to disclose efforts to sell or establish more franchises or distributorships than is reasonable to expect for the franchise to sustain.

157.    As a result of The Tox's unlawful conduct, Individual Counter-Plaintiffs have been damaged in an amount to be proven at trial.

## COUNT IX
### Tortious Interference with Contract, as to The Tox, by GenX

159.    GenX reincorporates and realleges the allegations contained in Paragraphs 1-114 as if set forth fully herein.

160.    GenX's lease agreement with its landlord in Boulder is a valid and enforceable contract.

161.    As detailed above, The Tox was well aware of the Hoggatts' efforts to open their The Tox franchise studio and the fact that they had entered into a lease agreement for a commercial space in Boulder, Colorado through their closely-held entity, GenX.

162.    The Tox engaged in the intentional and improper conduct described herein, including, but not limited to, The Tox's pretextual and unlawful termination of the Hoggatts' franchise, which caused GenX to purportedly violate the terms of its lease with its landlord.

163.    As a result of The Tox's tortious interference, GenX has suffered, and will continue to suffer, damages in an amount to be proven at trial, including, but not limited to, compensatory damages, consequential damages, and lost profits.

164.    The Tox intentionally and maliciously caused GenX to breach its lease.

165.    Because The Tox intentionally and maliciously interfered with GenX's compliance with its lease, GenX is entitled to punitive damages.

## COUNT X
### Indemnity, as to The Tox, by GenX

167.    GenX reincorporates and realleges the allegations contained in Paragraphs 1-114 as if set forth fully herein.

168.    Due to the wrongdoing of The Tox as described herein, including, but not limited to, The Tox's pretextual and unlawful termination of the Hoggatts' franchise, which caused GenX

55

to violate the terms of its lease with its landlord, GenX has incurred costs and obligations, such as amounts purportedly due under its lease because of The Tox's misconduct.

169.   As a consequence of The Tox's wrongdoing, GenX is engaged in a dispute with its landlord, and GenX has incurred costs to protect and assert its rights, including attorney's fees.

170.   Since the actions of The Tox caused GenX to incur these obligations and costs, Genx is indemnified by The Tox for these amounts, to be proven at the trial of this matter.

## PRAYER FOR RELIEF

**WHEREFORE**, Counter-Plaintiffs respectfully request that the Court enter judgment in their favor and against Counter-Defendants for the following relief:

1.   Compensatory damages, including but not limited to, out-of-pocket losses, as well as any and all other compensatory damages under the law;
2.   Pre-judgment and post-judgment interest as well as all discretionary costs and other relief to which Counter-Plaintiffs may be entitled;
3.   Punitive damages;
4.   Attorneys' fees pursuant to the relevant contracts (if enforceable);
5.   Attorneys' fees and costs pursuant to the Florida Franchise Act, § 817.416; and
6.   Such and further general relief as the Court deems appropriate.

## CERTIFICATE OF SERVICE

I hereby certify that on January 27, 2026, I served the foregoing documents upon the following persons through the Court's CM/ECF and Electronic Mail.

Bryan J. Mazzola
Matthew D. Wolf
BOYD RICHARDS PARKER & COLONNELLI, P.L.
100 S.E. 2nd Street, Suite 2600
Miami, Florida 33131
bmazzola@boydlawgroup.com
mpereira@boydlawgroup.com
mwolf@boydlawgroup.com
dmorales@boydlawgroup.com

Matthew Margolis
700 Rosemary Avenue, #204
West Palm Beach, Florida 33401
matthew@margolispllc.com

Evan M. Goldman
Thomas D. Emmons
225 Wilmington West Chester Pike, Suite 200
Chadds Ford, Pennsylvania 19317
evan@thefranchisefirm.com
**Counsel for Counter-Defendants The Tox Franchising Group, LLC and The Tox IP, LLC**

Andrew Dymowski, Esq.
Capri Trigo, Esq.
GORDON REES SCULLY MANSUKHANI
100 S.E. Second Street, Suite 3900
Miami, Florida 33131
ddymowski@grsm.com
ctrigo@grsm.com
**Counsel for Franchise Fastlane, LLC**

/s/Crystal Broughan
Crystal T. Broughan, Esquire
Florida Bar No.: 863343
Logan K. McEwen, Esquire
Florida Bar No.: 98683
**MARKS GRAY, P.A.**
Post Office Box 447
Jacksonville, Florida 32201

57

Telephone: (904) 398-0900
Facsimile: (904) 399-8440
Email:  cbroughan@marksgray.com

Stuart A. Burkhalter (TN BPR#029078)
Riley & Jacobson, PLC
*Admitted Pro Hac Vice*
1906 West End Avenue
Nashville, Tennessee 37203
Telephone: (615) 320-3700
Facsimile: (615) 320-3737
sburkhalter@rjfirm.com
***Attorneys for Defendants/Counter-Plaintiffs***

58