**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF FLORIDA**
**FORT PIERCE DIVISION**

**CASE NO. 2:25-cv-14261-CANNON-MAYNARD**

| | |
|---|---|
| **THE TOX FRANCHISING GROUP, LLC,** a Florida limited liability company, | ) ) ) ) |
| Plaintiff, Counter-Defendant, | ) ) |
| **THE TOX IP, LLC,** a Florida limited liability company, | ) ) ) |
| Plaintiff, | ) ) |
| **v.** | ) ) |
| **DARBY HOGGATT,** an individual; **JESSICA HOGGATT,** an individual; and **GENX HOLDINGS, LLC,** a Colorado limited liability company, | ) ) ) ) ) |
| Defendants, Counter-Plaintiffs, | ) ) |
| **v.** | ) ) |
| **FRANCHISE FASTLANE, LLC,** a Nebraska limited liability company, | ) ) ) |
| Additional Counter-Defendant, | ) ) ) |

**COUNTER-DEFENDANTS, THE TOX FRANCHISING GROUP, LLC'S AND FRANCHISE FASTLANE, LLC'S, JOINT MOTION TO DISMISS COUNTER-PLAINTIFFS' AMENDED COUNTERCLAIM WITH PREJUDICE**

Counter-Defendants, The Tox Franchising Group, LLC, a Florida limited liability company ("The Tox") and Franchise Fastlane, LLC, a Nebraska limited liability company ("FFL") (collectively "Counter-Defendants"), pursuant to Rule 8(a)(2), 10(b), and 12(b)(6), *Federal Rules of Civil Procedure*, file their Joint Motion to Dismiss Counter-Plaintiffs', Darby Hoggatt, Jessica

1

Hoggatt, and GenX Holdings, LLC a Colorado limited liability company (collectively "Counter-Plaintiffs"), Amended Counterclaim with Prejudice, and in support, state as follows:

## INTRODUCTION

Counter-Plaintiffs assert ten (10) counterclaims against Counter-Defendants for breaches of contract, fraud, and misrepresentations supposedly made in connection with their failed franchise. However, the Amended Counterclaim, like the original, is a shotgun pleading and each counterclaim asserted fails to state a cause of action. Thus, the Amended Counterclaim should be dismissed with prejudice.

## STANDARD OF REVIEW

"A motion to dismiss a counterclaim pursuant to Federal Rule of Civil Procedure 12(b)(6) is evaluated in the same manner as a motion to dismiss a complaint." *Dave & Buster's I, L.P. v. Arcade Time USA LLC*, 2025 U.S. Dist. LEXIS. 204327, at *2 (S.D. Fla. October 16, 2025). Dismissal will be granted for "failure to state a claim upon which relief can be granted." *McElrath v. ABN AMRO Mortg. Group, Inc.*, 2012 U.S. Dist. LEXIS 17361, at *3 (S.D. Fla. Feb. 13, 2012)(*citing* Fed. R. Civ. P. 12(b)(6)). Dismissal as per Rule 12(b)(6) is proper if a claim does not allege the proper elements of the cause of action. *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 555 (2007). The plaintiff is obligated to provide the grounds of his entitlement to relief, and "that obligation requires more than labels and conclusion or a formulaic recitation of the elements of a cause of action." *Id*. ("Factual allegations must be enough to raise a right of relief beyond a speculative level."). To survive dismissal, a claim must be plausible. *Twombly*, 550 U.S. at 570). "A claim has facial plausibility when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Id.* As a result, "conclusory allegations, unwarranted factual deductions or legal conclusions masquerading

as facts will not prevent dismissal." *See Merlin Petroleum Co. v. Sarabia*, 2016 U.S. Dist. LEXIS 72626, at *3 (S.D. Fla June 3, 2016).

**ARGUMENT AND MEMORANDUM OF LAW**

**I. THE COUNTERCLAIM IS A SHOTGUN PLEADING VIOLATING RULES 8(a)(2) AND 10(b)**

Shotgun pleadings are a "waste [of] scarce judicial resources." *See Vibe Micro, Inc. v. Shabanets*, 878 F. 3d 1291, 1295 (11th Cir. 2018). A shotgun pleading is a complaint which violates either Rule 8(a)(2), Rule 10(b), or both, and there are four categories: (1) a complaint containing multiple counts where each count adopts the allegations of all preceding counts, causing each count to carry all that came before it and the last count to be a combination of the entire complaint; (2) a complaint that is "replate with conclusory, vague, and immaterial facts not obviously connected to any particular cause of action"; (3) a complaint that fails to separate "each cause of action or claim for relief" into different counts; and (4) a complaint that "assert[s] multiple claims against multiple defendants without specifying which of the defendants are responsible for which acts or omissions, or which of the defendants the claim is brought against." *Weiland v. Palm Beach Cnty. Sheriff's Off.*, 792 F. 3d 1313, 1320 - 1323 (11th Cir. 2015).

Here, the Amended Counterclaim is defective (again) because it encompasses two of the four defective pleading types. First, it is again replete with conclusory, vague, and immaterial "facts" (commentary) that are not obviously connected to any particular claim. For example, Counter-Plaintiffs' offer their own negative opinions of the franchise industry, FFL's "cut" of the fees paid to The Tox, and a territorial "scheme" for multiple franchises (without alleging application here); ongoing issues that Counter-Plaintiffs experienced in the process before contracting to start their franchise; their own personal issues with The Tox Entities and their counsel; and legal arguments raised in a separate litigation to try and "get ahead" of the

3

forthcoming arguments in the instant Motion, [1] none of which have any connection to any alleged misrepresentations, fraud, civil conspiracy, or violations of state law in an attempt to replead their arguments and defenses to The Tox Entities' affirmative claims here. [D.E. 75 at ¶¶ 34, 35, 36, 83, 88, 108-112]. They also assert the law on agency relationships, even though they concede they cannot argue that FFL acts as The Tox's Agent. [D.E. 75, ¶ 10]. Also, and as discussed in more detail below, several counts against the Counter-Defendants are again replete with vague and conclusory rote recitations of the elements for these claims, are devoid of any actual supporting facts that satisfy the heightened pleading standards for claims rooted in fraud, are directly contradicted by the exhibits, and repeatedly leave the door open to rely on un-pled facts to support their claims. Additionally, five of the ten counts asserted against The Tox are (again) commingled with FFL, making it impossible to know which claims are brought against which Counter-Defendant and by whom. Further, like the original Counterclaim, Counter-Plaintiffs commingle all alleged statements and allegations within these five counts amongst both Counter-Defendants, fail to specify which Counter-Defendant is responsible for which specific acts or omissions, and essentially attempt to plead "guilt by association" within each count in an attempt to make either entity liable for the alleged acts and/or statements of the other. Without more, Counter-Defendants have no plausible method or ability to identify which facts support which claims in order to adequately defend themselves.

Thus, the Amended Counterclaim is a shotgun pleading, warranting dismissal here. Significantly, "[d]ismissal of a shotgun pleading with prejudice for a repeated pleading defect is

---

[1]     Counter-Plaintiffs argue that they have satisfied the pleading requirement and cite a separate litigation involving FFL in an unrelated dispute. However, the separate case involving FFL is irrelevant because those claims do not involve fraud, and thus are not subject to the heightened pleading standard that Counter-Plaintiffs are held to in the Amended Counterclaim, nor do they resolve the pleading defects at issue here for each individual count or that the Amended Counterclaim is an impermissible shotgun pleading.

warranted 'where the plaintiff was previously given an opportunity to amend the complaint to correct the defect but failed to do so.'" *See White v. Carnival Corp.*, 2025 U.S. Dist. LEXIS 128058, at *10 (S.D. Fla. July 7, 2025)(*quoting McDowell v. Gonzalez*, 424 F. Supp. 3d 1214, 1222 (S.D. Fla. 2019). Here, and despite the Court's clear and unambiguous Order dismissing the Original Counterclaim as a shotgun pleading and ordering the Counter-Plaintiffs to plead with more specificity, several of the same pleading defects at issue have not been cured. [*Cf.* D.E. 42; D.E. 73]. Accordingly, as this is Counter-Plaintiffs' second bite at the apple, and Counter-Plaintiffs have blatantly failed to comply with this Court's Order and basic federal pleading standards (again), the Amended Counterclaim should be dismissed with prejudice. *See White v. Carnival Corp.*, 2025 U.S. Dist. LEXIS 128058, at *10-12 (dismissing Plaintiff's amended complaint with prejudice because it was a shotgun pleading for the same reasons that the original complaint was a shotgun pleading, and since the Court had already given Plaintiff's leave to amend to cure the deficiencies argued in the Defendant's first motion to dismiss.).

## II.     COUNT I FAILS TO STATE A CAUSE OF ACTION

"Under Florida law, the elements of fraud are: (1) a false statement concerning a specific material fact; (2) the maker's knowledge that the representation is false; (3) an intention that the representation induces another's reliance; and (4) consequent injury by the other party acting in reliance on the representation." *Horne v. Social Sec. Admin*., 359 Fed. Appx. 138, 145 (11th Cir. 2010) (internal citations omitted). "Where a complaint alleges fraud, the allegations must also satisfy Federal Rule of Civil Procedure 9(b)." *Kane v. Loria Pharm., LLC*,  2024 U.S. Dist. LEXIS 198963, at *9 (S.D. Fla. November 1, 2024)."Rule 9(b) is satisfied if the complaint sets forth (1) **precisely** what statements were made in what documents or oral representations or what omissions were made, and (2) the time and place of each such statement and the person responsible for making (or, in the case of omissions, not making) same, and (3) the content of such statements and

the manner in which they misled the plaintiff, and (4) what the defendants obtained as a consequence of the fraud." *Sovereign Bonds Exch. LLC v. Fed. Republic of Germany*, 899 F. Supp. 2d 1304, 1316 (S.D. Fla. 2010) (internal citations omitted)(emphasis added).

Here, Count I must be dismissed because all allegations remain improperly commingled, that is that they are generically asserted by all Counter-Plaintiffs against both Counter-Defendants, and all allegations regarding each individual Counter-Defendant, rendering it impossible for either Counter-Defendant to ascertain which representations Counter-Plaintiffs rely on to support their fraud cause of action against which. In fact, as to The Tox specifically, Counter-Plaintiffs have failed to plead any facts showing that any of the alleged "false statements" pertaining to a large franchisee base, The Tox's "systems" in place to assist franchisees in being successful, calls with prospective franchisees, or that that The Tox would provide turnkey marketing "**specific to each franchisee's market,**" which form the basis of their fraud claim, were actually made by The Tox. [*Cf.* D.E. 75 ¶¶ 19, 25, 27, 37-45, 72, 117] (emphasis added).  Yet, Counter-Plaintiffs lump the Counter-Defendants together and generically allege that these misrepresentations and conduct damaged them.  [D.E. 75 ¶¶ 119-120].

Further, the Franchise Disclosure Document ("FDD") Counter-Plaintiffs' cite and rely on directly refutes their claims. For example, it explicitly states that The Tox has no obligation to advertise or conduct marketing campaigns in any particular area, including Counter-Plaintiffs' territory. [*See* the 2023 FDD attached as Exhibit A, p. 28]. Likewise, it is alleged that other material misrepresentations were that (1) the Tox had a large franchise base; and (2) the build out costs were low. The FDD though explicitly refutes both allegations. It states that as of February 28, 2022, there was one franchise outlet; and that build out costs are **estimates based on prior experience, but that the rates, costs, and fees may be more or less than the estimated range**

6

**depending on the location of the franchise.** [*See* D.E. 75 ¶ 22; Ex. A, p. 16-21].  Furthermore, Count I also fails because it relies on Counter-Plaintiffs' conclusory opinions and arguments that Counter-Defendants specifically advised Counter-Plaintiffs that they could successfully open and operate multiple franchise locations, while the Amended Counterclaim lacks any actual facts supporting same. [*Cf.* D.E. 75 ¶¶ 36, 117].

Counter-Plaintiffs also failed to plead and specify (again) which alleged misrepresentations by The Tox were fraudulent; which misrepresentations Counter-Defendants knew to be false and were intended to induce Counter-Plaintiffs (unknown as to which), to act and how; [2] and which "material" false statements they relied upon to enter into a "number of different contracts," and more specifically, the Franchise Agreement[3]. They also failed to plead what omitted "material information" was not disclosed; which partial disclosures related to the franchise model were disclosed and those "other material facts" not revealed; or any facts evidencing what Counter-Defendants obtained as a consequence of each alleged fraudulent statement. In sum, Counter-Plaintiffs have not satisfied Rule 9(b)'s heightened pleading standard. *See Merch. One, Inc. v. TLO, Inc.*, 2020 U.S. Dist. LEXIS 7462, at *17 (S.D. Fla. 2020)(dismissing a fraud claim because, despite providing some examples of purported fraud, Rule 9(b) was not satisfied "because Plaintiff must set forth precisely each statement alleged to be fraudulent."); *Genesis Custom Jetliners, LLC v. ASG Aero. LLC*, 2025 U.S. Dist. LEXIS 146137, at *6-16 (S.D. Fla. July 29,

---

[2]     The word "intent" is used, but Counter-Plaintiffs do not allege any facts which explain why, given the franchise model and mutually beneficial relationship, they would be induced to purchase a franchise with the intent to collect initial fees and then be set up to fail.

[3]     Counter-Plaintiffs' argue that they were fraudulently induced to enter into the Franchise Agreement and it is unenforceable. Yet, they also argue that the Franchise Agreement is enforceable and The Tox breached more than twenty (20) of its various provisions. Counter-Plaintiffs cannot reasonably argue that the terms of the Franchise Agreement do not apply to them and that their defaults are null and void, while simultaneously attempt to enforce the Franchise Agreement where they believe it helps them.

2025)(dismissing fraud claims for among other reasons, ASG failed to state "a plausible case that Global intended for any fraudulent or negligent misconduct to induce ASG" which were grounds for dismissal of those claims alone, and because ASG could not show that "but for Global's alleged misrepresentations or omissions, ASG would not have entered into an transaction.").

Count I is little more than a *pro forma* recitation of the fraud elements; relies on unknown oral statements and written statements from the FDD, none of which were ever pleaded in their entirety or attached to the Counterclaim and were only briefly (inaccurately) summarized by Counter-Plaintiffs; relies on conclusory arguments and opinions about the franchise and marketing systems they had in place to imply that the Counter-Defendants omitted unknown "material facts"; lacks any factual connection to a material misrepresentation that caused any damages; and fails to allege facts that demonstrate damages due to the alleged fraud. *See Grave v. Wells Fargo Bank, N.A.*, 2014 U.S. Dist. LEXIS 197375, at *18-20 (S.D. Fla. July 10, 2014)(dismissing fraudulent misrepresentation claim for failing to satisfy the requirements of Rule 9(b) because "[t]here are no allegations identifying the specific time, place, content, and communicator of the fraudulent statements."). Thus, Count I falls well short of asserting a *prima facie* fraud claim, and as a result, it must be dismissed with prejudice. *See Bell Atl. Corp. v. Twombly*, 550 U.S. at 555.

## III.   COUNT II FAILS TO STATE A CAUSE OF ACTION

Count II must be dismissed because Counter-Plaintiffs failed to properly plead a claim for aiding and abetting fraud against FFL. Aiding and abetting fraud consists of three elements: "(1) the existence of an underlying fraud; (2) that the defendant had knowledge of the fraud; and (3) that the defendant provided substantial assistance to advance the commission of the fraud." *Chang v. JPMorgan Chase Bank, N.A.*, 845 F.3d 1087, 1097-98 (11th Cir. 2017). The strict pleading requirements of Rule 9(b) also apply to aiding and abetting. *See Am. United Life Ins. Co. v.*

*Martinez*, 480 F.3d 1043, 1067 (11th Cir. 2007) (affirming dismissal of aiding and abetting claim for lack of specificity). Further, regarding the knowledge of fraud, "conclusory statement[s] that a defendant 'actually knew' [are] insufficient to support an aiding and abetting claim where the facts in the complaint only suggest that the defendant 'should have known that something was amiss.'" *Platinum Estates, Inc. v. TD Bank*, 2012 U.S. Dist. LEXIS 30684, at *3 (S.D. Fla Mar. 7, 2012) (quoting *Groom v. Bank of America*, 2012 U.S. Dist. LEXIS 2374 at *3 (M.D. Fla. Jan. 9, 2012)).

Here, Count II formalistically alleges that the Tox committed fraud but, again, does not identify the who, what, when, where, and how of the fraud alleged. The Amended Counterclaim also fails to establish that FFL had actual knowledge of the alleged fraud. Rather, the Amended Counterclaim makes the conclusory allegation that "Counter-Defendant FFL knew that The Tox was committing fraud." [D.E. 75 ¶ 124]. Lastly, with regard to providing substantial assistance, the Amended Counterclaim simply alleges that FFL assisted The Tox by making numerous false statements. [*Id.*] However, Counter-Plaintiffs cannot possibly show that FFL substantially assisted or helped conceal fraud because they have again failed to show that FFL knew the alleged false statements were actually false. It is clear that Count II falls below the strict pleading requirements under Rule 9(b). Accordingly, Count II must be dismissed.

## IV.    COUNT III FAILS TO STATE A CAUSE OF ACTION

FDUTPA prohibits "[u]fair methods of competition, unconscionable acts or practices, and unfair or deceptive acts or practices in the conduct of any trade or commerce." *Intercoastal Realty, Inc. v. Tracy*, 706 F. Supp. 2d 1325, 1333 (S.D. Fla. April 16, 2010)(*quoting* §501.204(1), *Florida Statutes*). FDUTPA is intended to "protect the consuming public and legitimate business enterprises from those who engage in unfair methods of competition, or unconscionable, deceptive, or unfair acts or practices in the conduct of any trade or commerce." *Id.* (*quoting* § 501.202(2),

9

*Florida. Statutes*). An unfair practice under FDUPTA is one that "offends established public policy or is immoral, unethical, oppressive, unscrupulous, or substantially injurious to consumers." *Id.* (internal citations and quotations omitted). Deception in this context as "a representation, omission, or practice that is likely to mislead the consumer acting reasonably in the circumstances, to the consumer's detriment." *Caribbean Cruise Line, Inc. v. Better Bus. Bureau of Palm Beach County*, 169 So. 3d 164, 169 (Fla. 4th DCA 2015). (internal citations omitted).

A plaintiff must allege a deceptive act or unfair practice, causation, and actual damages. *Alvarez v. Bank of Am. Corp.*, 2014 U.S. Dist. LEXIS 104640, at *6 (S.D. Fla. July 31, 2014). The allegedly deceptive act must have been in furtherance of "trade or commerce." *See Law Office of David J. Stern, P.A. v. Dep't of Legal Affs.,* 83 So. 3d 847, 850 (Fla. 4th DCA 2011). "Trade or commerce" is defined as the "advertising, soliciting, providing, offering, or distributing whether by sale, rental or otherwise, any good or service, or any property, whether tangible or intangible or any other article or thing of value, wherever situated." *Id.* at 849 (*quoting* Section 501.203(8), *Florida Statutes).* An aggrieved party can only recover actual damages "incurred as a consequence of a violation of the statute." *City First Mortg. Corp. v. Barton*, 988 So. 2d 82, 86 (Fla. 4th DCA 2008)(FDUTPA provides for recovery only of "actual damages," which cannot include consequential or special damages.)(internal citations omitted); *see also Cravens v. Garda CL SE.,* Inc., 2024 U.S. Dist. LEXIS 227104, at *36 (S.D. Fla. December 6, 2024)(indicating that FDUTPA "entitles a consumer to recover damages attributable to the diminished value of the goods or services received, but does not authorize recovery of consequential damages to other property attributable to the consumer's use of such goods or services.")(internal quotations and citations omitted).

Count III fails because Counter-Plaintiffs have failed to plead sufficient facts to comply

with Rule 9(b)'s specificity requirements (again), or plead facts that identify any specific unfair or deceptive trade practice that the Counter-Defendants engaged in or how. The Amended Counterclaim only vaguely and loosely asserts that Counter-Defendants (again without distinguishing between them), engaged in "unfair and deceptive trade practices," "unfair methods of competition," "or unconscionable acts or practices," and continued to use "misrepresentations and other unlawful practices" to market and sell the Tox franchises, generally, without pleading any facts evidencing how. [D.E. 75 ¶129]. Moreover, Counter-Plaintiffs' also attempt to regurgitate the same vague list of "false statements" used in their fraud claim and qualify them as an alleged violation of FDUTPA, despite the fact that the Amended Counterclaim, as argued above, fails to plead or specify any facts demonstrating that any of these alleged statements were ever made by The Tox, and in some cases, either Counter-Defendant, and are based on Counter-Plaintiffs' opinions and theories of The Tox's franchise and marketing systems in place, rather than any identifiable statement or act by either Counter-Defendant. [*Cf.* D.E. 75 ¶¶ 19, 25, 27, 36-45, 117, 129]. Such conclusory allegations do not support a FDUTPA violation because none of these "false statements" or opinions qualify as an unfair, deceptive, or otherwise improper act within the meaning of FDUTPA, and Counter-Plaintiffs have failed to plead any facts of what "unfair and deceptive trade practices," "unfair methods of competition," or what "unconscionable acts or practices" that Counter-Defendants, and specifically The Tox, engaged in that actually caused each individual Counter-Plaintiff actual damages, and how.

Moreover, this claim likewise fails because, for the second time, Counter-Plaintiffs have not pleaded any actual damages, as is required. The only allegation of damages under FDUTPA are vague: Counter-Plaintiffs "have been damaged and are entitled to all remedies and damages permitted under the FDUTPA including actual damages . . .." [D.E. 75 ¶ 130]. This conclusory

11

and speculative allegation is insufficient and Counter-Plaintiffs' fail to plead any actual facts that would support them. *See Cravens v. Garda CL Se., Inc.*, 2027 U.S. Dist. LEXIS 227104, at *35-37 (holding that Plaintiffs failed to allege actual damages as defined by FDUTPA where the first injury claimed of "ascertainable losses of money or property" was "wholly conclusory," and that the remaining damages asserted were unrecoverable consequential damages.). Instead, and consistent with the Amended Counterclaim as a whole, Counter-Plaintiffs' allegations are simply generic, recitations of the elements to "check the box" (again) and improperly commingle all allegations amongst the Counter-Defendants generally (again), which is insufficient to plead a FDUTPA violation. As a result, Count III should be dismissed.

## V.    COUNT IV FAILS TO STATE A CAUSE OF ACTION

The elements of a breach of contract action are: (1) a valid contract; (2) a material breach; and (3) damages. *People's Tr. Ins. Co. v. Valentin*, 305 So. 3d 324, 326 (Fla. 3d DCA 2020). However, "[i]t is a basic tenet of contract law that a party can only advance a claim of breach of written contract by identifying and presenting the actual terms of the contract allegedly breached." *Herssein Law Grp. v. Reed Elsevier, Inc.*, 594 F. App'x 606, 608 (11th Cir. 2015)(internal citations omitted). "[T]he duty to accept the facts in a complaint as true at the motion-to-dismiss stage does not require the Court to turn a blind eye to clear factual contradictions between general allegations in the pleading and its exhibits." *See Reinsurance Partners Invs. v. Maite, LLC*, 2024 U.S. Dist. LEXIS 232833, at *18 (S.D. Fla. December 16, 2024). Thus, if the Franchise Agreement does not contain the provision(s) and/or promises that Counter-Plaintiffs' claim were breached, dismissal of their breach of contract claim is appropriate. *See Caterpillar Fin. Servs. Corp v. Venequip Mach Sales Corp.*, 147 F.4th 1341, 1349 (11th Cir. 2025)(" . . . our decision in *Young* suggest that, if the documents the plaintiff cites or attaches to its complaint do not actually contain the promises the plaintiff alleged were breached . . . dismissal is appropriate.")(*citing Young v. Grand Canyon Univ.*

12

*Inc.*, 57 F.th 861 (11th Cir. 2023); *see also Burger King Corp. v. Berry*, 2020 U.S. Dist. LEXIS 256918, at *15-17 (S.D. Fla. Sept. 4, 2020)("The Counterclaim fails to state a cause of action for breach of contract because the plain language of the Franchise Agreement can only be read as imposing no contractual obligation for BKC to do what the Counter-Claimants allege.").

"Exhibits attached to a Complaint are properly considered part of the pleadings for all purposes, including a Rule 12(b)(6) motion. *See Jordan v. Miami-Dade County*, 429 F. Supp. 2d 1237, 1240 (Fla. S.D. July 13, 2006)(internal citation omitted); Fed. R. Civ. P. 10(c) ("A copy of a written instrument that is an exhibit to a pleading is a part of the pleading for all purposes."). Moreover, "when the exhibits contradict the general and conclusory allegations of the pleadings, the exhibits govern." *See Fla. Virtual Sch. V. D2l Corp.*, 2021 U.S. Dist. LEXIS 98176, at *2-3 (M.D. Fla. February 17, 2021)(citing *Griffin Indus., Inc. v. Irvin*, 496 F.3d 1189, 1206 (11th Cir. 2007)). Accordingly, the Court may consider the Franchise Agreement because it was attached as an exhibit to the original complaint, and may also consider the FDD and the Relationship Disclosure Form for Franchisees since they have been incorporated by reference in the allegations, and are integral to Counter-Plaintiffs' claims. *See Sch. Bd. V. L.H.*, 666 F. Supp. 2d 1285 (M.D. Fla. August 24, 2009)(internal citations omitted); *see also* [D.E. 75 ¶ 133].

    **a.   Counter-Plaintiffs' Fail to Plead any Breach of the Franchise Agreement**

At bar, Counter-Plaintiffs mischaracterize and misquote the Franchise Agreement's terms to try to tie them to their conclusory breach of contract claims. However, Counter-Plaintiffs' vague claims for breach of the Franchise Agreement fail for several reasons. First, Counter-Plaintiffs assert that The Tox breached the Franchise Agreement in "many ways," and proceed to list several alleged "promises" and "representations" related to providing a "proprietary system," trade secrets, turnkey marketing, and the total investment needed for the Franchise. [DE 75, ¶¶ 133]. These fail

not only because Counter-Plaintiffs do not plead which proprietary system or trade secrets they claim were not provided, but also because the Franchise Agreement at ¶ 2 does not contain any obligation to provide Counter-Plaintiffs with a "proprietary system". Similarly, neither Sections 14.1.1 or 19.2, place any obligations on The Tox, and rather indicate ownership of the trademarks and prohibit Counter-Plaintiffs from disclosing trade secrets, respectively.

Additionally, Counter-Plaintiffs reliance on "representations" made about the turnkey marketing and build out costs do not support a breach of the Franchise Agreement because: (1) the FDD is NOT an exhibit to the Franchise Agreement; (2) in any event, the FDD directly contradicts these allegations; (3) Attachment 10 of the Franchise Agreement is the **Franchisee Acknowledgement Statement** and does not include any representations regarding turnkey marketing or build out costs [*see* D.E. 1-2, p. 70-73]; (4) the Relationship Disclosure Form expressly indicates that it is not a contract and does not include any express promise or obligation by the Tox that can be breached [*See* the Relationship Disclosure Form for Franchisees attached as Exhibit B]; and (5) because Counter-Plaintiffs fail to identify the specific provision(s) of the Franchise Agreement that these "breaches" are based upon. S*ee Brush v. Miami Beach Healthcare Grp. Ltd.*, 238 F. Supp. 3d 1359, 1366-67 (S.D. Fla. February 17, 2017)(*quoting and citing Regal v. Butler & Hosch, P.A.*, 2015 U.S. Dist. LEXIS 182446, at \*14-15 (S.D. Fla. October 8, 2015)). Thus, since the Franchise Agreement does not contain the promises that Counter-Plaintiff maintains were breached, these allegations fail. *See Caterpillar*, 147 F.4th at 1349.

Next, Counter-Plaintiffs loosely assert (again) that The Tox breached an additional nineteen (19) separate provisions of the Franchise Agreement (3.1, 6.5, 7.1, 7.3, 7.4, 7.5, 7.6, 9.5, 10.5, 10.6, 10.8, 10.9, 12.1.9, 13.1, 13.2.3, 13.3.2, 13.3.4, 13.4, and 13.5). [DE 75, ¶ 133]. However, Counter-Plaintiffs have failed to assert a *prima facie* claim as to any alleged breaches.

First, any argument that The Tox breached section 3.1 (preventing the franchisor from opening competing franchises within the same territory) fails because there are no allegations that The Tox operated, or authorized any other franchisees to operate, in Counter-Plaintiffs designated territory. At most, they allege that The Tox promoted "selling their franchises within the Hoggatt's territory." [DE 75, ¶74]. However, nothing within section 3.1 prohibits The Tox from promoting its business, and the actual photo of the post contradicts this allegation. There is no reference to The Tox allowing another franchisee in their territory. *Id.* Similarly, the allegation that section 6.5 (charging a technology fee) was breached also fails. There are no allegations that The Tox changed the amount of the technology fee without the required notice. To the extent that Counter-Plaintiffs complain about other fees, such as the MindBody fee or other technology or software fees, the Franchise Agreement at section 12.3.7 expressly discloses that Counter-Plaintiffs were obligated to pay these fees, *i.e.*,, **in addition to** a technology fee, they agreed to pay all regular recurring frees for software and internet access, license fees, help desk fees, and licensing user-based fees. As with the FDD, the written terms directly contradict Counter-Plaintiffs allegations.

Counter-Plaintiffs' allege that Section 7.1 was breached, but this fails because Counter-Plaintiffs concede that they were provided the initial management training before they opened, and Section 7.1 expressly states provides that [The Tox] has the discretion of where the training takes place and that [Counter-Plaintiffs] are responsible for all associated fees and expenses. [DE 75, ¶¶ 87-92]. Next, allegations of a breach of Section 7.4 fail because no factual allegations have been pleaded that The Tox failed to provide opening assistance within sixty (60) days of the May 9, 2025, opening. [*Cf.* DE 75, ¶93]. Additionally, there is no contractual requirement in section 7.4 that the **Franchisee** has the ability to require additional training by Franchisor. Rather, section 7.4 provides that the **Franchisor** may offer mandatory and/or optional additional training, and that if

15

required by the **<u>Franchisor</u>**, the franchisee or their principals shall participate in an additional training at a location designated by the Franchisor. Thus, any allegation of a breach of section 7.4 lacks any factual support and is contradicted by the plain language of the Franchise Agreement.

Similarly, any breach of section 7.5 likewise fails because Counter-Plaintiffs mischaracterize this provision, and again, the Counterclaim lacks any facts where Counter-Plaintiffs requested remedial training at their location, additional business and/or technique training at The Tox's Headquarters, or that The Tox refused to provide same. Likewise, section 7.6 fails because Counter-Plaintiff's also mischaracterize it, which provides that The Tox shall provide consultation and assistance, **<u>as [The Tox] deems appropriate</u>** and subject to [The Tox's] personnel's availability, regarding the operation of the business. Here, the only allegation that could reasonably support this claim is that Mr. Yaeger, whose relationship to The Tox was never pleaded, indicated that he would not help Ms. Hoggatt, which is insufficient to support a breach. [DE 75 ¶ 80]. Accordingly, it follows that any violation of sections 10.8 or 10.9 likewise fails, as the Counterclaim lacks any facts that The Tox failed to comply with its requirements in Article 7 of the Franchise Agreement.

Furthermore, Counter-Plaintiffs allege a breach of section 9.5, but this too fails because this provision does not grant Counter-Plaintiffs the right to establish an advisory council, and instead, explicitly reserves that right to The Tox. Thus, there can be no breach for declining to consider a Franchise Advisory Council as suggested by Counter-Plaintiffs. Likewise, the assertion of a breach of section 10.5 fails because there are no facts pleaded that The Tox did not provide the required list specified in this section. Any allegation that section 10.6 was breached also fails because Counter-Plaintiffs' allegations expressly contradict any notion that The Tox failed to provide samples or digital artwork of advertising and promotional materials and information

developed by The Tox. Counter-Plaintiffs' mere unhappiness or disagreement with these materials does not establish a breach. [DE 75, ¶¶ 72-75]. Further, the implication that Counter-Plaintiffs' approval of marketing materials was required is directly contradicted by section 10.6, which indicates that the materials and information were to be developed by The Tox, and used by Counter-Plaintiffs; by section 13.1, which states that in all aspects of The Tox's advertising and sales promotion programs, the standards and specification established by The Tox, as modified from time to time "shall be final and binding upon [Counter-Plaintiffs]"; and the fact that no such provision in the Franchise Agreement requiring their approval exists.

Next, the alleged breach of section 12.1.9 fails because this section contains an obligation for **Counter-Plaintiffs** to conduct all advertising programs in a manner consistent with The Tox's standards, and does not place any obligation on The Tox. The breach claim based on section 13.1 fails because the allegation mischaracterizes and misquotes this provision, which does not place any obligation on The Tox that they could breach, and instead, merely indicates that The Tox may develop advertising and sales promotion programs, and designates **Counter-Plaintiffs'** obligation to participate in same.

The claim as to section 13.2.3 also fails because this provision does not indicate, as alleged, that The Tox shall conduct a grand opening marketing campaign. [DE 75, ¶ 133]. Rather, it places this responsibility on Counter-Plaintiffs. Similarly, Counter-Plaintiffs' misquote and mischaracterize section 13.3.2 which again, contrary to the allegations, places no duty on The Tox pertaining to the "intention" of the Brand Fund, and instead indicates that Counter-Plaintiffs agree a and acknowledge this intention. They also mischaracterize section 13.3.4, which explicitly states that despite this "intention," The Tox reserves the right to use the Brand Fund for public relations, to explain the franchise system, and/or to include a notation in advertisement that franchises are

17

available. Nonetheless, Counter-Plaintiffs arguments fail because there are no factual allegations that The Tox did anything with respect to the Brand Fund that is contrary to the Franchise Agreement. Also, there can be no breach of section 13.4, as it explicitly states that The Tox reserves the right to establish a regional advertising cooperative in its own discretion.

Finally, Counter-Plaintiffs allege a breach of section 13.5, but it too fails because exemption from social media fees only applies during the first two (2) months of the **operation** of the franchised business. Here, Counter-Plaintiffs assert that the social media fees were attempted to be withdrawn on March 6, 2025, before the franchise opened. [DE 75 ¶75]. However, Counter-Plaintiffs' franchise did not become operational until the store opened on May 9, 2025. [DE 75 ¶93]. Accordingly, Counter-Plaintiffs' claim of a breach is explicitly contradicted by the allegations in the Counterclaim, and any exemption from paying social media fees **before** the franchise became operational is notably absent from section 13.5. As a result, Counter-Plaintiffs fail to allege any facts supporting that The Tox breached the Franchise Agreement. Thus, Count IV must be dismissed.

### b.  The Breach of the Covenant of Good Faith and Fair Dealing Claim Fails

"In Florida, the elements of breach of implied covenant of good faith and fair dealing are: (1) existence of a contract; (2) the plaintiff did all, or substantially all, of the significant things the contract required it to do; (3) all conditions required for the defendant's performance had occurred; (4) the defendant's conduct was not consistent with the parties' reasonable expectations under the contract; and (5) the plaintiff was damaged." *Nat'l Equestrian League v. White*, 2021 U.S. Dist. LEXIS 207632, at *16-17 (S.D. Fla. October 2021). Florida law also requires that the claim "must 'relate to the performance of an express term of the contract and is not an abstract and independent term of a contract which may be asserted as a source of breach when all other terms have been

18

performed pursuant to the contract requirements," and that the covenant "is a gap-filling default rule, which comes into play when a question is not resolved by the terms of the contract or when one party has the power to make a discretionary decision without defined standards." *See Id.* at *17-18 (internal citations and quotations omitted).

Furthermore, a "claim for a breach of the implied covenant of good faith and fair dealing cannot be maintained under Florida law in the absence of a breach of an express term of a contract." *See Crossroads Fin., LLC v. Alma-Mater Collection, Inc.*, 2020 U.S. Dist. LEXIS 77317, at *11 (S.D. Fla. April 30, 2020)(internal citations and quotations omitted). "Nor can this claim be invoked to override the express terms of the agreement between the parties." *Id.* at *11-12 (internal citations and quotations omitted). "The breach of the implied covenant of good faith and fair dealing is not an independent cause of action but attaches instead to the performance of a specific contractual obligation." *Id.* at *12 (internal citations omitted). Finally, "a breach of the implied covenant of good faith and fair dealing cannot be advanced when the allegations underlying that claim are duplicative of the allegations supporting the breach of contract claim." *Id.* (internal citations omitted).

Counter-Plaintiffs' alternative claim is again contradicted by the Franchise Agreement. Section 17.2 expressly provides that The Tox has the option to terminate the Franchise Agreement "**without affording Franchisee any opportunity to cure**" based on the defaults at issue here, and, in any event, Counter-Plaintiffs failed to perform by paying required fees pursuant to the Agreement. (Emphasis added). Moreover, the breach of implied covenant of good faith and fair dealing count also fails because Counter-Plaintiffs' have not pleaded any facts supporting each of the elements for this cause of action. Rather, they allege only vague and conclusory allegations that The Tox made "numerous representations in the Franchise Agreement in bad faith and of

19

which it had no intention of performing" without any factual detail. Counter-Plaintiffs merely regurgitate the same alleged breaches of the Franchise Agreement and label them a breach of the implied covenant of good faith and fair dealing. [DE 75 ¶ 136]. However, and as discussed above, each and every one of these allegations fails to support a breach of any provision of the Franchise Agreement, and absent a breach of the express term of the contract, their claim for a breach of implied covenant of good faith and fair dealing fails as a matter of law. *See Crossroads Fin., LLC v. Alma-Mater Collection, Inc.*, 2020 U.S. Dist. LEXIS 77317, at \*11.

The only provision not previously referenced, which was a violation of section 13.2.4, also fails because Counter-Plaintiffs misconstrue and mischaracterize this section to assert that The Tox was required to provide social media influencers to assist with marketing. [DE 75 ¶ 136]. However, this allegation is contradicted by section 13.2.4, which has no such requirement and expressly states that "[The Tox] shall be permitted to provide up to twenty (20) social media influencers . . .." Thus, there is no breach of the Franchise Agreement, and like the rest of Counter-Plaintiffs' conclusory allegations, Counter-Plaintiffs cannot assert a claim for the breach of the implied covenant of good faith and fair dealing as a matter of law, and Count IV must be dismissed.

## VI.  COUNT V FAILS TO STATE A CAUSE OF ACTION

Under Florida law, a claim for negligent misrepresentation requires: (1) a misrepresentation of material fact; (2) the representer either knew of the misrepresentation, made the misrepresentation without knowledge of its truth or falsity, or should have known the representation was false; (3) the representer intended to induce another to act on the misrepresentation; and (4) injury resulted to a party acting in justifiable reliance upon the misrepresentation. *Tiara Condo. Ass'n v. Marsh & McLennan Cos.*, 607 F.3d 742, 747 (11th Cir. 2010) (citing *Baggett v. Electricians Local 915 Credit Union*, 620 So. 2d 784, 786 (Fla. 2d DCA 1993)). The heightened pleading standard set out in Rule 9(b) applies to negligent

misrepresentation claims because such claims  sound in fraud. *See Wilding v. DNC Servs. Corp.*, 941 F.3d 1116, 1128 (11th Cir. 2019) (citing *Lamm v. State Street Bank & Trust*, 749 F.3d 938, 951 (11th Cir. 2014)).

While pleaded alternatively, and even though the count this claim is actually in the alternative to has not been identified for a second time, Count V, again, fails because it falls short of the Rule 9(b) heightened requirements and has the hallmarks of a shotgun pleading. Specifically, Count V fails to specify the precise alleged misrepresentations made by each Counter-Defendant to support this claim; allege that Counter-Defendants "negligently supplied false information to Counter-Plaintiffs," without identifying which Counter-Plaintiff was supplied misinformation or even what information; and fails to identify how each Counter-Defendant either knew of the alleged misrepresentations, did not have knowledge of the representations' truth or falsity, or how each Counter-Defendant should have known the alleged misrepresentations were false. *See* [D.E. ¶¶ 140-143].

Likewise, Counter-Plaintiffs' fail to plead any articulable facts demonstrating that they justifiably relied on any specific misrepresentations made by The Tox that caused their injuries, warranting dismissal here. *See D.S. v. Carnival Corp*, 2025 U.S. Dist. LEXIS 99981, at *18-20 (S.D. Fla. May 27, 2025). Rather, Counter-Plaintiffs improperly commingle all allegations and alleged misrepresentations amongst both Counter-Defendants (again), and fail to specify or plead any identifiable misrepresentations that they refer to. Thus, these vague and conclusory allegations are nothing mor than a blanket recitation of the elements of their claim and fail to state any specific facts supporting same, which is insufficient to plead a claim for negligent misrepresentation. Accordingly, Count V must be dismissed.

## VII.    COUNT VI FAILS TO STATE A CAUSE OF ACTION

To establish a claim for unjust enrichment, Counter-Plaintiffs must prove that "(1) plaintiff

has conferred a benefit on the defendant, who has knowledge thereof; (2) defendant voluntarily accepts and retains the benefit conferred; and (3) the circumstances are such that it would be inequitable for the defendant to retain the benefit without first paying the value thereof to the plaintiff." *See Duty Free World, Inc. v. Miami Perfume Junction, Inc.*, 253 So. 3d 689, 693 (Fla. 3d DCA 2018). While Counter-Plaintiffs have pleaded Count VI in the alternative, their unjust enrichment claim still fails because, for a second time, they failed to plead the various unknown and unidentified fees from each separate Counter-Defendant that it seeks to recoup, which is insufficient to state a cause of action. [D.E. 75 ¶ 146].

Additionally, Count VI must be dismissed because there is an express contract. The law will not imply a contract where an express contract exists and "Florida courts routinely dismiss quasi-contract claims when there is an express contract that governs the transaction at issue." *Glob. Network Mgmt., Ltd. v. CenturyLink Latin Am. Sols., LLC*, 67 F.4th 1312, 1318 (11th Cir. 2023); *Total Containment Solutions, Inc. v. Glacier Energy Serv., Inc.*, 2015 WL 3562626 at *2 (M.D. Fla. June 5, 2015). This rule "applies even where the defendant against whom the plaintiff seeks recovery is not a party to the contract, because '[t]he existence of a valid legal remedy against one party will bar recovery in equity against another party.'" *WB's Septic & Sitework, Inc. v. Tucker*, 365 So. 3d 1242, 1246 (Fla. 4th DCA 2023) (quoting *Doral Collision Ctr., Inc. v. Daimler Tr.*, 341 So. 3d 424, 430 (Fla. 3d DCA 2022)).

Here, Counter-Plaintiffs cannot be permitted to plead a claim for unjust enrichment because there is an express contract between The Tox and the Hoggatts. While FFL is not a party to the contract, Counter-Plaintiffs are also barred from recovery against FFL because they have a legal remedy through the contract. Therefore, Count VI must be dismissed.

## VIII.    COUNT VII FAILS TO STATE A CAUSE OF ACTION

Count VII must be dismissed because it fails to state a cause of action. To plead a claim

for civil conspiracy, a plaintiff must allege: "(1) an agreement between two or more parties; (2) to do an unlawful act or to do a lawful act by unlawful means; (3) the doing of some overt act in pursuance of the conspiracy; and (4) damage to plaintiff as a result of the acts done under the conspiracy." *Honig v. Kornfeld*, 339 F. Supp. 3d 1323, 1345 (S.D. Fla. 2018) (quoting *Philip Morris USA, Inc. v. Russo*, 175 So. 3d 681, 686 n.9 (Fla. 2015)). General allegations of conspiracy are inadequate." *Eagletech Communications, Inc. v. Bryn Mawr Inv. Grp., Inc.,* 79 So. 3d 855, 863 (Fla. 4th DCA 2012) (citation omitted). Again, the heightened pleading requirements of Rule 9(b) apply to civil conspiracy claims based in fraud and "require specific factual allegations regarding the time, place, and manner of the conspiracy. *Casado v. Miami-Dade Cty.*, 340 F. Supp 3d 1320 (S.D. Fla. 2018) (citing Fed. R. Civ. P. 9(b); *Am. United Life Ins. Co. v. Martinez*, 480 F.3d 1043, 1067 (11th Cir. 2007)). In "conspiracy actions, conclusory, vague, and general allegations of conspiracy may justify dismissal of a complaint." *Kearson v. S. Bell Tel. & Tel. Co.*, 763 F.2d 405, 407 (11th Cir. 1985).

### a.      Counter-Plaintiffs Failed to Sufficiently Allege an Agreement Between Counter-Defendants

Counter-Plaintiffs allege that Counter-Defendants had a sales representative agreement with one another. [D.E. 75 ¶¶ 7, 150]. However, Count VII fails because this is not unlawful or otherwise sufficient to establish an agreement to commit civil conspiracy. Again, Counter-Plaintiffs offer no facts to establish that any agreement was entered into between Counter-Defendants to perform an unlawful act or to do a lawful act by unlawful means, which is required to sustain a civil conspiracy cause of action. Moreover, the Amended Counterclaim also fails to plead the terms of any such agreement, such as when any alleged agreement was entered, where the agreement was reached, and what fraud the Counter-Defendants allegedly agreed to commit. Without more, Counter-Plaintiffs cannot possibly establish a claim for civil conspiracy, as

conclusory allegations do not establish a civil conspiracy. *Honig v. Kornfeld*, 339 F. Supp. 3d 1323, 1347 (S.D. Fla. 2018); *Alhassid v. Bank of Am., N.A.,* 60 F. Supp. 3d at 1319 (finding the plaintiffs' conclusory allegation the defendants "engaged in a conspiracy" was insufficient while noting that details, including the who, what, when, where and how are required). Therefore, Count VII must be dismissed.

### b.   Counter-Plaintiffs Failed to Identify Overt Acts in Furtherance of the Conspiracy

"[A] claim for civil conspiracy must contain clear, positive and specific allegations; general allegations of conspiracy are not sufficient." *Lavender Health Care, LLC v. Redstone LLC*, 2021 U.S. Dist. LEXIS 174119, at *19 (M.D. Fla. Sep. 14, 2021). Here, Counter-Plaintiffs simply regurgitate the same commingled list of alleged misrepresentations made by the Counter-Defendants, again without specifying which said what, and claim that these statements were "overt acts in furtherance of the conspiracy." [*See* D.E. 75 ¶150]. However, this claim fails because none of these alleged statements are in furtherance of an agreement between Counter-Defendants to do anything unlawful or a lawful thing by unlawful means, nor do Counter-Plaintiffs' plead same, which is required to state a cause of action. Thus Count VII must be dismissed.

### c.   Count VII Must be Dismissed to the Extent Counter-Plaintiffs Cannot Establish an Underlying Wrong

Count VII must also be dismissed because Counter-Plaintiffs cannot establish an underlying wrong. "An actionable conspiracy requires an actionable underlying tort or wrong." *Bostwick Labs., Inc. v. Farley*, 2014 U.S. Dist. LEXIS 201026 at *4 (S.D. Fla. Aug. 1, 2014). When an underlying claim for fraud fails, the claim for civil conspiracy to commit fraud fails with it. *See Yaques v. Zhenzhen Lin*, 2024 U.S. Dist. LEXIS 98087 (S.D. Fla. May 31, 2024). Here, Counter-Plaintiffs assert that the "underlying wrongs are the other torts alleged herein." [*See* D.E.

24

75 ¶150]. However, as discussed above, Counter-Plaintiffs cannot establish their underlying tort claims. Thus, to the extent the underlying claims are dismissed, Counter-Plaintiffs' claim for conspiracy necessarily fails. *See Yaques v. Zhenzhen Lin,* No. 2024 U.S. Dist. LEXIS 98087, at *15 (S.D. Fla. May 31, 2024)(because the underlying claims fail to state a claim, their derivative civil conspiracy fails).

## IX.   COUNT VIII FAILS TO STATE A CAUSE OF ACTION

Counter-Plaintiffs, in a conclusory fashion, assert that The Tox violated each subsection of the Florida Franchise Act, and in support merely copy and paste the language from the statute, without asserting any factual detail. *Cf.* Fla. Stat. §817.416(2)(a)-(c), [D.E. 75 ¶ 156]. Once again, Counter-Plaintiffs have failed to comply with Rule 9(b)'s heightened pleading requirements based on the alleged fraudulent misrepresentations by The Tox and failures to disclose, nor have they pleaded any specific facts evidencing that The Tox **intentionally** misrepresented the prospects or chances of success of The Tox franchise, or that The Tox **intentionally** mispresented the known required total investment for their franchise. Rather, the allegations contradict this conclusory allegation, and make clear that the increase in expenses to start the franchise were based on Counter-Plaintiffs' own decisions to take bids from construction contractors, of their own choosing, when they did not need to use a contractor; chose to enter into a separate construction contract for an increased amount than what was recommended; and that Counter-Plaintiffs were explicitly advised by The Tox after becoming aware of their decisions that "Boulder was just expensive and they had not seen those numbers before." [D.E. 75 ¶¶ 61-66, 77-78]. Also, the FDD that they rely on explicitly states that initial investment fees complained of are **estimates** based on prior experience, but that the rates, costs, and fees may be more or less than the estimated range depending on the location of the franchise. [*See* Ex. A, p. 16-21]. Moreover, Count VIII also fails because Counter-Plaintiffs' failed to plead any facts evidencing that The Tox "intentionally failed

25

to disclose efforts to sell or establish more franchises or distributorships than is reasonable to expect for the franchise to sustain," which would be required to sustain a cause of action for a violation of the Florida Franchise Act. As a result, Counter-Plaintiffs' allegations in Count VIII are nothing more than a recitation of the statute and are devoid of any ultimate facts to support them, which is improper. Thus, Count VIII must be dismissed.

## X. COUNT IX FAILS TO STATE A CAUSE OF ACTION

### a. Counter-Plaintiffs failed to plead sufficient facts to state a claim

In order plead a claim for tortious interference with a contract or business relationship, GenX must allege:

> (1) the existence of a business relationship between the plaintiff and a third person, not necessarily evidenced by an enforceable contract, under which the plaintiff has legal rights; (2) the defendant's knowledge of the relationship; (3) an intentional and unjustified interference with the relationship by the defendant which induces or otherwise causes the third person not to perform; and (4) damage to the plaintiff resulting from the third person's failure to perform.

*See Steward Title Guar. Co. v. Title Dynamics*, 2005 U.S. Dist. LEXIS 48191, at *7 (M.D. Fla. October 11, 2005)(internal citations omitted). "The gravamen of an action for tortious interference with a contractual relationship is the malicious interference by a third party, with a contract between other persons, whereby one contracting party is induced to breach the contract **to the injury of the other**." *Benessere Inv. Grp., LLC v. Swider*, 2024 U.S. Dist. LEXIS 198469, at *27 (S.D. Fla. October 31, 2024)(citing *McKinney-Green, Inc. v. Davis*, 606 So. 2d 393, 397 (Fla. 1st DCA 1992)) (emphasis added).

In this case, GenX's tortious interference claim is defective in that it has failed to plead sufficient facts evidencing that The Tox intentionally interfered with the Boulder lease, which caused Counter-Plaintiffs to breach same. Rather, Counter-Plaintiffs' allegations discussing this issue only mention that due to The Tox's termination of Counter-Plaintiffs' franchise (authorized

26

by Counter-Plaintiff's defaults), The Tox caused GenX to **<u>purportedly</u>** breach or violate its Boulder lease "as one lease obligation is to 'use the Premises as a franchisee under The Tox franchise only . . . and for no other purpose whatsoever." [*See* D.E. 75, ¶¶ 69, 114, 162] (emphasis added).[4] At best though, these allegations make clear that any "purported" breach of this section of the Boulder lease was nothing more than a byproduct or unintended consequence of Counter-Plaintiffs' failures to comply with, and The Tox's decision to terminate, the Franchise Agreement. NOT that The Tox **<u>intentionally</u>** interfered with the Boulder lease, which is required.

Moreover, these allegations are also insufficient to state a *prima facie* claim because the vague and conclusory allegations fail to plead that the Boulder lease was actually breached (as their allegations leaves open the possibility that they may not have); and the executed version of the Boulder lease makes clear that GenX's obligations are not conditioned upon GenX's status as a franchisee. *See* n.4. Also notably absent from the Amended Counterclaim is any mention or fact that The Tox caused GenX to use the Premises for anything other than the services prescribed in the Boulder lease to actually violate this provision; that GenX has been damaged by the Boulder lease's landlord's failure to perform under the lease; or that the landlord has been damaged in order satisfy the element of their claim. Rather, GenX's claim is nothing more than a last-ditch effort to now sue The Tox for its own lost profits and damages from Counter-Plaintiffs' failed franchise, due to their failure to abide by the terms of the Franchise Agreement. However, Counter-Plaintiff's vague and conclusory allegations are insufficient to state a cause of action for tortious interference

---

[4]     As discussed above, the Court can consider the full text of the Boulder lease provision at issue as it is incorporated in and integral to Counter-Plaintiffs' claims. [*See* D.E. 75 ¶ 114]. The full provision from the Boulder lease states: "Tenant shall use the Premises as a franchisee under The Tox franchise only, **for the purposes of provision of Health and Wellness Services, related product sales**, and for no other purpose whatsoever. **However, neither this Lease nor the obligations of Tenant hereunder are conditioned upon Tenant's status as a franchisee under The Tox franchise.**" (emphasis added).

with a contract, and as a result, Count IX should be dismissed.

### b. The Tox has a supervisory and financial interest in the lease agreement

"Under Florida law, a cause of action for tortious interference does not exist against one who is himself a party to the business relationship allegedly interfered with." *Burger King*, 2020 U.S. Dist. LEXIS 256918, at *36. "In other words, [t]he tort of willful interference with a business relationship does not exist where the defendant was the source of the business opportunity allegedly interfered with." *Id.* (internal citations and quotations omitted) "[T]he interfering defendant must be a third party, a stranger to the business relationship." *Id.* (internal citations omitted).  Importantly, "a defendant is not a stranger to a business relationship, and thus cannot be held liable for tortious interference, when it has a supervisory interest in how the relationship is conducted or a potential financial interest in how a contract is performed." *See Palm Beach County Health Care District v. Professional Medical Education, Inc.*, 13 So. 3d 1090, 1094 (Fla. 4th DCA 2009).

While not a party to the Boulder lease, The Tox cannot be held liable for tortious interference because it had a financial and supervisory interest in the Boulder lease. Like *Burger King*, the allegations make clear that The Tox is the source of Counter-Plaintiffs' Boulder franchise, and sections 8.1.3 and 8.1.4 of the Franchise Agreement dictate that The Tox has the sole discretion of whether a location for a franchised business is approved and requires a Conditional Assignment of Lease to The Tox be submitted with any proposed lease. *See Burger King,* 2020 U.S. Dist. LEXIS 256918 at *35-38 (internal citations omitted). In *Burger King*, the tortious interference claim against the franchisor was dismissed with prejudice because it was based on allegedly intentionally delaying the sale of the franchisee's restaurant and convincing a prospective buyer to buy from the franchisor directly, as opposed to the franchisee. *See Id.* The

28

Court stated that where it was "undisputed that [franchisor] is the source of the proposed transactions to sell the franchisee's restaurants, since the sale would involve operation of the restaurants as Burger Kings by a potential new owner/franchisee"; the franchise agreement, expressly conditioned the sale of restaurants upon franchisor's prior written consent; and that as a result, franchisor "is itself a necessary party to the business relationships allegedly interfered with and cannot be liable for tortious interference." *See Id.* Moreover, the allegations in this case also make clear that The Tox has a financial interest in the performance of the Boulder lease, as it is owed the numerous fees and royalties disputed by Counter-Plaintiffs for the operation of their The Tox Franchise. Accordingly, The Tox is not a stranger to the Boulder lease as a matter of law, and cannot be held liable for tortious interference with the contract. *See Genet Co. v. Annheuser-Busch, Inc.*, 498 So. 2d 683, 684 (Fla. 3d DCA 1986) (Because plaintiffs' agreement with Lopez was specifically conditioned upon A-B's approval, as a matter of law, A-B cannot be liable for tortious interference with their agreement). Thus, Count IX must be dismissed.

**XI.    COUNT X FAILS TO STATE A CAUSE OF ACTION**

"Indemnification serves to 'shift[ ] the entire loss from one who, although without fault, has been obligated to pay because of some vicarious, constructive, derivative, or technical liability to another who should bear the costs because it was the latter's wrongdoing for which the former is held liable.'" *Rutledge v. Action Prods. Int'l*, 2010 U.S. Dist. LEXIS 165097, at *6 (M.D. Fla. October 28, 2010) (internal citations omitted). "To plead an action for common-law indemnity under Florida law, the party seeking indemnity must allege the following three elements: (1) that he is wholly without fault; (2) that the party from whom he is seeking indemnity is at fault; and (3) that he is liable to the injured party only because he is vicariously, constructively, derivatively, or technically liable for the wrongful acts of the party from whom he is seeking indemnity." *Technolojoy, LLC v. BHPH Consulting Servs., LLC*, 2022 U.S. Dist. LEXIS 41262, at *34 (S.D.

Fla. March 8, 2022)(*citing Florida Farm Bureau Gen. Ins. Co. v. Ins. Co. of N. Am.*, 763 So. 2d 429, 435 (Fla. 5th DCA 2000)). "Moreover, recovery for common law indemnity is precluded if both parties are at fault, no matter how slight the fault of the party seeking indemnity." *Underwriters at Interest v. All Logistics Grp., Inc.*, 483 F. Supp. 3d 1199, 1208 (S.D. Fla. May 25, 2020). However, "[t]o be wholly without fault means that the basis of the claim for indemnification does not arise out of any conduct or act of the party seeking indemnification." *Id.*

GenX's claim for indemnity fails because it did not plead: (1) that it is wholly without fault for amounts becoming due under the Boulder lease; or (2) that a special relationship exists between GenX and The Tox to pursue an indemnity cause of action. *See Rutledge*, 2010 U.S. Dist. LEXIS at *6-9. In other words, GenX has failed to plead facts that The Tox is vicariously, constructively, derivatively, or technically liable for the amounts owed by GenX under its lease or the attorney's fees incurred to sustain an indemnity cause of action. Thus, Count X should be dismissed.

**WHEREFORE**, Counter-Defendants, The Tox Franchising Group, LLC, a Florida limited liability company, and Franchise Fastlane, LLC, a Nebraska limited liability company (collectively "Counter-Defendants"), respectfully request this Honorable Court Grant the Counter-Defendants' Motion to Dismiss Amended Counterclaim with Prejudice, enter an Order dismissing the Amended Counterclaim with Prejudice, awarding Counter-Defendants their attorneys' fees and costs pursuant to Section 501.2105, *Florida Statutes*, and providing any other relief the Court deems just and proper.

DATED: February 10, 2026

**BOYD RICHARDS PARKER & COLONNELLI, P.L.**
1555 Palm Beach Lakes Blvd, Suite 550
West Palm Beach, Florida 33408
Tel.: (786) 425-1045
Fax: (786) 425-3905
For Service of Pleadings:

ServiceMia@boydlawgroup.com

By: /s/ *Bryan J. Mazzola*
  **BRYAN J. MAZZOLA, ESQ.**
  Florida Bar No. 1021407
  bmazzola@boydlawgroup.com
  mapereira@boydlawgroup.com
  **MATTHEW D. WOLF, ESQ.**
  Florida Bar No. 1015588
  mwolf@boydlawgroup.com
  pmocega@boydlawgroup.com
  *Counsel for Counter-Defendant, The Tox*
  *Franchising Group, LLC*

And

  /s/ *Andrew Dymowski*
  Andrew Dymowski, Esq.
  Florida Bar No.: 1058209
  Capri Trigo, Esq.
  Florida Bar No.: 28564
  GORDON REES SCULLY MANSUKHANI
  100 S.E. Second Street, Suite 3900
  Miami, Florida 33131
  Emails: ctrigo@grsm.com; ddymowski@grsm.com;
  jzmartinez@grsm.com
  Mia_eservice@gordonrees.com
  *Counsel for Counter-Defendant, Franchise*
  *Fastlane, LLC*

## CERTIFICATE OF SERVICE

**I HEREBY CERTIFY** that on February 10, 2026, I electronically filed the foregoing with the Clerk of Court via the CM/ECF system  and, a true and correct copy of the foregoing was also served via e-mail on all parties on the Service List below.

By: */s/ Bryan J. Mazzola*
  **BRYAN J. MAZZOLA, ESQ.**

31

## SERVICE LIST

MARKS GRAY, P.A.
**Crystal T. Broughan, Esq.**
(FL Bar No. 863343)
**Logan K. McEwen**
(FL Bar No. 98683)
P.O. Box 447
Jacksonville, FL 32201
Tel: 904-398-9000
Email: cbroughan@marksgray.com

RILEY & JACOBSON, PLC
**Stuart A. Burkhalter, Esq.**
(TN Bar No. 29078)
*Admitted Pro Hac Vice*
1906 West End Avenue
Nashville, TN 37203
Tel: 615-320-3700
Email: sburkhalter@rjfirm.com

*Counsel for Defendants/Counter-Plaintiffs*

Matthew Margolis
700 Rosemary Avenue, 204
West Palm Beach, FL 33401
Email: matthew@margolispllc.com

Evan M. Goldman
Thomas D. Emmons
225 Wilmington West Chester Pike, Suite 200
Chadds Ford, PA 19317
Email: evan@thefranchisefirm.com