# EXHIBIT A

**FRANCHISE DISCLOSURE DOCUMENT**

**The Tox Franchising Group, LLC**
**A Florida limited liability company**
**2145 Sanford Court**
**Vero Beach, Florida 32963**
**772-253-1403**
**franchise@thetoxcorp.com**
**thetoxtechnique.com**

# THE TOX

You will operate a business that provides patients with a variety of lymphatic-based body sculpting services and related products and merchandise under The Tox trademarks. The total investment necessary to begin operation of a The Tox franchise ranges from $235,000 to $396,500. This includes $99,500 to $119,500 that must be paid to the franchisor or affiliate. The total investment necessary to begin operation of a The Tox multi-unit development business ranges from $277,000 to $698,500 for a maximum of ten (10) The Tox outlets to be developed, including $141,500 to $421,500 which must be paid to us or our affiliate(s).

This disclosure document summarizes certain provisions of your franchise agreement and other information in plain English. Read this disclosure document and all accompanying agreements carefully. You must receive the disclosure document at least 14 calendar days before you sign a binding agreement with, or make any payment to the franchisor or an affiliate in connection with the proposed franchise sale. **Note, however, that no government agency has verified the information contained in this document.**

The terms of your contract will govern your franchise relationship. Don't rely on the disclosure document alone to understand your contract. Read your entire contract carefully. Show your contract and this disclosure document to an advisor, like a lawyer or accountant.

Buying a franchise is a complex investment. The information in this disclosure document can help you make up your mind. More information on franchising, such as "A Consumer's Guide to Buying a Franchise", which can help you understand how to use this disclosure document, is available from the Federal Trade Commission. You can contact the FTC at 1-877-FTC-HELP or by writing to the FTC at 600 Pennsylvania Avenue, NW, Washington, DC 20580. You can also visit the FTC's home page at www.ftc.gov for additional information. Call your state agency or visit your public library for other sources of information on franchising.

There may also be laws on franchising in your state. Ask your state agencies about them.

Issuance Date: **August 17, 2023**

## How to Use This Franchise Disclosure Document

Here are some questions you may be asking about buying a franchise and tips on how to find more information:

| QUESTION | WHERE TO FIND INFORMATION |
|---|---|
| **How much can I earn?** | Item 19 may give you information about outlet sales, costs, profits or losses. You should also try to obtain this information from others, like current and former franchisees. You can find their names and contact information in Item 20 or Exhibit F. |
| **How much will I need to invest?** | Items 5 and 6 list fees you will be paying to the franchisor or at the franchisor's direction. Item 7 lists the initial investment to open. Item 8 describes the suppliers you must use. |
| **Does the franchisor have the financial ability to provide support to my business?** | Item 21 or Exhibit D includes financial statements. Review these statements carefully. |
| **Is the franchise system stable, growing, or shrinking?** | Item 20 summarizes the recent history of the number of company-owned and franchised outlets. |
| **Will my business be the only The Tox business in my area?** | Item 12 and the "territory" provisions in the franchise agreement describe whether the franchisor and other franchisees can compete with you. |
| **Does the franchisor have a troubled legal history?** | Items 3 and 4 tell you whether the franchisor or its management have been involved in material litigation or bankruptcy proceedings. |
| **What's it like to be a The Tox franchisee?** | Item 20 or Exhibit F lists current and former franchisees. You can contact them to ask about their experiences. |
| **What else should I know?** | These questions are only a few things you should look for. Review all 23 Items and all Exhibits in this disclosure document to better understand this franchise opportunity. See the table of contents. |

DocuSign Envelope ID: FC868933-7613-4774-90B5-7AB1E5ZB12C1

## What You Need To Know About Franchising *Generally*

**Continuing responsibility to pay fees**. You may have to pay royalties and other fees even if you are losing money.

**Business model can change**. The franchise agreement may allow the franchisor to change its manuals and business model without your consent. These changes may require you to make additional investments in your franchise business or may harm your franchise business.

**Supplier restrictions**. You may have to buy or lease items from the franchisor or a limited group of suppliers the franchisor designates. These items may be more expensive than similar items you could buy on your own.

**Operating restrictions**. The franchise agreement may prohibit you from operating a similar business during the term of the franchise. There are usually other restrictions. Some examples may include controlling your location, your access to customers, what you sell, how you market, and your hours of operation.

**Competition from franchisor**. Even if the franchise agreement grants you a territory, the franchisor may have the right to compete with you in your territory.

**Renewal**. Your franchise agreement may not permit you to renew. Even if it does, you may have to sign a new agreement with different terms and conditions in order to continue to operate your franchise business.

**When your franchise ends**. The franchise agreement may prohibit you from operating a similar business after your franchise ends even if you still have obligations to your landlord or other creditors.

## Some States Require Registration

Your state may have a franchise law, or other law, that requires franchisors to register before offering or selling franchises in the state. Registration does not mean that the state recommends the franchise or has verified the information in this document. To find out if your state has a registration requirement, or to contact your state, use the agency information in Exhibit A.

Your state also may have laws that require special disclosures or amendments be made to your franchise agreement. If so, you should check the State Specific Addenda. See the Table of Contents for the location of the State Specific Addenda.

**Special Risks to Consider About *This* Franchise**

Certain states require that the following risk(s) be highlighted:

1. **<u>Out-of-State Dispute Resolution</u>.** The franchise agreement requires you to resolve disputes with the franchisor by mediation and/or litigation only in Florida. Out-of-state mediation or litigation may force you to accept a less favorable settlement for disputes. It may also cost more to mediate, arbitrate, or litigate with the franchisor in Florida than in your own state.

2. **<u>Spousal Risk Factor</u>.** Your spouse must sign a document that makes your spouse liable for your financial obligations under the franchise agreement, even though your spouse has no ownership interest in the business. This guarantee will place both your and your spouse's personal and marital assets, perhaps including your house, at risk if your franchise fails.

3. **<u>Short Operating History</u>**. The franchisor is at an early stage of development and has a limited operating history. This franchise is likely to be a riskier investment than a franchise in a system with a longer operating history.

4. **<u>Mandatory Minimum Payments</u>**. You must make minimum royalty or advertising fund payments, regardless of your sales levels. Your inability to make the payments may result in termination of your franchise and loss of your investment.

5. **<u>Financial Condition</u>**. The franchisor's financial condition, as reflected in its financial statements (see Item 21), calls into question the franchisor's financial ability to provide services and support to you.

Certain states may require other risks to be highlighted. Check the "State Specific Addenda" (if any) to see whether your state requires other risks to be highlighted.

**THE TOX FRANCHISING GROUP, LLC**
**Franchise Disclosure Document**

## Table of Contents

ITEM 1:     THE FRANCHISOR, AND ANY PARENTS, PREDECESSORS AND AFFILIATES ............... 6
ITEM 2:     BUSINESS EXPERIENCE ................................................................................................ 7
ITEM 3:     LITIGATION ................................................................................................................... 8
ITEM 4:     BANKRUPTCY ............................................................................................................... 8
ITEM 5:     INITIAL FEES ................................................................................................................ 8
ITEM 6:     OTHER FEES ................................................................................................................. 9
ITEM 7:     ESTIMATED INITIAL INVESTMENT ........................................................................ 16
ITEM 8:     RESTRICTIONS ON SOURCES OF PRODUCTS AND SERVICES .................................... 21
ITEM 9:     FRANCHISEE'S OBLIGATIONS ................................................................................... 23
ITEM 10:    FINANCING .................................................................................................................. 25
ITEM 11:    FRANCHISOR'S ASSISTANCE, ADVERTISING, COMPUTER SYSTEMS AND
            TRAINING ................................................................................................................... 25
ITEM 12:    TERRITORY .................................................................................................................. 31
ITEM 13:    TRADEMARKS .............................................................................................................. 33
ITEM 14:    PATENTS, COPYRIGHTS AND PROPRIETARY INFORMATION ................................. 33
ITEM 15:    OBLIGATIONS OF THE FRANCHISEE TO PARTICIPATE IN THE ACTUAL
            OPERATION OF THE FRANCHISE BUSINESS ............................................................. 34
ITEM 16:    RESTRICTION ON WHAT FRANCHISEE MAY SELL ................................................... 35
ITEM 17:    RENEWAL, TERMINATION, TRANSFER AND DISPUTE RESOLUTION ......................... 35
ITEM 18:    PUBLIC FIGURES ......................................................................................................... 43
ITEM 19:    FINANCIAL PERFORMANCE REPRESENTATIONS ....................................................... 43
ITEM 20:    OUTLETS AND FRANCHISEE INFORMATION ............................................................. 47
ITEM 21:    FINANCIAL STATEMENTS ........................................................................................... 49
ITEM 22:    CONTRACTS ................................................................................................................ 49
ITEM 23:    RECEIPT ...................................................................................................................... 50

LIST OF EXHIBITS

EXHIBIT A:  List Of State Franchise Administrators And Agents For Service Of Process
EXHIBIT B:  Franchise Agreement
                Attachment 1: Trademarks
                Attachment 2: Territory
                Attachment 3: Release
                Attachment 4: Collateral Assignment of Lease
                Attachment 5: ACH Authorization
                Attachment 6: Statement of Ownership Interests in Franchisee
                Attachment 7: Internet Advertising, Social Media, and Telephone Listings Agreement
                Attachment 8: Guaranty
                Attachment 9: Confidentiality and Non-Compete Agreement
EXHIBIT C: Multi-Unit Development Agreement
EXHIBIT D: Financial Statements of The Tox Franchising Group, LLC
EXHIBIT E: Operations Manual Table of Contents
EXHIBIT F: Outlets as of the date of this Disclosure Document
EXHIBIT G: Franchisee Acknowledgment Statement
EXHIBIT H: State Addenda
State Effective Dates
EXHIBIT I: Receipt

## ITEM 1:    THE FRANCHISOR, AND ANY PARENTS, PREDECESSORS AND AFFILIATES

To simplify the language in this disclosure document, the terms "Franchisor", or "we" or "us" means The Tox Franchising Group, LLC, the Franchisor. The terms "we", "us" and "Franchisor" do not include you, the "Franchisee". We refer to the purchaser(s) of a The Tox franchise, as "you" or "Franchisee", whether an individual, a partnership, corporation, or limited liability company. If you are a corporation, partnership or other entity, our Franchise Agreement also will apply to your owners, officers and directors. If you are married and your spouse is not a partner in the franchise business, certain provisions of our Franchise Agreement will also apply to that spouse.

We were formed as a limited liability company in the State of California on January 24, 2021 and converted to a Florida limited liability company on July 20, 2023. Our  principal business address is 2145 Sanford Court, Vero Beach, Florida 32963 and our telephone number is 772-253-1403. We do business under our company name, "The Tox", and its associated design (the "Marks"). Our affiliate, The Tox IP, LLC, has registered, or has filed for registration of, our principal service marks on the Principal Register of the United States Patent and Trademark Office. We do not own or operate any businesses of the type you will be operating. We have not offered franchises in any other line of business. We only offer franchises which operate under the "The Tox" Marks. We began offering franchises in February 2021.

The principal business addresses of our agents for service of process are shown on Exhibit A.

### Our Parents, Predecessors and Affiliates

We are wholly owned by our parent, The Tox Franchise Holdings Corporation, a Florida corporation with a principal place of business at 2145 Sanford Court, Vero Beach, Florida 32963. The Tox Franchise Holdings Corporation was formed on March 8, 2022 and has not offered franchises in this or in any other lines of business previously.

We have an affiliated company, The Tox Manufacturing Group, LLC, a Florida limited liability company with a principal place of business at 2145 Sanford Court, Vero Beach, Florida 32963. The Tox Manufacturing Group, LLC was formed on July 21, 2014 in the State of California and converted to a Florida limited liability company on July 20, 2023. The Tox Manufacturing Group, LLC operates a product packaging and distribution service for The Tox proprietary products. The Tox Manufacturing Group, LLC is a designated vendor and may require you to purchase goods from it. The Tox Manufacturing Group, LLC has not offered franchises in this or in any other lines of business previously.

We have a second affiliated company, The Tox IP, LLC, a Florida limited liability company with a principal place of business at 2145 Sanford Court, Vero Beach, Florida 32963. The Tox IP, LLC was formed on January 24, 2021 in the State of California and converted to a Florida limited liability company on July 20, 2023. The Tox IP, LLC is the owner of the Marks and has exclusively licensed use of the Marks to us. The Tox IP, LLC has not offered franchises in this or in any other lines of business previously.

We have operated, through our affiliates, The Tox outlets similar to the franchise offered by this Disclosure Document since 2019. We or our affiliates may operate other The Tox concepts, including additional The Tox outlets, in the future.

### The Franchise Offered:

We grant franchises for the right to operate a business that provides lymphatic-based body sculpting wellness services and related products and merchandise under the "The Tox" Marks, using our distinctive operating procedures and standards in a limited protected territory and from a single location (the "Franchised Business").

The distinguishing characteristics of the Franchised Business include our distinctive interior and exterior design, décor, color schemes, graphics, fixtures and furniture, proprietary products, operation methods, customer service standards, advertising and marketing specifications, and other standards, specifications, techniques and procedures that we designate for developing, operating and managing The Tox outlets, all of which we may change, improve and further develop (collectively, our "System").

We also offer qualified individuals the right to open a minimum of two (2) and up to ten (10) The Tox outlets in a designated area under the terms of a multi-unit development agreement. You must sign the then-current form of franchise agreement, to be developed under the multi-unit development agreement, which may differ from the current Franchise Agreement included with this Franchise Disclosure Document.

**Market and Competition:**

The market for your The Tox Franchised Business generally consists of middle to upper-middle income individuals seeking wellness services. The market for our services is emerging. You will compete with other entities, including national, regional and local businesses, offering services similar to those offered by your Franchised Business. There are other wellness and similar industry franchises, as well as independent businesses throughout the United States, that may offer similar products and services. The demand for the products and services offered by your Franchised Business are also affected by changes in consumer tases, demographics and economic conditions. The market for our services is not seasonal but does have peak periods.

**Industry Specific Regulations:**

Some states have licensing, certification or registration requirements applicable to some or all of the services you and your employees will be providing through your Franchised Business. You may be required to pay a fee to the state agency or association responsible for enforcing these requirements. Some states may require a minimum level of education or related work experience to obtain licenses.

You must comply with all local, state and federal laws and regulations that apply to the operation of your Franchised Business, including, among others, zoning ordinances, business operations, insurance, discrimination, and employment laws. Your advertising of the Franchised Business is regulated by the Federal Trade Commission. There may be federal, state and local laws which affect your Franchised Business in addition to those listed here. You will be responsible for investigating and complying with any such laws in your designated territory. You should consider both their effect on your business and the cost of compliance. You should thoroughly investigate all of these laws and requirements before purchasing a The Tox franchise.

**ITEM 2:       BUSINESS EXPERIENCE**

**Founder and Chief Executive Officer: Courtney Yeager**

Courtney is our founder and has served as Chief Executive Officer since our inception in January 2021. She is also the founder of The Tox Corp., serving as as its Chief Executive Officer since its inception in June 2019; House of Tens Clothing Company, serving as its Chief Executive Officer since its inception in July 2016; and BarreSocks, LLC, servicing as its Chief Executive Officer since its inception in July 2013. Each of these companies is currently headquartered in Vero Beach, Florida.

**Chief Operating Officer: Ryan Yeager**

Ryan is our Chief Operations Officer, a position he has held since our inception in January 2021. In addition to being our Chief Operations Officer, Ryan is currently the CEO of RRY Asset Management based in Vero Beach, Florida, a position he has held since June 2014.

**Corporate Manager: Alyssa Edwards**

Alyssa currently serves as a Corporate Manager for The Tox Franchising Group, LLC, a position she has held since February 2022, where she specializes in overseeing studio success, managing onboarding processes for new locations and ensuring effective management processes. Prior to joining The Tox, she served as a Director at Ocean Mental Health in Ocean, New Jersey from April 2017 to April 2020.

**Corporate Manager: Natalie Yauri**

Natalie currently serves as a Corporate Manager for The Tox Franchising Group, LLC, a position she has held since May 2022, where she specializes in sales and team management as well as overseeing east coast studios and providing studio support. Natalie originally joined The Tox as a Front Desk Manager in New York, New York in October 2021. Prior to that, Natalie served as a District Manager at Med-Star Surgical based in New York, New York from April 2016 to March 2020.

**Corporate Manager: Kristin Fleisher**

Kristin currently serves as Corporate Manager for The Tox Franchising Group, LLC, a position she has held since January 2023, where she specializes in logistics and product management. Prior to joining The Tox, she served as an Executive Officer for a large construction company based in Vero Beach, Florida from June 2015 to December 2022.

## ITEM 3:      LITIGATION

No litigation is required to be disclosed in this Item.

## ITEM 4:      BANKRUPTCY

No bankruptcy information is required to be disclosed in this Item.

## ITEM 5:      INITIAL FEES

We will charge you an initial franchise fee ("Initial Franchise Fee") when you sign the Franchise Agreement. The Initial Franchise Fee is Forty-Nine Thousand Five Hundred Dollars ($49,500). This payment is fully earned by us and due in lump sum when you sign the Franchise Agreement. The Initial Franchise Fee is not refundable under any circumstance.

8

We will charge you a development fee ("Development Fee") when you sign the Multi-Unit Development Agreement. The Development Fee is an amount based on the number of outlets you agree to develop, as set forth in the chart below:

| Units to be Developed | Price per Additional Unit | Total Development Fee |
| --- | --- | --- |
| 1 | $49,500 | N/A |
| 2 | $42,000 | $91,500 |
| 3 | $38,000 | $129,500 |
| 4 | $36,000 | $165,500 |
| 5 | $34,000 | $199,500 |
| 6 | $32,000 | $231,500 |
| 7+ | $30,000* | $261,500 |

*The Development Fee will be increased by $30,000 for each additional unit above 7.

From time to time, we may offer special incentive programs as part of our franchise development activities. We reserve the right to offer, modify or withdraw any incentive program without notice to you.

You are required to purchase your opening product inventory, and certain of your fixtures and supplies, prior to opening, from our affiliate, The Tox Manufacturing Group, LLC. Opening inventory for a The Tox franchised business is approximately Forty Thousand Dollars ($40,000) to Sixty Thousand Dollars ($60,000), which you will be required to purchase within thirty (30) days following the execution of the Franchise Agreement.

Prior to attending the Initial Technique Training Program, you must pay us a training fee of Ten Thousand Dollars ($10,000), which includes tuition for our Initial Technique Training Program for up to eight (8) people. If we determine, in our discretion, that you must complete the Initial Technique Training Program at your location, you will also be required to pay us the costs of travel and other expenses incurred by our training personnel, which we estimate to be approximately Five Thousand Dollars ($5,000) to Seven Thousand Five Hundred Dollars ($7,500).

**ITEM 6:     OTHER FEES**

| Type of Fee | Amount | Due Date | Remarks |
| --- | --- | --- | --- |
| Continuing Royalty Fee | 8% of Gross Revenue, subject to minimum of $1,000 per month. | Weekly on Tuesday for Gross Revenue of the prior week (Monday through Sunday). | Payable to us. See footnote 1. |

| Type of Fee | Amount | Due Date | Remarks |
|---|---|---|---|
| Required Minimum Expenditure for Local Marketing and Advertising | Up to 20 social media influencers hosted at the Franchised Business per month. We also reserve the right to require you to spend a minimum percentage of monthly Gross Revenue per calendar month. Currently none. | As incurred. | Payable to third parties. All advertising must be pre-approved by us. See footnote 2. |
| Brand Fund Contribution | 2% of Gross Revenue. | Weekly on Tuesday for Gross Revenue of the prior week (Monday through Sunday). | Payable directly to the Brand Fund. See footnote 3. |
| Social Media Management | Beginning in your 3rd month of operation, $2,500 per month for your 1st The Tox outlet. If you sign a Multi-Unit Development Agreement, or subsequently open additional outlets, $2,000 per month for your 2nd The Tox outlet; $1,750 per month for your 3rd The Tox outlet; and $1,500 per month for your 4th and each subsequent The Tox outlet. | Monthly on the 5th day of the Calendar month. | Payable to us. You will not be required to pay this fee during the first two (2) months following the opening of your The Tox outlet.<br><br>You may not maintain any business profile on Facebook, Twitter, LinkedIn, YouTube or any other social media and/or networking site without our prior written approval, and unless and until we grant our approval to do so, we will manage all social media accounts on your behalf. |

| Type of Fee | Amount | Due Date | Remarks |
|---|---|---|---|
| Advertising Cooperative | Your share of actual cost of advertising. | As determined by cooperative. | No cooperatives have been established as of the date of this Disclosure Document. You are required to join an advertising cooperative if one is formed. Cooperatives will be comprised of all franchised The Tox outlets in a designated geographic area. Any affiliate-owned outlets may participate in an advertising cooperative, in our sole discretion. |
| Technology Fee | $300 per month. | Monthly on the 5th day of the Calendar month. | Payable to us for new or improved technology for the benefit of the System and the Franchised Business, including, but not limited to, assigned phone numbers and email addresses, a franchise portal, benchmarking platform or other operations or communications systems. We may increase the fee based on supplier pricing increases, introduction of new technology and/or changes in vendors. |
| Late Charge | $100 | As incurred | If you fail to pay us the Continuing Royalty Fee, Brand Fund Contribution or if you fail to submit your Gross Revenue report when due, we may charge you this amount for each late submission in addition to interest charges explained below. |
| Interest Charge | 18% per annum from due date, or maximum allowed by law | As incurred | If you fail to pay us any amount when due, we may charge you interest on the unpaid balance until the payment is received. |
| Non-Sufficient Funds Fee | $100 | As incurred | If your check is returned or an electronic funds transfer from your bank account is denied for insufficient funds, for each occurrence we may charge you a Non-Sufficient Funds Fee. |

| Type of Fee | Amount | Due Date | Remarks |
|---|---|---|---|
| Successor Agreement Fee | 50% of the then-current initial franchise fee. | Before signing successor franchise agreement | Payable to us. See Item 17. |
| Transfer Fee | $10,000, plus our costs and expenses incurred in approving a transfer (including any third-party fees payable by us as a result of a transfer). | Before we approve the transfer. | Payable to us. See Item 17 |
| Initial Training | $10,000 for up to eight (8) individuals to attend initial training prior to opening your Franchised Business. You pay all travel and other related expenses incurred by all trainees. The current fee to train additional personnel is $2,000 per person. | Travel and related expenses are due as incurred. Fees for training your personnel are due prior to the commencement of training. | Initial training takes place at an affiliate-owned or franchised location in the U.S., at you're the Tox outlet, or another location designated by us. See Item 11. |
| Annual Conference | Up to $1,000 per person. | As incurred. | See footnote 4. |
| Additional Business Training | Our then-current fee, plus expenses. Our current fee is $2,000 for up to 4 individuals to attend Business Training. | As incurred. | We may impose this fee, payable to us, if you request additional business training at our headquarters, or if you are operating below our standards and we require you to have additional business training. You must also pay all costs incurred by you and your personnel associated with training at our headquarters, which include, but are not limited to, airfare, transportation, hotel, wages and meals. |

| Type of Fee | Amount | Due Date | Remarks |
|---|---|---|---|
| Additional Technique Training | Our then-current fee, plus expenses. Our current fee is $5,000 for up to 4 individuals to attend Technique Training. | As incurred. | We may impose this fee, payable to us, if you request additional technique training at our headquarters, of if you are operating below our standards and we require you to have additional technique training. You must also pay all costs incurred by you and your personnel associated with training at our headquarters, which include, but are not limited to, airfare, transportation, hotel, wages and meals. |
| Remedial Training Fee | Our then-current trainer per diem rate, plus expenses. Our current fee is $5,000 for up to 40 hours of on-site training. | As incurred. | We may impose this fee, payable to us, if you request additional training at your premises from time-to-time, or if you are operating below our standards and we require you to have additional training. You must also pay all costs of our trainer, which include but are not limited to, airfare, transportation, hotel and meals. |
| Interim Management Support Fee | Our then-current per diem rate for on-site management, plus expenses. | As incurred. | We may impose this fee (in addition to all regularly occurring fees such as the Continuing Royalty Fee), payable to us, if we provide on-site management of your Franchised Business. See footnote 5. |
| Examination of Books and Records | Cost of examination plus related expenses. | As incurred. | We have the right under the Franchise Agreement to examine your books, records and tax returns. If an examination reveals that you have understated any Gross Revenue report by two percent (2%) or more, you must pay to us the cost of the audit and all travel and related expenses, in addition to repaying monies owed and interest on the monies owed. |

DocuSign Envelope ID: EC868933-7613-4774-00BF-7AB1F57B12C1

| Type of Fee | Amount | Due Date | Remarks |
|---|---|---|---|
| Evaluation Fee For Alternative Supplies and Services Requested | $500 evaluation fee, plus the actual cost of inspection and/or testing | As incurred. | Payable to us. |
| Quality Review Services | Varies | As incurred | Payable to third-party providers. See footnote 6. |
| Indemnification | Amount of loss or damages plus costs | As incurred. | See footnote 7. |
| Reimbursement of Cost and Expenses for Non-compliance | $1,000 plus actual costs and expenses. | As incurred. | See footnote 8. |
| Reimbursement of legal fees and expenses | Our costs and expenses, including but not limited to attorneys' fees, incurred for your failure to pay amounts when due or failure to comply in any way with the Franchise Agreement. | As Incurred. | Payable to us. |
| Confidential Operation Manual Replacement Fee | $250, or our then-current fee | As incurred. | Paid to us. |
| Insurance Reimbursement | Amount paid by us for your insurance obligations, plus a 10% administrative fee and our legal fees, if any. | As incurred | You must reimburse us for any insurance costs and other fees we incur due to your failure to meet the insurance obligations required by the Franchise Agreement. |

| Type of Fee | Amount | Due Date | Remarks |
|---|---|---|---|
| Taxes | Amount of taxes | When incurred. | You must reimburse us for any taxes that we must pay to any taxing authority on account of either the operation of your Franchised Business or payments that you make to us, including, but not limited to any sales taxes or income taxes imposed by any authority. |
| Liquidated Damages | Royalty Fees and Brand Fund Contributions for the balance of the Term or 36 months, whichever is less. | Upon termination of the Franchise Agreement due to your default. | In the event your Franchise Agreement is terminated due to your default, you must pay us the average Royalty Fee and Brand Fund Contribution payable by you for the 12 months prior to your termination multiplied by the number of month remaining in the Term, or 36 months, whichever is less. |

All fees and expenses described in this Item 6 are nonrefundable and are uniformly imposed. Except as otherwise indicated in the preceding chart, we impose all fees and expenses listed and you must pay them to us.

[1] "Gross Revenue" means the aggregate of all revenues and income, from any source derived or received, by you from, through by or on account of the operation of the Franchised Business. Gross Revenue also includes all proceeds from any business interruption insurance. It does not include (i) sales taxes or similar taxes collected from clients and turned over to the governmental authority imposing the tax (ii) properly document refunds to clients; or (iii) properly documented promotional discounts (i.e., vouchers). At our request, you must execute documents that allow us to automatically take the Royalty Fee and Brand Fund Contribution from business bank accounts via electronic funds transfers. Interest and late fees will apply to any late payments or electronic funds transfer requests denied due to insufficient funds. You are required to set up authorization at your bank to allow us to electronically transfer funds from your bank account to our bank account. Interest and late fees will apply to any late payments or electronic funds transfer requests denied due to insufficient funds.

[2] We will provide up to twenty (20) social media influencers per month to receive The Tox services at the Franchised Business, and you are required to provide The Tox services to all such social media influencers provided by us. You may request we provide additional social media influencers at the Franchised Business, subject to availability. The cost of all services provided to social media influencers are at your sole cost and expense, and at no charge to such social media influencers. Upon our request, you must furnish us with a quarterly report and documentation of local advertising expenditures during the previous calendar quarter. You may not use social media platforms, such as Facebook, Twitter, Instagram, LinkedIn, blogs and other networking and sharing websites, unless you first receive our written approval to do so and such use is in strict accordance with our requirements.

[3] You must pay directly to our Brand Fund a Brand Fund Contribution of two percent (2%) of your Gross Revenue per week. Payments are due at the same time and in the same manner as the Royalty Fee.

[4] We may offer mandatory and/or optional additional training programs from time to time. If we require it, you, your General Manager, and your technicians must attend an annual conference and/or an annual training summit, at a location we designate. We reserve the right to impose a reasonable fee for all additional training programs, including the annual conference or annual training summit. You are responsible for any and all incidental expenses incurred by you and your personnel in connection with additional training or attendance at Franchisor's national business meeting or annual convention, including, without limitation, costs of travel, lodging, meals and wages.

[5] In the event of your death or disability, your default of the Franchise Agreement, or if you can otherwise no longer personally supervise the Franchised Business, or other reasons, in our sole discretion, we may provide interim on-site management of your Franchised Business.

[6] We may establish quality assurance programs conducted by third-party providers, such as, by way of example only, mystery shop programs and periodic quality audits, to monitor the operations of your Franchised Business. If we require it, you must subscribe and pay the fees for any such program.

[7] You must indemnify and hold us, our affiliates, and all of our respective officers, directors, agents and employees harmless from and against any and all claims, losses, costs, expenses, liability and damages arising directly or indirectly from, as a result of, or in connection with your business operations under the Franchise Agreement, as well as the costs, including attorneys' fees, of defending against them.

[8] If you fail to do so, in our sole discretion, we may correct any deficiency in the Franchised Business and/or your operation of the Franchised Business or take steps to modify, alter or de-identify the Franchised Location upon the termination or expiration of the Franchise Agreement. You will reimburse us for our costs and expenses incurred to correct any deficiency or to modify, alter or de-identify the Franchised Business location.

## ITEM 7:       ESTIMATED INITIAL INVESTMENT

### YOUR ESTIMATED INITIAL INVESTMENT
### (For a Single Franchised Business)

| Type of Expenditure | Amount | Method of Payment | When Due | To Whom Payment is Made |
|---|---|---|---|---|
| Initial Franchise Fee[1] | $49,500 | Lump sum | Upon signing the Franchise Agreement. | Us |
| Your Training Expenses[2] | $10,000 - $25,000 | Prior to attending Initial Training; As incurred. | As required by suppliers of online courses, transportation, lodging & meals. | Us; Suppliers of transportation, lodging & meals. |

| Type of Expenditure | Amount | Method of Payment | When Due | To Whom Payment is Made |
|---|---|---|---|---|
| Premises lease deposits[3] | $10,000 - $25,000 | As required by landlord | As required by landlord | Landlord |
| Utilities Deposits[4] | $250 - $500 | As required by utility providers | As required by utility providers | Utility providers |
| Architect & Design Fees | $2,500 - $5,000 | As required | As required | Us; Architect |
| Leasehold Improvements, Construction and/or Remodeling and Signage[5] | $50,000 - $110,000 | As required by supplier, contractor or landlord | Before opening, as required by supplier. | Suppliers, contractor and/or Landlord |
| Furniture, Fixtures, Equipment[6] | $50,000 - $70,000 | As required by suppliers | 30 days following execution of Franchise Agreement | Suppliers; The Tox Manufacturing Group, LLC |
| Business Licenses and Permits[7] | $500 - $2,000 | As required by government agencies | Before opening, as required by government agencies | Government Agencies |
| Initial Inventory to Begin Operating[8] | $40,000 - $60,000 | As required prior to opening | 30 days following execution of Franchise Agreement. | The Tox Manufacturing Group, LLC |
| Office Equipment, Computer Systems, and Supplies[9] | $5,000 - $7,000 | As required by suppliers | Before opening | Suppliers |
| Professional Fees[10] | $3,000 - $5,000 | As required by providers | As incurred | Attorney, Accountant, Other Professional Service Providers |
| Grand Opening Advertising | $4,000 - $6,000 | As required by supplier | As required by supplier | Suppliers |
| Insurance[11] | $250 - $1,500 | As required by insurer | Before opening | Insurer |
| Operating Expenses / Additional | $10,000 - $30,000 | As incurred | according to agreed-upon | Employees, landlord, utilities, suppliers, etc. |

| Type of Expenditure | Amount | Method of Payment | When Due | To Whom Payment is Made |
|---|---|---|---|---|
| Funds – 3 months[12] | | | terms for expenses | |
| TOTAL | $235,000 - $396,500 | | | |

## YOUR ESTIMATED INITIAL INVESTMENT
### (For a Multi-Unit Development Opportunity)

| Type of Expenditure | Amount | Method of Payment | When Due | To Whom Payment is Made |
|---|---|---|---|---|
| Development Fee[1] | $91,500 - $351,500 | Lump sum | Upon signing the Franchise Agreement. | Us |
| Your Training Expenses[2] | $10,000 - $25,000 | Prior to attending Initial Training; As incurred. | As required by suppliers of online courses, transportation, lodging & meals. | Us; Suppliers of transportation, lodging & meals. |
| Premises lease deposits[3] | $10,000 - $25,000 | As required by landlord | As required by landlord | Landlord |
| Utilities Deposits[4] | $250 - $500 | As required by utility providers | As required by utility providers | Utility providers |
| Architect & Design Fees | $2,500 - $5,000 | As required | As required | Us; Architect |
| Leasehold Improvements, Construction and/or Remodeling and Signage[5] | $50,000 - $110,000 | As required by supplier, contractor or landlord | Before opening, as required by supplier. | Suppliers, contractor and/or Landlord |
| Furniture, Fixtures, Equipment[6] | $50,000 - $70,000 | As required by suppliers | 30 days following execution of Franchise Agreement | Suppliers; The Tox Manufacturing Group, LLC |
| Business Licenses and Permits[7] | $500 - $2,000 | As required by government agencies | Before opening, as required by government agencies | Government Agencies |
| Initial Inventory to Begin Operating[8] | $40,000 - $60,000 | As required prior to opening | 30 days following execution of | The Tox Manufacturing Group, LLC |

18

| Type of Expenditure | Amount | Method of Payment | When Due | To Whom Payment is Made |
|---|---|---|---|---|
| | | | Franchise Agreement. | |
| Office Equipment, Computer Systems, and Supplies[9] | $5,000 - $7,000 | As required by suppliers | Before opening | Suppliers |
| Professional Fees[10] | $3,000 - $5,000 | As required by providers | As incurred | Attorney, Accountant, Other Professional Service Providers |
| Grand Opening Advertising | $4,000 - $6,000 | As required by supplier | As required by supplier | Suppliers |
| Insurance[11] | $250 - $1,500 | As required by insurer | Before opening | Insurer |
| Operating Expenses / Additional Funds – 3 months[12] | $10,000 - $30,000 | As incurred | according to agreed-upon terms for expenses | Employees, landlord, utilities, suppliers, etc. |
| TOTAL | $277,000 - $698,500 | | | |

[1] Please see Item 5 for information on incentive programs that may offer a discount on the Initial Franchise Fee.

[2] You are required to pay to us a training fee equal to Ten Thousand Dollars ($10,000.00) which covers the cost of tuition for up to eight (8) people to attend the Initial Technique Training Program. Travel, living, and wage costs are not included in the training fee. Your costs will depend on the number of people attending training, their point of origin, method of travel, class of accommodation and living expenses. Additionally, if we determine, in our discretion, that you must complete the Initial Technique Training Program at your location, you will also be required to pay us the costs of travel and other expenses incurred by our training personnel.

[3] This estimate represents deposit plus three (3) months of rent for a 1,500 square foot location at a minimum rent, common area maintenance (CAM) fees, landlord contributions, and the requirements of individual landlords. Real estate costs vary widely from place to place. We assume the landlord will require the first month's rent and a security deposit equal to one month's rent. The amounts paid are typically not refundable, except for a security deposit, which may be refunded. This estimate is based on the experience of our affiliate-owned The Tox outlet(s). Rental rates may be more or less than this range depending on the location of your Franchised Business. You may also incur real estate broker fees and/or additional prepayments (e.g., first and/or last month's rent), depending on the terms of your lease. Pre-paid rent is generally non-

19

refundable while security or other deposits may be refundable either in full or in part depending upon your lease or rental contract.

[4] Utility providers set the amounts of the utility deposits. A credit check may be required by the issuing utility company prior to the initiation of services, or a higher deposit required for first time customers. These costs will vary depending on the type of services required for the facility and the municipality or utility provider from which they are being contracted. We have based our estimate on the experiences of our affiliate. The figures in the chart include deposits that may be refundable to you at a later time. In most cases, your lease will require you to pay electric, gas, water, and other utilities directly; however, some landlords cover some utility charges through operating fees.

[5] This estimate is for the costs for improvements to your Franchised Business location without a tenant improvement allowance from the landlord. We have based our estimates on the historical experience of our affiliate.

[6] The furniture, fixtures and equipment required for your Franchised Business include cabinetry, fixtures, desks, chairs, lobby chairs, and end tables, lamps, wall hangings, décor, and any other equipment that we require, or you determine in the operation of your The Tox outlet.

[7] This is an estimate of the costs of building permits, sign permits and a certificate of occupancy for your premises. Not all locations will require all of these permits, depending on the prior use of the premises and the requirements of local ordinances. This estimate also includes the cost of a local business license. The costs of permits and licenses will vary by location. We cannot estimate the cost of this license because requirements and fees vary widely. Please contact your local governing agency for this information.

[8] This estimate is for the cost of the initial inventory sufficient for approximately 1-2 months of operation. Your initial inventory will include the required The Tox branded products for use in the Franchised Business.

[9] Your office equipment includes the computer systems and software we require for use in your Franchised Business. This estimate includes the cost of software license fees for three (3) months. You will also need incidental office supplies such as printing paper, writing implements, forms and stationery. You must also have Internet and other telecommunications equipment and services in accordance with our standards to permit electronic transmission of revenue information and client communication. We reserve the right to change your requirements for computer hardware and software at any time.

[10] You may incur professional fees depending on the scope of work performed, which may include, legal and accounting fees to review franchise documents and costs of forming a separate legal entity and/or obtaining zoning approval. This list is not exhaustive. This amount will vary greatly depending on your specific needs and location. It is also advisable to consult these professionals to review any lease or other contracts that you will enter into as part of starting your franchise.

[11] Before you open for business, you must purchase and maintain at your sole cost and expense the insurance coverage that we specify. Insurance costs and requirements may vary widely in different localities. The estimate is for a quarterly premium of required minimum coverage. We reserve the right to require additional types of insurance and coverage as provided in the Franchise Agreement.

[12] This is an estimate of the amount of additional operating capital that you may need to operate your Franchised Business during the first three (3) months after commencing operations. We cannot guarantee that you will not incur additional expenses in starting the business that may exceed this estimate. This estimate includes such items as rent, utilities, internet service, initial payroll and payroll taxes, Royalties (as described in this disclosure document), local advertising, repairs and maintenance, bank charges, miscellaneous supplies and equipment, initial staff recruiting expenses, and other miscellaneous items. These estimates do not include any compensation to you, nor do they include debt service. These items are by no means all-inclusive of the extent of possible expenses.

We relied upon the experience of our affiliate-owned The Tox outlets to compile these estimates. We estimate that a franchisee can expect to put additional cash into the business during at least the first three to six months, and sometimes longer.

We do not offer financing for any part of the initial investment.

All fees and payments are non-refundable, unless otherwise stated or permitted by payee.

**ITEM 8:**     <u>**RESTRICTIONS ON SOURCES OF PRODUCTS AND SERVICES**</u>

We have identified various suppliers, distributors and manufacturers of equipment, inventory, fixtures, furnishings, supplies and services that your Franchised Business must use or provide which meet our standards and requirements. You must purchase all equipment, fixtures, inventory, supplies and services from our designated suppliers and contractors or in accordance with our specifications. We maintain written lists of approved items of equipment, fixtures, furnishings, supplies and services (by brand name and/or by standards and specifications) and a list of designated suppliers and contractors for those items. We will update these lists periodically and issue the updated lists to all franchisees.

We approve suppliers after careful review of the quality of the products they provide to us and you. If you would like us to consider another item or supplier, you must make such request in writing to us and have the supplier give us samples of its product or service and such other information that we may require. If the item and/or supplier meet our specifications, as we determine in our sole discretion, we will approve it as an additional item or supplier. We will notify you whether we approve or disapprove of the proposed item or supplier within 10 days after we receive all required information to evaluate the product or service. We reserve the right to revoke approval of any item or supplier that does not continue to meet our then-current standards. Our criteria for approving items and suppliers are not available to you. If you request that we approve a proposed item or supplier, we reserve the right to charge you a fee equal to our actual costs of inspection and testing.

You are required to purchase The Tox branded products, and certain proprietary equipment and supplies, from our affiliate, The Tox Manufacturing Group, LLC, or another vendor as we may designate. The Tox Manufacturing Group, LLC, is currently the only approved supplier of these items. Our corporate officers own interests in The Tox Manufacturing Group, LLC.

We reserve the right to require you to engage the services of a third-party accounting services firm, designated and approved by us.

Before you open your franchised business, you must purchase and maintain the insurance that we specify. Our System may regulate the types, amounts, terms and conditions of insurance coverage for your franchise and standards for underwriters of policies providing required insurance coverage;

21

DocuSign Envelope ID: EC868933-7613-4774-00BF-7AB1F57B12C1

our protection and rights under the policies as an additional named insured; required or impermissible insurance contract provisions; assignment of policy rights to us; periodic verification of insurance coverage that must be furnished to us; our right to obtain insurance coverage at your expense if you fail to obtain required coverage; our right to defend claims; and similar matters relating to uninsured claims.

Our current coverage minimum are as follows: general liability insurance, including public liability, personal injury, advertising injury and product liability with a combined single limit of at least $1,000,000 per occurrence and $2,000,000 aggregate, including $50,000 rented premises damages coverage and $5,000 medical expenses; worker's compensation insurance with coverage limits of $1,000,000 for bodily injury by disease per accident, $1,000,000 policy limit and $1,000,000 per employee; employment practices liability insurance with minimum coverage limits of $250,000 per occurrence and $250,000 aggregate, including third-party liability and wage and hour coverage of at least $25,000; property and casualty insurance in the amount required to cover the full replacement value of your leasehold improvements, equipment, furniture, fixtures and inventory; and business interruption insurance in an amount necessary to cover payments to us of Royalties and Brand Fund Contributions during the period of business interruption; professional liability insurance with minimum coverage limits of $1,000,000 per occurrence and $2,000,000 aggregate; sexual abuse and molestation insurance with minimum limits of $100,000 per occurrence and $300,000 aggregate; cyber liability insurance with minimum coverage limits of $250,000 per occurrence and $250,000 aggregate; commercial auto insurance with a $1,000,000 combined single limit covering uninsured/underinsured motorists, owned (when applicable), hired and non-owned autos; and umbrella/excess liability coverage in the amount of $3,000,000 per occurrence and $3,000,000 aggregate above general liability coverage.

All insurance policies must name us and our members, officers, directors and employees as additional named Certificate Holders and otherwise comply with the provision of the Agreement. Each policy must be written by a responsible carrier or carriers acceptable to us, with an A.M. Best rating of not less than A-VII, and must name us and our respective officers, directors, partners, agents and employees as additional insured parties. We reserve the right to require a designated broker who can negotiate better rates on our franchisees' behalf, track any loss history for the system and ensure that all franchisees are complying with our insurance requirements.

Other than as described above, neither we nor any of our affiliates is the only supplier of any good or service that you are required to purchase. However, we reserve the right to require you to purchase goods and services from us or any of our affiliates in the future.

We estimate that your purchase or lease of products, supplies and services from approved suppliers (or those which meet our specifications) will represent approximately 25% to 50% of your costs to establish your Franchised Business and approximately 25% to 50% of your costs for ongoing operation.

Currently, there are no purchasing or distribution cooperatives. However, we can require that you make your purchases through a cooperative if one is formed.

Our affiliate, The Tox Manufacturing Group, LLC, will drive revenue from your purchase of The Tox branded products. Based on The Tox Manufacturing Group, LLC's financial statements, in the fiscal year ending February 28, 2023, The Tox Manufacturing Group, LLC received no revenue from require purchases by franchisees.

We do not receive any other revenue, rebates, discounts or other material consideration from any other suppliers based on your required purchases of products, supplies or equipment; however, we may do so in the future, and any rebates or discounts we receive may be kept by us in our sole discretion.

Although we have not yet done so, from time to time, we may negotiate purchase arrangements, including price terms, with designated and approved suppliers on behalf of all franchisees.

We provide no material benefits (such as the grant of additional franchises) based on your use of designated sources; however, failure to use approved items or designated suppliers and contractors may be a default under the Franchise Agreement. Additionally, when there is any default under the Franchise Agreement, we reserve the right, in addition to other remedies available under the Franchise Agreement, to direct suppliers to withhold furnishing products and services to you.

**ITEM 9:**       **FRANCHISEE'S OBLIGATIONS**

**This table lists your principal obligations under the franchise and other agreements. It will help you find more detailed information about your obligations in these agreements and in other items of this Disclosure Document.**

| Obligation | Section or Article in Franchise Agreement | Section or Article in Multi-Unit Development Agreement | Item in Franchise Disclosure Document |
|---|---|---|---|
| a.  Site Selection and Acquisition | 8.1 | Not Applicable | 11 |
| b.  Pre-Opening Purchase/Leases | 8.3, 12.1.1, 12.3.1 | Not Applicable | 7, 11 |
| c.  Site Development & other Pre-Opening Requirements | 8.2, 8.3, 12.1.1, 12.1.3 | Article 5 | 11 |
| d.  Initial and Ongoing Training | Article 7 | Not Applicable | 11 |
| e.  Opening | 8.1, 8.2 | Not Applicable | 11 |
| f.  Fees | 5.2.7, Article 6, 7.4, 7.5, 8.4, 11.4.3, 12.3.7, 12.6, 12.8, 15.6, 16.4, 18.1.4, 18.1.5, 19.1.5 | Article 4 | 5, 6, 7 |

23

| Obligation | Section or Article in Franchise Agreement | Section or Article in Multi-Unit Development Agreement | Item in Franchise Disclosure Document |
|---|---|---|---|
| g. Compliance with Standards and Policies/Operating Manual | Article 9, 12.1, 12.1.5, 19.1.1 | Not Applicable | 8, 11 |
| h. Trademarks and Proprietary Information | 9.3, Article 14, 19.2, 19.3, 19.4 | Not Applicable | 13, 14 |
| i. Restrictions on Products/Services Offered | 12.1.6, 12.6 | Not Applicable | 8 |
| j. Warranty and Customer Service Requirements | Not Applicable | Not Applicable | Not Applicable |
| k. Territorial Development and Sales Quotas | 13.2 | Article 5 | 12 |
| l. Ongoing Product/Service Purchases | 12.3.4, 12.3.5 | Not Applicable | 8 |
| m. Maintenance, Appearance and Remodeling Requirements | Article 9, 12.1.6, 12.1.7 | Not Applicable | 11,17 |
| n. Insurance | Article 15 | Not Applicable | 7 |
| o. Advertising | Article 13 | Not Applicable | 6, 11 |
| p. Indemnification | 15.4, 15.6, 16.3.6, 21.1 | Article 9 | 14 |
| q. Owner's Participation, Management, Staffing | 11.1, 11.4, 12.1.5 | Not Applicable | 11, 15 |
| r. Records /Reports | 12.2 | Not Applicable | 6 |
| s. Inspections and Audits | 12.1.6, 12.2.5 | Not Applicable | 6, 11 |
| t. Transfer | Article 16 | Article 6 | 17 |
| u. Renewal | Article 5 | Not Applicable | 17 |
| v. Post-Termination Obligations | Article 18 | Section 7.4 | 17 |
| w. Non-Competition Covenants | 19.5 | Article 8 | 17 |

24

| Obligation | Section or Article in Franchise Agreement | Section or Article in Multi-Unit Development Agreement | Item in Franchise Disclosure Document |
|---|---|---|---|
| x.   Dispute Resolution | Article 20 | Article 10 | 17 |
| y.   Spousal Guaranty | 11.3, Attachment 8 | Not Applicable | 15 |

## ITEM 10:      FINANCING

We do not offer direct or indirect financing. We do not guarantee any note, lease, or obligation on your behalf.

## ITEM 11:      FRANCHISOR'S ASSISTANCE, ADVERTISING, COMPUTER SYSTEMS AND TRAINING

**Except as listed below, we are not required to provide you with any assistance.**

**1.      Pre-Opening Obligations**

Before you open your Franchised Business, we will:

a.   provide you with site selection guidelines and approve a location for your Franchised Business. In our discretion, we may require you to use our designated broker or consultant for site selection assistance. Within sixty (60) days of signing the Franchise Agreement, you must submit a written request for approval to us describing the proposed location and providing other information about the site that we reasonably request. We will respond within ten (10) business days, either accepting or rejecting the proposed location. If you sign our Multi-Unit Development Agreement, we will approve or disapprove the site of each The Tox location you propose to develop in accordance with our then-current standards. We consider the following factors in approving a site: general location and neighborhood, distance from neighboring franchise territories, proximity to major roads and residential areas, traffic patterns, condition of premises, tenant mix, demographic characteristics of the area and lease terms. If you sign our Multi-Unit Development Agreement, we will designate your territory and newest location for each The Tox location you develop in accordance with our then-current standards. If you do not identify a site that meets our approval within ninety (90) days of signing the Franchise Agreement, we reserve the right to terminate the Franchise Agreement. We will not own and/or lease a site to you. You are responsible for negotiating a purchase or lease with the owner of a site we approve. (Franchise Agreement, Sections 8.1.2, 8.2, 10.1).

b.   provide you access to The Tox Operations Manual, other manuals and training aids we designate, for use in the operation of your The Tox Franchise, as they may be revised from time to time. (Franchise Agreement, Section 10.2).

c.   provide a written list of equipment, signage, supplies and products that will be required to open the Franchised Business. We and our affiliates are not obligated to install any of these items (Franchise Agreement, Section 10.3).

25

d.  provide initial training at an affiliate-owned or franchised outlet in the U.S. that we designate. We will determine, in our sole discretion, whether you satisfactorily complete the initial training. (Franchise Agreement, Sections 7.1, 7.2).

e.  provide a trainer at your premises for on-site training, supervision and assistance for up to two (2) days within sixty (60) days of the opening of your Franchised Business. (Franchise Agreement, Section 7.3)

f.  provide you with standards for qualifications and training of your employees. We do not otherwise assist you with employee hiring and training (Franchise Agreement, Section 12.1.4).

2. **Time to Open**

We estimate the typical length of time between the signing of the Franchise Agreement and the time you open your Franchised Business is one hundred eighty (180) days. Factors that may affect this time period include your ability to acquire financing or permits, build out of your location, have signs and equipment installed in your location, and completion of required training. If you have not opened your Franchised Business within (i) one hundred twenty (120) days after we consent to the site of the Franchised Business, or (ii) within twelve (12) months of signing the Franchise Agreement, you must obtain our consent to extend the time to open, which we may or may not grant, at our discretion. Failure to open your Franchised Business within the original time as extended, is a default of the Franchise Agreement. (Franchise Agreement, Sections 8.1, 8.2, 8.3)

3. **Obligations After Opening**

During the operation of your franchise, we will:

a.  offer from time to time, in our discretion, mandatory or optional additional training programs. If we require it, you, your General Manager and your technicians must attend an annual conference and/or annual training summit at a location we designate. Failure to attend mandatory additional training or an annual conference or training summit is a default of the Franchise Agreement. We reserve the right to impose a reasonable fee for tuition and/or attendance for all additional training programs, including the annual conference or training summit. You must also pay your transportation, lodging, meals and other expenses to attend any mandatory training program. If you fail to attend any mandatory training program, you are required to obtain the training at a location we designate, at your sole cost, which includes tuition at the then-current rate, plus all of your travel costs and our trainer's travel costs.  (Franchise Agreement, Section 7.4).

b.  upon your request, or as we determine to be appropriate, provide supplemental corrective on-site training and assistance at your premises. For any on-site supplemental training, you must reimburse all costs for the services of our trainer, including but not limited to the trainer's then-current per diem fee and all travel-related expenses, such as transportation, meals and lodging. (Franchise Agreement, Section 7.5).

c.  upon your request, provide individualized assistance to you within reasonable limits by telephone, video conferencing, electronic mail or postage service, subject at all times to availability of our personnel and in reasonable limits (Franchise Agreement, Section 7.6).

d. from time to time, as may become available, provide you with samples or digital artwork, advertising and promotional materials (Franchise Agreement, Section 10.4).

e. provide you with any written specifications for required equipment, products and services and updated lists of any approved suppliers of these items (Franchise Agreement, Section 10.5).

f. subject to applicable law, recommend minimum and maximum prices for products and services at your Franchised Business (Franchise Agreement, Section 12.5).

g. approve or disapprove of all advertising, direct mail, and other promotional material and campaigns you propose in writing to us. We will respond within ten (10) business days, either accepting or rejecting the proposed material and/or campaign; however, if we do not respond within ten (10) business days, the proposed material and/or campaign is deemed "disapproved". (Franchise Agreement, Section 13.6).

4. **Advertising**

**Local Advertising** (Franchise Agreement, Sections 13.2 and 13.6)

We require you to spend Four Thousand Dollars ($4,000.00) to Six Thousand Dollars ($6,000.00), as we determine necessary, in opening advertising and promotional activities for at least thirty (30) days prior to, and sixty (60) days following, the opening of your Franchised Business in the Territory where your Franchised Business is located. We do not currently require you to spend a minimum amount on local advertising to promote your Franchised Business, but we reserve the right to establish such a requirement in the future. Upon our request, you must furnish us with a quarterly report and documentation of local advertising expenditures during the previous calendar quarter. We reserve the right to collect some or all of your grand opening funds and/or your Local Advertising expenditure and implement grand opening campaign activities and/or Local Advertising on your behalf.

In addition to any required minimum local advertising expenditure (if established) we will provide up to twenty (20) social media influencers per month to receive The Tox services at the Franchised Business, and you are required to provide The Tox services to all such social media influencers provided by us. You may request we provide additional social media influencers at the Franchised Business, subject to availability. The cost of all services provided to social media influencers are at your sole cost and expense, and at no charge to such social media influencers

You may develop advertising materials for your own use at your own cost, and you may use marketing materials that we may offer to you from time to time. You may not use any advertising or marketing materials, including press releases, unless they have been approved in advance in writing by us, which approval may be withheld in our discretion. We will respond to your request for approval within ten (10) business days; however, if we do not respond within ten (10) business days, the proposed advertising or marketing material is deemed "disapproved".

We do not provide for placement of local advertising on your behalf, and we have no obligation to spend any amount on advertising in your area or territory. You are responsible for local advertising placement. If feasible, you may do cooperative advertising with other The Tox franchisees in your area, with our prior written approval. You may not maintain any business profile on Facebook, Twitter, Instagram, TikTok, LinkedIn, YouTube or any other social media and/or networking site without our prior written approval.

27

**System-wide Brand Fund** (Franchise Agreement, Section 13.3)

You are required to contribute to the Brand Fund two percent (2%) of your Gross Revenue per week. Each The Tox outlet operated by our affiliate or us may contribute to the Brand Fund, in our discretion, but has no obligation to do so.

The Brand Fund is administered by our accounting and marketing personnel.  We may use Brand Fund Contributions to pay any and all costs for the development, production and placement of advertising, marketing, promotional and public relations materials and programs.  We may also use Brand Fund contributions to pay any and all costs of marketing seminars and training programs, market research, services of advertising and/or public relations agencies, and website development and maintenance.  We may further use Brand Fund contributions to pay our costs (including personnel and other administrative costs) for advertising that is administered by us or prepared by us, as well as for administration and direction of the Brand Fund.

The Brand Fund will not be used to defray any of our other general operating expenses.  Brand Fund contributions will not be used to solicit new franchise sales; provided however, we reserve the right to include "Franchises Available" or similar language and contact information in advertising produced with Brand Fund contributions.

The Brand Fund collects and expends the Brand Fund contributions for the benefit of the System as a whole.  We reserve the right to use the Brand Fund contributions to place advertising in national, regional or local media (including broadcast, print, or other media) and to conduct marketing campaigns through any channel, in our discretion, including but not limited to, Internet and direct-mail campaigns.  We have no obligation, however, to place advertising or conduct marketing campaigns in any particular area, including the Territory where your Franchised Business is located. The Brand Fund and its earnings shall not otherwise inure to our benefit except that any resulting technology and intellectual property shall be deemed our property.

We have no obligation to make expenditures that are equivalent or proportionate to your Brand Fund contribution or to ensure that you benefit directly or pro rata from the production or placement of advertising from the Brand Fund.

The Brand Fund is not audited.  An annual unaudited financial statement of the Brand Fund is available to any franchisee upon written request.

If we spend more or less than the total of all contributions to the Brand Fund in any fiscal year, we may carry forward any surplus or deficit to the next fiscal year.

No Brand Fund contributions were required, made or expended in our most recently concluded fiscal year, which ended on December 31, 2022.  Although the Brand Fund is intended to be of perpetual duration, we may terminate it at any time and for any reason or no reason.  We will not terminate the Brand Fund, however, until all monies in the Brand Fund have been spent for advertising or promotional purposes or returned to contributors, without interest, on the basis of their respective contributions.

**Regional Advertising** (Franchise Agreement, Section 13.4)

Currently, our System has no regional advertising fund or cooperative. However, we may decide to establish a regional fund or cooperative in the future and your participation may be mandatory,

in our sole discretion. A regional cooperative will be comprised of all franchised The Tox outlets in a designated geographic area. Our affiliate-owned outlets may participate in a regional cooperative, in our sole discretion. Each The Tox outlet will have one vote in the cooperative. We will determine in advance how each cooperative will be organized and governed. We have the right to form, dissolve, merge or change the structure of the cooperatives.  If a cooperative is established during the term of your Franchise Agreement, you must sign all documents we request and become a member of the cooperative according to the terms of the documents. Currently, there are no governing documents available for your review.

If we establish a regional advertising fund or cooperative, each The Tox outlet, whether franchise-owned and affiliate-owned, must contribute amounts equal to each outlet's pro-rata share of cooperative advertising costs. Your contributions to a regional advertising fund or cooperative will be in addition to your required contributions to the Brand Fund and required expenditures for local advertising (if established).

**Advertising Council** (Franchise Agreement, Section 9.5)

We do not have an advertising council composed of franchisees that advises us on advertising policies. The Franchise Agreement gives us the right, in our discretion, to create a franchisee advisory council to communicate ideas, including proposed advertising policies.  If created, we will determine in advance how franchisees are selected to the council, which may include factors such as a franchisee's level of success, superior performance, and outlet profitability. We reserve the right to change or dissolve the council at any time.

5. **Computer Systems** (Franchise Agreement, Section 12.3)

You must purchase and use the hardware, software, and computer platforms we specify. You are required to have an internet-capable Apple laptop or desktop computer and iPad that can operate the latest version of software and computer platforms we require. We currently require that you use MindBody Online in the operation of your Franchised Business. We will own your MindBody account, and all information and data contained or stored therein. MindBody performs a variety of functions, including customer relations management, inventory management, payment processing, bookkeeping and sales report generation. We also currently require you to use Quickbooks for digital bookkeeping. The cost of purchasing the required hardware and software is approximately $5,000 to $7,000 and approximately $4,500 annually.

There are no contractual limitations on the frequency and cost of upgrades and/or updates to the above-described systems. We may in the future modify or establish other sales reporting systems, as we deem appropriate, for the accurate and expeditious reporting of Gross Revenue and delivery of our products and services. You must fully cooperate in implementing any such modifications at your expense.

We have no obligation to maintain, repair, update or upgrade your computer and software. At your cost, you must provide on-going maintenance and repairs to your computer and software. You must upgrade your computer hardware and software as necessary to operate the most current version of our System requirements. We cannot estimate the cost of maintaining, updating and upgrading your computer hardware and software because it will depend on the make and model of your computer, repair history, usage, local cost of computer maintenance services in your area and technological advances that we cannot predict.

We reserve the right to have remote and independent access to your revenue information and client data generated by and stored in your computer system. There are no contractual limitations on our right to have full access to this information. We may retrieve, download, analyze and store such information and data at any time. Upon our request, you must sign any documents we require to allow us to independently and electronically access and retrieve the information stored in the computer system. We own all customer data stored in the computer system

6. **Table of Contents of Operations Manual**

The Table of Contents of our The Tox Operations Manual, current as of the date of this Disclosure Document is attached as Exhibit E. The Operations Manual has approximately 170 pages.

7. **Training** (Franchise Agreement, Article 7)

You (if the franchisee is an individual) or all of your owners (if the franchisee is a business entity) must complete our Initial Training Program, to our satisfaction, prior to opening your Franchised Business. We will train you at an affiliate-owned or franchised outlet in the U.S. that we designate, at your outlet, or another location that we specify.

**TRAINING PROGRAM**

| Subject | Hours of Classroom Training | Hours of On The Job Training | Location |
|---|---|---|---|
| Introduction | 1 | 2 | TBD or your location |
| The Master Tox | 0 | 48 | TBD or your location |
| Facial Sculpting | 0 | 8 | TBD or your location |
| The Tox Products and the Tox Brand | 1 | 1 | TBD or your location |
| MBO Training | 4 | 4 | TBD or your location |
| FOH Operations | 8 | 32 | TBD or your location |
| Maintenance | 2 | 1 | TBD or your location |
| **Totals** | 16 | 96 | |

Training will be conducted under the direction of Courtney Yeager. Courtney is our founder and Chief Executive Officer, a position she has held since our inception. Courtney oversees all aspects of The Tox brand operations, including service methods and techniques, sales, marketing, brand development, technology and process management.

Our training materials consist of the Operations Manual supplemented with online materials, active observation, participation and verbal instruction.

The cost of our instructors and training materials for up to eight (8) individuals is Ten Thousand Dollars ($10,000.00). You must pay for all of travel and personal expenses, including, but not

limited to, all costs for your transportation, meals, and lodging for yourself and your personnel. We reserve the right to require you to complete the Initial Technique Training Program at your Franchised Business location. If we do so, you will also be required to pay the expenses for all of our training personnel, including, without limitation, transportation, meals and lodging for our trainers. Our current fee to provide initial training to any additional trainee is Two Thousand Dollars ($2,000.00) per person.

If you do not complete our Initial Technique Training Program to our satisfaction, we reserve the right to terminate the Franchise Agreement.

We will provide you with on-site training, supervision and assistance for up to two (2) days within sixty (60) days of the opening of your Franchised Business.

We may conduct mandatory or optional additional training programs, including an annual conference and/or annual training summit. If we require it, you, your General Manager and your technicians must attend an annual convention and/or annual training summit at a location we designate. We reserve the right to impose a reasonable fee for tuition and/or attendance for all additional training programs, including the annual conference and/or training summit. You must also pay your transportation, lodging, meals and other expenses to attend any mandatory training program. If you fail to attend any mandatory training program, you are required to obtain the training at a location we designate, at your sole cost, which includes tuition at the then-current rate, plus all of your travel costs and our trainer's travel costs.

## ITEM 12:  **TERRITORY**

Under the Franchise Agreement, you have the right to establish and operate one (1) The Tox outlet within a territory that will be defined after the location of you're the Tox outlet is identified and approved by us (the "Territory"). You are required to find and obtain possession of a specific location for your Franchised Business that meets our site selection criteria and our approval. Your Territory is located in all or a portion of listed town, city or county, and is identified by a group of contiguous zip codes, marked map, radial distance from the Franchised Business, or other method that we deem appropriate. The Territory is determined on an individual basis taking into account demographics, minimum numbers of households, household income and market potential. The minimum Territory that will be granted is an area with a population of one hundred thousand (100,000) people or a three (3) mile radius from your Franchised Business location, whichever is less. Your Territory will be defined and attached to your Franchise Agreement as Attachment 2. If you do not yet have a location at the signing of the Franchise Agreement, you will receive a non-exclusive sit search area list as Attachment 2.

You will not receive an exclusive territory. You may face competition from other franchisees, from outlets that we own, or from other channels of distribution or competitive brands that we control.

During the term of your Franchise Agreement, and provided that you are not in default of your Franchise Agreement, we will not open another The Tox outlet or grant the right to anyone else to open a The Tox outlet within the Territory. However, notwithstanding this limited protection right we grant to you, we reserve all rights to sell, either directly or through others, our products and services under the Marks in the Territory through alternative distribution channels, as discussed below.

If you sign a Multi-Unit Development Agreement, you will not receive an exclusive development area. You may face competition from other franchisees, from outlets that we own, or from other

channels of distribution or competitive brands that we control. During the term of your Multi-Unit Development Agreement, provided that you are not in default of your Agreement or development schedule, we will not open another The Tox outlet within your development area until the expiration or sooner termination of your Multi-Unit Development Agreement. However, notwithstanding this limited protection right we grant to you, we reserve all rights to sell our products and services under the Marks in the development area through alternative distribution channels, as discussed below.

There is no minimum sales requirement, market penetration or other contingency that will affect your limited protected right to operate in the Territory during the term of your Franchise Agreement, unless you are in default of your obligations to us.

You may not change the location of your Franchised Business, without our written consent, which we may withhold in our sole discretion. The conditions under which we may allow you to relocate include the following: loss of your premises not due to your default, demographics of the surrounding area, proximity to other The Tox outlets, lease requirements, traffic patterns, vehicular and pedestrian access, proximity to major roads, available parking and overall suitability. If you wish to relocate, you must identify a new location for the Franchised Business that meets our approval, in accordance with our then-current site selection procedures, within sixty (60) days. If you do not identify a site within this time period, we may terminate the Franchise Agreement. While you are closed for relocation, you must continue to pay us a minimum Royalty Fee and Brand Fund Contribution equal to the average paid during the four (4) calendar quarters immediately preceding the loss of your premises.

Unless you have signed our Multi-Unit Development Agreement, we may, but have no obligation, to consider granting you the right to establish additional The Tox outlets under other franchise agreements if you are in compliance with the Franchise Agreement and propose to open another The Tox outlet in an area and at a location we approve. The Franchise Agreement grants you no options, rights of first refusal or similar rights to acquire additional franchises.

We reserve all rights not expressly granted in the Franchise Agreement. For example, we or our affiliates may own, operate or authorize others to own or operate The Tox outlets outside of the Territory and may operate other kinds of businesses within the Territory. Although we do not currently do so and have no plans to do so, we and our affiliates may own, acquire, conduct or authorize others to conduct, any form of business at any location selling any type of product or service not offered under the Mark, including a product or service similar to those you will sell at you Franchised Business. We reserve the right to merge with, acquire, or be acquired by, an existing competitive or non-competitive franchise network, chain, or other business; however, we will not convert any acquired business in your Territory to a franchise using our primary trademarks during the Term of your Franchise Agreement.

We and our affiliates may sell products and services under the Mark within or outside the Territory through any method of distribution other than a dedicated The Tox outlet, such as co-branding with other health-conscious lifestyle businesses, and products offered through retail stores, the Internet or direct marketing ("Alternative Distribution Channels"). You will receive no compensation for our sales through Alternative Distribution Channels in the Territory.

You may not use Alternative Distribution Channels to make sales inside or outside your Territory; however, we will include a listing on our website of your The Tox outlet location. You may only solicit sales from customers in your territory. Your local advertising must target customers and

referral sources in your Territory, although the reach of your local advertising may extend beyond your Territory.

## ITEM 13:     TRADEMARKS

Our affiliate, The Tox IP, LLC, is the owner of the Mark and has granted us the exclusive right to use the Mark and license to others the right to use the Mark in the operation of a The Tox outlet in accordance with the system. The Franchise Agreement will license to you the right to operate your Franchised Business under the The Tox service mark, as described below ("Principal Mark"):

| Mark | Registration Number | Registration Date | Register |
|---|---|---|---|
| THE TOX | 6157970 | September 22, 2020 | Principal |

The Tox IP, LLC has filed all required affidavits.

You must notify us immediately when you learn about an infringement of or challenge to your use of the Principal Mark or other Marks. Our affiliate and we will take any action we think appropriate and, if you have given us timely notice and are in full compliance with the Franchise Agreement, we will indemnify you for all expenses and damages arising from any claim challenging your authorized use of the Principal Mark or other Marks. Our affiliate and we have the right to control any administrative proceedings or litigation involving the Principal Mark or other Mark licensed by us to you. You must cooperate fully with our affiliate and us in defending and/or settling the litigation.

We reserve the right to substitute different Marks if we can no longer use the current Marks, or if we determine that substitution of different Marks will be beneficial to the System. In such event, we may require you, at your expense, to modify or stop using any Mark, including the Principal Mark, or to use one or more additional or substitute Marks.

You must not directly or indirectly contest our affiliate's right, or our right, to the Principal Mark or other Marks.

There are no currently effective material determinations of the United States Patent and Trademark Office, the Trademark Trial and Appeals Board, the Trademark Administration of any state, or any court relating to the Marks. There is no pending infringement, opposition or cancellation. There is no pending material federal or state court litigation involving the Principal Mark or other Marks.

As of the date of this Disclosure Document, we know of no superior prior rights or infringing uses that could materially affect your use of the Principal Marks.

## ITEM 14:     PATENTS, COPYRIGHTS AND PROPRIETARY INFORMATION

We hold no patents and have no pending patent applications that are material to the franchise. We have registered no copyright with the United States Copyright Office. However, we claim copyrights on certain forms, advertisements, promotional materials, photographs and other written materials. We also claim copyrights and other proprietary rights in our Manual and on our website.

33

There are no current material determinations of, or proceedings pending in, the United States Patent and Trademark Office, the U.S. Copyright Office, or any court regarding any of our copyrights discussed above.

There are no agreements currently in effect that limit your right to use any of our copyrights. As of the date of this Disclosure Document, we are unaware of any infringing uses of or superior previous rights to any of our copyrights that could materially affect your use of them.

You must notify us immediately when you learn about an infringement of or challenge to your use of our copyrights. We will take any action we think appropriate and, if you have given us timely notice and are in full compliance with the Franchise Agreement, we will indemnify you for all expenses and damages arising from any claim challenging your authorized use of our copyrights. We have the right to control any administrative proceedings or litigation involving our copyrights licensed by us to you. You must cooperate fully with us in defending and/or settling the litigation.

During the term of the Franchise Agreement, you may have access to and become acquainted with our trade secrets, including, but not limited to, designs, methods, processes, customer lists, vendor partnerships and/or relationships, sales and technical information, financial information, costs, product prices and names, software tools and applications, website and/or email design, products, services, equipment, technologies and procedures relating to the operation of the Franchised Business; the Manual; methods of advertising and promotion; instructional materials; any other information which Franchisor may or may not specifically designate as "confidential" or "proprietary"; and the components of the System, whether or not such information is protected or protectable by patent, copyright, trade secret or other proprietary rights (collectively called the "Confidential Information"). You agree that you will take all reasonable measures to maintain the confidentiality of all Confidential Information in your possession or control and that all such Confidential Information and trade secrets shall remain our exclusive property. You may never (during the Initial Term, any Renewal Term, or after the Franchise Agreement expires or is terminated) reveal any of our confidential information to another person or use it for any other person or business. You may not copy any of our Confidential Information or give it to a third party except as we authorize in writing to you prior to any dissemination. Your personnel who have access to our Confidential Information must sign our Confidentiality/Non-Competition Agreement (Franchise Agreement, Attachment 9).

You must promptly tell us when you learn about unauthorized use of any Confidential Information. We are not obligated to take any action but will respond to this information as we think appropriate. We will indemnify you for losses brought by a third party concerning your use, in strict compliance with the Franchise Agreement, of the Confidential Information.

**ITEM 15:** **OBLIGATIONS OF THE FRANCHISEE TO PARTICIPATE IN THE ACTUAL OPERATION OF THE FRANCHISE BUSINESS**

The Franchise Agreement requires that you personally supervise your The Tox outlet. You may appoint a General Manager to oversee the day to day operations of your The Tox outlet, but you must remain active in overseeing the Franchised Business. Your general manager can either be you or someone appointed by you who is acceptable to us. Your general manager must successfully complete our Initial Technique Training Program and all other training courses we require. Your general manager must devote full time to the job and cannot have an interest or business relationship with any competitors. If the franchisee is a business entity, your general manager is not required to have an equity interest in the franchisee entity. If you sign a Multi-Unit Development

Agreement, you must have a General Manager in all Franchised Businesses you are not directly supervising.

Your general manager and all other personnel who will have access to our proprietary and Confidential Information and training must sign our Non-Disclosure/Non-Competition Agreement, which is attached to our Franchise Agreement as Attachment 9. If your Franchised Business is owned by an entity, all owners of the entity must personally sign the Franchise Agreement as Principal. If you are a married individual, your spouse must sign our Spousal Guaranty, which is attached to our Franchise Agreement as Attachment 8.

## ITEM 16: RESTRICTION ON WHAT FRANCHISEE MAY SELL

You must offer and sell all products and services that are part of the System, and all services and products which we incorporate into the System in the future. You may only offer products and services that we have previously approved and for which you are qualified to provide.

You may not use our Marks for any other business, and you may not conduct any other business from your Franchised Business location. You cannot engage in any other business (other than an additional The Tox outlet) that competes with your Franchised Business, with us or our affiliates, or with The Tox outlets owned by other franchisees, whether such business is inside or outside of the Territory.

We may add to, delete from or modify the products and services that you can and must offer. You must abide by any additions, deletions and modifications. There are no limits on our rights to make these changes.

You may only sell products and services in the manner we prescribe. You must solicit sales from customers and referral sources in your Territory. Your local advertising must target customers and referral sources in your Territory, although the reach of your local advertising may extend beyond your Territory. You may not advertise, promote, post or list information relating to the Franchised Business or using the Marks on the Internet (whether through the creation of a website or otherwise), without our prior written consent. See Item 12 for restrictions on sales within and outside the Territory.

## ITEM 17: RENEWAL, TERMINATION, TRANSFER AND DISPUTE RESOLUTION

### THE FRANCHISE RELATIONSHIP

**This table lists certain important provisions of the franchise and related agreements. You should read these provisions in the agreements attached to this disclosure document.**

| | Provision | Section in Franchise Agreement | Summary |
|---|---|---|---|
| a. | Length of the franchise term | Art. 4 | Term is ten (10) years |

| | Provision | Section in Franchise Agreement | Summary |
|---|---|---|---|
| b. | Renewal | Sections 5.1 and 5.4 | If you are in good standing as defined below, you can sign a successor agreement for two (2) additional terms of five (5) years each, unless we have determined, in our sole discretion, to withdraw from the geographical area where your Franchise is located. |
| c. | Requirements for franchisee to renew or extend | Sections 5.2 and 5.3 | Be in full compliance, have no more than three (3) events of default during current term; provide written notice to us at least six months before the end of the term; execute a new franchise agreement; pay us the Successor Agreement Fee fee equal to 50% of the then-current initial franchise fee; continue to maintain your location, current trade dress and other standards; execute a general release; comply with then-current qualifications and training requirements; including completion of additional training.<br><br>You may be asked to sign a new Franchise Agreement with materially different terms and conditions than your original Franchise Agreement. |
| d. | Termination by franchisee | None | You may seek termination upon any grounds available by state law. |
| e. | Termination by franchisor without cause | Section 16.7 | The Franchise Agreement will terminate upon your death or permanent disability and the Franchise must be transferred within six months to a replacement franchisee that we approve. |
| f. | Termination by franchisor with cause | Article 17 | We may terminate only if you default. The Franchise Agreement describes defaults throughout. Please read it carefully. |
| g. | "Cause" defined – curable defaults | Section 17.3 | You have 5 days to cure non-payments and any other defaults (except for non-curable defaults listed in the Franchise Agreement and described in h. immediately below). |

| h. | "Cause" defined - non-curable defaults | Sections 17.1 and 17.2 | The Franchise Agreement will terminate automatically, without notice for the following defaults: insolvency; bankruptcy; written admission of inability to pay debts; receivership; levy; composition with creditors; unsatisfied final judgment for more than 30 days; or foreclosure proceeding that is not dismissed within 30 days. We may terminate the Franchise Agreement upon notice to you if you: do not acquire a site, do not complete construction, obtain licenses and permits and/or open the Franchised Business within required time frames; falsify any report to us; cease operations for 5 days or more, unless the premises are damaged and you apply to relocate; lose possession of the premises, unless you are not at fault for loss and you timely apply to relocate; fail to restore and re-open the Franchised Business within 120 days after a casualty, as may be extended by us; fail to comply with applicable laws; default under any lease or sublease for the premises or default under any lease or financing agreement for your vehicle; understate Gross Revenue two (2) or more times; fails to report all production and collections exclusively in the software approved by Franchisor; fail to comply with insurance and indemnification requirements; attempt a transfer in violation of the Franchise Agreement; fail, or your legal representative fails to transfer as required upon your death or permanent disability; misrepresent or omit a material fact in applying for the Franchise; are convicted or plead no contest to a felony or crime that could damage the goodwill or reputation of our trademarks or the System; receive an adverse judgment in any proceeding involving allegations of fraud, racketeering or improper trade practices or similar claim that could damage the goodwill or reputation of our trademarks or the System; conceal revenues or maintain false books; create a threat or danger to public health or safety; fails to cure a violation of law within three (3) days of notification; refuse an inspection or audit by us; use our trademarks, copyrighted material or Confidential Information in an unauthorized manner; make an unauthorized disclosure of Confidential Information; fail to comply with non-competition covenants; default in the performance of your obligations three (3) or more times during the term or receive two (2) or more default notices in any 12-month period; default under any other |

| | Provision | Section in Franchise Agreement | Summary |
|---|---|---|---|
| | | | agreement with us or our affiliate; have insufficient funds to honor a check or EFT three (3) or more times during the term; or terminate the Franchise Agreement without cause. |
| i. | Franchisee's obligations on termination/non-renewal | Article 18 | Upon termination, you must: cease operations; cease to identify yourself as a The Tox franchisee; cease to use our trademarks; cancel any assumed name registration that contains any Mark; pay us and our affiliates all sums owing; pay us any damages, costs or expenses we incur in obtaining any remedy for any violation of the Franchise Agreement by you, including, but not limited to attorneys' fees; deliver to us all Confidential Information, the Operations Manual and all records and files related to your Franchised Business; comply with the non-disclosure and non-competition covenants; pay liquidated damages, sell to us, at our option, all furnishing, fixtures, equipment, inventory and supplies of your Franchised Business; and assign, at our option, your telephone numbers, directory and internet listings, and social media and software accounts and the lease for the location. |
| j. | Assignment of contract by franchisor | Section 16.1.1 | No restrictions on our right to assign. |
| k. | "Transfer" by franchisee defined | Section 16.3 | Any assignment, sale, transfer, gift, devise or encumbrance of any interest in the Franchise Agreement, the Franchised Business, any assets of the Franchised Business, or in the Franchisee (if the Franchisee is a business entity). |
| l. | Franchisor approval of transfer by franchisee | Sections 16.2 and 16.3 | No transfer is allowed without our consent, which we will not unreasonably withhold. |
| m. | Conditions for franchisor approval of a transfer | Sections 16.3 and 16.4 | Conditions include: our decision not to exercise our right of first refusal; transferee meets our then-current standards for qualifying franchisees; transferee signs our then-current form of Franchise Agreement, which may have materially different terms from your Franchise Agreement; transferee successfully complete our Initial Training Program; you have paid us and third-party creditors all amounts owed; you and the transferee sign a General Release in the form of Attachment 3 to the Franchise Agreement; you shall subordinate any claims you have against the transferee to us; you will indemnify us for a period of 3 years following the transfer; our approval of the material terms and conditions of the transfer; payment of a transfer fee. |

| | Provision | Section in Franchise Agreement | Summary |
|---|---|---|---|
| n. | Franchisor's right of first refusal to acquire franchisee's business | Section 16.6 | You must promptly notify us of any written offer to purchase your Franchise. We have 30 days to exercise our first right to buy it on the same terms and conditions, provided that (a) we may substitute cash for any other consideration (b) we may pay the entire purchase price at closing, (c) our credit is deemed as good as the proposed purchaser, (d) we have at least 60 days to close and (e) you shall give us all customary seller's representations and warranties. |
| o. | Franchisor's option to purchase franchisee's business | Section 18.2 | Upon termination of the Franchise Agreement, we have the option to purchase your equipment, furniture, fixtures, signs, advertising materials, supplies, and inventory at your cost or fair market value, whichever is less. |
| p. | Death or disability of franchisee | Sections 16.3, 16.4 and 16.7 | The Franchise Agreement will terminate automatically upon your death or permanent disability, unless prohibited by law and the Franchise is transferred within 3 months to a replacement franchisee that we approve. |
| q. | Non-competition covenants during the term of the franchise | Section 19.5.1 | You may not: divert, or attempt to divert, customers of any The Tox outlet (including yours) to any competitor, participate in any capacity, including, but not limited to as an owner, investor, officer, director, employee or agent, in any competing business; do any act that could damage the goodwill of the Marks or System, or disrupt or jeopardize our business or that of our franchisees. |
| r. | Non-competition covenants after the franchise is terminated or expires | Section 19.5.2 | For 24 months after the termination of the Franchise Agreement, you may not: divert, or attempt to divert, customers of any The Tox outlet (including yours) to any competitor, participate in any capacity, including, but not limited to as an owner, investor, officer, director, employee or agent, in any competing business within 25 miles of your former The Tox location or any other The Tox outlet location (franchised or company owned); do any act that could damage the goodwill of the Marks or System, or disrupt or jeopardize our business or that of our franchisees. |
| s. | Modification of the agreement | Sections 9.4, 14.6, 19.1.4 and 21.4 | No oral modifications generally, but we may change the Operations Manual and System standards at any time. You may be required to implement these changes at your own costs. We have the right to modify our Marks at any time upon written notice to you. |

| | Provision | Section in Franchise Agreement | Summary |
|---|---|---|---|
| t. | Integration/merger clause | Section 21.4 | Only the terms of the Franchise Agreement and other related written agreements, such as any attachments to the Franchise Agreement or addenda, are binding (subject to applicable state law.) Any representations or promises outside of the disclosure document and Franchise Agreement may not be enforceable. |
| u. | Dispute resolution by arbitration or mediation | Sections 20.1 and 20.2 | At our option, claims that are not resolved internally may be submitted to non-binding mediation only at our headquarters located in Vero Beach, Florida. |
| v. | Choice of forum | Section 20.3 | Litigation takes place in Florida (subject to applicable state law) |
| w. | Choice of law | Section 20.3 | Florida law applies (subject to applicable state law) |

## THE FRANCHISE RELATIONSHIP
## (UNDER THE MULTI-UNIT DEVELOPMENT AGREEMENT)

**This table lists certain important provisions of the multi-unit development agreement. You should read these provisions in the agreement attached to this disclosure document.**

| | Provision | Section in Multi-Unit Development Agreement | Summary |
|---|---|---|---|
| a. | Length of the franchise term | Art. 4 | As determined by you and us based on the number of The Tox outlets you are to develop. |
| b. | Renewal or extension of the Term | Not Applicable | Not Applicable |
| c. | Requirements for franchisee to renew or extend | Not Applicable | Not Applicable |
| d. | Termination by franchisee | Not Applicable | Not Applicable |
| e. | Termination by franchisor without cause | Section 6.6 | The Multi-Unit Development Agreement will terminate automatically upon your death or permanent disability, unless prohibited by law and the Development Rights are transferred within 6 months to a replacement developer that we approve. |
| f. | Termination by franchisor with cause | Article 7 | We may terminate only if you default. The Multi-Unit Development Agreement describes defaults throughout. Please read it carefully. |
| g. | "Cause" defined – curable defaults | Section 7.3 | You have 5 days to cure non-payments and any other defaults (except for non-curable defaults listed in the Multi-Unit Development Agreement and described in h. immediately below). |

| | Provision | Section in Multi-Unit Development Agreement | Summary |
|---|---|---|---|
| h. | "Cause" defined - non-curable defaults | Sections 7.1 and 7.2 | The Multi-Unit Development Agreement will terminate automatically, without notice for the following defaults: insolvency; bankruptcy; written admission of inability to pay debts; receivership; levy; composition with creditors; unsatisfied final judgment for more than 30 days; or foreclosure proceeding that is not dismissed within 30 days. We may terminate the Multi-Unit Development Agreement upon notice to you if you: misrepresent or omit a material fact in applying for the Development Rights; falsify any report to us; fail to comply with any federal, state or local law, rule or regulation, applicable to the development and operations of Developer's The Tox outlets, including, but not limited to, the failure to pay taxes; fail to develop the The Tox outlets in accordance with the Mandatory Development Schedule; attempt a transfer in violation of the Multi-Unit Development Agreement; are convicted or plead no contest to a felony or crime that could damage the goodwill or reputation of our trademarks or the System; receive an adverse judgment in any proceeding involving allegations of fraud, racketeering or improper trade practices or similar claim that could damage the goodwill or reputation of our trademarks or the System; fail to comply with non-competition covenants; default, or your affiliate defaults, under any other agreement, including any Franchise Agreement, with us or any of our affiliates, suppliers or landlord and does not cure such default within the time period provided in such other agreement; or terminate the Multi-Unit Development Agreement without cause. |
| i. | Franchisee's obligations on termination/ non-renewal | Section 7.4 | Upon termination, you must: cease all development operations and comply with the non-disclosure and non-competition covenants. |
| j. | Assignment of contract by franchisor | Section 6.1 | No restrictions on our right to assign. |
| k. | "Transfer" by franchisee defined | Section 6.3 | Any assignment, sale, transfer, gift, devise or encumbrance of any interest in the Multi-Unit Development Agreement or Development Rights. |
| l. | Franchisor approval of transfer by franchisee | Sections 6.2, 6.3 | No transfer is allowed without our consent, which we will not unreasonably withhold. |

| | Provision | Section in Multi-Unit Development Agreement | Summary |
|---|---|---|---|
| m. | Conditions for franchisor approval of a transfer | Section 16.3 and 16.4 | Conditions include: our decision not to exercise our right of first refusal; transferee meets our then-current standards for qualifying developers; you have paid us all amounts owed; transferee signs our then-current form of Multi-Unit Development Agreement, which may have materially different terms from your Multi-Unit Development Agreement; you and the transferee sign a General Release in the form of Attachment 3 to the Franchise Agreement; you shall subordinate any claims you have against the transferee to us; our approval of the material terms and conditions of the transfer; payment of a transfer fee equal to fifty percent (50%) of the then-current initial franchise fee multiplied by the number of remaining Franchised Businesses to be developed under the Multi-Unit Development Agreement. |
| n. | Franchisor's right of first refusal to acquire franchisee's business | Section 6.5 | You must promptly notify us of any written offer to purchase your Development Rights. We have 30 days to exercise our first right to buy it on the same terms and conditions, provided that (a) we may substitute cash for any other consideration (b).we may pay the entire purchase price at closing, (c) our credit is deemed as good as the proposed purchaser, (d) we have at least 60 days to close and (e) you shall give us all customary seller's representations and warranties. |
| o. | Franchisor's option to purchase franchisee's business | Not Applicable | Not Applicable |
| p. | Death or disability of franchisee | Section 6.6 | The Multi-Unit Development Agreement will terminate automatically upon your death or permanent disability, unless prohibited by law and the Development Rights are transferred within 6 months to a replacement developer that we approve. |
| q. | Non-competition covenants during the term of the franchise | Section 8.3.1 | You may not: divert, or attempt to divert, customers of any The Tox outlet (including yours) to any competitor, participate in any capacity, including, but not limited to as an owner, investor, officer, director, employee or agent, in any competing business, induce any person employed by us to leave their employment; do any act that could damage the goodwill of our trademarks or System, or disrupt or jeopardize our business or that of our franchisees. |

| | Provision | Section in Multi-Unit Development Agreement | Summary |
|---|---|---|---|
| r. | Non-competition covenants after the franchise is terminated or expires | Section 8.3.2 | For 24 months after the termination of the Franchise Agreement, you may not: divert, or attempt to divert, customers of any The Tox outlet (including yours) to any competitor, participate in any capacity, including, but not limited to as an owner, investor, officer, director, employee or agent, in any competing business within 25 miles of your former The Tox outlet locations or any other The Tox outlet location, induce any person employed by us to leave their employment; do any act that could damage the goodwill of our trademarks or System, or disrupt or jeopardize our business or that of our franchisees. |
| s. | Modification of the agreement | Section 12.4 | No oral modifications. No amendment of the provisions will be binding upon either party unless the amendment has been made in writing and executed by all interested parties. |
| t. | Integration/merger clause | Section 12.4 | Only the terms of the Multi-Unit Development Agreement and other related written agreements are binding (subject to applicable state law.) Any representations or promises outside of Multi-Unit Development Agreement may not be enforceable. Notwithstanding the foregoing, nothing in the Multi-Unit Development Agreement is intended to disclaim the express representations made in this Franchise Disclosure Document. |
| u. | Dispute resolution by arbitration or mediation | Sections 10.1, 10.2, 10.3, and 10.4 | At our option, claims that are not resolved internally may be submitted to non-binding mediation only at our headquarters located in Vero Beach, Florida. |
| v. | Choice of forum | Section 10.5 | Litigation takes place in Florida (subject to applicable state law). |
| w. | Choice of law | Section 10.5 | Florida law applies (subject to applicable state law). |

See the state addenda to this Franchise Disclosure Document, the Franchise Agreement and the Multi-Unit Development Agreement for special state disclosures.

**ITEM 18:      PUBLIC FIGURES**

We do not currently use any public figures to promote our franchise.

**ITEM 19:      FINANCIAL PERFORMANCE REPRESENTATIONS**

The FTC's Franchise Rule permits a franchisor to provide information about the actual or potential financial performance of its franchised and/or franchisor-owned outlets, if there is a reasonable basis for the information, and if the information is included in the disclosure document. Financial

performance information that differs from that included in Item 19 may be given only if: (1) a franchisor provides the actual records of an existing outlet you are considering buying; or (2) a franchisor supplements the information provided in this Item 19, for example, by providing information about possible performance at a particular location or under particular circumstances.

This Item contains an historic financial performance representation of existing outlets at the end of our last fiscal year, February 28, 2022. As of February 28, 2022, we had a total of 9 affiliate-owned outlets and 1 franchised outlet. We have excluded the following affiliate-owned outlets: 1 outlet has been excluded as it primarily operates as corporate offices and warehousing for our affiliate, The Tox Manufacturing Group, LLC; 1 outlet has been excluded because it operates with limited staffing; 1 outlet has been excluded because it operates from a limited space and is not representative of the size of the facility from which franchisees will operate; 1 outlet has been excluded because its bookkeeping was done in conjunction with other locations, and as a result, we do not have reliable financial data specific to this outlet; and 2 outlets have been excluded because they have been closed for prolonged periods of time throughout the past 12 months.

The information provided below is from July 1, 2022 to June 30, 2023. The data used in preparing this financial performance representation was compiled from information contained in the POS System (Mindbody) for each location. Outlet 4 in each of the below tables shows the financial performance representation based on our only franchised outlet in operation as of February 28, 2022.

Table 1

|  | Outlet 1 | Outlet 2 | Outlet 3 | Outlet 4 | Average |
|---|---|---|---|---|---|
| Opening Date | 7/5/22 | 11/1/21 | 2/1/22 | 6/12/22 |  |
| Total Annual Client Visits | 2,219 | 5,781 | 3,726 | 2,038 | 3,441 |
| Outlet Sq. Ft. | 2,150 | 2,000 | 1,823 | 1,890 | 1,966 |
| Treatment Rooms | 2 | 6 | 5 | 4 | 4 |
| Average Ticket Per Customer | $303 | $288 | $292 | $276 | $290 |

Table 2

|  | Outlet 1 | Outlet 2 | Outlet 3 | Outlet 4 | Average | % |
|---|---|---|---|---|---|---|
| **Revenue** | | | | | | |
| The Master Tox | $369,855 | $901,760 | $475,696 | $202,604 | $491,986 | 49.3% |
| 90-Minute Master Tox | $60,863 | $167,712 | $143,848 | $81,263 | $113,422 | 11.4% |
| Master Tox + Facial Sculpting | $86,017 | $196,608 | $62,625 | $116,520 | $115,443 | 11.6% |
| 90-Minute Master Tox + Facial Sculpting | $20,681 | $61,254 | $149,975 | $20,867 | $63,194 | 6.3% |
| Sculpting Facial Treatment | $12,727 | $30,545 | $29,768 | $12,068 | $21,277 | 2.1% |
| Tox Products | $41,387 | $105,562 | $81,567 | $44,897 | $68,353 | 6.9% |
| Rescheduling Fees | $3,525 | $9,120 | $3,850 | $1,200 | $4,424 | 0.4% |
| Credit Card Gratuities | $73,490 | $187,798 | $136,252 | $63,271 | $115,203 | 11.5% |
| Facility Service Charge | $3,002 | $6,933 | $5,069 | $1,666 | $4,168 | 0.4% |
| **Total Gross Revenue** | **$671,577** | **$1,667,292** | **$1,088,650** | **$562,356** | **$997,469** | **100%** |
| **Cost of Goods Sold** | | | | | | |
| Products Used for Services | $10,549 | $28,667 | $22,960 | $0 | $20,725 | 22.6% |
| Wholesale Tox Products | $14,801 | $36,527 | $25,474 | $10,752 | $21,889 | 24.0% |
| Merchant Fees | $21,705 | $59,210 | $34,284 | $9,636 | $31,209 | 34.3% |
| Laundry Services | $12,009 | $33,638 | $18,630 | $4,558 | $17,209 | 18.3% |

| | | | | | | |
|---|---|---|---|---|---|---|
| Quench Water Service | $780 | $780 | $780 | $0 | $585 | 0.6% |
| **Total Cost of Goods Sold** | **$59,844** | **$158,822** | **$102,128** | **$25,826** | **$91,836** | **100%** |
| | | | | | | |
| **Gross Profit** | **$611,733** | **$1,508,470** | **$986,522** | **$536,530** | **$905,632** | |
| **Operating Expenses** | | | | | | |
| Mindbody | $3,645 | $3,645 | $3,889 | $6,520 | $4,425 | 0.8% |
| Insurance | $1,163 | $8,097 | $1,117 | $5,525 | $3,976 | 0.7% |
| Supplies | $10,545 | $16,107 | $11,368 | $19,633 | $14,413 | 2.6% |
| Payroll | $266,038 | $714,798 | $421,122 | $285,460 | $421,854 | 75.5% |
| Rent | $73,821 | $154,053 | $95,838 | $57,605 | $95,329 | 17.1% |
| Utilities | $5,253 | $14,411 | $4,772 | $6,701 | $7,784 | 1.4% |
| Cleaning Services | $11,226 | $11,226 | $0 | $0 | $5,613 | 1.0% |
| **Total Operating Expenses** | **$371,691** | **$922,337** | **$538,106** | **$381,444** | **$553,395** | **100%** |
| | | | | | | |
| **Net Income** | **$240,042** | **$586,133** | **$448,916** | **$155,086** | **$357,544** | |
| **Franchise-Related Expenses** | | | | | | |
| Royalty Fee | $53,726 | $133,383 | $87,092 | $44,988 | $79,798 | |
| Brand Fund | $13,432 | $33,346 | $21,733 | $11,247 | $19,949 | |
| | | | | | | |
| **Adjusted Net Income** | **$172,844** | **$419,404** | **$339,551** | **$98,851** | **$257,663** | |
| **Margin** | **25.7%** | **25.2%** | **31.2%** | **17.5%** | **25.8%** | |

Table 3

| | High | Low | Average | Median |
|---|---|---|---|---|
| Total Gross Revenue | $1,667,292 | $562,356 | $997,469 | $880,114 |
| Adjusted Net Income | $419,404 | $98,851 | $257,663 | $256,197.50 |
| Margin | 31.2% | 17.5% | 25.8% | 25.45% |

Table 4

| 7/1/2022 - 6/30/2023 | Outlet 1 | Outlet 2 | Outlet 3 | Outlet 4 | AVERAGES |
|---|---|---|---|---|---|
| **New Clients** | 694 | 1472 | 1182 | 989 | **1084** |
| **Repeat Clients** | N/A | 413 | 261 | 26 | **233** |
| **Repeat Clients Retained** | N/A | 258 | 152 | 15 | **142** |
| **Repeat Client Retention Rate** | N/A | 62.5% | 58.2% | 57.7% | **59.5%** |
| **Total Clients** | 694 | 1885 | 1443 | 1015 | **1259** |
| **Portion of New Clients** | 100% | 78% | 82% | 97% | |
| **Portion of Repeat Clients** | N/A | 22% | 18% | 3% | |

* With respect to the above chart, the numbers provided indicate how many clients from July 1, 2021 to June 30, 2022 returned during the period from July 1, 2022 to June 30, 2023. Outlet 1 opened in July 2022 and Outlet 4 opened in June 2022. As a result, Outlet 1 did not have any clients to compare for the stated period, and we are only able to state the number of clients from June 2022 that returned to Outlet 4 during the period of July 1, 2022 to June 30, 2023.

Table 5

| STAFF MEMBER STATE | POSITION | NUMBER OF CLIENTS | AVERAGE HOURS WORKED PER WEEK | TOTAL COMPENSATION Including Tips | TIPS |
|---|---|---|---|---|---|
| NEW YORK | FULL-YEAR TECHNICIAN | 819 | 27.6 | $81,755 | $28,651 |
| NEW YORK | FULL-YEAR TECHNICIAN | 758 | 26.7 | $74,775 | $24,415 |
| NEW YORK | FULL-YEAR TECHNICIAN | 787 | 26.2 | $73,789 | $24,512 |
| TEXAS | FULL-YEAR TECHNICIAN | 789 | 28.1 | $70,136 | $31,995 |
| ARIZONA | FULL-YEAR TECHNICIAN | 628 | 23.4 | $55,527 | $20,514 |
| NEW YORK | FULL-YEAR TECHNICIAN | 638 | 21.2 | $52,859 | $20,360 |
| TEXAS | FULL-YEAR TECHNICIAN | 571 | 19.1 | $47,952 | $21,288 |
| NEW YORK | MANAGER | | | $47,849 | |
| ARIZONA | FULL-YEAR TECHNICIAN | 544 | 20.7 | $47,141 | $16,354 |
| NEW YORK | MANAGER HALF YEAR | | | $46,488 | |
| NEW YORK | FULL-YEAR TECHNICIAN | 418 | 14.1 | $41,657 | $14,045 |
| TEXAS | CO MANAGER | START DATE 10/3/22 | | $26,994 | |
| NEW YORK | FULL-YEAR TECHNICIAN | 303 | 10.0 | $26,091 | $10,743 |
| NEW YORK | FRONT DESK | WORKED 7/22/22-3/13/23 | | $21,479 | |
| TEXAS | CO MANAGER | START DATE 12/5/22 | | $19,964 | |
| NEW YORK | FULL-YEAR TECHNICIAN | 218 | 7.0 | $17,961 | $5,501 |
| NEW YORK | FULL-YEAR TECHNICIAN | 202 | 7.9 | $15,733 | $6,873 |
| NEW YORK | FRONT DESK | FULL TIME, START DATE 11/1/22 | | $15,694 | |

Notes Regarding the Above Financial Performance Representation:

1. These results are unaudited.

2. These results represent sales of products and services which will be available for franchisees to sell.

3. The affiliate-owned locations included above operate without territorial restrictions, and are not required to pay us a royalty fee or contribution to the Brand Fund. For our affiliate-owned outlets, these amounts represent the hypothetical Royalty Fee and Brand Fund Contribution our affiliates would pay under the Franchise Agreement. Other than the size of your territory and the hypothetical Royalty Fee and Brand Fund Contributions, there are no material differences between the affiliate-owned outlets disclosed in this Item 19 and the outlet you will operate.

4. The percentage column represents the average of each subcategory as a percentage of the average of each main category. For example, the percentage stated with respect to "The Master Tox" is calculated as $491,986 (the average revenue generated across all 4 included outlets from The Master Tox) divided by $997,469 (the average Total Gross Revenue across all 4 included outlets) multiplied by 100.

DocuSign Envelope ID: EC868933-7613-4774-90BF-7AB1F57B12C1

5. Gross Profit is calculated as Total Gross Revenue less Total Cost of Goods Sold. Net Income is calculated as Gross Profit less Total Operating Expenses. Adjusted Net Income is calculated as Net Income less Franchise-Related Expenses.

**Some outlets have earned this much. Your individual results may differ. There is no assurance that you'll earn as much.**

Written substantiation for the financial performance representation will be made available to you upon reasonable request.

Other than the preceding information, we do not make any representations about a franchisee's future financial performance or the past financial performance of company-owned or franchised outlets. We also do not authorize our employees or representatives to make any such representations either orally or in writing. If you are purchasing an existing outlet, however, we may provide you with the actual records of that outlet. If you receive any other financial performance information or projections of your future income, you should report it to the franchisor's management by contacting Courtney Yeager at The Tox Franchising Group, LLC, 2145 Sanford Court, Vero Beach, Florida 32963, 772-253-1403, the Federal Trade Commission, and the appropriate state regulatory agencies.

**ITEM 20:** **OUTLETS AND FRANCHISEE INFORMATION**

Table No. 1

System-wide Outlet Summary
For Years 2021 to 2023

| Column 1 Outlet Type | Column 2 Year | Column 3 Outlets at the Start of the Year | Column 4 Outlets at the End of the Year | Column 5 Net Change |
|---|---|---|---|---|
| Franchised | 2021 | 0 | 0 | 0 |
| | 2022 | 0 | 0 | 0 |
| | 2023 | 0 | 1 | +1 |
| Company – Owned* | 2021 | 2 | 4 | +2 |
| | 2022 | 4 | 7 | +3 |
| | 2023 | 7 | 9 | +2 |
| Total Outlets | 2021 | 2 | 4 | +2 |
| | 2022 | 4 | 7 | +3 |
| | 2023 | 7 | 10 | +3 |

\* Company-owned outlets are operated by affiliated entities.

Table No. 2

Transfers of Outlets From Franchisees to New Owners (Other than the Franchisor)
For Years 2021 to 2023

| Column 1 State | Column 2 Year | Column 3 Number of Transfers |
|---|---|---|

| None | 2021 | 0 |
|---|---|---|
| | 2022 | 0 |
| | 2023 | 0 |
| Total | 2021 | 0 |
| | 2022 | 0 |
| | 2023 | 0 |

Table No. 3

Status of Franchised Outlets
For Years 2021 to 2023

| Column 1 State | Column 2 Year | Column 3 Outlets at Start of Year | Column 4 Outlets Opened | Column 5 Terminations | Column 6 Non-renewals | Column 7 Reacquired by Franchisor | Column 8 Ceased Operations - Other Reasons | Column 9 Outlets at End of the Year |
|---|---|---|---|---|---|---|---|---|
| AZ | 2021 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| | 2022 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| | 2023 | 0 | 1 | 0 | 0 | 0 | 0 | 1 |
| Totals | 2021 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| | 2022 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| | 2023 | 0 | 1 | 0 | 0 | 0 | 0 | 1 |

Table No. 4

Status of Company Owned* Outlets
For Years 2021 to 2023

| Col. 1 State | Col. 2 Year | Col. 3 Outlets at Start of Year | Col. 4 Outlets Opened | Col. 5 Outlets Reacquired from Franchisees | Col. 6 Outlets Closed | Col. 7 Outlets Sold to Franchisees | Col. 8 Outlets at End of the Year |
|---|---|---|---|---|---|---|---|
| CA | 2021 | 1 | 1 | 0 | 0 | 0 | 2 |
| | 2022 | 2 | 1 | 0 | 0 | 0 | 3 |
| | 2023 | 3 | 0 | 0 | 0 | 0 | 3 |
| FL | 2021 | 0 | 1 | 0 | 0 | 0 | 1 |
| | 2022 | 1 | 0 | 0 | 0 | 0 | 1 |
| | 2023 | 1 | 0 | 0 | 0 | 0 | 1 |
| NY | 2021 | 1 | 0 | 0 | 0 | 0 | 1 |
| | 2022 | 1 | 1 | 0 | 0 | 0 | 2 |
| | 2023 | 2 | 1 | 0 | 0 | 0 | 3 |
| TX | 2021 | 0 | 0 | 0 | 0 | 0 | 0 |
| | 2022 | 0 | 1 | 0 | 0 | 0 | 1 |
| | 2023 | 1 | 1 | 0 | 0 | 0 | 1 |
| Total | 2020 | 2 | 2 | 0 | 0 | 0 | 4 |

| | 2021 | 4 | 3 | 0 | 0 | 0 | 7 |
| | 2022 | 7 | 2 | 0 | 0 | 0 | 9 |

* Company-owned outlets are operated by affiliated entities.

Table No. 5
Projected Openings as of February 28, 2023

| Column 1<br>State | Column 2<br>Franchise Agreements Signed But Outlet Not Opened | Column 3<br>Projected New Franchised Outlets in the Next Fiscal Year | Column 4<br>Projected New Company Owned Outlets in the Next Fiscal Year |
|---|---|---|---|
| DC | 0 | 0 | 1 |
| GA | 1 | 1 | 0 |
| MA | 0 | 0 | 1 |
| NV | 0 | 0 | 1 |
| TX | 0 | 0 | 1 |
| Total | 1 | 1 | 4 |

* Company-owned stores are operated by affiliated entities.

Exhibit F lists the location of each The Tox franchised outlet in our System and each franchisee during our last fiscal year who has had an outlet terminated, canceled, not renewed, or has otherwise voluntarily or involuntarily ceased to do business under the franchise agreement or has not communicated with us within 10 weeks of the date of this Disclosure Document. If you buy this franchise, your contact information may be disclosed to other buyers when you leave the franchise system.

No franchisee has signed confidentiality clauses during the last three years.

There are no trademark-specific franchisee organizations associated with the franchise system being offered in this Franchise Disclosure Document.

## ITEM 21:       FINANCIAL STATEMENTS

The Tox Franchising Group, LLC was formed on January 24, 2021. Because we have not been in business for three (3) years, we are not able to include the three (3) prior years of audited financial statements normally required by this Item 21. Exhibit D contains our audited financial statements dated as of February 28, 2022 and February 28, 2023.

Our fiscal year end is February 28.

## ITEM 22:       CONTRACTS

Copies of all proposed agreements regarding the franchise offering are included in Exhibit B. These include our Franchise Agreement and all attachments to it (Marks; Territory Description; General Release; ACH Authorization; Collateral Assignment of Lease; Statement of Ownership Interests in Franchisee; Telephone, Internet Web Sites and Listings Agreement; Spousal Guaranty;

49

Confidentiality and Non-Compete Agreement;). Our Multi-Unit Development Agreement and all exhibits to it is included in Exhibit C. Our Franchise Acknowledgement Statement is included in Exhibit G on page 58.

**ITEM 23:**      **RECEIPT**

A receipt in duplicate is attached to this Disclosure Document as Exhibit I. You should sign both copies of the receipt. Keep one copy for your own records and return the other signed copy to Courtney Yeager, 2145 Sanford Court, Vero Beach, Florida 32963.

# EXHIBIT A

## AGENCIES/AGENTS FOR SERVICE OF PROCESS

This list includes the names, addresses and telephone numbers of state agencies having responsibility for franchising disclosure/registration laws, and serving as our agents for service of process (to the extent that we are registered in their states). This list also includes the names, addresses and telephone numbers of other agencies, companies or entities serving as our agents for service of process.

| State | State Agency | Agent for Service of Process |
|---|---|---|
| CALIFORNIA | Commissioner of Business Oversight<br>Department of Financial Protection and Innovation<br>320 West 4th Street, Suite 750<br>Los Angeles, CA  90013<br>(213) 576-7505<br>Toll-free (866-275-2677) | Commissioner of Business Oversight |
| CONNECTICUT | State of Connecticut<br>Department of Banking<br>Securities & Business Investments Division<br>260 Constitution Plaza<br>Hartford, CT  06103-1800<br>(860) 240-8230 | Banking Commissioner |
| HAWAII | Business Registration Division<br>Department of Commerce and<br> Consumer Affairs<br>335 Merchant Street, Room 203<br>Honolulu, HI  96813<br>(808) 586-2722 | Commissioner of Securities of the State of Hawaii |
| ILLINOIS | Office of Attorney General<br>Franchise Division<br>500 South Second Street<br>Springfield, IL  62706<br>(217) 782-4465 | Illinois Attorney General |
| INDIANA | Indiana Secretary of State<br>Securities Division<br>302 West Washington St., Room E-111<br>Indianapolis, IN  46204<br>(317) 232-6681 | Indiana Secretary of State<br>201 State House<br>Indianapolis, IN  46204 |
| MARYLAND | Office of the Attorney General<br>Division of Securities<br>200 St. Paul Place<br>Baltimore, MD  21202-2020<br>(410) 576-6360 | Maryland Securities Commissioner<br>200 St. Paul Place<br>Baltimore, MD  21202-2020<br>(410) 576-6360 |
| MICHIGAN | Michigan Department of Attorney General<br>Consumer Protection Division<br>Antitrust and Franchise Unit<br>670 Law Building<br>Lansing, MI  48913<br>(517) 373-7117 | Michigan Department of Commerce, Corporations and Securities Bureau |

| State | State Agency | Agent for Service of Process |
|---|---|---|
| MINNESOTA | Minnesota Department of Commerce<br>85 7th Place East, Suite 280<br>St. Paul, MN  55101-2198<br>(651) 539-1500 | Minnesota Commissioner of Commerce |
| NEW YORK | Office of the New York State Attorney General<br>Investor Protection Bureau, Franchise Section<br>28 Liberty Street, 21st Floor<br>New York, NY  10005<br>(212) 416-8211 Phone<br>(212) 416-6042   Fax | Attention: New York Secretary of State<br>New York Department of State<br>One Commerce Plaza<br>99 Washington Avenue, 6th Floor<br>Albany, NY 11231-0001<br>(518) 473-2492 |
| NORTH DAKOTA | North Dakota Securities Department<br>600 East Boulevard, 5th Floor<br>Bismarck, ND  58505-0510<br>(701) 328-4712 | North Dakota Securities Commissioner |
| OREGON | Department of Consumer and Business Services<br>Division of Finance and Corporate Labor and Industries Building<br>Salem, Oregon 97310<br>(503) 378-4387 | Director of the Department of Consumer and Business Services |
| RHODE ISLAND | Department of Business Regulation<br>Division of Securities<br>1511 Pontiac Avenue, Building 69-1<br>Cranston, RI 02920<br>(401) 462-9585 | Director of Rhode Island Department of Business Regulation |
| SOUTH DAKOTA | Division of Insurance<br>Securities Regulation<br>124 South Euclid, Suite 104<br>Pierre, SD  57501<br>(605) 773-3563 | Director of Insurance-Securities Regulation |
| VIRGINIA | State Corporation Commission<br>Division of Securities and Retail Franchising<br>1300 East Main Street, 9th Floor<br>Richmond, VA  23219<br>(804) 371-9051 | Clerk of State Corporation Commission<br>1300 East Main Street, 1st Floor<br>Richmond, VA  23219<br>(804) 371-9733 |
| WASHINGTON | Department of Financial Institutions<br>Securities Division<br>P.O. Box 9033<br>Olympia, WA  98507-9033<br> (360) 902-8760 | Director of Washington Financial Institutions Securities Division<br>150 Israel Road, SW<br>Tumwater, WA  98501 |
| WISCONSIN | Wisconsin Securities Commissioner<br>Securities and Franchise Registration<br>345 W. Washington Avenue<br>Madison, WI  53703<br>(608) 266-8559 | Commissioner of Securities of Wisconsin |

**EXHIBIT B**

## FRANCHISE AGREEMENT

DocuSign Envelope ID: EC868933-7613-4774-99BF-7AB1F57B12C1

THE TOX FRANCHISING GROUP, LLC
FRANCHISE AGREEMENT

# Table of Contents

1. RECITATIONS. 2

2. GRANT OF FRANCHISE. 2

3. TERRITORY 3

4. TERM. 3

5.RENEWAL OPTIONS. 3

6. FEES 5

7. TRAINING 8

8. FRANCHISED BUSINESS SITE REQUIREMENTS 9

9. MAINTENANCE AND IMPROVEMENT OF THE FRANCHISED LOCATION AND SYSTEM 13

10. FRANCHISOR'S OBLIGATIONS 14

11. FRANCHISEE'S REPRESENTATIONS, WARRANTIES AND COVENANTS 15

12. FRANCHISEE'S OPERATIONS 18

13. ADVERTISING, PROMOTIONS AND RELATED FEES 23

14. INTELLECTUAL PROPERTY 27

15. INSURANCE AND INDEMNIFICATION 29

16. TRANSFERS 32

17. DEFAULTS 36

18. POST-TERMINATION 39

19. NON-DISCLOSURE AND NON-COMPETITION COVENANTS 41

20.  DISPUTE RESOLUTION 45

21. GENERAL 47

22. ACKNOWLEDGMENTS. **ERROR! BOOKMARK NOT DEFINED.**

Attachment 1:     Trademarks
Attachment 2:     Territory and Franchised Business Location
Attachment 3:     Release
Attachment 4:     Collateral Assignment of Lease
Attachment 5:     ACH Authorization
Attachment 6:     Statement of Ownership Interests in Franchisee
Attachment 7:     Internet Advertising, Social Media, and Telephone Account Agreement
Attachment 8:     Guaranty
Attachment 9:     Confidentiality and Non-Compete Agreement

THIS FRANCHISE AGREEMENT (this "Agreement") is being entered into this day of ___ _____ (the "Effective Date") by and between The Tox Franchising Group, LLC, a Florida limited liability company with its principal place of business at 2145 Sanford Court, Vero Beach, Florida 32963 (herein "Franchisor") and _____ _____, a(n) _____, with its principal place of business located at_____ _____ and _____'s principals _____ _____, an individual residing at _____ and _____ _____, an individual residing at _____ ("Principal(s)"). _____ and Principal(s) shall be collectively referred to in this Agreement as the "Franchisee".

## RECITATIONS

Through the expenditure of considerable time, effort and money, Franchisor has developed and established unique and distinctive businesses that provide lymphatic-based body sculpting services and related products and merchandise under The Tox trademarks and using Franchisor's confidential operations manual (the "Manual") of business practices and policies, and Franchisor's distinctive décor, fixtures and furnishings, operations methods, sales techniques, inventory, procedures for management control and training, assistance, advertising, and promotional programs, all of which may be changed, improved or further developed by Franchisor at any time (taken together herein, the "System").

The System is identified by certain trade names, service marks, trademarks, logos, emblems and indicia of origin, including but not limited to The Tox service marks, as set forth in Attachment 1, and such other trade names, service marks, and trademarks as are now designated and may hereafter be designated or substituted by Franchisor for use in connection with the System (the "Marks").

Franchisor continues to develop, use, and control the use of such Marks in order to identify for the public the source of services and products marketed under the Marks and the System and to represent the System's high standards of quality, appearance, and service.

Franchisee understands and acknowledges the importance of Franchisor's high and uniform standards of quality, service, and appearance, and the necessity of operating the business franchised hereunder in conformity with Franchisor's standards and specifications.

NOW, THEREFORE, the parties, in consideration of the promises, undertakings and commitments of each party to the other set forth herein, and intending to be legally bound hereby, mutually agree as follows:

1.      **RECITATIONS**.  The Recitations set out above form part of this Agreement.

2.      **GRANT OF FRANCHISE**.  Franchisor hereby grants to Franchisee and Franchisee accepts, upon the terms and conditions contained in this Agreement, the license to operate a The Tox franchise (the "Franchised Business"), using only the Marks licensed hereunder, in strict conformity with the System, which may be changed, improved and further developed by Franchisor from time to time.

This grant applies only to a single location within a territory that is designated in Attachment 2 hereto and incorporated herein (the "Territory").

3.    **TERRITORY**

3.1    Territory.  This Agreement grants Franchisee the right to operate the Franchise Business at a single location within the Territory. Subject to Section 3.2 below, Franchisor agrees that Franchisor will not operate, and will not authorize any other franchisees to operate, a The Tox outlet in the Territory using the same Marks as licensed to Franchisee in this Agreement so long as Franchisee is not in default under this Agreement or this Agreement has not been terminated. Except as otherwise specified in this Agreement, Franchisor reserves the right to open, operate or franchise The Tox franchises around, bordering, and adjacent to the Territory. Franchisee will be selling its products and services from a single location that will be determined by Franchisee with Franchisor's prior written approval, which may be withheld or denied in Franchisor's sole discretion. Franchisee is prohibited from selling and soliciting customers through alternative distribution channels as more fully specified herein.

3.2    Reservation of Rights. Franchisee understands and agrees that all rights to any businesses, other than as specified in this Agreement, are fully reserved to Franchisor within or outside of the Territory. By way of example only, Franchisor reserves the rights to offer (i) other services and products not offered under the Marks, (ii) other lifestyle concepts or products under the Marks or other trademarks, and (iii) products or services through other channels of distribution in the Territory including, but not limited to, co-branding with other health-conscious lifestyle businesses, and products offered through retail stores, in captive market locations, the Internet or direct marketing ("Alternate Distribution Channels"). Franchisee will receive no compensation for Franchisor's sales through Alternate Distribution Channels made within the Territory.  Franchisee agrees that such implementation of Franchisor's rights pursuant to this Section 3.2 is deemed not to impair or injure Franchisee's rights pursuant to Section 2 hereof.

4.    **TERM**.  Unless terminated earlier in accordance with the terms set forth in this Agreement, this Agreement and the Franchise granted hereunder shall commence upon the Effective Date set forth above, and terminate on the date that is ten (10) years following the Opening Date, as defined in Section 8 hereof (the "Term").

5.    **SUCCESSOR OPTIONS**.   Subject to the terms and conditions of this Agreement, Franchisee shall have the right, following the expiration of the Term hereof, to enter into a new franchise agreement and other agreements then customarily employed by Franchisor and in the form then generally being offered to prospective franchisees in the state in which the Territory is located (the "Successor Franchise Agreement") for up to two (2) additional terms equal to five (5) years each. The term of each such Successor Franchise Agreement shall commence upon the date of expiration of the immediately preceding term.  Franchisee shall be charged a renewal fee equal to fifty percent (50%) of the then-current initial franchise fee ("Renewal Fee").

5.1 <u>Form and Manner of Successor Agreement.</u>   If Franchisee desires to exercise Franchisee's option to enter into a Successor Franchise Agreement, it shall be done in the following manner:

 5.1.1 Not less than six (6) months prior to the expiration of the Term of this Agreement, Franchisee shall request from Franchisor in writing, a copy of Franchisor's then current Disclosure Document (including Franchisor's then current franchise agreement).

 5.1.2 Franchisee must execute and return to Franchisor all required documents, including any and all ancillary documents, within thirty (30) days after receipt by Franchisee of a copy of Franchisor's then current Disclosure Document.

 5.1.3 The Renewal Franchise Agreement shall supersede this Agreement in all respects, and Franchisee understands and acknowledges that the terms of such new agreement may differ from the terms of this Agreement, including, without limitation, higher or lower royalty and other fees.

 5.1.4 If Franchisee fails to perform any of the acts, or deliver any of the notices required pursuant to this Paragraph 5 in a timely fashion, such failure shall be deemed an election by Franchisee not to exercise Franchisee's option to enter into the Renewal Franchise Agreement, and such failure shall cause Franchisee's right and option to automatically lapse and expire, without further notice by Franchisor.

 5.1.5 Franchisee acknowledges that the initial Term of this Agreement provides Franchisee more than a sufficient opportunity to recoup Franchisee's investment in the Franchise, as well as a reasonable return on such investment.

5.2 <u>Conditions of Successor Agreement.</u>   Franchisee's right to enter into a Successor Franchise Agreement is conditioned upon the following:

 5.2.1 Franchisee shall be in full compliance with this Agreement and shall have materially performed Franchisee's obligations under this Agreement, the Manual and under all other agreements that may be in effect between Franchisee and Franchisor, including but not limited to all monetary obligations.

 5.2.2 Franchisee shall not have committed three (3) or more events constituting default during the then current Term of this Agreement, whether or not such defaults were cured.

 5.2.3 Franchisee will have completed any required additional training to Franchisor's reasonable satisfaction.

 5.2.4 Franchisee shall have obtained the right to continue to occupy the Franchised Business location following the expiration of the Term hereof for the full term of

the Successor Franchise Agreement and/or have received Franchisor's approval regarding locating the Franchised Business at a new location.

5.2.5 Franchisee shall execute a general release of all claims Franchisee may have against The Tox Franchising Group, LLC, its parent, subsidiaries and affiliates, its officers, directors, shareholders, agents, and employees, whether in their corporate and/or individual capacities, in the form attached hereto as Attachment 3. This release will include all claims arising under any federal, state, or local law, rule, or ordinance.

5.2.6 Franchisee performs such remodeling, repairs, replacements and redecoration as Franchisor may require in order to cause the Franchised Business premises and equipment, fixtures, furnishings and/or furniture to conform to the plans and specifications being used for new or remodeled franchised businesses on the renewal date.

5.2.7 Franchisee shall pay the required Successor Agreement Fee and sign the Successor Franchise Agreement.

5.3 <u>Notice Required by Law.</u>  If applicable law requires Franchisor to give notice to Franchisee prior to the expiration of the Term, this Agreement shall remain in effect on a month-to-month basis until Franchisor has given the notice required by such applicable law.  If Franchisor is not offering new The Tox franchises, is in the process of revising, amending or renewing Franchisor's form of franchise agreement or disclosure document, or Franchisor is not lawfully able to offer Franchisee the then current form of Successor Franchise Agreement at the time Franchisee advises Franchisor pursuant to Paragraph 5.2 hereof that Franchisee desires to renew, Franchisor may, in Franchisor's sole discretion, (i) offer to renew this Agreement upon the same terms set forth herein for the appropriate renewal term or (ii) offer to extend the Term hereof on a month-to-month basis following the expiration of the Term for as long as Franchisor deems necessary or appropriate so that Franchisor may lawfully offer the then current form of Successor Franchise Agreement.  Any timeframes specified in this Paragraph 5 shall be inclusive of any state mandated notice periods.

5.4 <u>Additional Reservation of Rights.</u>  Notwithstanding anything herein to the contrary, Franchisor reserves the right not to renew this Franchise as a result of a decision to withdraw from the Territory in which Franchisee's Franchised Business is located.

6. **FEES**

6.1 <u>Initial Franchise and Royalty Fee</u>. As part of the consideration for the right to operate the Franchise granted herein, Franchisee shall pay to Franchisor the following fees:

6.1.1 <u>Initial Franchise Fee</u>. Franchisee acknowledges and agrees that the grant of this Franchise and the rights and obligations of the parties under this Agreement constitute the sole and only consideration for the initial franchise fee of Forty-Nine Thousand Five Hundred Dollars ($49,500.00) (the "Initial Fee").  **The**

**Initial Fee is fully earned at the time this Franchise Agreement is signed and is not refundable under any circumstances.** Franchise shall pay the full amount of the Initial Fee to Franchisor upon Franchisee's execution of this Agreement.

6.1.2   <u>Royalty Fee.</u> Franchisee agrees to pay Franchisor, monthly throughout the Term, a royalty fee equal to the greater of One Thousand Dollars ($1,000) or eight percent (8%) of the Gross Revenue, as hereinafter defined, realized from the Franchised Business and from any other revenues received using Franchisor's methods, operations and/or trade secrets (the "Royalty Fee"). The term "Gross Revenues" means the aggregate of all revenues and income from any source derived, invoiced or received, by Franchisee from, through, by or on account of the operation of the Franchised Business whether invoiced only or received in cash, in services, in kind, from barter and/or exchange, on credit (whether or not payment is actually received) or otherwise.  It does not include (i) any sales tax or similar taxes collected from customers and turned over to the governmental authority imposing the tax, (ii) properly document refunds to customers, (iii) properly documented promotional discounts (i.e., coupons), or (iv) properly documented employee discounts (limited to 3% of Gross Revenue). Gross Revenue does not include gift card purchases, at the time of purchase, but does include the redemption amount of purchases made by gift card. At Franchisor's option, Franchisee shall submit, or grant Franchisor access to, the Gross Revenue Report by an electronic transfer of data via the POS System at the times and interims specified by Franchisor.

6.1.3   <u>Gross Revenue Reports</u>.  Franchisee shall, on Tuesday for each week for Gross Revenue of the prior week (Monday through Sunday), furnish Franchisor with a report showing Franchisee's Gross Revenue from the Franchised Business and/or made pursuant to the rights granted hereunder during such period (the "Gross Revenue Report").  The Gross Revenue Report shall be in such form and shall contain such information as Franchisor may from time to time prescribe. Franchisor reserves the right to establish a point of sale system ("POS System") that Franchisor may require Franchisee to use in the operation of the Franchised Business. At Franchisor's option, Franchisee shall submit the Gross Revenue Report by an electronic transfer of data via the POS System at the times and interims then specified by Franchisor.

6.1.4   <u>Method of Payment</u>.  Franchisee shall, together with the submission of the Gross Revenue Report, pay Franchisor the Royalty Fee, Technology Fee and the Brand Fund Contribution, as defined and more particularly described in Article 13, then due.  At Franchisor's request, Franchisee must execute documents, including but not limited to, the Authorization attached as Attachment 5, that allow Franchisor to automatically take the Royalty Fee, Technology Fee and Brand Fund Contribution due as well as other sums due to Franchisor, from business bank accounts via electronic funds transfers or Automated Clearing House ("ACH") payments. Franchisee's failure to allow electronic funds transfers or ACH payments on an ongoing basis is a material breach of this Agreement. If Franchisee fails to timely

report Gross Revenue, then, in addition to a late fee and interest pursuant to Sections 6.2 and 6.3 hereof, Franchisor shall collect one hundred twenty percent (120%) of the last Royalty Fee payable. Franchisor shall reconcile amounts when Gross Revenues are reported. Franchisor reserves the right to modify the method and frequency of collection of the Royalty Fee and Brand Fund Contribution upon thirty (30) days' prior notice to Franchisee.

6.2   Late Fee.  If the Royalty Fee, Brand Fund Contribution, Technology Fee or any Gross Revenue Reports are not received by Franchisor as required by this Agreement, Franchisee shall pay to Franchisor, in addition to the overdue amount, a late fee of One Hundred Dollars ($100.00).  This late fee is reasonably related to Franchisor's costs resulting from the delay in payment and/or receipt of any report, is not a penalty, and is in addition to any other remedy available to Franchisor under this Agreement for Franchisee's failure to pay the Royalty Fee, the Brand Fund Contribution, and/or submit Gross Revenue Reports in accordance with the terms of this Agreement.

6.3   Interest.  Any and all amounts that shall become due and owing from Franchisee to Franchisor under the terms hereof shall bear interest from the date due until paid at the rate of 1.5% per month or at the highest rate permitted by law, whichever is lower.

6.4   Non-Sufficient Funds Fee.  In the event any of Franchisee's checks are returned, or an electronic funds transfer from Franchisee's bank account is denied, for insufficient funds, Franchisee shall pay Franchisor, in addition to the amount due, a non-sufficient funds fee of One Hundred Dollars ($100.00) per occurrence. This non-sufficient funds fee is reasonably related to Franchisor's costs resulting from the delayed and declined payment, is not a penalty, and is in addition to any other remedy available to Franchisor under this Agreement.

6.5   Technology Fee. Franchisee agrees to pay Franchisor, throughout the term of the Agreement, a technology fee equal to Three Hundred Fifty Dollars ($300.00) per month ("Technology Fee"). Franchisee shall pay the Technology Fee monthly, together with the first Royalty Fee and Brand Fund Contribution, as defined and more particularly described in Article 13, of each month for software license and/or maintenance fees, website hosting and/or maintenance, Franchisee web portal access, or other operations or communications systems. In Franchisor's sole discretion, Franchisor may (i) increase the amount of the technology fees upon thirty (30) days' prior notice to Franchisee or (ii) replace the software and technology with different technology, developed by Franchisor or a third-party, and Franchisee shall pay the then-current fees for the replacement technology and for continuous access thereto.

6.6   Taxes.  If any sales, excise, use or privilege tax is imposed or levied by any government or governmental agency on Franchisor for any Royalty Fee, Brand Fund Contribution or other fees due and payable to Franchisor under this Agreement, Franchisee shall pay Franchisor a sum equal to the amount of such tax.

## 7. TRAINING

7.1     Initial Training Program. Franchisee (specifically including all Franchisee's principals) shall attend and complete to Franchisor's sole and absolute satisfaction, Franchisor's initial management training program ("Initial Technique Training Program") prior to the opening of the Franchised Business, unless otherwise approved by Franchisor.   The Initial Technique Training Program consists of an eight (8) day course conducted, in Franchisor's discretion, at an affiliate-owned or franchised outlet, or at the Franchised Business location.  Franchisor reserves the right to designate an alternate location for the course component of the Initial Technique Training Program.  Franchisee must at all times during the term of this Agreement have principals who have successfully completed the Initial Technique Training Program to Franchisor's sole and complete satisfaction.  Franchisee shall pay Franchisor an Initial Technique Training Fee of Ten Thousand Dollars ($10,000.00), which is due and payable to Franchisor at least fifteen (15) days prior to Franchisee's commencement of the Initial Technique Training Program. Franchisee hereby authorizes Franchisor to take payment of the Initial Technique Training Fee, at Franchisor's option, through electronic funds transfer or ACH payment. The Initial Technique Training Fee includes up to eight (8) individuals, including Principal(s) and Franchisee's initial therapists ("Initial Trainees"). For any additional initial trainees beyond eight (8), the Initial Technique Training Fee shall be increased by Two Thousand Dollars ($2,000.00) per individual. In addition to the Initial Technique Training Fee, Franchisee shall be required to pay all of the expenses of the Initial Trainees, including, without limitation, costs of travel, lodging, meals and wages. In the event Franchisor elects, in its sole discretion, to require Franchisee to complete the Initial Technique Training Program at the Franchised Business Location, in addition to the Initial Technique Training Fee and the Initial Trainees' expenses, Franchisee shall be required to pay all of the expenses of Franchisor's training personnel, including, without limitation, costs of travel, lodging, and meals.

7.2     Satisfactory Completion. Franchisor shall determine, in Franchisor's sole discretion, whether the Initial Trainees have satisfactorily completed the Initial Management Training Program.  If the Initial Management Training Program is not satisfactorily completed by the Initial Trainees, or if Franchisor, in Franchisor's reasonable business judgment based upon the performance of the Initial Trainees, determines that the Initial Management Training Program cannot be satisfactorily completed by Franchisee and Franchisee's Principal(s), Franchisor may terminate this Agreement.

7.3     Opening Assistance.  Within sixty (60) days of the opening of the Franchised Business, Franchisor shall provide Franchisee with opening assistance by a trained representative of Franchisor.   The trainer will provide on-site opening training, supervision, and assistance to Franchisee for up to two (2) days at no charge to Franchisee.

7.4.    Additional Training.  Franchisor may offer mandatory and/or optional additional training programs from time to time.  If required by Franchisor, Franchisee, or Franchisee's principals shall participate in the following additional training:

DocuSign Envelope ID: EC868933-7613-4774-99BF-7AB1F57B12C1

(i) on-going training at a location designated by Franchisor.

(ii) an annual conference and/or annual training summit at a location designated by Franchisor.

Franchisor reserves the right to impose a reasonable fee for all additional training programs, including the annual conference and/or annual training summit.  Franchisee shall be responsible for any and all incidental expenses incurred by Franchisee or Franchisee's personnel in connection with additional training or attendance at Franchisor's annual conference or annual training summit, including, without limitation, costs of travel, lodging, meals and wages.  Franchisee's failure to attend and/or complete mandatory additional training or failure to attend Franchisor's annual conference or annual training summit is a default of this Agreement.  Franchisee or Franchisee's principal(s) shall be required to obtain any missed mandatory additional training at a location Franchisor designates.  Franchisee shall pay all costs and expenses for such additional training, including but not limited to, tuition at the then-current rate and any and all transportation, meals and lodging of Franchisee, Franchisee's principal(s) and Franchisor's training personnel.  Franchisee shall pay to Franchisor any incurred expenses by Franchisor's training personnel within ten (10) days of Franchisor's billing thereof to Franchisee.

7.5.  <u>On-Site Remedial Training</u>.  Upon Franchisee's reasonable request or as Franchisor shall deem appropriate, Franchisor shall, during the term hereof, subject to the availability of personnel, provide Franchisee with additional trained representatives who shall provide (i) on-site remedial training and assistance to Franchisee's personnel at the Franchised Business location, (ii) additional business training and assistance at Franchisor's headquarters or (iii) additional technique training and assistance at Franchisor's headquarters.  For any additional training and assistance, Franchisee shall pay the fee then being charged to franchisees under the System for the services of such trained representatives, plus (i) such trained representatives' costs of travel, lodging, and meals if provided at the Franchised Business location, or (ii) Franchisee's personnel's costs of travel, lodging and meals if provided at Franchisor's headquarters.

7.6.  <u>Counseling and Assistance</u>.  In addition to visits by Franchisor's field representatives, as Franchisor deems appropriate, Franchisor shall, within reasonable limits and subject to the availability of Franchisor's personnel, upon Franchisee's request and at no charge, unless such assistance is provided at the Franchised Business location pursuant to Section 7.5, furnish consultation and assistance to Franchisee, either in person or by telephone, video conference, electronic mail or postal service, as determined by Franchisor, in Franchisor's sole discretion, with respect to the operation of the Franchised Business, including consultation and advice regarding employee training, marketing, operation issues, bookkeeping and System improvements.

## 8. FRANCHISED BUSINESS SITE REQUIREMENTS

8.1 <u>Site Selection</u>.

DocuSign Envelope ID: EC868933-7613-4774-90BF-7AB1F57B12C1

8.1.1   Franchisee assumes all cost, liability, expense and responsibility for obtaining and developing a site for the Franchised Business within the Territory and for constructing and equipping the Franchised Business at such site. Franchisee shall not make any binding commitment to a prospective vendor or lessor of real estate with respect to a site for the Franchised Business unless the site location is approved by Franchisor. While Franchisor may render assistance to Franchisee in the selection of a site, as set forth in Section 8.1.2 below, Franchisee has the sole responsibility for procuring and developing a site for the Franchised Business and Franchisee may and is encouraged to consult with professionals of Franchisee's choosing in discharging such responsibility. Franchisee acknowledges that Franchisor's approval of a prospective site location is permission only, does not constitute a representation, promise, warranty or guarantee, express or implied, by Franchisor that the Franchised Business operated at that site will be profitable or otherwise successful, and cannot, and does not, create a liability for Franchisor. Franchisee releases Franchisor from any claims over the site location selection and evaluation by Franchisor, and Franchisee shall hold Franchisor harmless with respect to Franchisee's selection of the site for the Franchisee's Franchised Business.

8.1.2   Franchisor, in Franchisor's discretion, may require Franchisee to use Franchisor's designated broker and/or consultant for the purposes of locating a site for the Franchised Business. In such case, Franchisee shall pay all fees required by such broker or consultant for site selection assistance.

8.1.3   Franchisee shall locate a site that satisfies the site selection guidelines provided to Franchisee by Franchisor and shall submit to Franchisor, in writing, a description of the proposed site, together with such other information and materials as Franchisor may reasonably require. Recognizing that time is of the essence, Franchisee shall submit such information and materials for a proposed site to Franchisor for its consent no later than sixty (60) days after the execution of this Agreement.  Franchisor shall have ten (10) business days after receipt of this information and materials to consent, in its sole and absolute discretion, to the proposed site as the location of the Franchised Business. If Franchisor fails to respond to Franchisee's submission within ten (10) business days, such proposed site shall be deemed "disapproved".  No site may be used for the location of the Franchised Business unless it is consented to in writing by Franchisor.

8.1.4   Within thirty (30) days after Franchisor has consented to the site for the Franchised Business (or such longer period as Franchisor consents to in writing), Franchisee shall execute a lease therefor and obtain physical possession of the premises. Any lease must include Franchisor's Collateral Assignment of Lease Agreement, a copy of which is attached hereto as Attachment 4. Failure by Franchisee to acquire the site for the Franchised Business within the time and in the manner required herein shall constitute a material event of default under this Agreement.

DocuSign Envelope ID: EC868933-7613-4774-99BF-7AB1F57B12C1

8.1.5 Upon consent by Franchisor to the location of the Franchised Business, Franchisor shall set forth the location and Territory on Attachment 2 of this Agreement and shall provide a copy thereof to Franchisee. Attachment 2, as completed by Franchisor, shall be incorporated herein and made a part hereof. Franchisee shall notify Franchisor within fifteen (15) days of any error or rejection of Attachment 2; otherwise, Attachment 2 provided to Franchisee shall be deemed final.

8.2 Construction.

8.2.1 Franchisee shall be responsible for obtaining clearances that may be required by state or local laws, ordinances or regulations or that may be necessary as a result of any restrictive covenants relating to the Franchised Business location, including but not limited to, the availability of potable water. Prior to beginning the construction of the Franchised Business, Franchisee shall (a) obtain all permits, licenses, insurance and certifications required for the lawful construction or remodeling and operation of the Franchised Business, including permits for the installation of signage, and (b) certify in writing to Franchisor that all required approvals, clearances, permits, insurance and certifications have been obtained.

8.2.2 Franchisee must obtain all architectural, engineering, design, fabrication and installation services necessary for the construction and/or remodeling of the Franchised Business, including the installation of signage, at its own expense from vendor(s) designated or otherwise approved in writing by Franchisor. Franchisor shall provide layout and design guidance to Franchisee, as Franchisor deems appropriate, and Franchisor reserves the right to require Franchisee to pay a design fee of up to Five Hundred Dollars ($500.00). Franchisee acknowledges that Franchisor's or its representative's review of construction plans relates only to compliance with the System and that acceptance by Franchisor of such plans does not constitute a representation, warranty, or guarantee, express or implied, by Franchisor or its representative, including, but not limited to, any representation, warranty or guarantee that such plans are accurate or free of error, concerning their design or structural application.

8.2.3 During the time of construction or remodeling, Franchisee shall provide Franchisor, or its designated representative, with such periodic reports regarding the progress in obtaining all licenses and permits; and of the construction or remodeling as may be reasonably requested by Franchisor or its representative. In addition, Franchisor or its representative may make such on-site inspections as it may deem reasonably necessary to evaluate such progress. At least thirty (30) days prior to completion of the construction or remodeling, Franchisee shall notify Franchisor of the scheduled date for completion of construction or remodeling. Within a reasonable time after the date of completion of construction or remodeling, Franchisor or its representative may, at its option, conduct an inspection of the completed Franchised Business site.

DocuSign Envelope ID: EC868933-7613-4774-90BF-7AB1F57B12C1

8.2.4   Franchisee acknowledges and agrees that it will not open the Franchised Business for business without the written authorization of Franchisor and that authorization to open shall be conditioned upon Franchisee's strict compliance with this Agreement.

8.3   <u>Time to Open</u>.  Franchisee acknowledges that time is of the essence in this Agreement. Upon Franchisee's compliance with the conditions stated below, Franchisee shall open the Franchised Business, which shall be defined herein as the "Opening Date".  Prior to the Opening Date, Franchisee shall (i) satisfactorily complete Franchisor's Initial Training Program, as further set forth in Article 7, (ii) hire and train staff, (iii) obtain all required licenses to operate the Franchised Business, and (iv) secure and outfit a professional, commercial office.  If Franchisee fails to comply with any of such obligations, Franchisor shall have the right to prohibit Franchisee from opening for business.  Franchisee's failure to open the Franchised Business and commence business (i) in accordance with the foregoing and (ii) within (x) one hundred twenty (120) days following the date Franchisor consents to the site of the Franchised Business, or (y) within twelve (12) months of the Effective Date hereof, unless otherwise extended by Franchisor, shall be deemed a material event of default under this Agreement.

8.4   <u>No Relocation</u>. Franchisee's rights to operate the Franchised Business shall be limited to the location set forth in Attachment 2, and no other.  Franchisee shall not relocate the Franchised Business at any time without Franchisor's written approval, which approval shall be granted only in the sole and complete discretion of Franchisor, and if permitted, shall be at Franchisee's sole expense and subject to the following:

8.4.1   Franchisee shall continue to operate at the original Franchised Business site, where feasible, until construction of the new site is complete and ready to commence operation;

8.4.2   Franchisee shall construct and develop the new site to conform to Franchisor's then-current specifications for design, appearance and leasehold improvements for new Franchised Businesses;

8.4.3   Franchisee shall remove any signs or other property from the original Franchised Business location which identified the original Franchise Business location as part of the System;

8.4.4   If Franchisee is required to suspend operations at the original Franchised Business location, Franchisee agrees that, during the build-out, decorating and furnishing of the new site, and at Franchisor's sole and absolute discretion: (i) the term of this Agreement shall not be abated, and (ii) Franchisee shall remain liable to pay a minimum Royalty Fee and Brand Fund Contribution that is equal to the average amount paid by Franchisee during the four (4) calendar quarters immediately preceding the date that operations cease or the shorter period that Franchisee had been in business at the original Franchised Business location; and

8.4.5 Franchisor shall issue a revised Attachment 2, in accordance with Section 8.1.5, to reflect the address of the new Franchised Business location.

8.4.6 If a relocation site acceptable to Franchisor is not identified within sixty (60) days following Franchisee's request to relocate, Franchisor may terminate this Agreement.

## 9. MAINTENANCE AND IMPROVEMENT OF THE FRANCHISED LOCATION AND SYSTEM

9.1 <u>Maintenance of Franchised Business Location</u>.  Franchisee shall equip and maintain the Franchised Business location, the Computer System, and all hardware, software and related accessories to the standards of quality, repair and condition required by Franchisor, which standards are specified in the Manual and other written directives, standards and specifications. Franchisee, at Franchisee's expense, shall make such alterations, repairs, refurbishing and replacements as may be required to comply with Franchisor's standards, including, without limitation, periodic repairs or replacement of worn or impaired décor, materials, furniture, fixtures, equipment and computer hardware, software and accessories, as Franchisor may direct.

9.2 <u>Equipment and Technology Updates</u>.  Franchisee shall make any and all upgrades to equipment, including but not limited to, the Computer System, telecommunications hardware and software, payment processing systems, and any technology used in conjunction therewith, as Franchisor requires in its sole and absolute discretion.

9.3 <u>Trade Dress Modifications</u>.

9.3.1 Franchisee is aware that to maintain and improve the image and reputation of the System, Franchisor, in its sole and absolute discretion, may change and modify identifying elements of the System, including but not limited to, the adoption and use of new exterior building designs, new interior decors, new color schemes, new or modified marks, and new furnishings (collectively, "Trade Dress Modifications").

9.3.2 Upon Franchisor's request, no more often than once in a twenty-four (24) month period, Franchisee shall refurbish the Franchised Business location at Franchisee's sole expense, as required by Franchisor, to conform to Trade Dress Modifications. This includes, without limitation, structural changes, remodeling, redecoration, and modifications to existing improvements. F Notwithstanding the foregoing restriction on the frequency of Trade Dress Modifications, Franchisee, upon notice by Franchisor and in accordance with Section 14.6 hereof, shall immediately discontinue the use of any Mark that is no longer desirable or available to Franchisor and substitute a different Mark or Marks as Franchisor directs.

9.3.3 Franchisee will accept, use and display any such Trade Dress Modifications as if they were a part of this Franchise Agreement at the time of execution hereof.

9.4 <u>No Liability/Waiver of Claims</u>. Franchisor shall not be liable to Franchisee for any expenses, losses or damages sustained by Franchisee as a result of any of the modifications, including Trade Dress Modifications, required by this Article 9. Franchisee hereby covenants not to commence or join in any litigation or other proceeding against Franchisor or any third party, complaining of any such or seeking expenses, losses or damages caused thereby. Further, Franchisee expressly waives any claims, demands or damages arising from or related to the modifications contemplated by this Article 9, including, without limitation, any claim of breach of contract, breach of fiduciary duty, fraud, and/or breach of the implied covenant of good faith and fair dealing.

9.5 <u>Franchisee Advisory Council</u>. Franchisor reserves the right to create (and if created, the right to change or dissolve) a franchisee advisory council as a formal means for System franchisees to communicate ideas. In the event a franchisee advisory council is created, Franchisor may invite Franchisee to participate in council-related activities and meetings, which invitation may be based on a franchisee's level of success, superior performance and profitability. Franchisee shall attend advisory council programs, at Franchisee's expenses. Franchisor further reserves the right to assess a reasonable administrative fee for advisory council programming, which fee shall be payable by Franchisee upon written notice from Franchisor.

## 10. FRANCHISOR'S OBLIGATIONS

Franchisor and/or its designated representative will provide the services described below:

10.1 <u>Site Selection Guidelines</u>. Site selection criteria, as Franchisor may deem advisable. Franchisor shall also approve the site in accordance with Section 8.1.2.

10.2 <u>Construction</u>. Provide to Franchisee criteria and specifications for a The Tox outlet. Franchisee shall independently, and at Franchisee's expense, have such criteria and specifications incorporated into the construction of the Franchised Business in accordance with Article 8. Franchisor will also designate or otherwise approve vendors for architectural, design, fabrication and installation services for the Franchised Business.

10.3 <u>Manual</u>. Provide Franchisee access to the Confidential Operations Manual and such other manuals and written materials as Franchisor may hereafter develop for use by franchisees, as the same may be revised by Franchisor from time to time. Such documents may be provided electronically or via the Internet, at Franchisor's sole and absolute discretion.

10.4 <u>Inspection</u>. Inspection of the Franchised Business and evaluations of the products sold and services rendered therein whenever reasonably determined by Franchisor.

10.5 <u>Pre-Opening Requirements</u>. Provide a written list of equipment, fixtures, furnishings, signage, supplies and products that will be required and/or recommended to open the Franchised Business for business.

10.6 <u>Advertising Materials</u>. Provide samples or digital artwork of certain advertising and promotional materials and information developed by Franchisor from time to time for use by Franchisee in marketing and conducting local advertising for the Franchised Business.

10.7 <u>List of Suppliers</u>. Make available from time to time, and amend as deemed appropriate by Franchisor, a list of approved and/or recommended suppliers of products and services for System franchisees.

10.8 <u>Training</u>. The training programs specified in Article 7 herein.

10.9 <u>On-Going Assistance</u>. Post-opening assistance at the Franchised Business office location in accordance with the provisions of Article 7.

10.10 <u>Brand Fund</u>. Administer a Brand Fund in accordance with Section 13.3.

## 11. FRANCHISEE'S REPRESENTATIONS, WARRANTIES AND COVENANTS

11.1 <u>Best Efforts</u>. Franchisee, including each of Franchisee's Principals covenants and agrees that he or she shall make all commercially reasonable efforts to operate the Franchised Business so as to achieve optimum revenue.

11.2 <u>Corporate Representations</u>. If Franchisee is a corporation, partnership, limited liability company, or other legal entity, Franchisee and each Principal represent, warrant and covenant that:

11.2.1 Franchisee is duly organized and validly existing under the state law of its formation;

11.2.2 Franchisee is duly qualified and is authorized to do business in the jurisdiction of the Franchised Business location and the Territory;

11.2.3 Franchisee's organizational documents shall at all times provide that the activities of Franchisee are confined exclusively to the operation of the Franchise granted herein, unless otherwise consented to in writing by Franchisor, which consent may be withheld by Franchisor in Franchisor's sole discretion;

11.2.4 The execution of this Agreement and the consummation of the transactions contemplated hereby are within Franchisee's power and have been duly authorized by Franchisee;

11.2.5 Any financial statements and tax returns provided to Franchisor shall be certified as true, complete and correct and shall have been prepared in conformity with

generally accepted accounting principles applicable to the respective periods involved and, except as expressly described in the applicable notes, applied on a consistent basis. No material liabilities, adverse claims, commitments or obligations of any nature exist as of the date of the statements or returns, whether accrued, unliquidated, absolute, contingent or otherwise, that are not reflected as liabilities; and

11.2.6 If any Principal is a married individual and the Principal's spouse has not executed this Agreement, such Principal shall cause his or her spouse to personally execute and bind himself or herself to the terms of a Guaranty, in the form attached as Attachment 8 hereof.

11.3 <u>Appointment of Manager</u>.

11.3.1. Franchisee shall be actively involved in the management of the Franchised Business. Notwithstanding the foregoing, Franchisee may designate and retain at all times a general manager ("General Manager") to direct the daily operation and management of the Franchised Business. The General Manager may be Franchisee, if Franchisee is an individual, or a Principal. In the event Franchisee elects to designate a General Manager, Franchisee shall designate its General Manager prior to attending the Initial Management Training Program.

11.3.2. The General Manager shall, during the entire period he or she serves as General Manager, meet the following qualifications:

11.3.2.1. Meet Franchisor's standards and criteria for such individual, as set forth in the Manual or otherwise in writing by Franchisor, and shall be an individual otherwise acceptable to Franchisor in its sole discretion.

11.3.2.2. Shall devote his or her full time and best efforts to the supervision and management of the Franchised Business, and may not engage in any other business activity without the Franchisor's consent, which may be withheld in Franchisor's sole discretion.

11.3.2.3. Shall satisfy the training requirements set forth in Article 7.

11.3.3. If the General Manager is not able to continue to serve in such capacity, or no longer qualifies to act as such in accordance with this Agreement, Franchisee shall promptly notify Franchisor and designate a replacement manager within thirty (30) days after the General Manager ceases to serve, such replacement being subject to the same qualifications required by this Agreement (including, but not limited to, completing all training and obtaining all certifications required by Franchisor). Until such replacement is designated, Franchisee shall provide for interim management of the Franchised Business, who shall act in accordance with the terms of this Agreement. Any failure to comply with the requirements of this Section shall be deemed a material event of default under this Agreement. Franchisor, in Franchisor's sole

discretion, may provide interim management support and charge Franchisee the then-current interim management support fee until a replacement General Manager is properly trained or certified in accordance with Franchisor's requirements. Franchisee shall pay the interim management support fee, plus any and all costs of travel, lodging, meals and other expenses reasonably incurred by Franchisor, upon written demand by Franchisor, or Franchisor may withdraw such amounts from Franchisee's designated bank account in accordance with Section 6.1.4.

11.4 <u>Legal Compliance</u>.  Franchisee shall comply with all federal, state and local laws, rules and regulations and shall timely obtain any and all permits, certificates or licenses necessary for the full and proper conduct of the Franchised Business. Such laws, rules and regulations shall include, without limitation, licenses to do business, fictitious name registrations, sales and other tax permits, fire and police department clearances, Americans With Disability Act compliance, health permits, any permits, certificates or licenses required by any health care or environmental federal, state or local law, rule or regulation and any other requirement, rule, law or regulation of any federal, state or local jurisdiction.

11.5 <u>Claims and Potential Claims</u>.  Franchisee shall notify Franchisor in writing within three (3) days of any incident or injury that could lead to, or the actual commencement of any action, suit or proceeding and of the issuance of any order, writ, injunction, award or decree of any court, agency or other governmental instrumentality, which in any way relating to or affecting the operation or financial condition of the Franchised Business. Any and all media inquiries concerning the Franchised Business or Franchised Business location, including, but not limited to, the business operation and incidents and occurrences related to a client or employee, shall be referred to Franchisor. Neither Franchisee, Franchisee's employees nor anyone on Franchisee's behalf may comment to any broadcast medium, except as directed by Franchisor.

11.6 <u>Assignment of Numbers and Listings</u>.  At Franchisor's request, Franchisee shall execute such forms and documents as Franchisor deems necessary to appoint Franchisor its true and lawful attorney-in-fact, with full power and authority, for the sole purpose of assigning to Franchisor, Franchisee's telephone numbers and listings; and provide Franchisor with passwords and administrator rights for all email and social media accounts used or created by Franchisee.  Upon the expiration or termination of this Agreement, Franchisor may exercise its authority, pursuant to such documents, to obtain any and all of Franchisee's rights to the telephone numbers of the Franchised Business and all related telephone directory listings and other business listings, and all Internet listings, domain names, Internet advertising, websites, listings with search engines, electronic mail addresses, social media, or any other similar listing or usages related to the Franchised Business.

11.7 <u>Access to Tax Filings</u>.  Upon execution of this Agreement, and at any time thereafter upon Franchisor's request, Franchisee shall execute such forms and documents as Franchisor deems necessary, to appoint Franchisor its true and lawful attorney-in-fact with full power and authority, for the sole purpose of obtaining any and all returns and reports filed by Franchisee with any state or federal taxing authority.

11.8   <u>Continuing Obligation</u>.  Franchisee and each Principal acknowledge and agree that the representations, warranties and covenants set forth in this Article 11 are continuing obligations of Franchisee and each Principal, as applicable, and that any failure to comply with such representations, warranties and covenants shall constitute a material event of default under this Agreement.  Franchisee and each Principal shall cooperate with Franchisor in any efforts made by Franchisor to verify compliance with such representations, warranties and covenants.

12.   **FRANCHISEE'S OPERATIONS**

12.1.  <u>Operation of Franchised Business Location</u>.  In order to maintain the highest degree of quality and service on a uniform System-wide basis, Franchisee shall operate the Franchised Business in conformity with the methods, standards and specifications prescribed by Franchisor.  Franchisee agrees to comply with the Manual, as it is modified from time to time, and all directives, rules and procedures specified by Franchisor, and will, among other things:

12.1.1  Use only those furnishings, fixtures, décor, equipment, supplies, and signage that conform with Franchisor's specifications and/or which shall be purchased from only those vendors designated and approved by Franchisor;

12.1.2  Maintain and operate the Franchised Business location in use in the Franchised Business in attractive condition and good repair, using Franchisee's best efforts to maintain a clean, enjoyable and inviting atmosphere thereabout in accordance with System standards, the Manual and all other directives and requirements of Franchisor, and do such redecoration, repairing, refurbishing and restoration as from time to time may be reasonably required to meet System standards and Franchisor's requirements as they may be modified from time to time;

12.1.3  Procure the necessary licenses or permits to operate the Franchised Business and otherwise comply with all applicable governmental laws, ordinances, rules and regulations including those related to health and sanitation;

12.1.4  Maintain sufficient inventories of products, as prescribed by Franchisor;

12.1.5  Conduct sales in accordance with Franchisor's standards and specifications, as set forth in the Manual and other directives of Franchisor. Franchisee acknowledges and accepts that Franchisee may only engage in providing the Franchised Business's products and services to end-consumers. Franchisee is expressly prohibited from selling products on the internet, to dealers and/or distributors for subsequent re-sale, and engaging in such sales shall be a material default of this Agreement.

12.1.6  Employ only qualified individuals who are trained in accordance with Franchisor's standards, including but not limited to the protection of Franchisor's confidential and proprietary information, and who will at all times enhance Franchisor's brand and

conduct themselves in a competent and courteous manner in accordance with this Agreement and the image and reputation of the System..  Franchisee shall use its best efforts to ensure that Franchisee's employees maintain a neat and clean appearance and render competent and courteous service to Franchisee's clients.  Franchisee acknowledges and agrees that poorly trained employees, sloppy or unclean appearances and incompetent or discourteous service are extremely damaging to the goodwill of the System and the Marks and are a material default of this Agreement;

12.1.7   Permit Franchisor or its agents, to inspect the Franchised Business location and any services, products or equipment, to determine whether they meet Franchisor's then-current standards, specifications and requirements.  In addition to any other remedies Franchisor may have, Franchisee shall reimburse Franchisor for Franchisor's inspection costs of any item that does not conform to the System standards and specifications;

12.1.8   Prominently display signage in and upon the Franchised Business location using the Marks and/or other advertising and/or signs of such nature, form, color, number, location and size, and containing such material, as Franchisor may from time to time reasonably direct or approve in writing; and to not display in or upon the Franchised Business location or elsewhere any sign or advertising media or interior décor of any kind to which Franchisor reasonably objects, including signs, advertising media or interior décor which are outdated. Upon giving Franchisee notice of its objection to same or upon termination hereof, Franchisor may at any time enter upon the Franchised Business location or elsewhere and remove any objectionable or non-approved signs, advertising media or interior décor and keep or destroy same without paying therefor or without being deemed guilty of trespass or any other tort;

12.1.9   Conduct all advertising programs in a manner consistent with Franchisor's standards and specifications, in a manner satisfactory to Franchisor and that will not detract from the reputation of the System or the Marks.

12.2. Bookkeeping and Reports.

12.2.1   Franchisee agrees to keep and maintain complete and accurate books and records of its transactions and business operations using the accounting procedures specified by Franchisor.  Franchisee agrees to purchase the computer systems, software and online services specified in Section 12.3 to maintain the records and accounts of the Franchisee to the standards of the Franchisor and which allow Franchisor electronic access to such records and accounts in accordance with Section 12.3.2. Franchisee acknowledges and agrees that the financial data of Franchisee's Franchised Business (i) is owned by Franchisor, (ii) is Franchisor's Proprietary Information, (iii) may be published in the franchise disclosure document(s) issued by Franchisor following the Effective Date hereof, and (iv) may be shared with other System franchisees.

DocuSign Envelope ID: EC868933-7613-4774-99BF-7AB1F57B12C1

12.2.2  Within thirty (30) days after the close of each calendar quarter and within ninety (90) days after the close of each fiscal year, Franchisee will furnish Franchisor a full and complete written statement of income and expense and a profit and loss statement for the operation of the Franchised Business during said period, together with a balance sheet for the Franchised Business, all of which shall be prepared in accordance with generally accepted accounting principles and practice.  Franchisee's annual statements and balance sheets shall be prepared by an independent certified public accountant and certified to be correct.

12.2.3  The financial statements required hereunder shall be in such form and contain such information as Franchisor may from time to time reasonably designate.

12.2.4  Franchisor reserves the right to require Franchisee to engage the services of a third-party accounting services firm, designated and approved by Franchisor.

12.2.5.  Franchisor shall have the right at all reasonable times to examine, at its expense, Franchisee's books, records, and tax returns.  If Franchisor's examination finds that any Gross Revenue Report was understated by two percent (2%) or more, Franchisee shall reimburse Franchisor for the cost of such examination and pay the Franchisor the amounts due together with interest thereon at a rate equal to the lesser of (i) eighteen percent (18%) per annum, or (ii) the maximum commercial contract interest allowed by law. Such understatement may be considered a material default hereunder. Two (2) such understatements during the term of this Agreement may, at the option of Franchisor, be considered an incurable default and thereby subject to termination as provided herein.

12.3.  <u>Computer Systems</u>.

12.3.1.  Franchisee, at Franchisee's sole expense, shall install and maintain the POS System, and other computer hardware and software (collectively, the "Computer System") Franchisor requires for the operation of the Franchised Business and shall follow the procedures related thereto that Franchisor specifies in the Manual or otherwise in writing.

12.3.2.  Franchisee shall, at Franchisee's sole expense, install and maintain systems and web-based payment processing and bookkeeping accounts that permit Franchisor to independently and electronically access and retrieve any information stored in Franchisee's Computer System and accounts, including, without limitation, information concerning Gross Revenue.  Upon Franchisor's request, Franchisee shall execute such documents as Franchisor deems necessary to permit Franchisor to independently and electronically access and retrieve all information stored on Franchisee's Computer System, other systems and web-based payment processing and bookkeeping accounts.

12.3.3  Any and all customer data collected or provided by Franchisee, retrieved from Franchisee's Computer System, or otherwise collected from Franchisee by

Franchisor or provided to Franchisor, is and will be owned exclusively by Franchisor and will be considered to be Franchisor's proprietary and Confidential Information. Franchisor has the right to use such data in any manner without compensation to Franchisee. Franchisor licenses to Franchisee the sue of such data solely for the purpose of operating the Franchised Business; provided that, this license shall automatically and irrevocably terminate, without any additional action or notice required by Franchisor, upon the expiration or earlier termination of this Agreement.

12.3.4   Franchisor may require Franchisee, at Franchisee's sole expense, to enter into software license agreements in the form that Franchisor requires for software Franchisor develops or acquires for use in the System.

12.3.5   Franchisee shall have and maintain adequate hardware and software in order to access the Internet at the speed required by Franchisor from time to time. Franchisee shall utilize the electronic mail account provided by Franchisor. Franchisee shall promptly read and respond to all electronic mail related to the Franchised Business no less often than on a daily basis and shall accept and acknowledge receipt of all electronic mail sent by Franchisor.  Franchisee shall not establish any website or other listing on the Internet except as provided and specifically permitted herein.

12.3.6   Franchisor has established a website that provides information about the System and the services and products offered by the The Tox System (the "Website"). Franchisor has sole discretion and control over the Website.  Franchisor shall include a listing on its Website linking Franchisee's Franchised Business location. Franchisee has no ownership or other proprietary rights to Franchisor's website and Franchisee will lose all rights to such link to Franchisee's location upon expiration or termination of this Agreement for any reason.

12.3.7   In addition to Franchisee's obligation pursuant to Section 6.5 hereof, Franchisee shall pay all other fees, whether to Franchisor or third party vendor(s), and expenses for technology required by this Agreement, including but not limited to, the costs of computer hardware and software, regularly recurring fees for software and Internet access, license fees, help desk fees, and licensing or user-based fees.

12.3.8   Franchisee is solely responsible for maintaining the security and integrity of the computer and payment processing systems used in the Franchised Business and the customer and other data stored therein. Franchisee, at Franchisee' sole cost and expense, shall implement all computer hardware, software and Internet security procedures, including required updates or upgrades thereto, that are reasonably necessary to protect Franchisee's computer and payment processing systems and the data stored therein from viruses, malware, privacy breaches or other unauthorized access.

12.4   <u>Safety and Security</u>. Franchisee is solely responsible for the safe and secure operation of

DocuSign Envelope ID: EC868933-7613-4774-99BF-7AB1F57B12C1

the Franchised Business and the services provided thereby for Franchisee, Franchisee's personnel, clients, agents and the general public. All matters of safety and security are within Franchisee's discretion and control, and Franchisee's indemnification obligations set forth in Section 15.6 hereof shall apply to any claims made against Franchisor regarding safety or security.

12.5 <u>Safety of Clients</u>.  Franchisee shall conduct a background review of every prospective employee's criminal history and any other histories (such as motor vehicle, medical and/or credit histories) that Franchisor requires and that Franchisee determines to be necessary and appropriate, prior to hiring. Franchisee shall not hire any prospective employee if such prospective employee's background review indicates, in Franchisee's sole discretion, a propensity for violence, dishonesty, negligent, reckless or careless behavior, or a conviction for any crime.  Notwithstanding the foregoing, all matters of employment and the safety of Franchisee's clients are within Franchisee's discretion and control.  Franchisor shall not be liable to Franchisee, any employee or prospective employee of Franchisee, or any third party for any act or omission of Franchisee or any employee or agent of Franchisee, and Franchisee's indemnification obligations set forth in Section 15.6 hereof shall apply to any claims, demands or actions against Franchisor arising from any act or omission of Franchisee or any employee or agent of Franchisee (including, without limitation, refusal to hire or discrimination claims or claims asserted by third parties for torts allegedly committed by any employee or agent of Franchisee).

12.6 <u>Client Dispute Resolution</u>. Franchisee acknowledges that client satisfaction is essential to Franchisee's success as well as the reputation and success of the System and other The Tox franchisees. Accordingly, Franchisee agrees to: (i) use its best efforts to ensure the satisfaction of each of Franchisee's clients; (ii) use good faith in all dealings with clients, potential clients, referral sources, suppliers and creditors; (iii) respond to client complaints in a courteous, prompt, and professional manner; (iv) use its best efforts to promptly and fairly resolve client disputes; and (v) within seven (7) days of receiving a request from Franchisor, provide Franchisor a written summary of the dispute.  If Franchisee fails to resolve a dispute with a client, for any reason whatsoever, Franchisor, in its sole discretion and for the sole purpose of protecting the goodwill and reputation of the System and the Marks, may (but shall not be obligated to) investigate the matter and take such action as Franchisor may deem necessary or appropriate to resolve the dispute fairly and promptly, including, but not limited to, the issuance of a refund on Franchisee's behalf. Within ten (10) days after receiving notice thereof, Franchisee shall reimburse Franchisor for any amounts refunded to a client on Franchisee's behalf.  Nothing contained in this Section or any other provision of this Agreement shall be construed to impose liability upon Franchisor to any third party for any action by or obligation of Franchisee.

12.7 <u>Prices</u>. Subject to applicable law, Franchisor will recommend minimum and maximum prices for services and products offered by Franchisee, which may vary depending on geographic and other market conditions. Franchisee acknowledges that Franchisor has made no guarantee or warranty that offering services or products at any particular price will enhance Franchisee's sales or profits.

12.8 <u>Unapproved Item/Suppliers</u>.   If Franchisee desires to purchase, lease or use any unapproved equipment, product, or service or to purchase, lease or use any equipment, product or service from an unapproved supplier, Franchisee shall submit to Franchisor a written request for such approval prior to utilizing such product, service or supplier. Franchisee shall not purchase or lease any item or use any supplier until and unless such item or supplier has been approved in writing by Franchisor.  Franchisor shall have the right to require that its representatives be permitted to inspect the supplier's facilities and to test or otherwise evaluate samples from the supplier.  Franchisor reserves the right to charge Franchisee a fee equal to Five Hundred Dollars ($500.00) plus the actual cost and expense for inspection and testing. Franchisor shall notify Franchisee whether Franchisor approves or disapproves of the proposed item or supplier within ten (10) days after Franchisor receives all required information to evaluate the product, service or supplier. Franchisor reserves the right, at its option, to re-inspect from time to time the facilities and products of any such approved supplier and to revoke its approval upon the supplier's failure to continue to meet any of Franchisor's then-current criteria.  Nothing in the foregoing shall be construed to require Franchisor to approve any particular item or supplier.

12.9 <u>External Quality Assurance Services</u>.  Franchisor reserves the right to establish quality assurance programs conducted by third-party providers, including, but not limited to, customer satisfaction surveys and periodic quality assurance audits ("Quality Review Services").   Upon Franchisor's request and at Franchisee's sole cost and expense, Franchisee shall subscribe, to any such third-party provider for Quality Review Services to monitor the operations of the Franchised Business as directed by Franchisor.

12.10 <u>Variations in Standards</u>.  Notwithstanding anything to the contrary contained in this Agreement and this Section 12 in particular, Franchisee acknowledges and agrees that because complete and detailed uniformity under many varying conditions may not be possible or practical, Franchisor specifically reserves the right and privilege, at its sole discretion and as it may deem in the best interests of all concerned in any specific instance, to vary performance standards for some franchisees based upon the peculiarities and characteristics of the particular site or circumstance, business potential, existing business practices or any other condition which Franchisor deems to be of importance to the successful operation of such particular franchise business.  Franchisor has full rights to vary standard specifications and practices for any other franchisee at any time without giving Franchisee comparable rights. Franchisee shall not be entitled to require Franchisor to disclose or grant to Franchisee a like or similar variation.

13.    **ADVERTISING, PROMOTIONS AND RELATED FEES**

13.1 <u>Advertising Programs</u>.   Franchisor may from time to time develop and administer advertising and sales promotion programs designed to promote and enhance the collective success of all Franchised Businesses operating under the System.  Franchisee shall participate in all such advertising and sales promotion programs in accordance with the terms and conditions established by Franchisor from time to time for each program. In all aspects of these programs, including, without limitation, the type, quantity, timing,

placement and choice of media, market areas and advertising agencies, the standards and specifications established by Franchisor, as modified from time to time, shall be final and binding upon Franchisee.

13.2   Local Advertising.

13.2.1   In addition to the ongoing advertising contributions set forth herein, and following the expenditures set forth in Section 13.2.3 below, Franchisor reserves the right to establish a minimum monthly expenditure per month on advertising for the Franchised Business in the Territory ("Local Advertising"). In the event Franchisor exercises the foregoing right, Franchisor reserves the right to increase this minimum expenditure in its sole discretion. Franchisor may require Franchisee to allocate to an advertising cooperative, as described in Section 13.4, some or all of Franchisee's required Local Advertising expenditures. Such allocation will be in partial or full satisfaction of Franchisee's obligations pursuant to this Section 13.2.1. Franchisor reserves the right to collect some or all of Franchisee's Local Advertising expenditure and implement Local Advertising on Franchisee's behalf.

13.2.2   Within ten (10) business days of Franchisor's request, Franchisee shall provide a quarterly expenditure report accurately reflecting Franchisee's Local Advertising expenditures for the preceding quarterly period.  The following costs and expenditures incurred by Franchisee shall *not* be included in Franchisee's expenditures on Local Advertising for purposes of this Section, unless approved in advance by Franchisor in writing: (i) incentive programs for employees or agents of Franchisee; (ii) research expenditures; (iii) salaries and expenses of any of Franchisee's personnel to attend advertising meetings, workshops or other marketing activities; (iv) charitable, political or other contributions or donations.

13.2.3   During the thirty (30) days prior to and sixty (60) days following the opening of the Franchised Business, Franchisee shall conduct a grand opening marketing campaign in the Territory in which Franchisee must spend between Four Thousand Dollars ($4,000.00) and Six Thousand Dollars ($6,000.00), as determined by Franchisor, on marketing, promotion and awareness-generating activities. Franchisor shall advise Franchisee on a grand-opening campaign, and Franchisee acknowledges that additional funds may be required for approved grand opening activities. Franchisor reserves the right to collect some or all of Franchisees grand opening funds and implement grand opening campaign activities on Franchisee's behalf.

13.2.4   In addition to the required minimum monthly Local Advertising expenditures set forth in Section 13.2.1 above, if established, Franchisor shall be permitted to provide up to twenty (20) social media influencers per month to receive The Tox services at the Franchised Business, and Franchisee shall be required to provide The Tox services to all such social media influencers provided by Franchisor. Upon Franchisor providing twenty (20) social media influencers in any month, Franchisee shall have the option to request Franchisor's placement of additional social media influencers at the Franchised Business, subject to availability. All

services provided to such social media influencers shall be at Franchisee's sole cost and expense, and at no charge to such social media influencers.

13.3   Brand Fund.

13.3.1   Franchisor has established a national Brand Fund on behalf of the System for national advertising, marketing, and brand development (the "Brand Fund"). Franchisee is required to contribute two percent (2%) of the Gross Revenue generated by the Franchised Business to the Brand Fund ("Brand Fund Contribution"). Payments will be made in the same manner and time as the Royalty Fees.

13.3.2   Franchisor shall direct the Brand Fund and shall have sole discretion to approve or disapprove the creative concepts, materials and media used in such programs and the placement and allocation thereof.  Franchisee agrees and acknowledges that the Brand Fund is intended to maximize general public recognition and acceptance of the Marks and enhance the collective success of all Franchised Businesses operating under the System.

13.3.3   Franchisor may, but has no obligation to, contribute to the Brand Fund on the same basis as Franchisee with respect to The Tox outlets operated by Franchisor or Franchisor's affiliates.

13.3.4   Franchisor may use the Brand Fund to satisfy any and all costs of developing, preparing, producing, directing, administering, conducting, maintaining and disseminating advertising, marketing, promotional and public relations materials, programs, campaigns, sales and marketing seminars and training programs of every kind and nature, through media now existing or hereafter developed (including, without limitation, the cost of television, radio, magazine, social media, newspaper and electronic advertising campaigns; direct mail and outdoor billboard advertising; public relations activities; conducting marketing research, employing advertising agencies to assist therein; developing, enhancing and maintaining the Website; and personnel and other departmental costs for advertising that Franchisor internally administers or prepares). While Franchisor does not intend that any part of the Brand Fund will be used for advertising which is principally a solicitation for franchisees, Franchisor reserves the right to use the Brand Fund for public relations, to explain the franchise system, and/or to include a notation in any advertisement indicating "Franchises Available."

13.3.5   The Brand Fund will not be used to defray any of Franchisor's general operating expenses, except for reasonable administrative costs and overhead that Franchisor may incur in activities related to the administration and direction of the Brand Fund and such costs and expenses pursuant Section 13.3.4.  The Brand Fund and its earnings shall not otherwise inure to Franchisor's benefit.

13.3.6 Franchisor will prepare an unaudited annual statement of the Brand Fund's operations and will make it available to Franchisee upon request. In administering the Brand Fund, Franchisor undertakes no obligation to make expenditures for Franchisee that are equivalent or proportionate to Franchisee's contribution or to ensure that any particular franchisee benefits directly or pro rata from the production or placement of advertising.

13.3.7 Although the Brand Fund is intended to be of perpetual duration, Franchisor may terminate it at any time and for any reason or no reason. Franchisor will not terminate the Brand Fund, however, until all monies in the Brand Fund have been spent for advertising or promotional purposes or returned to contributors, without interest, on the basis of their respective contributions.

13.4 <u>Regional Advertising</u>. Franchisor reserves the right to establish, in Franchisor's sole discretion, a regional advertising cooperative. If a regional cooperative is established during the term of this Agreement, Franchisee agrees to sign all documents Franchisor requests to become a member of the cooperative according to the terms of the documents. If Franchisor establishes a regional cooperative, Franchisee agrees to contribute amounts Franchisor requires, in addition to required Brand Fund Contributions.

13.5 <u>Directory Listings</u>. At Franchisee's sole cost and expense, Franchisee must list the Franchised Business in local business directories, including, but not limited to, listings on Internet search engines. If feasible, and with Franchisor's prior written approval, Franchisee may do cooperative listings with other System franchisees. Notwithstanding the foregoing, Franchisee may not maintain any business profile on Facebook, Twitter, Instagram, LinkedIn, TikTok, YouTube or any other social media and/or networking site without Franchisor's prior written approval and in strict accordance with Franchisor's requirements. Unless and until Franchisor grants Franchisee approval to maintain a business profile on Facebook, Twitter, Instagram, LinkedIn, TikTok, YouTube or any other social media and/or networking site, Franchisor shall manage such profile(s) on Franchisee's behalf. Franchisee shall pay to Franchisor, together with the first (1st) Royalty Fee and Brand Fund Contribution of each month, a social media management fee equal to Two Thousand Five Hundred Dollars ($2,500.00) per month ("Social Media Management Fee"). Notwithstanding the foregoing, Franchisee shall not be required to pay to Franchisor the Social Media Management Fee during the first two (2) months of operation of the Franchised Business.

13.6 <u>Approval of Advertising</u>. All advertising and promotion by Franchisee, in any medium, shall be conducted in a professional manner and shall conform to the standards and requirements of Franchisor as set forth in the Manual or otherwise. Franchisee shall submit to Franchisor for its approval samples of all advertising, press releases, promotional plans and materials and public relations programs that Franchisee desires to use, including, without limitation, any materials in digital, electronic or computerized form, or in any form of media now or hereafter developed that have not been either provided or previously approved by Franchisor. Franchisor shall approve or disapprove such plans and materials within ten (10) business days of Franchisor's receipt thereof. If Franchisor fails to respond to Franchisee's submission within ten (10) business days,

DocuSign Envelope ID: EC868933-7613-4774-99BF-7AB1F57B12C1

such plans and materials shall be deemed "disapproved". Franchisee shall not use such unapproved plans or materials until they have been approved by Franchisor in writing, and shall promptly discontinue use of any advertising or promotional plans or materials, whether or not previously approved, upon notice from Franchisor. Any advertising, marketing or sales concepts, programs or materials proposed or developed by Franchisee for The Tox brand and approved by Franchisor may be used by other System franchisees without any compensation to Franchisee.

## 14. INTELLECTUAL PROPERTY

14.1 <u>Ownership</u>.

14.1.1 Franchisee expressly understands and acknowledges that The Tox IP, LLC ("Licensor"), or its successor, is the record owner of the Marks. Franchisor holds the exclusive right to license the Marks to franchisees of the System for use pursuant to the System. Franchisee further expressly understands and acknowledges that Franchisor and/or Licensor claims copyrights on certain material used in the System, including but not limited to its website, documents, advertisements, promotional materials and the Manual, whether or not Franchisor has filed for copyrights thereto with the U.S. Copyright Office. The Marks and copyrights, along with Franchisor's trade secrets, service marks, trade dress and proprietary systems are hereafter collectively referred to as the "Intellectual Property".

14.1.2 As between Franchisor and Franchisee, Licensor and Franchisor are the owner of all right, title and interest in and to the Intellectual Property and the goodwill associated with and symbolized by them.

14.2 <u>No Interference</u>. Neither Franchisee nor any Principal shall take any action that would prejudice or interfere with the validity of Franchisor's or Licensor's rights with respect to the Intellectual Property. Nothing in this Agreement shall give the Franchisee any right, title, or interest in or to any of the Intellectual Property or any of Franchisor's or Licensor's service marks, trademarks, trade names, trade dress, logos, copyrights or proprietary materials, except the right to use the Intellectual Property and the System in accordance with the terms and conditions of this Agreement for the operation of a Franchised Business and only at or from the Franchised Business location or in approved advertising related to the Franchised Business.

14.3 <u>Goodwill</u>. Franchisee understands and agrees that any and all goodwill arising from Franchisee's use of the Intellectual Property and the System shall inure solely and exclusively to the benefit of Franchisor and Licensor, and upon expiration or termination of this Agreement and the license herein granted, no monetary amount shall be assigned as attributable to any goodwill associated with Franchisee's use of the Intellectual Property.

14.4 <u>Validity</u>.  Franchisee shall not contest the validity of, or Franchisor's or Licensor's interest in, the Intellectual Property or assist others to contest the validity of, or Franchisor's or Licensor's interest in, the Intellectual Property.

14.5 <u>Infringement</u>.  Franchisee acknowledges that any unauthorized use of the Intellectual Property shall constitute an infringement of Franchisor's or Licensor's rights in the Intellectual Property and a material event of default hereunder.  Franchisee shall provide Franchisor or Licensor with all assignments, affidavits, documents, information and assistance Franchisor or Licensor reasonably requests to fully vest in Franchisor or Licensor all such rights, title and interest in and to the Intellectual Property, including all such items as are reasonably requested by Franchisor or Licensor to register, maintain and enforce such rights in the Intellectual Property.

14.6 <u>Substitution</u>.  Franchisor reserves the right to substitute different Marks for use in identifying the System and the Franchised Business, if it in its sole discretion, determines that substitution of different Marks will be beneficial to the System. Franchisor will not be liable to Franchisee for any expenses, losses or damages sustained by Franchisee as a result of any additions, modifications, substitutions or discontinuation of the Marks. Franchisee covenants not to commence or join in any litigation or other proceeding against Franchisor for any of these expenses, losses or damages.

14.7 <u>Franchisee's Use of the Intellectual Property</u>.  With respect to Franchisee's use of the Intellectual Property pursuant to this Agreement, Franchisee further agrees that:

14.7.1 Unless otherwise authorized or required by Franchisor, Franchisee shall advertise the Franchised Business only under the Marks "The Tox" and logo set forth on Attachment 1.  Franchisee shall not use the Marks, or any portions, variations, or derivatives thereof, as part of its corporate or other legal name. All fictitious names used by Franchisee shall bear the designation "a franchisee of The Tox Franchising Group, LLC".

14.7.2 Franchisee shall identify itself as the owner of the Franchised Business and as an independent The Tox franchisee in conjunction with any use of the Intellectual Property, including, but not limited to, uses on invoices, order forms, receipts and contracts, as well as the display of a notice in such content and form and at such conspicuous locations on the premises of the Franchised Business as Franchisor may designate in writing.

14.7.3 Franchisee shall not use the Intellectual Property to incur any obligation or indebtedness on behalf of Franchisor.

14.7.4 Any item offered by Franchisee that contains the Marks, must be approved by Franchisor in writing prior to being distributed or sold by Franchisee and such approval may be granted or denied in Franchisor's sole and absolute discretion.

DocuSign Envelope ID: EC868933-7613-4774-99BF-7AB1F57B12C1

14.8   <u>Claims</u>.  Franchisee shall notify Franchisor immediately via both email and telephone, of any apparent infringement of or challenge to Franchisee's use of any Intellectual Property and of any claim by any person of any rights in any Intellectual Property. Franchisee shall not communicate with any person other than Franchisor or any designated affiliate thereof, their counsel and Franchisee's counsel in connection with any such infringement, challenge or claim.  Franchisor shall have complete discretion to take such action as it deems appropriate in connection with the foregoing, and the right to control exclusively, or to delegate control to any of its affiliates of, any settlement, litigation or other proceeding arising out of any such alleged infringement, challenge or claim or otherwise relating to any Intellectual Property.  Franchisee agrees to execute any and all instruments and documents, render such assistance, and do such acts or things as may, in the opinion of Franchisor, reasonably be necessary or advisable to protect and maintain the interests of Franchisor or any other person or entity in any litigation or other proceeding or to otherwise protect and maintain the interests of Franchisor or any other interested party in the Intellectual Property. Franchisor will indemnify and defend Franchisee against and reimburse Franchisee for actual damages (including settlement amounts) for which Franchisee is held liable in any proceeding arising out of Franchisee's use of any of the Intellectual Property that infringes on the rights of any other party, provided that the conduct of Franchisee with respect to such proceeding and use of the Intellectual Property is in full compliance with the terms of this Agreement.

14.9   Franchisor may use and grant franchises and licenses to others to use the Intellectual Property and the System and to establish, develop and franchise other systems, different from the System licensed to Franchisee herein, without offering or providing Franchisee any rights in, to or under such other systems and Franchisor may modify or change, in whole or in part, any aspect of the Intellectual Property or the System, so long as Franchisee's rights thereto are in no way materially harmed thereby.

14.10   Franchisee shall not register or attempt to register the Intellectual Property in Franchisee's name or that of any other person, firm, entity or corporation.

## 15.   INSURANCE AND INDEMNIFICATION

15.1   <u>Procurement</u>.  Franchisee shall procure, prior to the commencement of any operations under this Agreement, and thereafter maintain in full force and effect during the term of this Agreement at Franchisee's sole cost and expense and to Franchisor's sole satisfaction, insurance policies protecting Franchisee and Franchisor, and naming Franchisor, its officers, directors, partners, owners, employees and affiliates as additional insureds as their interests may appear. Franchisor reserves the right to require a designated broker who can negotiate better rates on franchisees' behalf, track any loss history for the system, and ensure that all franchisees are complying with Franchisor's insurance requirements.  As of the Effective Date hereof, the following are the minimum limits (except as additional coverage and higher policy limits may reasonably be specified from time to time in the Manual or otherwise in writing):

15.1.1   <u>Liability.</u> Comprehensive general liability insurance, including contractual liability, professional liability, public liability, personal injury, product liability, advertising

injury, and completed operations in the amount of at least One Million Dollars ($1,000,000.00) per occurrence and Two Million Dollars ($2,000,000.00) general aggregate, including Fifty Thousand Dollars ($50,000.00) rented premises damage coverage and Five Thousand Dollars ($5,000.00) medical expenses;

15.1.2 <u>Employment</u>.  Worker's compensation insurance with coverage limits of One Million Dollars ($1,000,000.00) for bodily injury by disease per accident, One Million Dollars ($1,000,000.00) policy limit and One Million Dollars ($1,000,000.00) per employee, and employment practices liability insurance with minimum coverage limits of Two Hundred Fifty Thousand Dollars ($250,000.00) per occurrence and Two Hundred Fifty Thousand Dollars ($250,000.00) aggregate, including thirty-party liability and wage and hour coverage of at least Twenty-Five Thousand Dollars ($25,000.00);

15.1.3 <u>Property</u>.  Fire, vandalism and extended coverage insurance with primary and excess limits of not less than the full replacement value of the equipment, furniture, fixtures, vehicles and inventory;

15.1.4 <u>Business</u>. Business interruption insurance in an amount necessary to satisfy Franchisee's obligations under this Agreement and the lease for the Franchised Business office;

15.1.5 <u>Abuse</u>. Sexual abuse and molestation insurance with minimum limits of One Hundred Thousand Dollars ($100,000.00) per occurrence and Three Hundred Thousand Dollars ($300,000.00) aggregate;

15.1.6 <u>Cyber</u>. Cyber liability insurance with minimum coverage limits of Two Hundred Fifty Thousand Dollars ($250,000.00) per occurrence and Two Hundred Fifty Thousand Dollars ($250,000.00) aggregate;

15.1.7 <u>Automobile</u>. Commercial auto insurance with a One Million Dollar ($1,000,000.00) combined single limit covering uninsured/underinsured motorists, owned (when applicable), hired and non-hired autos; and

15.1.8 <u>Umbrella</u>. Umbrella/excess liability coverage in the amount of Three Million Dollars ($3,000,000.00) per occurrence and Three Million Dollars ($3,000,000.00) aggregate above general liability coverage.

15.2 <u>Evidence of Insurance</u>.  Franchisee shall deliver to, and maintain at all times with Franchisor, current Certificates of Insurance evidencing the existence and continuation of the required coverages.  In addition, if requested by Franchisor, Franchisee shall deliver to Franchisor a copy of the insurance policy or policies required hereunder.

15.3 <u>Failure to Procure</u>.  If, for any reason, Franchisee should fail to procure or maintain the insurance required by this Agreement as revised from time to time for all franchisees by the Manual or otherwise in writing, Franchisor shall have the right and authority

(without, however, any obligation) to immediately procure such insurance and to charge Franchisee for the cost thereof together with a reasonable fee for Franchisor's expenses in so acting, including all attorneys' fees.  Franchisee shall pay Franchisor immediately upon notice by Franchisor to Franchisee that Franchisor has undertaken such action and the cost thereof.

15.4 <u>Increase in Coverage</u>**.**   The levels and types of insurance stated herein are minimum requirements.  Franchisor reserves the right to raise the required minimum requirements for any type of insurance or add additional types of insurance requirements as Franchisor deems reasonably prudent to require.  Within thirty (30) days of any such required new limits or types of coverage, Franchisee must submit proof to Franchisor of Franchisee's coverage pursuant to Franchisor's requirements.

15.5 <u>Additional Insured</u>.  All required insurance policies shall name Franchisor and their affiliates and their members, officers, agents and employees as additional insureds as their interests may appear, on a primary, noncontributory basis, and shall contain a waiver of rights of subrogation against Franchisor. All public liability policies shall contain a provision that the additional insureds, although named as insureds, shall nevertheless be entitled to recover under such policies on any loss caused by Franchisee or Franchisee's servants, agents or employees.

15.6 <u>Indemnification</u>.  TO THE FULLEST EXTENT PERMITTED BY LAW, FRANCHISEE AGREES TO EXONERATE AND INDEMNIFY AND HOLD HARMLESS THE TOX FRANCHISING, LLC, THE TOX FRANCHISE HOLDINGS, LLC, THE TOX IP, LLC, AND ANY OF THESE COMPANIES' PARENT COMPANY, SUBSIDIARIES, DIVISIONS, AFFILIATES, SUCCESSORS, ASSIGNS AND DESIGNEES AS WELL AS THEIR DIRECTORS, OFFICERS, EPLOYEES, AGENTS, SHAREHOLDERS, SUCCESSORS, DESIGNEES AND REPRESENTATIVES (COLLECTIVELY REFERRED TO AS "THE TOX INDEMNITEES"), FROM ALL CLAIMS BASED UPON, ARISING OUT OF, OR IN ANY WAY RELATED TO THE OPERATION CONDITION, OR ANY PART OF FRANCHISEE'S THE TOX FRANCHISE, THE FRANCHISED BUSINESS, THE PRODUCTS, THE PREMISES, OR ANY ASPECT OF THE REAL ESTATE CONNECTED TO THE FRANCHISEE'S FRANCHISED BUSINESS, WEHTHER CAUSED BY FRANCHISEE, FRANCHISEE'S AGENTS OR EMPLOYEES, OR ARISING FROM FRANCHISEE'S ADVERTISING OR BUSINESS PRACTICES. FRANCHISEE AGREES TO PAY FOR ALL THE TOX INDEMNITEES' LOSSES, EXPENSES (INCLUDING BY NOT LIMITED TO ATTORNEYS' FEES) OR CONCURRENT OR CONTRIBUTING LIABILITY INCURRED IN CONNECTION WITH ANY ACTION, SUIT, PROCEEDING, INQUIRY (REGARDLESS OF WHETHER THE SAME IS REDUCED TO JUDGEMENT OR DETERMINATION), OR ANY SETTLEMENT THEREOF FOR THE INDEMNIFICATION GRANTED BY FRANCHISEE HEREUNDER. THE TOX INDEMNITEES SHALL HAVE THE RIGHT TO SELECT AND APPOINT INDEPENDENT COUNSEL TO REPRESENT ANY OF THE TOX INDEMNITEES IN ANY ACTION OR PROCEEDING COVERED BY THIS INDEMNITY. FRANCHISEE AGREES THAT TO HOLD THE TOX INDEMNITEES HARMELSS, FRANCHISEE

DocuSign Envelope ID: EC868933-7613-4774-90BF-7AB1F57B12C1

WILL REIMBURSE THE TOX INDEMNITEES AS THE COSTS AND EXPENSES ARE INCURRED BY THE TOX INDEMNITEES.

_____
Initial

### 16. TRANSFERS

16.1. <u>Transfers by Franchisor</u>.

16.1.1 Franchisor shall have the right to assign this Agreement, and all of Franchisor's rights and privileges hereunder, to any person, firm, corporation or other entity, without Franchisee's permission or prior knowledge, provided that, with respect to any assignment resulting in the subsequent performance by the assignee of Franchisor's obligations, the assignee shall expressly assume and agree to perform Franchisor's obligations hereunder. Specifically, and without limitation to the foregoing, Franchisee expressly affirms and agrees that Franchisor may: (i) sell Franchisor's assets and Franchisor's rights to the Marks and the System outright to a third party; (ii) engage in a public or private placement of some or all of Franchisor's securities; (iii) merge, acquire other corporations, or be acquired by another corporation, including competitors; (iv) undertake a refinancing, recapitalization, leveraged buy-out or other economic or financial restructuring; and (v) with regard to any or all of the above sales, assignments and dispositions, Franchisee expressly and specifically waives any claims, demands or damages arising from or relating to the loss of association with or identification of Franchisor. Nothing contained in this Agreement shall require Franchisor to remain in the business franchised herein or to offer the same products and services, whether or not bearing the Marks, in the event that Franchisor exercises its prerogative hereunder to assign Franchisor's rights in this Agreement.

16.1.2 Franchisee agrees that Franchisor has the right, now or in the future, to purchase, merge, acquire or affiliate with an existing competitive or non-competitive franchise network, chain or any other business regardless of the location of that chain's or business' facilities, and to operate, franchise or license those businesses and/or facilities operating under the Marks or any other marks following Franchisor's purchase, merger, acquisition or affiliation, regardless of the location of the facilities (which Franchisee acknowledges may be within the Territory or, proximate thereto). However, Franchisor represents that it will not convert any such acquired businesses and/or facilities that are operating within the Territory to a The Tox franchise during the Term of this Agreement.

16.1.3 If Franchisor assigns its rights in this Agreement, nothing herein shall be deemed to require Franchisor to remain in the wellness services business or to offer or sell any products or services to Franchisee.

16.2 <u>Restrictions on Transfers by Franchisee</u>.  Franchisee's rights and duties under this Agreement are personal to Franchisee as it is organized and with the Principals of the business as they exist on the date of execution of this Agreement, and Franchisor has

made this Agreement with Franchisee in reliance on Franchisor's perceptions of the individual and collective character, skill, aptitude, attitude, business ability, and financial capacity of Franchisee. Thus, no transfer, as hereafter defined, may be made without Franchisor's prior written approval. Franchisor may void any transfer made without such approval.

16.3 <u>Transfers by Franchisee</u>. Franchisee shall not directly or indirectly sell, assign, transfer, give, devise, convey or encumber this Agreement or any right or interest herein or hereunder, the Franchise, the Franchised Business or any assets thereof (except in the ordinary course of business) or suffer or permit any such assignment, transfer, or encumbrance to occur by operation of law (a "Transfer"), unless it first obtains the written consent of Franchisor . A transfer of any stock in the Franchisee if it is a corporation or a transfer of any ownership rights in Franchisee if it is a partnership, a limited liability company or limited partnership shall be considered a Transfer restricted hereunder. If Franchisee has complied fully with this Agreement and subject to Franchisor's Right of First Refusal set forth in Section 16.6, Franchisor will not unreasonably withhold its consent of a Transfer that meets the following requirements:

16.3.1 The proposed transferee and all its principals must have the demeanor, and be individuals of good character, and otherwise meet Franchisor's then-applicable standards for franchisees.

16.3.2 The transferee must have sufficient business experience, aptitude and financial resources to operate the Franchised Business and to comply with this Agreement;

16.3.3 The transferee has agreed to complete Franchisor's Initial Management Training Program to Franchisor's satisfaction;

16.3.4 Franchisee has paid all amounts owed to Franchisor and third-party creditors;

16.3.5 The transferee has executed Franchisor's then-standard form of Franchise Agreement, which may have terms and conditions different from this Agreement, except that the transferee shall not be required to pay the Initial Franchise Fee;

16.3.6 Franchisee and the transferee and each of Franchisee's and the transferee's Principals shall have executed a general release under seal, in a form satisfactory to Franchisor, of any and all claims against Franchisor and Franchisor's officers, directors, shareholders, members and employees in their corporate and individual capacities, including, without limitation, claims arising under federal, state and local laws, rules and ordinances. Franchisee will agree to subordinate any claims Franchisee may have against the transferee to Franchisor, and indemnify Franchisor against all claims brought against Franchisor by the transferee for a period of three (3) years following the transfer;

16.3.7 Franchisor has granted written approval of the material terms and conditions of the Transfer, including, without limitation, that the price and terms of payment will not

adversely affect the Franchised Business's operation.  However, Franchisor's approval of a Transfer is not in any way a representation or warranty of the transferee's success or the soundness of transferee's decision to purchase the Franchise on such terms and conditions.  Franchisee shall provide Franchisor all proposed transfer documents for Franchisor's review at least thirty (30) days prior to a closing of the proposed Transfer;

16.3.8 If Franchisee or any Principal finances any part of the sale price of the Transfer, Franchisee or its Principal have agreed that all obligations of the transferee under any notes, agreements or security interests to Franchisee or its Principal will be subordinate to the transferee's obligations to Franchisor; and

16.3.9 If consent is required, the lessor of the Franchised Business's premises consents to the assignment or further sublet of the premises to the transferee.

16.4 <u>Transfer Fee</u>.  As a condition to any Transfer, Franchisee shall pay Franchisor a transfer fee equal to Ten Thousand Dollars ($10,000.00), plus Franchisor's costs and expenses incurred in approving a Transfer (including any third-party fees payable by Franchisor as a result of a Transfer).

16.5 <u>Entity Formation Documents</u>. The By-Laws of a corporation or Operating Agreement of a limited liability company of a Franchisee that is an entity must state that (i) the issuance and assignment of any interest in Franchisee are restricted by this Article 16;  (ii) Franchisee may conduct no business except the operation of a Franchised Business pursuant to the terms of this Agreement; (iii) transfers of interests in Franchisee are subject to the terms of this Agreement governing transfers; and (iv) stock or member certificates will contain a legend so indicating.

16.6 <u>Franchisor 's Right of First Refusal.</u>

16.6.1  If Franchisee wishes to transfer all or part of its interest in the Franchised Business or this Agreement or if a Principal wishes to transfer any ownership interest in Franchisee, pursuant to any bona fide offer to purchase such interest, then Franchisee or such Principal shall promptly notify Franchisor in writing of each such offer, and shall provide such information and documentation relating to the offer as Franchisor may require.

16.6.2 Franchisor has the right, exercisable by written notice to Franchisee within thirty (30) days after receipt of written notification and copies of all documentation required by Franchisor describing such offer, to buy the interest in this Agreement and the Franchised Business or the Principal's interest in Franchisee for the price and on the terms and conditions contained in the offer, subject to Section 16.6.3.

16.6.3 Franchisee further agrees, in the event Franchisor exercises its right of first refusal, notwithstanding anything to the contrary contained in the offer, that (i) Franchisor may substitute cash for any other form of consideration contained in the offer; (ii)

DocuSign Envelope ID: EC868933-7613-4774-00BF-7AB1F57B12C1

at Franchisor 's option, Franchisor may pay the entire purchase price at closing; (iii) Franchisor 's credit will be deemed equal to the credit of any proposed transferee; (vi) Franchisor will have at least sixty (60) days to close the purchase; and (v) Franchisor will be entitled to receive from the Franchisee all customary representations and warranties given by a seller of the assets of a business or equity interest in an entity, as applicable.

16.6.4 If Franchisor does not exercise its right to buy within thirty (30) days, Franchisee may thereafter transfer the interest to the transferee on terms no more favorable than those disclosed to Franchisor, provided that such transfer is subject to Franchisor's prior written approval pursuant to Section 16.3 hereof. However, if (i) the sale to the transferee is not completed within one hundred twenty (120) days after the offer is given to Franchisor or (ii) there is any material change in the terms of the offer, the offer will again be subject to Franchisor's right of first refusal.

16.7 <u>Death or Permanent Disability</u>. The grant of rights under this Agreement is personal to the Franchisee, and on the death or permanent disability of Franchisee or any of Franchisee's Principals, the executor, administrator, conservator or other personal representative of Franchisee or Principal, as the case may be, shall be required to transfer Franchisee's or Principals' interest in this Agreement within six (6) months from the date of death or permanent disability to a third party approved by Franchisor. Failure to transfer in accordance with the foregoing will constitute a material default and the Franchise granted by this Agreement will terminate. A transfer under this Section 16.7, including without limitation, transfer by devise or inheritance, is subject to the conditions for Transfers in this Article 16 and unless transferred by gift, devise or inheritance, subject to the terms of Section 16.6 above. For purposes of this Agreement, the term "permanent disability" means a mental or physical disability, impairment or condition that is reasonably expected to prevent or actually does prevent such person from providing continuous and material supervision of the operation of Franchisee's Franchised Business during the six (6)-month period from its onset.

Immediately after the death or permanent disability of such person, or while the Franchise is owned by an executor, administrator, guardian, personal representative or trustee of that person, the Franchised Business shall be supervised by an interim successor manager satisfactory to Franchisor, or Franchisor, in its sole discretion, may provide interim management at Franchisor's then-current rates during the term of interim management, plus all travel related and other expenses, pending transfer of the Franchise to the deceased or disabled individual's lawful heirs or successors.

16.8 <u>Effect of Consent to Transfer</u>. Franchisor's consent to a Transfer will not waive any claims Franchisor may have against the Franchisee or any Franchisee's Principals nor waive its right to demand that the transferee comply strictly with this Agreement.

16.9 <u>Security Interests to Lender</u>. If Franchisee is in full compliance with this Agreement, Franchisee may pledge or give a security interest in Franchisee's interest in the assets of the Franchised Business to a lender of the funds needed by Franchisee for Franchisee's

initial investment, provided that the security interest is subordinate to Franchisee's obligations to Franchisor, that a foreclosure on such a pledge or security interest and/or any Transfer resulting from such a foreclosure shall be subject to all provisions of this Agreement, and that Franchisee obtains from the lender a written acknowledgement to Franchisor of these restrictions. Notwithstanding the foregoing, in the event Franchisee obtains a loan (an "SBA Loan") from a lender (the "Lender") in which funding is provided with the assistance of the United States Small Business Administration ("SBA"), Franchisee shall be permitted to grant Lender and/or SBA a senior lien on any Uniform Commercial Code collateral Franchisee uses to secure the SBA Loan, and Franchisor agrees to subordinate its interest in any lien on Franchisee's Uniform Commercial Code collateral to that of the Lender and/or SBA as the case may be.

## 17.    DEFAULTS

17.1    <u>Default and Automatic Termination</u>.  Franchisee shall be deemed to be in material default under this Agreement, and all rights granted herein shall automatically terminate without notice to Franchisee, if Franchisee shall become insolvent or makes a general assignment for the benefit of creditors; or if Franchisee files a voluntary petition under any section or chapter of federal bankruptcy law or under any similar law or statute of the United States or any state thereof, or admits in writing its inability to pay its debts when due; or if Franchisee is adjudicated a bankrupt or insolvent in proceedings filed against Franchisee under any section or chapter of federal bankruptcy laws or under any similar law or statute of the United States or any state; or if a bill in equity or other proceeding for the appointment of a receiver of Franchisee or other custodian for Franchisee's business or assets is filed and consented to by Franchisee; or if a receiver or other custodian (permanent or temporary) of Franchisee's assets or property, or any part thereof, is appointed by any court of competent jurisdiction; or if proceedings for a composition with creditors under any state or federal law should be instituted by or against Franchisee; or if a final judgment remains unsatisfied or of record for thirty (30) days or longer (unless supersedeas bond is filed); or if Franchisee is dissolved; or if execution is levied against Franchisee's business or property; or if suit to foreclose any lien or mortgage against the Franchised Business premises or equipment is instituted against Franchisee and not dismissed within thirty (30) days.

17.2    <u>Defaults with No Opportunity to Cure</u>.  Franchisee shall be deemed to be in material default and Franchisor may, at its option, terminate this Agreement and all rights granted hereunder, without affording Franchisee any opportunity to cure the default, effective immediately upon notice to Franchisee, if Franchisee, or any Principal, as the case may be:

17.2.1 fails to obtain all required licenses and permits before opening, identify a mutually acceptable office location or open the Franchised Business within the time and in the manner specified in Article 8.

17.2.2  falsifies any report required to be furnished Franchisor hereunder;

17.2.3  ceases to operate the Franchised Business for a period of five (5) days or more;

DocuSign Envelope ID: EC868933-7613-4774-90BF-7AB1F57B12C1

17.2.4  fails to comply with any federal, state or local law, rule or regulation, applicable to the operation of the Franchised Business;

17.2.5  understates Gross Revenue on two (2) occasions or more, whether or not cured on any or all of those occasions;

17.2.6  fails to comply with the covenants in Article 15;

17.2.7 permits a Transfer in violation of the provisions of Article 16 of this Agreement;

17.2.8  fails, or Franchisee's legal representative fails, to transfer the interests in this Agreement and the Franchised Business upon death or permanent disability of Franchisee or any Principal of Franchisee as required by Section 16.7.

17.2.9 has misrepresented or omitted material facts in applying for the Franchise;

17.2.10 is convicted of, or pleads no contest to, a felony or to a crime that could damage the goodwill associated with the Marks or does anything to harm the reputation of the System or the goodwill associated with the Marks;

17.2.11 receives an adverse judgment or a consent decree in any case or proceeding involving allegations of fraud, racketeering, unfair or improper trade practices or similar claim which is likely to have an adverse effect on the System, or the Marks, the goodwill associated therewith or Franchisor's interest therein, in Franchisor's sole opinion;

17.2.12 conceals revenues, knowingly maintains false books or records, or knowingly submits any false reports;

17.2.13 creates a threat or danger to public health or safety from operation of the Franchised Business;

17.2.14 refuses to permit Franchisor to inspect or audit Franchisee's books or records;

17.2.15 makes any unauthorized use of the Marks or copyrighted material or any unauthorized use or disclosure of Confidential Information (as defined in Section 19.2);

17.2.16 fails to comply with the non-competition covenants in Section 19.5;

17.2.17 defaults in the performance of Franchisee's obligations under this Agreement three (3) or more times during the term of this Agreement or has been given at least two (2) notices of default in any consecutive twelve (12)–month period, whether or not the defaults have been corrected;

17.2.18 has insufficient funds to honor a check or electronic funds transfer two (2) or more times within any consecutive twelve (12)-month period;

17.2.19 defaults, or an affiliate of Franchisee defaults, under any other agreement, including any other franchise agreement, with Franchisor or any of its affiliates, or suppliers and does not cure such default within the time period provided in such other agreement; or

17.2.20 terminates this Agreement without cause.

17.3    Curable Defaults.  Franchisee shall be deemed to be in material default and Franchisor may, at its option, terminate this Agreement and all rights granted hereunder, if Franchisee fails to cure the default within the time period set forth in this Section 17.3, effective immediately upon notice to Franchisee, if Franchisee, or any Principal, as the case may be:

17.3.1   fails to pay when due any amounts due to Franchisor under this Agreement or any related agreement and does not correct the failure within five (5) days after written notice; provided, however, Franchisor has no obligation to give written notice of a late payment more than two (2) times in any twelve (12)–month period, and the third such late payment in any twelve (12)–month period shall be a non-curable default under Sections 17.2.17 and/or 17.2.18;

17.3.2  fails to perform any non-monetary obligation imposed by this Agreement (excepting those defaults of obligations set forth in Sections 17.1 and 17.2 for which there is no opportunity to cure) and such default shall continue for five (5) days after Franchisor has given written notice of such default, or if the default cannot be reasonably corrected within said five (5)-day period, then if it is not corrected within such additional time as may be reasonably required assuming Franchisee proceeds diligently to cure; provided, however, Franchisor has no obligation to give written notice of a non-monetary default more than two (2) times in any twelve (12)–month period, and the third such default, whether monetary or non-monetary, in any twelve (12) – month period shall be a non-curable default under Section 17.2.17.

17.4  Franchisor's Cure of Franchisee's Defaults.  In the event of a default by Franchisee, in addition to Franchisor's right to terminate the Franchise Agreement, and not in lieu thereof, Franchisor may, but has no obligation to:

17.4.1 effect a cure on Franchisee's behalf and at Franchisee's expense, and Franchisee shall immediately pay Franchisor the costs incurred by Franchisor upon demand; or

17.4.2 exercise complete authority with respect to the operation of the Franchised Business until such time as Franchisor determines that the default of Franchisee has been cured and that Franchisee is complying with the requirements of this Agreement.

Franchisee specifically agrees that a designated representative of Franchisor may take over, control and operate the Franchised Business.  In addition to all other fees paid under this Agreement, Franchisee shall pay Franchisor at Franchisor's then-current rates for interim management, plus all travel related and other expenses, during Franchisor's operation thereof as compensation therefor.   Further, Franchisee shall pay to Franchisor a fee equal to One Thousand Dollars ($1,000.00) plus the full compensation paid to such representative including the cost of all fringe benefits plus all travel expenses, lodging, meals and other expenses reasonably incurred by such representative until the default has been cured and Franchisee is complying with the terms of this Agreement.

17.5   Notice to Suppliers.  In the event of a default by Franchisee, in addition to Franchisor's right to terminate the Franchise Agreement, and not in lieu thereof, Franchisor reserves the right with five (5) days' prior written notice to Franchisee, to direct suppliers to stop furnishing any and all products and supplies, including, but not limited to products sold under Franchisor's discounted pricing schedules, until such time as Franchisee's default is cured.  In no event shall Franchisee have recourse against Franchisor for loss of revenue, customer goodwill, profits or other business arising from Franchisor's actions and the actions of suppliers.

## 18.   POST-TERMINATION

18.1 Franchisee's Obligations.  Upon termination or expiration of this Agreement, all rights and licenses granted hereunder to Franchisee shall immediately terminate and Franchisee and each Principal, if any, shall:

18.1.1 immediately cease to operate the Franchised Business, and shall not thereafter, directly or indirectly identify himself, herself or itself as a current The Tox owner, franchisee or licensee;

18.1.2 immediately and permanently cease to use the Marks, any imitation of any Mark, Franchisor's copyrighted material or other intellectual property, confidential or proprietary material or indicia of the Franchised Business, or use any trade name, trade or service mark or other commercial symbol that suggests an association with Franchisor, Licensor, or the System.  In particular, Franchisee shall cease to use, without limitation, all signs, banners, advertising materials, displays, stationery, forms and any other articles, which display the Marks;

18.1.3 take such action as may be necessary to cancel any assumed name or equivalent registration that contains the Mark or any other service mark or trademark of Franchisor, and Franchisee shall furnish Franchisor with evidence of compliance with this obligation which is satisfactory to Franchisor, within five (5) days after termination or expiration of this Agreement;

18.1.4 promptly pay all sums owing to Franchisor and its affiliates.  Such sums shall include all damages, costs and expenses, including reasonable attorneys' fees, incurred by Franchisor as a result of any default by Franchisee. The payment obligation herein shall give rise to and remain, until paid in full, a lien in favor of Franchisor against any and all of the personal property, furnishings, equipment,

fixtures, and inventory owned by Franchisee and located at the Franchised Business location at the time of default;

18.1.5 pay to Franchisor all damages, costs and expenses, including reasonable attorneys' fees, incurred by Franchisor in connection with obtaining any remedy available to Franchisor for any violation of this Agreement and, subsequent to the termination or expiration of this Agreement, in obtaining injunctive or other relief for the enforcement of any provisions of this Agreement that survive its termination;

18.1.6 immediately deliver at Franchisee's sole cost and expense, to Franchisor the Manual and all records, files, instructions, correspondence, invoices, agreements, all confidential, proprietary and copyrighted material and all other materials related to operation of the Franchised Business, including but not limited to client lists and records, subject to applicable law, (all of which are acknowledged to be Franchisor's property), delete all electronic copies and retain no copy or record of any of the foregoing, except Franchisee's copy of this Agreement and of any correspondence between the parties and any other documents that Franchisee reasonably needs for compliance with any provision of law;

18.1.7 comply with the non-disclosure and non-competition covenants contained in Article 19;

18.1.8 in the event this Agreement is terminated due to Franchisee's default, pay Franchisor a lump sum payment (as liquidated damages and not as a penalty) in an amount equal to: (a) the average Royalty Fee and Brand Fund Contributions payable by Franchisee over the twelve (12) month period immediately prior to the date of termination (or such shorter time period if the Franchised Business has been open less than twelve (12) months); (b) multiplied by the lesser of (i) the number of months months then remaining in the then-current term of this Agreement, or (ii) thirty-six (36) months. Franchisee acknowledges that a precise calculation of the full extent of the damages Franchisor will incur in the event of termination of this Agreement as a result of Franchisee's default is difficult to determine and that this lump sum payment is reasonable in light thereof. The liquidated damages payable by Franchisee pursuant to this Section 18.1.8 shall be in addition to all other amounts payable under this Agreement and shall not affect Franchisor's right to obtain appropriate injunctive relief and remedies pursuant to any other provision of this Agreement.

18.2 <u>Right to Purchase</u>.

18.2.1 Franchisor shall have the option, to be exercised within thirty (30) days after termination or expiration of this Agreement, to purchase from Franchisee any or all of the furnishings, equipment (including any part of the Computer System), signs, fixtures, advertising materials, supplies, and inventory of Franchisee related to the operation of the Franchised Business, at Franchisee's cost or fair market value, whichever is less.  Franchisor shall purchase Franchisee's assets free and clear of any liens, charges, encumbrances or security interests and Franchisor shall assume no liabilities whatsoever, unless otherwise agreed to in writing by the parties.  If the parties cannot agree on the fair market value within thirty (30) days of Franchisor's exercise of its option, fair market value shall be determined by two (2)

appraisers, with each party selecting one (1) appraiser, and the average of their determinations shall be binding. In the event of such appraisal, each party shall bear its own legal and other costs and shall split the appraisal fees equally. If Franchisor elects to exercise its option to purchase herein provided, it shall have the right to set off (i) all fees for any such independent appraiser due from Franchisee, (ii) all amounts due from Franchisee to Franchisor or any of its affiliates and (iii) any costs incurred in connection with any escrow arrangement (including reasonable legal fees), against any payment therefor and shall pay the remaining amount in cash. Closing of the purchase shall take place no later than thirty (30) days after determination of the fair market value.

18.2.2 With respect to the option described in Section 18.2.1, Franchisee shall deliver to Franchisor in a form satisfactory to Franchisor, such warranties, releases of lien, bills of sale, assignments and such other documents and instruments that Franchisor deems necessary in order to perfect Franchisor's title and possession in and to the assets being purchased or assigned and to meet the requirements of all tax and government authorities. If, at the time of closing, Franchisee has not obtained all of these certificates and other documents, Franchisor may, in its sole discretion, place the purchase price in escrow pending issuance of any required certificates or documents.

18.2.3 Franchisor shall be entitled to assign any and all of its option in Section 18.2.1 to any other party, without the consent of Franchisee.

18.3 Assignment of Telephone Numbers. Franchisee, at the option of Franchisor, shall assign to Franchisor all rights to the telephone numbers of the Franchised Business and any related public directory listing or other business listings and execute all forms and documents required by Franchisor and any telephone company at any time, to transfer such service and numbers to Franchisor. Further, Franchisee shall assign to Franchisor any and all social media and internet listings, domain names, internet advertising, websites, listings with search engines, electronic mail addresses or any other similar listing or usage related to the Franchised Business. Notwithstanding any forms and documents that may have been executed by Franchisee under Section 11.6, Franchisee shall provide Franchisor with all passwords and administrative rights, and hereby appoints Franchisor its true and lawful agent and attorney-in-fact with full power and authority, for the sole purpose of taking such action as is necessary to complete such assignment. This power of attorney shall survive the expiration or termination of this Agreement. Franchisee shall thereafter use different telephone numbers, electronic mail addresses or other listings or usages at or in connection with any subsequent business conducted by Franchisee.

18.4 Survival. The rights and obligations of the parties contained in this Article 18 shall survive the expiration or sooner termination of this Agreement.

## 19. NON-DISCLOSURE AND NON-COMPETITION COVENANTS

19.1 Operations Manual.

19.1.1 Franchisor has provided to Franchisee, on loan, a current copy of the Manual. The Manual may be in hard copy or made available to Franchisee in digital, electronic or computerized form or in some other form now existing or hereafter developed that would allow Franchisee to view the contents thereof.  If the Manual (or any changes thereto) are provided in a form other than physical copy, Franchisee shall pay any and all costs to retrieve, review, use or access the Manual.  To protect the reputation and goodwill of Franchisor and to maintain high standards of operation under Franchisor's Marks, Franchisee shall operate all aspects of the Franchised Business in accordance with the Manual, as they may from time to time be modified by Franchisor, other written directives that Franchisor may issue to Franchisee from time to time, whether or not such directives are included in the Manual, and any other manual and materials created or approved for use in the operation of the Franchised Business.

19.1.2 Franchisee and any and all Principals shall at all times treat the Manual, written directives, and other materials and any other confidential communications or materials, and the information contained therein, as confidential and shall maintain such information as trade secret and confidential in accordance with this Article and this Agreement.  Franchisee and Franchisee's Principals, if any, shall not divulge and make such materials available to anyone other than those of Franchisee's employees who require the information contained therein to operate the Franchised Business.  Franchisee shall, prior to disclosure, fully train and inform its employees on all the restrictions, terms and conditions under which it is permitted to use Franchisor's intellectual, proprietary and confidential information; and shall ensure its employees' compliance with such restrictions, terms and conditions.  Franchisee, Franchisee's Principals, and any person working with Franchisee shall agree to not, at any time use, copy, duplicate, record or otherwise reproduce these materials, in whole or in part, or otherwise make the same available to any person other than those authorized above, without Franchisor's prior written consent.

19.1.3 The Manual, written directives, and other materials and any other confidential communications provided or approved by Franchisor shall at all times remain the sole property of Franchisor.  Franchisee shall maintain the Manual and all Franchisor's confidential and proprietary materials at all times in a safe and secure location, shall take all reasonable measures to prevent unauthorized access thereto, whether any attempted unauthorized access takes the form of physical access or access via computer or telecommunications networks or otherwise, and shall report the theft or loss of the Manual, or any portion thereof, immediately to Franchisor. At a minimum, Franchisee shall, in the case of computer and telecommunications networks, use the latest available firewall, encryption and similar technology to prevent unauthorized access.  Franchisee shall delete all electronic copies and return and cease using any physical copy of the Manual and other confidential and proprietary materials to Franchisor immediately upon request or upon transfer, termination or expiration of this Agreement.

19.1.4 Franchisor may from time to time revise the contents of the Manual and other materials created or approved for use in the operation of the Franchised Business. Franchisee expressly agrees to comply with each new or changed policy, standard or directive. In the event of any dispute as to the contents of the Manual, the terms of the master copy of the Manual maintained by Franchisor shall control.

19.1.5 If Franchisee loses, misplaces or otherwise requests a physical copy of the Manual, Franchisor, in its discretion, may provide such physical copy and Franchisee shall pay Franchisor the then-current replacement fee.

19.2 <u>Confidential Information</u>.  Franchisee along with Franchisee's Principal(s) acknowledge and accept that during the term of this Agreement Franchisee and Principal(s) will have access to Franchisor's trade secrets, including, but not limited to, methods, processes, vendor partnerships and/or relationships, sales and technical information, costs, pricing, software tools and applications, website and/or email design, products, services, equipment, technologies and procedures relating to the operation of the Franchised Business; the Manual; methods of advertising and promotion; instructional materials; any other information which Franchisor may or may not specifically designate as "confidential" or "proprietary"; and the components of the System, whether or not such information is protected or protectable by patent, copyright, trade secret or other proprietary rights (collectively referred to herein as the "Confidential Information"). Neither Franchisee nor any Principal shall, during the term of this Agreement and thereafter, communicate or divulge to, or use for the benefit of, any other person or entity, and, following the expiration or termination of this Agreement, shall not use for their own benefit, any Confidential Information that may be communicated to Franchisee or any Principal or of which Franchisee or any Principal may be apprised in connection with the operation of the Franchised Business under the terms of this Agreement.  Franchisee and Principal(s) shall not divulge and make any Confidential Information available to anyone other than those of Franchisee's employees who require the Confidential Information to operate the Franchised Business and who have themselves entered into confidentiality and non-compete agreements containing the same provisions as contained in this Agreement, in accordance with Section 19.10 hereof. Franchisee and Principal(s) shall not at any time copy, duplicate, record or otherwise reproduce any Confidential Information, in whole or in part, or otherwise make the same available to any person other than those authorized above, without Franchisor's prior written consent.  The covenant in this Section 19.2 shall survive the expiration, termination or transfer of this Agreement or any interest herein and shall be perpetually binding upon Franchisee and each Principal.

19.3 <u>Protection of Information</u>.  Franchisee shall take all steps necessary, at Franchisee's own expense, to protect the Confidential Information and shall immediately notify Franchisor if Franchisee finds that any Confidential Information has been divulged in violation of this Agreement.

19.4    <u>New Concepts</u>.  If Franchisee or any Principal develops any new concept, process, product, service, or improvement in the operation or promotion of the Franchised Business ("Improvements"), Franchisee is required to promptly notify Franchisor and provide Franchisor with all related information, processes, products or other improvements, and sign any and all forms, documents and/or papers necessary for Franchisor to obtain full proprietary rights to such Improvements, without compensation and without any claim of ownership or proprietary rights to such Improvements. Franchisee and Principal(s) acknowledge that any such Improvements will become the property of Franchisor, and Franchisor may use or disclose such information to other franchisees as it determines to be appropriate.

19.5    <u>Noncompetition Covenants</u>.  Franchisee and each Principal specifically acknowledge that, pursuant to this Agreement, Franchisee and each Principal will receive valuable training, trade secrets and Confidential Information of the System that are beyond the present knowledge, training and experience of Franchisee, each Principal and Franchisee's managers and employees.  Franchisee and each Principal acknowledge that such specialized training, trade secrets and Confidential Information provide a competitive advantage and will be valuable to them in the development and operation of the Franchised Business, and that gaining access to such specialized training, trade secrets and Confidential Information is, therefore, a primary reason why Franchisee and each Principal are entering into this Agreement.  In consideration for such specialized training, trade secrets, Confidential Information and rights, Franchisee and each Principal covenant that, except as otherwise approved in writing by Franchisor:

19.5.1   During the term of this Agreement, Franchisee and each Principal shall not, either directly or indirectly, for themselves or through, on behalf of, or in conjunction with, any person or entity (i) divert, or attempt to divert, any business or customer of the Franchised Business or of other franchisees in the System to any competitor, by direct or indirect inducement or otherwise; (ii) participate as an owner, partner, director, officer, employee, consultant or agent or serve in any other capacity in any business substantially similar to the System; or (iii) seek to employ any person who is at that time employed by Franchisor, or otherwise induce such person to leave his or her employment; or (iv) do or perform, directly or indirectly, any other act injurious or prejudicial to the goodwill associated with the Marks and the System or (v) in any manner interfere with, disturb, disrupt, decrease or otherwise jeopardize the business of the Franchisor or any The Tox franchisees or Franchisor-affiliated outlets.

19.5.2   Upon the expiration or earlier termination of this Agreement or upon a Transfer and continuing for twenty-four (24) months thereafter, Franchisee and Principal(s) shall not, either directly or indirectly, for themselves or through, on behalf of or in conjunction with any person or entity (i) divert, or attempt to divert, any business or customer of the Franchised Business or of other franchisees in the System to any competitor, by direct or indirect inducement or otherwise; or (ii) participate as an owner, partner, director, officer, employee, consultant or agent or serve in any other capacity in any business substantially similar to the System within twenty five (25)

miles of the Territory or within twenty five (25) miles of any The Tox location; or (iii) seek to employ any person who is at that time employed by Franchisor, or otherwise induce such person to leave his or her employment or (iv) do or perform, directly or indirectly, any other act injurious or prejudicial to the goodwill associated with the Marks and the System or (v) in any manner interfere with, disturb, disrupt, decrease or otherwise jeopardize the business of the Franchisor or any The Tox franchisees.

19.6 <u>Reasonableness of Restrictions</u>.  Franchisee and each Principal acknowledges and agrees that the covenants not to compete set forth in this Agreement are fair and reasonable and will not impose any undue hardship on Franchisee or Principal(s) since Franchisee or Principal(s), as the case may be, have other considerable skills, experience and education which afford Franchisee or Principal(s), as the case may be, the opportunity to derive income from other endeavors.

19.7 <u>Reduction of Time or Scope</u>.  If the period of time or the geographic scope specified above, should be adjudged unreasonable in any proceeding, then the period of time will be reduced by such number of months or the geographic scope will be reduced by the elimination of such portion thereof, or both, so that such restrictions may be enforced for such time and scope as are adjudged to be reasonable.  In addition, Franchisor shall have the right, in its sole discretion, to reduce the scope of any covenant set forth in this Paragraph 19 or any portion thereof, without Franchisee's consent, effective immediately upon receipt by Franchisee of written notice thereof, and Franchisee agrees to forthwith comply with any covenant as so modified.

19.8 <u>Injunctive Relief</u>.  Franchisee and each Principal acknowledges that a violation of the covenants not to compete contained in this Agreement would result in immediate and irreparable injury to Franchisor for which no adequate remedy at law will be available. Accordingly, Franchisee and each Principal hereby consents to the entry of an injunction prohibiting any conduct by Franchisee or any Principal in violation of the terms of the covenants not to compete set forth in this Agreement.

19.9 <u>No Defense</u>.  Franchisee and each Principal expressly agree that the existence of any claims they may have against Franchisor, whether or not arising from this Agreement, shall not constitute a defense to the enforcement by Franchisor of the covenants in this Section.

19.10 <u>Covenants of Employees, Agents and Third Persons</u>.  Franchisee shall require and obtain execution of covenants similar to those set forth in this Section (including covenants applicable upon the termination of a person's employment with Franchisee) from all employees, contractors or third persons who will have access to Franchisor's confidential and proprietary information.  Such covenants shall be substantially in the form set forth in Attachment 9 as revised and updated from time to time and contained in the Manual.

20.    **DISPUTE RESOLUTION**

DocuSign Envelope ID: FC868933-7613-4774-00BF-7AB1F57B12C1

20.1   <u>Internal Dispute Resolution</u>.  Franchisee shall first bring any claim, controversy or dispute arising out of or relating to this Agreement, the Attachments hereto or the relationship created by this Agreement to Franchisor's president and/or chief executive officer for resolution.  After providing notice as set forth in Section 21.7 below. Franchisee must exhaust this internal dispute resolution procedure before Franchisee may bring Franchisee's dispute before a third party. This agreement to first attempt resolution of disputes internally shall survive termination or expiration of this Agreement.

20.2   <u>Mediation</u>.  At Franchisor's option, any claim, controversy or dispute that is not resolved pursuant to Section 20.1 hereof shall be submitted to non-binding mediation.  Franchisee shall provide Franchisor with written notice of Franchisee's intent to pursue any unresolved claim, controversy or dispute, specifying in sufficient detail the nature thereof, prior to commencing any legal action. Franchisor shall have thirty (30) days following receipt of Franchisee's notice to exercise Franchisor's option to submit such claim, controversy or dispute to mediation. Mediation shall be conducted through a mediator or mediators in accordance with the American Arbitration Association Commercial Mediation Rules. Such mediation shall take place in the then-current location of Franchisor's corporate headquarters.  The costs and expenses of mediation, including compensation and expenses of the mediator (and except for the attorneys fees incurred by either party), shall be borne by the parties equally.  Franchisor may specifically enforce Franchisor's rights to mediation, as set forth herein.

20.3   <u>Governing Law and Venue</u>.  This Agreement is made in, and shall be substantially performed in, the State of Florida.  Any claims, controversies, disputes or actions arising out of this Agreement shall be governed, enforced and interpreted pursuant to the laws of the State of Florida.  Franchisee and Principal(s), except where specifically prohibited by law, hereby irrevocably submit themselves to the sole and exclusive jurisdiction of the state and federal courts in Florida.  Franchisee and Principal(s) hereby waive all questions of personal jurisdiction for the purpose of carrying out this provision.

20.4   <u>Mutual Benefit</u>.  Franchisee, each Principal and Franchisor acknowledge that the parties' agreement regarding applicable state law and forum set forth in Section 20.3 provide each of the parties with the mutual benefit of uniform interpretation of this Agreement and any dispute arising hereunder. Each of Franchisee, Principal(s) and Franchisor further acknowledge the receipt and sufficiency of mutual consideration for such benefit and that each party's agreement regarding applicable state law and choice of forum have been negotiated in good faith and are part of the benefit of the bargain reflected by this Agreement.

20.5   <u>Waiver of Certain Damages</u>.  Franchisee and each Principal hereby waive, to the fullest extent permitted by law, any right to or claim for any punitive, exemplary, incidental, indirect, special, consequential or other damages (including, without limitation, loss of profits) against Franchisor, its affiliates, and their respective officers, directors, shareholders, partners, agents, representatives, independent contractors, servants and employees, in their corporate and individual capacities, arising out of any cause whatsoever.  Each of Franchisee and Principal(s) agree that in the event of a dispute,

Franchisee and each Principal shall be limited to the recovery of any actual damages sustained.

20.6   Injunctive Relief. Nothing herein contained (including, without limitation, Sections 20.1 through 20.3 above) shall bar Franchisor from the right to obtain immediate injunctive relief from any court of competent jurisdiction against threatened conduct by Franchisee that may cause Franchisor loss or damage, under the usual equity rules, including the applicable rules for obtaining specific performance, restraining orders, and preliminary injunctions.

20.7   Limitations of Claims. Any and all claims arising out of or relating to this Agreement or the relationship among the parties will be barred unless a proceeding for relief is commenced within one (1) year from the date on which the party asserting such claim knew or should have known of the facts giving rise to such claims.

20.8   Survival. The provisions of this Article 20 shall continue in full force and effect notwithstanding the expiration or termination of this Agreement or a transfer by Franchisee or any Principal of their respective interests in this Agreement.

21.   **GENERAL**

21.1   Independent Contractor.   Franchisee is and shall be an independent contractor under this Agreement, and no partnership shall exist between Franchisee and Franchisor.   This Agreement does not constitute Franchisee as an agent, legal representative, or employee of Franchisor for any purpose whatsoever, and Franchisee is not granted any right or authority to assume or create any obligation for or on behalf of, or in the name of, or in any way to bind Franchisor.   Franchisee agrees not to incur or contract any debt or obligation on behalf of Franchisor or commit any act, make any representation or advertise in any manner which may adversely affect any right of Franchisor or be detrimental to Franchisor or other franchisees of Franchisor.   Pursuant to the above, Franchisee agrees to indemnify Franchisor and hold Franchisor harmless from any and all liability, loss, attorney's fees, or damage Franchisor may suffer as a result of claims, demands, taxes, costs or judgments against Franchisor arising out of any allegation of an agent, partner or employment relationship.

21.2   Successors.   This Agreement shall bind and inure to the benefit of the successors and assigns of Franchisor and shall be personally binding on and inure to the benefit of Franchisee (including the individuals executing this Agreement on behalf of the Franchisee entity) and its or their respective heirs, executors, administrators and successors or assigns; provided, however, the foregoing provision shall not be construed to allow a transfer of any interest of Franchisee or Principal(s) in this Agreement or the Franchised Business, except in accordance with Article 16 hereof.

21.3   Invalidity of Part of Agreement.   Should any provisions in this Agreement, for any reason, be declared invalid, then such provision shall be invalid only to the extent of the prohibition without in any way invalidating or altering any other provision of this Agreement.

DocuSign Envelope ID: FC868933-7613-4774-00BF-7AB1F57B12C1

21.4 <u>Entire Agreement</u>.  This Agreement, including all attachments, is the entire agreement of the parties, superseding all prior written or oral agreements of the parties concerning the same subject matter, and superseding all prior written or oral representations made to Franchisee, except that nothing in this Agreement or in any related agreement is intended to disclaim the representations made to Franchisee in Franchisor's Franchise Disclosure Document.  No agreement of any kind relating to the matters covered by this Agreement and no amendment of the provisions hereof shall be binding upon either party unless and until the same has been made in writing and executed by all interested parties.

21.5 <u>Construction</u>.  All terms and words used in this Agreement, regardless of the number and gender in which they are used, shall be deemed and construed to include any other number, singular or plural, and any other gender, masculine, feminine or neuter, as the context or sense of this Agreement or any provision herein may require, as if such words had been fully and properly written in the appropriate number and gender.  All covenants, agreements and obligations assumed herein by Franchisee and Principal(s) shall be deemed to be joint and several covenants, agreements and obligations of each of the persons named as Franchisee, if more than one person is so named.

21.6 <u>Captions</u>.  Captions and section headings are used herein for convenience only.  They are not part of this Agreement and shall not be used in construing it.

21.7 <u>Notices</u>.  Whenever notice is required or permitted to be given under the terms of this Agreement, it shall be given in writing, and be delivered personally or by certified mail or courier, postage prepaid, addressed to the party for whom intended, and shall be deemed given on the date of delivery or delivery is refused.  All such notices shall be addressed to the party to be notified at their respective addresses as set forth in the introductory paragraph of this Agreement, or at such other address or addresses as the parties may from time to time designate in writing.

21.8 <u>Effect of Waivers</u>.  No waiver, delay, omission or forbearance on the part of Franchisor to exercise any right, option, duty or power arising from any default or breach by Franchisee shall affect or impair the rights of Franchisor with respect to any subsequent default of the same or of a different kind.  Any use by Franchisee of the System or any part thereof at any place other than in the Territory shall not give Franchisee any rights not specifically granted hereunder.  Failure to take action to stop such use shall not in any event be considered a waiver of the rights of Franchisor at any time to require Franchisee to restrict said use to the Territory.

21.9 <u>Remedies Cumulative</u>.  All rights and remedies of the parties to this Agreement shall be cumulative and not alternative, in addition to and not exclusive of any other rights or remedies that are provided for herein or that may be available at law or in equity in case of any breach, failure or default or threatened breach, failure or default of any term, provision or condition of this Agreement or any other agreement between Franchisee or any of its affiliates and Franchisor or any of its affiliates.  The rights and remedies of the parties to this Agreement shall be continuing and shall not be exhausted by any one or more uses thereof, and may be exercised at any time or from time to time as often as may

be expedient; and any option or election to enforce any such right or remedy may be exercised or taken at any time and from time to time.  The expiration, earlier termination or exercise of Franchisor's rights pursuant to Articles 17 and 18 shall not discharge or release Franchisee or any Principal from any liability or obligation then accrued, or any liability or obligation continuing beyond, or arising out of, the expiration, the earlier termination or the exercise of such rights under this Agreement.

21.10 <u>Consent to Do Business Electronically</u>. The parties to the Franchise Agreement hereby consent to do business electronically. Pursuant to the Uniform Electronic Transactions Act as adopted by the State of Florida, the parties hereby affirm to each other that they agree with the terms of the Franchise Agreement, and by attaching their digital signature, including any DocuSign signature, to the Franchise Agreement, they are executing the document and intending to attach their digital signature to it. Furthermore, the parties acknowledge that the other parties to the Franchise Agreement can rely on a digital signature, including a DocuSign signature, as the respective party's signature.

21.11 <u>Counterparts</u>.  This Agreement may be executed in multiple counterparts, each of which when so executed shall be an original, and all of which shall constitute one and the same instrument.

21.12 <u>Survival</u>.  Any obligation of Franchisee or any Principal that contemplates performance of such obligation after termination or expiration of this Agreement or the transfer of any interest of Franchisee or any Principal therein shall be deemed to survive such termination, expiration or transfer.

***Signature Page to Follow***

DocuSign Envelope ID: FC868933-7613-4774-00BF-7AB1F57B12C1

The parties hereto have executed this Franchise Agreement on the day and year first above written.

FRANCHISOR:
THE TOX FRANCHISING GROUP, LLC


By:_____

<u>Courtney Yeager</u>_____, <u>CEO</u>_____
       (Print Name, Title)


FRANCHISEE:

_____


By:_____

_____,_____
       (Print Name, Title)


PRINCIPAL:

_____

_____
       (Print Name)


PRINCIPAL:

_____

_____
       (Print Name)

DocuSign Envelope ID: FC868933-7613-4774-90BF-7AB1F57B12C1

**ATTACHMENT 1**

Service Mark –

THE TOX

**ATTACHMENT 2**

**TERRITORY/FRANCHISED BUSINESS LOCATION**

(If there is no Approved Location on the Effective Date, insert: ** TERRITORY AND ADDRESS TO BE DETERMINED AND INSERTED AFTER A THE TOX PREMISES IS IDENTIFIED BY FRANCHISEE AND APPROVED BY FRANCHISOR, IN ACCORDANCE WITH SECTION 8.1 OF THE FRANCHISE AGREEMENT, IN THE SITE SEARCH AREA OF _____.)

Territory (insert map and/or define by zip codes):

Radius =

Franchised Business Office Address:

_____

_____

_____

## ATTACHMENT 3

## GENERAL RELEASE

_____ ("Franchisee") and its principal(s):

_____

_____

_____

_____

(a)      Franchisee and Franchisee's Principal(s) do, for themselves and their successors and assigns, hereby release and forever discharge generally Franchisor and any affiliate, wholly owned or controlled limited liability company, subsidiary, successor or assign thereof and any shareholder, officer, director, employee, agent, executor, administrator, estate, trustee or heir of any of them (the "Released Franchisor Party"), from any and all claims, demands, damages, injuries, agreements and contracts, indebtedness, accounts of every kind or nature, whether presently known or unknown, suspected or unsuspected, disclosed or undisclosed, actual or potential, which Franchisee or Franchisee's Principal(s) may now have, or may hereafter claim to have or to have acquired of whatever source or origin, arising out of or related to any and all transactions of any kind or character at any time prior to and including the date hereof, including generally any and all claims at law or in equity, those arising under the common law or state or federal statutes, rules or regulations such as, by way of example only, franchising, securities and antitrust statutes, rules or regulations, in any way arising out of or connected with the Franchise Agreement or this General Release, and further promises never from this day forward, directly or indirectly, to institute, prosecute, commence, join in, or generally attempt to assert or maintain any action thereon against any Released Franchisor Party, in any court or tribunal of the United States of America, any state thereof, or any other jurisdiction for any matter or claim arising before execution of this General Release.  In the event Franchisee or Franchisee's Principal(s) breaches any of the promises, covenants, or undertakings made herein by any act or omission, Franchisee and Franchisee's Principal(s) shall pay, by way of indemnification, all costs and expenses of any Released Franchisor Party caused by the act or omission, including reasonable attorneys' fees and costs.

(b)      Franchisee and Franchisee's Principal(s) represent and warrant that no portion of any claim, right, demand, obligation, debt, guarantee, or cause of action released hereby has been assigned or transferred by Franchisee or Franchisee's Principal(s) to any other party, firm or entity in any manner including, but not limited to, assignment or transfer by subrogation or by operation of law.  In the event that any claim, demand, or suit shall be made or institute against any Released Franchisor Party because of any such purported assignment, transfer or subrogation, Franchisee and Franchisee's Principal(s) agree to indemnify and hold such Released Franchisor Party free and harmless from and against any such claim, demand, or suit, including reasonable costs and attorneys' fees incurred in connection therewith.  It is further agreed that this indemnification and hold harmless agreement shall not require payment to such claimant as a condition precedent to recovery under this paragraph.

(c)      THIS RELEASE IS A GENERAL RELEASE AND THE PARTIES INTEND AND AGREE THAT IT SHALL BE INTERPRETED, CONSTRUED AND ENFORCED AS SUCH.

(d)      Franchisee and Franchisee's Principal(s) acknowledge, warrant, and represent that no promises, representations, or inducements, except as set forth in this General Release, have been offered or made by any Franchisor Released Party to secure the execution of this General Release, and that this General Release is executed without reliance on any statements or any representations not contained herein.  Franchisee and Franchisee's Principal(s) knowingly waive (1) any claim that this General Release was induced by any misrepresentation or nondisclosure, and (2) any right to rescind or avoid this General Release based upon presently existing facts, known or unknown.

DocuSign Envelope ID: FC868933-7613-4774-00BF-7AB1F57B12C1

FRANCHISEE AND FRANCHISEE'S PRINCIPAL(S) ON BEHALF OF THEMSELVES AND THE FRANCHISEE RELEASORS WAIVE ANY RIGHTS AND BENEFITS CONFERRED BY ANY APPLICABLE PROVISION OF LAW EXISTING UNDER ANY FEDERAL, STATE OR POLITICAL SUBDIVISION THEREOF WHICH WOULD INVALIDATE ALL OR ANY PORTION OF THE RELEASE CONTAINED HEREIN BECAUSE SUCH RELEASE MAY EXTEND TO CLAIMS WHICH THE FRANCHISEE RELEASORS DO NOT KNOW OR SUSPECT TO EXIST IN THEIR FAVOR AT THE TIME OF EXECUTION OF THIS AGREEMENT. Franchisee and Franchisee's Principal(s) also covenant not to bring any suit, action, or proceeding, or make any demand or claim of any type, against any Released Franchisor Party with respect to any Franchisee Released Claim, and Franchisee and Franchisee's Principal(s) shall defend, indemnify, and hold harmless each of Franchisor Releasees against same.

Executed as of _____, 20___.

FRANCHISEE:                                           PRINCIPAL:

_____          _____

By:_____          _____
                                                                  (Print Name)
_____,_____
     (Print Name, Title)

PRINCIPAL:

_____

     (Print Name)

The Tox Franchise Agreement 2023 iii

## ATTACHMENT 4

## <u>CONDITIONAL ASSIGNMENT OF LEASE</u>

**FOR VALUE RECEIVED**, the undersigned _____ ("Assignor") hereby assigns and transfers to The Tox Franchising Goup, LLC, a Florida limited liability company with a notice address of 2145 Sanford Court, Vero Beach, Florida 32963 ("Assignee"), all of Assignor's right, title and interest as tenant in, to and under that certain lease, a copy of which shall be attached hereto (the "Lease") respecting premises commonly known as _____. This Assignment is for collateral purposes only and except as specified herein, Assignee shall have no liability or obligation of any kind whatsoever arising from or in connection with this Assignment or the Lease unless Assignee takes possession of the premises demised by the Lease pursuant to the terms hereof and assumes the obligations of Assignor thereunder.

Assignor represents and warrants to Assignee that Assignor has full power and authority to so assign the Lease and Assignor's interest therein and that Assignor has not previously assigned or transferred, and is not obligated to assign or transfer, any of Assignor's interest in the Lease or the premises demised thereby.

Upon a default by Assignor under the Lease or under the franchise agreement for a The Tox outlet between Assignee and Assignor (the "Franchise Agreement"), or in the event of a default by Assignor under any document or instrument securing the Franchise Agreement, Assignee shall have the right and is hereby empowered to take possession of the Premises demised by the Lease, expel Assignor therefrom, and, in such event, Assignor shall have no further right, title or interest in the Lease.

Assignor agrees that it will not suffer or permit any surrender, termination, amendment or modification of the Lease without the prior written consent of Assignee. Throughout the term of the Franchise Agreement and any renewals thereto, Assignor agrees that it shall elect and exercise all options to extend the term of or renew the Lease not less than thirty (30) days prior to the last day that the option must be exercised, unless Assignee otherwise agrees in writing. If Assignee does not otherwise agree in writing, and upon failure of Assignor to so elect to extend or renew the Lease as aforesaid, Assignor hereby appoints Assignee as its true and lawful attorney-in-fact to exercise such extension or renewal options in the name, place and stead of Assignor for the purpose of effecting such extension or renewal.

ASSIGNOR:

DATED: _____   By: _____

_____,_____
(Print Name, Title)

DATED: _____   _____

DATED: _____   _____

DocuSign Envelope ID: FC868933-7613-4774-00BF-7AB1F57B12C1

## CONSENT AND AGREEMENT OF LANDLORD

to that Conditional Assignment of Lease from _____ (Assignor) The Tox Franchising Group, LLC (Assignee) dated _____ for the property known as ___ _____.

The undersigned Landlord under the aforedescribed Lease further hereby:

(a)     Agrees to notify Assignee in writing of and upon the failure of Assignor to cure any default by Assignor under the Lease;

(b)     Agrees that Assignee shall have the right, but shall not be obligated, to cure any default by Assignor under the Lease within 30 days after delivery by Landlord of notice thereof in accordance with paragraph (a) above;

(c)     Consents to the foregoing Conditional Assignment and agrees that if Assignee takes possession of the Premises demised by the Lease and confirms to Landlord the assumption of the Lease by Assignee as tenant thereunder, Landlord shall recognize Assignee as tenant under the Lease, provided that Assignee cures within the 30-day period the non-monetary defaults, if any, of Assignor under the Lease;

(d)     Agrees that Assignee may further assign the Lease to a person, firm or corporation who shall agree to assume the tenant's obligations under the Lease and who is reasonably acceptable to Landlord and upon such assignment Assignee shall have no further liability or obligation under the Lease as assignee, tenant or otherwise.

(e)     Permits Assignee to enter upon the Premises without being guilty of trespass or any other crime or tort to de-identify the Premises as a The Tox outlet if Tenant fails to do so following termination of the Franchise Agreement or Lease, provided that Assignee shall repair any damage caused thereby.

DATED: _____       LANDLORD:

_____

_____

The Tox Franchise Agreement 2023 iii

DocuSign Envelope ID: FC868933-7613-4774-00BF-7AB1F57B12C1

## ATTACHMENT 5

### AUTHORIZATION AGREEMENT
### AUTOMATIC DEPOSITS (ACH WITHDRAWALS)

Franchisor Name: **The Tox Franchising, LLC**

I (We) hereby authorize The Tox Franchising, LLC, hereinafter called Franchisor, to initiate debit entries to my (our) Checking Account/Savings Account (Select One) indicated below at the depository financial institution named below, and to debit the same to such account. I (We) acknowledge that the origination of ACH transactions to my (our) account must comply with the provisions of U.S. Law, and that I will be responsible for any banking fees that my institution charges.

Financial Institution Name:_____Branch: _____

City:_____State:_____Zip:_____Phone: _____

ACH/Routing Number:_____Account Number: _____
                     (Nine Digits)

This authorization is to remain in full force and effect until Franchisor has received a written replacement ACH Withdrawal Form notification from me. I (We) understand that revocation of this Authorization Agreement by me (us) may constitute an event of Default under the Franchise Agreement.

I (We) understand that the amount to be withdrawn by Franchisor will not be the same each month and I (We) therefore authorize all monetary transfers pursuant to Articles 6 and 18 of the Franchise Agreement.

_____        _____
Print Franchisee / Account Holder Name        Print Franchisee/Co-Account Holder Name

_____        _____
Franchisee/ Account Holder Signature-Date        Franchisee/Co-Account Holder Signature-Date

_____        _____
Daytime Phone Number                            Email Address

### PLEASE ATTACH A VOIDED CHECK TO THIS FORM

**Please Return Form to:**
**The Tox Franchising Group, LLC**
**2145 Sanford Court**
**Vero Beach, Florida 32963**

DocuSign Envelope ID: FC868933-7613-4774-00BF-7AB1F57B12C1

# ATTACHMENT 6

## STATEMENT OF OWNERSHIP INTERESTS
## IN FRANCHISEE/FRANCHISEE ENTITY

| **Name** | **Percentage of Ownership** |
|---|---|
| | |

DocuSign Envelope ID: FC868933-7613-4774-90BF-7AB1F57B12C1

**ATTACHMENT 7**

**INTERNET ADVERTISING, SOCIAL MEDIA, SOFTWARE, AND**
**TELEPHONE LISTING AGREEMENT**

THIS INTERNET ADVERTISING, SOCIAL MEDIA, SOFTWARE, AND TELEPHONE LISTING AGREEMENT (the "Agreement") is made and entered into this day of _____ (the "Effective Date") by and between The Tox Franchising Group, LLC, a Florida limited liability company (the "Franchisor"), and _____, a _____ (the "Franchisee").

WHEREAS, Franchisee desires to enter into a franchise agreement with Franchisor for a The Tox business ("Franchise Agreement") which will allow Franchisee to conduct internet-based advertising, maintain social media accounts, and use telephone listings linked to The Tox brand.

WHEREAS, Franchisor would not enter into the Franchise Agreement without Franchisee's agreement to enter into, comply with, and be bound by all the terms and provisions of this Agreement;

NOW, THEREFORE, for and in consideration of the foregoing and the mutual promises and covenants contained herein, and in further consideration of the Franchise Agreement and the mutual promises and covenants contained therein, and for other good and valuable consideration, the receipt and sufficiency of which are hereby acknowledged, the parties hereto agree as follows:

1. **Definitions**

All terms used but not otherwise defined in this Agreement shall have the meanings set forth in the Franchise Agreement.  "Termination" of the Franchise Agreement shall include, but shall not be limited to, the voluntary termination, involuntary termination, or natural expiration thereof.

2. **Internet Advertising and Telephone Accounts**

2.1    Interest in Web Sites, Social Media Accounts and Other Electronic Listings.  Franchisee may acquire (whether in accordance with or in violation of the Franchise Agreement) during the term of Franchise Agreement, certain right, title, or interest in and to certain domain names, social media accounts, hypertext markup language, uniform resource locator addresses, access to corresponding internet web sites, and the right to hyperlink to certain web sites and listings on various internet search engines (collectively, "Electronic Advertising") related to the Franchised Business or the Marks.

2.2    Interest in Telephone Numbers and Listings.  Franchisee has or will acquire during the term of the Franchise Agreement, certain right, title, and interest in and to those certain telephone numbers and regular, classified, internet page, and other telephone directory listings (collectively, the "Telephone Listings") related to the Franchised Business or the Marks.

2.3    Transfer.  On Termination of the Franchise Agreement, or on periodic request of Franchisor, Franchisee will immediately:

2.3.1    direct all internet service providers, domain name registries, internet search engines, social media companies, and other listing agencies (collectively, the "Internet Companies") with which Franchisee has Internet Web Sites, Social Media Accounts and other Listings: (i) to transfer all of Franchisee's Interest in such Internet Web Sites, Social Media Accounts and other Listings to Franchisor; and (ii) to execute such documents and take such actions as may be necessary to effectuate such transfer.

In the event Franchisor does not desire to accept any or all such Internet Web Sites, Social Media Accounts and other Listings, Franchisee will immediately direct the Internet Companies to terminate such Internet Web Sites, Social Media Accounts and other Listings or will take such other actions with respect to the Internet Web Sites, Social Media Accounts and other Listings as Franchisor directs; and

2.3.2    direct all telephone companies, telephone directory publishers, and telephone directory listing agencies (collectively, the "Telephone Companies") with which Franchisee has Telephone Numbers and Listings: (i) to transfer all Franchisee's Interest in such Telephone Numbers and Listings to Franchisor; and (ii) to execute such documents and take such actions as may be necessary to effectuate such transfer.  In the event Franchisor does not desire to accept any or all such Telephone Numbers and Listings, Franchisee will immediately direct the Telephone Companies to terminate such Telephone Numbers and Listings or will take such other actions with respect to the Telephone Numbers and Listings as Franchisor directs.

2.4    Appointment; Power of Attorney.  Franchisee hereby constitutes and appoints Franchisor and any officer or agent of Franchisor, for Franchisor's benefit under the Franchise Agreement and this Agreement or otherwise, with full power of substitution, as Franchisee's true and lawful attorney-in-fact with full power and authority in Franchisee's place and stead, and in Franchisee's name or the name of any affiliated person or affiliated company of Franchisee, to take any and all appropriate action and to execute and deliver any and all documents that may be necessary or desirable to accomplish the purposes of this Agreement.  Franchisee further agrees that this appointment constitutes a power coupled with an interest and is irrevocable until Franchisee has satisfied all of its obligations under the Franchise Agreement and any and all other agreements to which Franchisee and any of its affiliates on the one hand, and Franchisor and any of its affiliates on the other, are parties, including without limitation this Agreement.  Without limiting the generality of the foregoing, Franchisee hereby grants to Franchisor the power and right to do the following:

2.4.1    Direct the Internet Companies to transfer all Franchisee's Interest in and to the Internet Web Sites, Social Media Accounts and/or other Listings to Franchisor, or alternatively, to direct the Internet Companies to terminate any or all of the Internet Web Sites, Social Media Accounts and/or other Listings;

2.4.2    Direct the Telephone Companies to transfer all Franchisee's Interest in and to the Telephone Numbers and Listings to Franchisor, or alternatively, to direct the Telephone Companies to terminate any or all of the Telephone Numbers and Listings; and

2.4.3    Execute such standard assignment forms or other documents as the Internet Companies and/or Telephone Companies may require in order to affect such transfers or terminations of Franchisee's Interest.

2.5    Certification of Termination.  Franchisee hereby directs the Internet Companies and Telephone Companies to accept, as conclusive proof of Termination of the Franchise Agreement, Franchisor's written statement, signed by an officer or agent of Franchisor, that the Franchise Agreement has terminated.

2.6    Cessation of Obligations.  After the Internet Companies and the Telephone Companies have duly transferred all Franchisee's Interests as described in paragraph 2.3 above to Franchisor, as between Franchisee and Franchisor, Franchisee will have no further interest in, or obligations with respect to the particular Electronic Advertising and/or Telephone Listing.  Notwithstanding the foregoing, Franchisee will remain liable to each and all of the Internet Companies and Telephone Companies for the respective sums Franchisee is obligated to pay to them for obligations Franchisee incurred before the date

DocuSign Envelope ID: FC868933-7613-4774-00BF-7AB1F57B12C1

Franchisor duly accepted the transfer of such Interests, or for any other obligations not subject to the Franchise Agreement or this Agreement.

3. **Miscellaneous**

3.1     <u>Release</u>.  Franchisee hereby releases, remises, acquits, and forever discharges each and all of the Internet Companies and/or Telephone Companies and each and all of their parent corporations, subsidiaries, affiliates, directors, officers, stockholders, employees, and agents, and the successors and assigns of any of them, from any and all rights, demands, claims, damage, losses, costs, expenses, actions, and causes of action whatsoever, whether in tort or in contract, at law or in equity, known or unknown, contingent or fixed, suspected or unsuspected, arising out of, asserted in, assertible in, or in any way related to this Agreement.

3.2     <u>Indemnification</u>.  Franchisee is solely responsible for all costs and expenses related to its performance, its nonperformance, and Franchisor's enforcement of this Agreement, which costs and expenses Franchisee will pay Franchisor in full, without defense or setoff, on demand.  Franchisee agrees that it will indemnify, defend, and hold harmless Franchisor and its affiliates, and its and their directors, officers, shareholders, partners, members, employees, agents, and attorneys, and the successors and assigns of any and all of them, from and against, and will reimburse Franchisor and any and all of them for, any and all loss, losses, damage, damages, claims, debts, claims, demands, or obligations that are related to or are based on this Agreement.

3.3     <u>No Duty</u>.  The powers conferred on Franchisor hereunder are solely to protect Franchisor's interests and shall not impose any duty on Franchisor to exercise any such powers.  Franchisee expressly agrees that in no event shall Franchisor be obligated to accept the transfer of any or all of Franchisee's Interest in any matter hereunder.

3.4     <u>Further Assurances</u>.  Franchisee agrees that at any time after the date of this Agreement, Franchisee will perform such acts and execute and deliver such documents as may be necessary to assist in or accomplish the purposes of this Agreement.

3.5     <u>Successors, Assigns, and Affiliates</u>.  All Franchisor's rights and powers, and all Franchisee's obligations, under this Agreement shall be binding on Franchisee's successors, assigns, and affiliated persons or entities as if they had duly executed this Agreement.

3.6     <u>Effect on Other Agreements</u>.  Except as otherwise provided in this Agreement, all provisions of the Franchise Agreement and attachments and schedules thereto shall remain in effect as set forth therein.

3.7     <u>Survival</u>.  This Agreement shall survive the Termination of the Franchise Agreement.

3.9     <u>Governing Law</u>.  This Internet Listing Agreement shall be governed by and construed under the laws of the State of Florida, without regard to the application of Florida conflict of law rules.

-Remainder of Page Intentionally Blank-

The undersigned have executed or caused their duly authorized representatives to execute this Agreement as of the Effective Date.

FRANCHISOR:

THE TOX FRANCHISING GROUP, LLC

By:_____

<u>Courtney Yeager</u>    , <u>CEO</u>
      (Print Name, Title)


FRANCHISEE:

_____


By:_____

_____,_____
      (Print Name, Title)


PRINCIPAL:

_____

_____

(Print Name)


PRINCIPAL:

_____

_____

(Print Name)


**ATTACHMENT 8**

DocuSign Envelope ID: FC868933-7613-4774-00BF-7AB1F57B12C1

## GUARANTY

This Guaranty and Covenant (this "Guaranty") is given by the undersigned ("Guarantor") on _____, (the "Effective Date") to The Tox Franchising Group, LLC, a Florida limited liability company ("Franchisor"), in order to induce Franchisor to enter into that certain Franchise Agreement dated on or about the Effective Date hereof (the "Franchisee Agreement") with _____, a(n) _____ _____ and _____ (collectively "Franchisee").

Guarantor acknowledges that Guarantor is the spouse of Franchisee's Principal, as that term is used in the Franchise Agreement.

Guarantor acknowledges that Guarantor has read the terms and conditions of the Franchise Agreement and acknowledges that the execution of this Guaranty are in partial consideration for, and a condition to the granting of, the rights granted in the Franchise Agreement to Franchisee, and that Franchisor would not have granted these rights without the execution of this Guaranty by Guarantor.

Guarantor hereby individually makes, agrees to be bound by, and agrees to perform, all of the monetary obligations and non-disclosure and non-competition covenants and agreements of the Franchisee as set forth in the Franchise Agreement, including but not limited to, the covenants set forth in Sections 19.2, 19.5, 19.6, 19.8 and 19.9 of the Franchise Agreement ("Guaranteed Obligations"). Guarantor shall perform and/or make punctual payment to Franchisor of the Guaranteed Obligations in accordance with the terms of the Franchise Agreement or other applicable document forthwith upon demand by Franchisor.

This Guaranty is an absolute and unconditional continuing guaranty of payment and performance of the Guaranteed Obligations. This Guaranty shall not be discharged by renewal of any claims guaranteed by this instrument, change in ownership or control of the Franchisee entity, transfer of the Franchise Agreement, the suffering of any indulgence to any debtor, extension of time of payment thereof, nor the discharge of Franchisee by bankruptcy, operation of law or otherwise. Presentment, demand, protest, notice of protest and dishonor, notice of default or nonpayment and diligence in collecting any obligation under any agreement between Franchisee and Franchisor are each and all waived by Guarantor and/or acknowledged as inapplicable. Guarantor waives notice of amendment of any agreement between Franchisee and Franchisor and notice of demand for payment by Franchisee. Guarantor further agrees to be bound by any and all amendments and changes to any agreement between Franchisee and Franchisor.

Franchisor may pursue its rights against Guarantor without first exhausting its remedies against Franchisee and without joining any other guarantor hereto and no delay on the part of Franchisor in the exercise of any right or remedy shall operate as a waiver of such right or remedy, and no single or partial exercise by Franchisor of any right or remedy shall preclude the further exercise of such right or remedy.

If other guarantors have guaranteed any and or all of the Guaranteed Obligations, their liability shall be joint and several to that of Guarantor.

DocuSign Envelope ID: FC868933-7613-4774-90BF-7AB1F57B12C1

Until all of the Guaranteed Obligations have been paid in full and/or performed in full, Guarantor shall not have any right of subrogation, unless expressly given to Guarantor in writing by Franchisor.

All Franchisor's rights, powers and remedies hereunder and under any other agreement now or at any time hereafter in force between Franchisor and Guarantor shall be cumulative and not alternative and shall be in addition to all rights, powers and remedies given to Franchisor by law.

Should any one or more provisions of this Guaranty be determined to be illegal or unenforceable, all other provisions nevertheless shall remain effective.

This Guaranty shall extend to and inure to the benefit of Franchisor and its successors and assigns and shall be binding on Guarantor and its successors and assigns.

IN WITNESS WHEREOF, Guarantor has signed this Guaranty as of the date set forth above.

GUARANTOR - SPOUSE OF FRANCHISEE'S PRINCIPAL:

_____

Print Name: _____

The Tox Franchise Agreement 2023 iii

**ATTACHMENT 9**
**CONFIDENTIALITY AND NON-COMPETE AGREEMENT**

This Confidentiality and Non-Compete Agreement (the "Agreement") is made and entered into this _____ day of _____, 20____, by _____ _____, a(n) _____ _____ ("Franchisee"), a franchisee of The Tox Franchising Group, LLC, a Florida limited liability company ("Franchisor"), and _____, an individual ("Covenantor") in connection with an Franchise Agreement dated.

**WHEREAS,** Franchisee and Franchisor are parties to a franchise agreement dated _____, 20____ (the "Franchise Agreement"), whereby Franchisor has granted Franchisee the right to use certain trademarks, including, the registered trademark "The Tox" and design mark, and certain proprietary products, services, promotions and methods (the "System") for the establishment and operation of Franchised Business outlets;

**WHEREAS**, in connection with his or her duties, it will be necessary for Covenantor to have access to some or all of the confidential information, knowledge, know-how, techniques, contents of The Tox operations manual and other materials used in or related to the System and/or concerning the methods of operation of the System (collectively referred to as "Confidential Information");

**WHEREAS**, the Confidential Information provides economic advantages to Franchisor and licensed users of the System, including Franchisee;

**WHEREAS**, Franchisee has acknowledged the importance of restricting the use, access and dissemination of the Confidential Information, and Franchisee therefore has agreed to obtain from Covenantor a written agreement protecting the Confidential Information and further protecting the System against unfair competition; and

**WHEREAS**, Covenantor acknowledges that receipt of and the right to use the Confidential Information constitutes independent valuable consideration for the representations, promises and covenants made by Covenantor herein.

**NOW, THEREFORE**, in consideration of the mutual covenants and obligations contained herein, the parties agree as follows:

**1.     Confidentiality Agreement.**

**a.**     Covenantor shall, at all times, maintain the confidentiality of the Confidential Information and shall use such Confidential Information only in the course of his or her employment by or association with Franchisee in connection with the operation of a Franchised Business under the Franchise Agreement.

**b.**     Covenantor shall not at any time make copies of any documents or compilations containing some or all of the Confidential Information without Franchisor's express written permission.

**c.**     Covenantor shall not at any time disclose or permit the disclosure of the Confidential Information except, and only then to the limited extent necessary, to those employees of Franchisee for training and assisting such employees in the operation of the Franchised Business.

**d.**     Covenantor shall surrender any material containing some or all of the Confidential Information to Franchisee or Franchisor, upon request, or upon termination of employment or association with Franchisee.

DocuSign Envelope ID: FC868933-7613-4774-00BF-7AB1F57B12C1

e.     Covenantor shall not at any time, directly or indirectly, do any act or omit to do any act that would or would likely be injurious or prejudicial to the goodwill associated with the System.

f.     Covenantor agrees that no Confidential Information may be reproduced, in whole or in part, without written consent.

## 2.     Covenants Not to Compete.

a.     In order to protect the goodwill and unique qualities of the System, and in consideration for the disclosure to Covenantor of the Confidential Information, Covenantor further agrees and covenants that during Covenantor's employment or association with Franchisee, Covenantor shall not, for Covenantor or through, on behalf of or in conjunction with any person or entity:

(i) divert, or attempt to divert, any business or customer of The Tox or of other franchisees in the System to any competitor, by direct or indirect inducement or otherwise or

(ii)  participate as an owner, partner, director, officer, employee, consultant or agent or serve in any other capacity in any business substantially similar to the System.

b.     In further consideration for the disclosure to Covenantor of the Confidential Information and to protect the goodwill and unique qualities of the System, Covenantor further agrees and covenants that, upon the termination of Covenantor's employment or association with Franchisee and continuing for twenty-four (24) months thereafter, Covenantor shall not, for Covenantor or through, on behalf of or in conjunction with any person or entity:

(i) divert, or attempt to divert, any business or customer of the Franchised Business or of other franchisees in The Tox to any competitor, by direct or indirect inducement or otherwise or

(ii)  participate as an owner, partner, director, officer, employee, consultant or agent or serve in any other capacity in any business substantially similar to the System within the Territory, within twenty five (25) miles outside of the boundaries of the Territory or within twenty five (25) miles of any The Tox store location.

c.     The parties acknowledge and agree that each of the covenants contained herein are reasonable limitations as to time, geographical area, and scope of activity to be restrained and do not impose a greater restraint than is necessary to protect the goodwill or other business interests of Franchisor.

d.   If the period of time or the geographic scope specified Section 2.b. above, should be adjudged unreasonable in any proceeding, then the period of time will be reduced by such number of months or the geographic scope will be reduced by the elimination of such portion thereof, or both, so that such restrictions may be enforced for such time and scope as are adjudged to be reasonable.  In addition, Franchisor shall have the right, in its sole discretion, to reduce the scope of any covenant set forth in this Agreement or any portion thereof, without Covenantor's or Franchisee's consent, effective immediately upon receipt by Covenantor of written notice thereof, and Covenantor agrees to forthwith comply with any covenant as so modified.

## 3.   General.

a.   Franchisee shall take full responsibility for ensuring that Covenantor acts as required by this Agreement.

The Tox Franchise Agreement 2023 iii

DocuSign Envelope ID: FC868933-7613-4774-90BF-7AB1F57B12C1

**b.**  Covenantor agrees that in the event of a breach of this Agreement, Franchisor would be irreparably injured and be without an adequate remedy at law.  Therefore, in the event of such a breach, or threatened or attempted breach of any of the provisions hereof, Franchisee is obligated to enforce the provisions of this Agreement and shall be entitled, in addition to any other remedies that are made available to it at law or in equity, to a temporary and/or permanent injunction and a decree for the specific performance of the terms of this Agreement, without the necessity of showing actual or threatened harm and without being required to furnish a bond or other security.

**c.**  Covenantor agrees to pay all expenses (including court costs and reasonable attorneys' fees) incurred by Franchisor and Franchisee in enforcing this Agreement.

**d.**  Any failure Franchisee to object to or take action with respect to any breach of any provision of this Agreement by Covenantor shall not operate or be construed as a waiver of or consent to that breach or any subsequent breach by Covenantor.

**e.**  THIS AGREEMENT SHALL BE INTERPRETED BY AND CONSTRUED AND ENFORCED IN ACCORDANCE WITH THE LAWS OF THE STATE IN WHICH THE FRANCHISED BUSINESS IS LOCATED, WITHOUT REFERENCE TO SUCH STATE'S CHOICE OF LAW PRINCIPLES.  COVENANTOR HEREBY IRREVOCABLY SUBMITS HIMSELF OR HERSELF TO THE JURISDICTION OF THE STATE AND FEDERAL COURTS OF SUCH STATE.  COVENANTOR HEREBY WAIVES ALL QUESTIONS OF PERSONAL JURISDICTION OR VENUE FOR THE PURPOSE OF CARRYING OUT THIS PROVISION. COVENANTOR HEREBY AGREES THAT SERVICE OF PROCESS MAY BE MADE UPON COVENANTOR IN ANY PROCEEDING RELATING TO OR ARISING UNDER THIS AGREEMENT OR THE RELATIONSHIP CREATED BY THIS AGREEMENT BY ANY MEANS ALLOWED BY SUCH STATE OR FEDERAL LAW.  COVENANTOR FURTHER AGREES THAT VENUE FOR ANY PROCEEDING RELATING TO OR ARISING OUT OF THIS AGREEMENT SHALL BE IN THE STATE IN WHICH THE FRANCHISED BUSINESS IS LOCATED; PROVIDED, HOWEVER, WITH RESPECT TO ANY ACTION THAT INCLUDES INJUNCTIVE RELIEF OR OTHER EXTRAORDINARY RELIEF, FRANCHISOR OR FRANCHISEE MAY BRING SUCH ACTION IN ANY COURT IN ANY STATE THAT HAS JURISDICTION.

**f.**  The parties agree that each of the foregoing covenants contained herein shall be construed as independent of any other covenant or provision of this Agreement.

**g.**  Covenantor acknowledges and agrees that each of the covenants contained herein will not impose any undue hardship on Covenantor since Covenantor has other considerable skills, experience and education which affords Covenantor the opportunity to derive income from other endeavors.

**h.**  This Agreement contains the entire agreement of the parties regarding the subject matter hereof.  This Agreement may be modified only by a duly authorized writing executed by all parties.

**i.**  All notices and demands required to be given hereunder shall be in writing, and shall be delivered personally or by certified or registered mail, postage prepaid, addressed to the party for whom intended, and shall be deemed given on the date of delivery or the date delivery is refused. All such notices shall be addressed to the party to be notified at the following addresses:

DocuSign Envelope ID: FC868933-7613-4774-00BF-7AB1F57B12C1

If directed to Franchisee:

_____

_____

If directed to Covenantor:

_____

_____

Any change in the foregoing addresses shall be effected by giving written notice of such change to the other parties.

**j.**  Franchisor is an intended third-party beneficiary of this Agreement, and Franchisor may take whatever action it deems necessary to enforce Covenantor's obligations hereunder.  The rights and remedies of Franchisor under this Agreement are fully assignable and transferable and shall inure to the benefit of its respective affiliates, successors and assigns.

**k.**  The respective obligations of Franchisee and Covenantor hereunder may not be assigned by Franchisee or Covenantor, without the prior written consent of Franchisor.

IN WITNESS WHEREOF, the undersigned have entered into this Confidentiality and Non-Compete Agreement as witnessed by their signatures below.

FRANCHISEE:

_____

By: _____
Name: _____
Title: _____

COVENANTOR:

_____

Name: _____

DocuSign Envelope ID: FC868933-7613-4774-00BF-7AB1F57B12C1

**EXHIBIT C**

## <u>MULTI-UNIT DEVELOPMENT AGREEMENT</u>

DocuSign Envelope ID: FC868933-7613-4774-00BF-7AB1F57B12C1

THE TOX FRANCHISING GROUP, LLC
MULTI-UNIT DEVELOPMENT AGREEMENT

THIS MULTI-UNIT DEVELOPMENT AGREEMENT (this "Agreement") is being entered into this _____, (the "Effective Date") by and between The Tox Franchising Group, LLC, a Florida limited liability company with a principal business address of 2145 Sanford Court, Vero Beach, Florida 32963 (herein "Franchisor") and _____ _____, a(n) _____, with its principal place of business located at _____, and _____ 's principal(s), _____, an individual residing at _____, and __ _____, an individual residing at _____ ("Principal(s)"). _____ and Principal(s) shall be collectively referred to in this Agreement as the Developer.

## RECITATIONS

Through the expenditure of considerable time, effort and money, Franchisor has developed and established unique and distinctive businesses (each a "Franchised Business") which feature, among other things, lymphatic-based body sculpting services and related products and merchandise, using Franchisor's designs, and using Franchisor's confidential brand standards manual ("Manual") of business practices and policies, and Franchisor's distinctive décor, fixtures and furnishings, operations methods, sales techniques, inventory, procedures for management control and training, assistance, advertising, and promotional programs, all of which may be changed, improved, or further developed by Franchisor at any time (taken together herein, the "System").

The System is identified by certain trade names, service marks, trademarks, logos, emblems and indicia of origin, including but not limited to The Tox service marks, as set forth in Attachment 1, and such other trade names, service marks, and trademarks as are now designated and may hereafter be designated or substituted by Franchisor for use in connection with the System (the "Marks").

Franchisor continues to develop, use, and control the use of such Marks in order to identify for the public the source of services and products marketed under the Marks and the System and to represent the System's high standards of quality, appearance, and service.

Pursuant to franchise agreements, Franchisor licenses to others the right to operate Franchised Businesses, using the Marks and System, in strict conformity therewith, which may be changed, improved and further developed by Franchisor from time to time (each a "Franchise Agreement").

Developer understands and acknowledges the importance of Franchisor's high and uniform standards of quality, service, and appearance, and the necessity of operating franchised businesses of the System in conformity with Franchisor's standards and specifications.

Developer desires to obtain the right to further develop and expand the System in accordance with the development schedule described in Section 5.2 hereof (the "Mandatory Development

1

The Tox MUDA 2023 i

DocuSign Envelope ID: FC868933-7613-4774-00BF-7AB1F57B12C1

Schedule") within the development area described in Attachment 3 (the "Development Area"), under the System and Marks, on the terms and conditions set forth in this Agreement;

NOW, THEREFORE, the parties, in consideration of the promises, undertakings and commitments of each party to the other set forth herein, and intending to be legally bound hereby, mutually agree as follows:

1. **RECITATIONS.**  The Recitations set out above form part of this Agreement.

2. **GRANT OF DEVELOPMENT RIGHTS.**

   2.1.   Grant.  Franchisor hereby grants to Developer, and the Developer hereby accepts from the Franchisor, on the terms and conditions set forth in this Agreement, which includes, but is not limited to, the execution of a Franchise Agreement pursuant to Section 4.1 hereof, the right to develop, construct, open and operate one Franchised Business within the Development Area set forth in Attachment 1.  Developer shall be granted rights to establish additional Franchised Businesses in the Development Area, up to the total number of outlets set forth in the Mandatory Development Schedule set forth in Section 5.2 hereof, subject to Developer's full compliance with all conditions precedent to the grant of such rights outlined below, which rights shall be exercised in accordance with Section 4.1 hereof.

   2.2.   Reservation of Rights.  Notwithstanding the provisions of Section 2.1 above, Developer understands and agrees Franchisor fully reserves all other rights, other than as specified in this Agreement, for sales, solicitation and distribution of The Tox products and services within or outside of the Development Area. This reservation of Franchisor's rights includes, but is not limited to, Franchisor's right to the rights to offer (i) other products or services not offered under the Marks, (ii) other lifestyle concepts or products under the Marks or other trademarks, and (iii) products or services through any channel in the Development Area other than a dedicated The Tox outlet, such as distribution through retail outlets, including but not limited to, grocery stores and gift shops; in captive market locations, such as airports, hospitals, stadiums and institutional/professional campuses and conferences; and the Internet ("Alternate Distribution Channels").

   2.3.   No License to System and Marks.  Developer expressly acknowledges that this Agreement is not a Franchise Agreement and does not grant to Developer any right or license to operate a Franchised Business, distribute any product or service, or use the Marks.  This Agreement sets forth conditions which, if fully satisfied, confer upon Developer the rights to enter a Franchise Agreement with Franchisor to establish one or more Franchised Businesses in the Development Area only.  Developer's rights to open and operate a Franchised Business and use the System and Marks shall be derived only through the execution of a Franchise Agreement for each Franchised Business to be established in the Development Area.

The Tox MUDA 2023 i

**3. TERM.** Unless sooner terminated in accordance with this Agreement, the term of this Agreement and all rights granted by Franchisor under this Agreement shall expire on the date on which Developer successfully and in a timely manner has complied with all of Developer's obligations hereunder and has completed the development obligations in accordance with the Development Schedule.

**4. DEVELOPMENT AND FRANCHISE FEES.**

4.1. <u>Multi-Unit Development Fee</u>. In consideration of the rights granted under this Agreement, Developer shall pay Franchisor a development fee ("Development Fee") equal to _____ \_\_\_\_\_ Dollars ($_____).

**The Development Fee is fully earned at the time this Multi-Unit Development Agreement is signed and is not refundable under any circumstances.** Developer shall pay the full amount of the Development Fee to Franchisor upon Developer's execution of this Agreement.

4.2. <u>Application of Development Fee</u>. Contemporaneous with the execution of this Agreement, Developer shall execute the initial Franchise Agreement for the first Franchised Business to be established pursuant to the Mandatory Development Schedule. Developer shall receive the applicable credit from the Development Fee, which shall be applied to the Initial Franchise Fee due under the initial Franchise Agreement. Provided that Developer is in compliance with the Mandatory Development Schedule and is not otherwise in breach of this Agreement, upon the execution each of additional Franchise Agreement for a Franchised Business to be developed hereunder, Developer shall receive the applicable credit from the Development Fee, which shall be applied to the Initial Franchise Fee payable pursuant to each such additional Franchise Agreement. Upon Franchisor's approval, Developer may enter into the initial Franchise Agreement or any subsequent Franchise Agreement as required under this Agreement using a newly formed entity, such as a limited liability company, corporation or partnership, for the sole purpose of entering into a Franchise Agreement and operating the Franchised Business pursuant thereto, provided that Developer shall also personally sign such Franchise Agreement as a principal.

**5. EXERCISE OF DEVELOPMENT RIGHTS.**

5.1. <u>Valid Exercise</u>. Developer shall exercise the development rights granted hereunder only by entering into a separate Franchise Agreement with Franchisor for each Franchised Business for which a development right is granted. Developer shall execute and deliver to Franchisor, concurrently with the execution and delivery of this Agreement, Franchisor's current form of Franchise Agreement for the first Franchised Business to be established by Developer pursuant to the Mandatory Development Schedule. For each subsequent Franchised Business to be established hereunder, Developer shall execute and deliver to Franchisor Franchisor's then-current form of Franchise Agreement, which shall be presented to Developer together with Franchisor's then-current Franchise Disclosure Document. The then-current form of Franchise Agreement may differ from the current

The Tox MUDA 2023 i

DocuSign Envelope ID: FC868933-7613-4774-90BF-7AB1F57B12C1

form of Franchise Agreement. Further, Developer acknowledges and agrees that Developer shall not receive any initial training related to each additional Franchised Business. Developer hereby waives all obligations by Franchisor to provide any training to Developer contained in each Franchise Agreement, other than the initial Franchise Agreement executed concurrently with this Agreement, by and between Franchisor and Developer. Developer hereby acknowledges and agrees that the training Developer receives pursuant to the initial Franchise Agreement executed concurrently with this Agreement is sufficient to allow Developer to construct, equip, open and operate each of Developer's Franchised Businesses in the Development Area.

5.2. <u>Mandatory Development Schedule</u>. Subsequent to Developer's signing of this Agreement and the initial Franchise Agreement, and provided that all conditions in Section 5.4 hereof are satisfied or waived, upon the execution of a lease for Developer's first Franchised Business, Developer shall execute an additional Franchise Agreement for the development of the second Franchised Business to be opened under the Mandatory Development Schedule. Provided that all conditions in Section 5.4 hereof are satisfied or waived, upon the execution of a lease for each subsequent Franchised Business to be developed by Developer, Developer shall execute an additional Franchise Agreement for the development of the next Franchised Business to be opened under the Mandatory Development Schedule. Notwithstanding the foregoing, Developer shall open the Franchised Businesses in accordance with the following schedule:

| Outlet for Development | Mandatory Open Date |
|:---:|:---:|
| 1 | ___ months following the Effective Date |
| 2 | ___ months following the Effective Date |
| 3 | ___ months following the Effective Date |

Developer acknowledges and agrees that the terms of the Mandatory Development Schedule are reasonable and viable based upon Developer's independent investigation and analysis. Failure by Developer to adhere to the Mandatory Development Schedule (including any extensions thereof approved by Franchisor in writing pursuant to Section 5.3 below) shall constitute a material event of default under this Agreement.

5.3. <u>Extension of Mandatory Development Schedule</u>. If Developer is unable to meet the Mandatory Development Schedule for any Franchised Business, Developer may seek a reasonable extension from Franchisor. Any request for an extension must be in writing and submitted to Franchisor at least sixty (60) days prior to the Mandatory Open Date for such outlet. Franchisor shall not unreasonably withhold consent for such reasonable extension provided that Developer has (i) submitted its extension request in a timely manner; (ii) demonstrated diligent efforts to meet the original Mandatory Open Date; and (iii) has at all times acted in good faith and is otherwise fulfilling its obligations under this Agreement.

4

5.4. <u>Conditions to Exercise Developer's Rights</u>. All of the following conditions must be satisfied or waived, in Franchisor's sole discretion, before Franchisor grants Developer the right to develop an additional Franchised Business in accordance with Section 5.1 hereof and pursuant to a Franchise Agreement:

5.4.1. Developer shall (i) request Franchisor's then-current Franchise Disclosure Document, (ii) submit to Franchisor all information and other documents requested by Franchisor prior to and as a basis for the issuance of Franchise Agreements in the System, (iii) submit to Franchisor all financial statements reasonably requested by Franchisor, and (iv) satisfy Franchisor's then-current financial criteria for multi-unit franchisees.

5.4.2. Developer shall be in full compliance with this Agreement, the Mandatory Development Schedule, and all Franchise Agreements with Franchisor and any other agreement with Franchisor or Franchisor's affiliates; and

5.4.3. Developer has demonstrated the management skills necessary for competent operation, organization, customer service and record keeping of an additional Franchised Business as determined by Franchisor, in Franchisor's sole discretion.

5.5. <u>Termination for Failure of Condition</u>. Notwithstanding anything to the contrary contained herein, in the event that Franchisor determines, in Franchisor's sole and absolute discretion, that any condition set forth in Section 5.4 hereof cannot be satisfied, Franchisor may terminate this Agreement upon written notice to Developer. Termination of this Agreement in accordance with this Section 5.5 shall have no effect on the validity of any other agreement between Franchisor and Developer, provided that Developer is in full compliance therewith.

## 6. TRANSFER.

6.1. <u>Transfers by Franchisor</u>.

6.1.1. Franchisor shall have the right to assign this Agreement, and all of Franchisor's rights and privileges hereunder, to any person, firm, corporation or other entity, without Developer's permission or prior knowledge, provided that, with respect to any assignment resulting in the subsequent performance by the assignee of Franchisor's obligations, the assignee shall expressly assume and agree to perform Franchisor's obligations hereunder. Specifically, and without limitation to the foregoing, Developer expressly affirms and agrees that Franchisor may: (i) sell Franchisor's assets and Franchisor's rights to the Marks and the System outright to a third party; (ii) engage in a public or private placement of some or all of Franchisor's securities; (iii) merge, acquire other corporations, or be acquired by another corporation, including competitors; (iv) undertake a refinancing, recapitalization, leveraged buy-out or other economic or financial restructuring; and (v) with regard to any or all of the above sales, assignments and dispositions, Developer expressly and specifically waives any claims, demands or damages arising from or relating to the loss of association with or identification of

5

The Tox MUDA 2023 i

DocuSign Envelope ID: FC868933-7613-4774-00BF-7AB1F57B12C1

Franchisor.  Nothing contained in this Agreement shall require Franchisor to remain in the business franchised herein or to offer the same products and services, whether or not bearing the Marks, in the event that Franchisor exercises its prerogative hereunder to assign Franchisor's rights in this Agreement.

6.1.2. Developer agrees that Franchisor has the right, now or in the future, to purchase, merge, acquire or affiliate with an existing competitive or non-competitive franchise network, chain or any other business regardless of the location of that chain's or business' facilities, and to operate, franchise or license those businesses and/or facilities operating under the Marks or any other marks following Franchisor's purchase, merger, acquisition or affiliation, regardless of the location of the facilities (which Developer acknowledges may be within the Development Area, proximate thereto, or proximate to any of Developer's Franchised Businesses).

6.1.3. If Franchisor assigns its rights in this Agreement, nothing herein shall be deemed to require Franchisor to remain in the wellness services business or to offer or sell any products or services to Developer.

6.2.  <u>Restrictions on Transfers by Developer</u>.  Developer's rights and duties under this Agreement are personal to Developer, and Franchisor has made this Agreement with Developer in reliance on Franchisor's perceptions of the individual and collective character, skill, aptitude, attitude, business ability, and financial capacity of Developer. Thus, no transfer, as hereafter defined, may be made without Franchisor's prior written approval.  Franchisor may void any transfer made without such approval.

6.3.  <u>Transfers by Developer</u>.  Developer shall not directly or indirectly sell, assign, transfer, give, devise, convey or encumber this Agreement or any right granted or interest herein or hereunder (a "Transfer") or suffer or permit any such assignment, transfer, or encumbrance to occur by operation of law unless Developer first obtains the written consent of Franchisor, which Franchisor may or may not grant in Franchisor's sole discretion, and subject to the following:

6.3.1. The proposed transferee must be an individual of good moral character and otherwise meet Franchisor's then-applicable standards for multi-unit franchisees.

6.3.2. The transferee must have sufficient business experience, aptitude and financial resources to operate multiple Franchised Businesses and to comply with this Agreement;

6.3.3. The transferee has agreed to complete Franchisor's Initial Management Training Program to Franchisor's satisfaction;

6.3.4. Developer has paid all amounts owed to (i) Franchisor pursuant to this Agreement and all Franchise Agreements and other agreements between Franchisor and/or Franchisor's affiliates and Developer and (ii) third-party creditors;

6

6.3.5. The transferee has executed Franchisor's then-standard form of Multi-Unit Development Agreement, which may have terms and conditions different from this Agreement, for a term no less than the unexpired term of future development obligations due pursuant to the Mandatory Development Schedule of this Agreement;

6.3.6. Developer and the transferee shall have executed a general release, in a form satisfactory to Franchisor, of any and all claims against Franchisor and Franchisor's officers, directors, shareholders, members and employees in their corporate and individual capacities, including, without limitation, claims arising under federal, state and local laws, rules and ordinances. Developer agrees to subordinate any claims Developer may have against the transferee to Franchisor, and indemnify Franchisor against all claims brought against Franchisor by the transferee for a period of three (3) years following the transfer;

6.3.7. Franchisor has granted written approval of the material terms and conditions of the Transfer, including, without limitation, that the price and terms of payment will not adversely affect the transferee's development obligations. However, Franchisor's approval of a Transfer is not in any way a representation or warranty of the transferee's success or the soundness of transferee's decision to purchase the Developer's development rights on such terms and conditions. Developer shall provide Franchisor all proposed transfer documents for Franchisor's review at least thirty (30) days prior to a closing of the proposed Transfer; and

6.3.8. If Developer, through Developer or any entity, finances any part of the sale price of the Transfer, Developer agrees that all obligations of the transferee under any notes, agreements or security interests to Developer or Developer's entity will be subordinate to the transferee's obligations to Franchisor.

6.4. <u>Transfer Fee</u>. As a condition to any Transfer, Developer shall pay Franchisor a transfer fee equal to fifty percent (50%) of the then-current initial franchise fee multiplied by the number of remaining Franchised Businesses to be developed hereunder; provided however for transfers among the individuals named as Developer in the introductory paragraph of this Agreement the transfer fee shall be waived.

6.5. <u>Franchisor 's Right of First Refusal.</u>

6.5.1. If Developer wishes to transfer all or part of his or her interest in this Agreement pursuant to any bona fide offer received from a third party to purchase such interest, then Developer shall promptly notify Franchisor in writing of each such offer, and shall provide such information and documentation relating to the offer as Franchisor may require.

6.5.2. Franchisor has the right, exercisable by written notice to Developer within thirty (30) days after receipt of written notification and copies of all documentation

7

The Tox MUDA 2023 i

required by Franchisor describing such offer, to buy the interest in this Agreement for the price and on the terms and conditions contained in the offer.

6.5.3. Developer further agrees, in the event Franchisor exercises its right of first refusal, notwithstanding anything to the contrary contained in the third-party offer, that (i) Franchisor may substitute cash for any other form of consideration contained in the offer; (ii) at Franchisor 's option, Franchisor may pay the entire purchase price at closing; (iii) Franchisor 's credit will be deemed equal to the credit of any proposed transferee; (vi) Franchisor will have at least sixty (60) days to close the purchase; and (v) Franchisor will be entitled to receive from Developer all customary representations and warranties given by a seller of franchise development rights.

6.5.4. If Franchisor does not exercise its right to buy within thirty (30) days, Developer may thereafter transfer the interest to the transferee on terms no more favorable than those disclosed to Franchisor, provided that such transfer is subject to Franchisor 's prior written approval pursuant to Section 6.3 hereof.  However, if (i) the sale to the transferee is not completed within one hundred twenty (120) days after the offer is given to Franchisor or (ii) there is any material change in the terms of the offer, the offer will again be subject to Franchisor's right of first refusal.

6.6    Death or Permanent Disability.  The grant of rights under this Agreement is personal to Developer, and on the death or permanent disability of Developer, the development rights granted by this Agreement will terminate, unless prohibited by applicable law.  If prohibited by applicable law, the executor, administrator, conservator or other personal representative of Developer will transfer Developer's interest in this Agreement within four (4) months from the date of death or permanent disability, to a third party approved by Franchisor.  A transfer under this Section 6.6, including without limitation, transfer by devise or inheritance, is subject to the conditions for Transfers in this Article 6 and unless transferred by gift, devise or inheritance, subject to the terms of Section 6.5 above.  For purposes of this Agreement, the term "permanent disability" means a mental or physical disability, impairment or condition that is reasonably expected to prevent or actually does prevent Developer from supervising the development and operation of Developer's Franchised Businesses continuously for six (6) months from its onset.

## 7. DEFAULT AND TERMINATION.

7.1.    Default and Automatic Termination.  Developer shall be deemed to be in material default under this Agreement, and all rights granted herein shall automatically terminate without notice to Developer, if any Developer shall become insolvent or makes a general assignment for the benefit of creditors; or if any Developer files a voluntary petition under any section or chapter of federal bankruptcy law or under any similar law or statute of the United States or any state thereof, or admits in writing his or her inability to pay debts when due; or if any Developer is adjudicated a bankrupt or insolvent in proceedings filed against any of Developer under any section or chapter of federal bankruptcy laws or under any similar law or statute of the United States or any state; or if a bill in equity or other proceeding for the appointment of a receiver of any Developer or other custodian

8

The Tox MUDA 2023 i

DocuSign Envelope ID: FC868933-7613-4774-00BF-7AB1F57B12C1

for Developer's business or assets is filed and consented to by any of Developer; or if a receiver or other custodian (permanent or temporary) of any Developer's assets or property, or any part thereof, is appointed by any court of competent jurisdiction; or if proceedings for a composition with creditors under any state or federal law should be instituted by or against any Developer; or if a final judgment remains unsatisfied or of record for thirty (30) days or longer (unless supersedeas bond is filed); or if any Developer is dissolved; or if execution is levied against any of Developer's business or property; or if suit to foreclose any lien or mortgage against any of Developer's Franchised Business premises or equipment is instituted against any Developer and not dismissed within thirty (30) days.

7.2. <u>Defaults With No Opportunity to Cure</u>. Developer shall be deemed to be in material default and Franchisor may, at its option, terminate this Agreement and all rights granted hereunder, without affording Developer any opportunity to cure the default, effective immediately upon notice to Developer, if Developer:

7.2.1. has misrepresented or omitted material facts in applying for the development rights granted hereunder;

7.2.2. falsifies any report required to be furnished Franchisor hereunder;

7.2.3. fails to comply with any federal, state or local law, rule or regulation, applicable to the development and operations of Developer's Franchised Businesses, including, but not limited to, the failure to pay taxes;

7.2.4. fails to develop the Franchised Businesses in accordance with the Mandatory Development Schedule.

7.2.5. attempts a Transfer in violation of the provisions of Article 6 of this Agreement;

7.2.6. is convicted of, or pleads no contest to, a felony or to a crime that could damage the goodwill associated with the Marks or does anything to harm the reputation of the System or the goodwill associated with the Marks;

7.2.7. receives an adverse judgment or a consent decree in any case or proceeding involving allegations of fraud, racketeering, unfair or improper trade practices or similar claim which is likely to have an adverse effect on the System, or the Marks, the goodwill associated therewith or Franchisor's interest therein, in Franchisor's sole opinion;

7.2.8. fails to comply with the non-disclosure and non-competition covenants in Article 8 hereof;

7.2.9. defaults, or an affiliate of any Developer defaults, under any other agreement, including any Franchise Agreement, with Franchisor or any of its affiliates, or with

9

suppliers or any Developer's landlord and does not cure such default within the time period provided in such other agreement; or

7.2.10. terminates this Agreement without cause.

7.3.   Curable Defaults.  Developer shall be deemed to be in material default and Franchisor may, at its option, terminate this Agreement and all rights granted hereunder, if Developer fails to cure the default within the time period set forth in this Section 7.3, effective immediately upon notice to Developer, if Developer:

7.3.1.   fails to pay when due any amounts due to Franchisor under this Agreement or any related agreement and does not correct the failure within five (5) days after written notice; provided, however, Franchisor has no obligation to give written notice of a late payment more than two (2) times in any twelve (12)–month period, and the third such late payment in any twelve (12)–month period shall be a non-curable default under Section 7.2;

7.3.2. fails to perform any non-monetary obligation imposed by this Agreement (excepting those defaults of obligations set forth in Sections 7.1 and 7.2 for which there is no opportunity to cure) and such default shall continue for five (5) days after Franchisor has given written notice of such default, or if the default cannot be reasonably corrected within said five (5)-day period, then if it is not corrected within such additional time as may be reasonably required assuming Developer proceeds diligently to cure; provided, however, Franchisor has no obligation to give written notice of a non-monetary default more than two (2) times in any twelve (12)–month period, and the third such default, whether monetary or non-monetary, in any twelve (12) – month period shall be a non-curable default under Section 7.2.

7.4.   Post-Termination Obligations. Upon termination or expiration of this Agreement, all rights and licenses granted hereunder to Developer shall immediately terminate and Developer shall (i) immediately cease all development operations pursuant to this Agreement; and (ii) comply with the non-disclosure and non-competition covenants contained in Article 8.

8.  **NON-DISCLOSURE AND NON-COMPETITION COVENANTS.**

8.1.   Confidential Information.  Developer acknowledges and accepts that during the term of this Agreement, Developer will have access to Franchisor's trade secrets, including, but not limited to, formulas, recipes, methods, processes, customer lists, vendor partnerships and/or relationships, sales and technical information, financial information, costs, product prices and names, software tools and applications, website and/or email design, products, services, equipment, technologies and procedures relating to the operation of the Franchised Business; the Manual; methods of advertising and promotion; instructional materials; any other information which Franchisor may or may not specifically designate as "confidential" or "proprietary"; and the components of the System, whether or not such information is protected or protectable by patent, copyright,

DocuSign Envelope ID: FC868933-7613-4774-00BF-7AB1F57B12C1

trade secret or other proprietary rights (collectively referred to herein as the "Confidential Information"). Developer shall not, during the term of this Agreement and thereafter, communicate or divulge to, or use for the benefit of, any other person or entity, and, following the expiration or termination of this Agreement, shall not use for Developer's own benefit, any Confidential Information that may be communicated to Developer or of which Developer may be apprised in connection with the development of Franchised Businesses under the terms of this Agreement. Developer shall not at any time copy, duplicate, record or otherwise reproduce any Confidential Information, in whole or in part, or otherwise make the same available to any person, without Franchisor's prior written consent. The covenant in this Section 8.1 shall survive the expiration, termination or transfer of this Agreement or any interest herein and shall be perpetually binding upon Developer.

8.2. <u>Protection of Information</u>. Developer shall take all steps necessary, at Developer's own expense, to protect the Confidential Information and shall immediately notify Franchisor if Developer finds that any Confidential Information has been divulged in violation of this Agreement.

8.3. <u>Noncompetition Covenants</u>. Developer acknowledges that, pursuant to this Agreement, Developer will receive valuable training, trade secrets and Confidential Information of the System that are beyond the present knowledge, training and experience of Developer. Developer acknowledges that such specialized training, trade secrets and Confidential Information provide a competitive advantage and will be valuable to him or her in the development and operation of Franchised Businesses, and that gaining access to such specialized training, trade secrets and Confidential Information is, therefore, a primary reason why Developer is entering into this Agreement. In consideration for such specialized training, trade secrets, Confidential Information and rights, Developer covenants that, except as otherwise approved in writing by Franchisor:

8.3.1. During the term of this Agreement, Developer shall not, either directly or indirectly, for himself or herself or through, on behalf of, or in conjunction with, any person or entity (i) divert, or attempt to divert, any business or customer of any Franchised Business to be developed hereunder or of other franchisees in the System to any competitor, by direct or indirect inducement or otherwise; (ii) participate as an owner, partner, director, officer, employee, consultant or agent or serve in any other capacity in any business substantially similar to the System ("Competitive Business"); (iii) do or perform, directly or indirectly, any other act injurious or prejudicial to the goodwill associated with the Marks and the System or (iv) in any manner interfere with, disturb, disrupt, decrease or otherwise jeopardize the business of the Franchisor or any The Tox franchisees or Franchisor-affiliated outlets.

8.3.2. Upon the expiration or earlier termination of this Agreement or upon a Transfer and continuing for twenty-four (24) months thereafter, Developer shall not, either directly or indirectly, for himself or herself or through, on behalf of or in conjunction with any person or entity (i) divert, or attempt to divert, any business

11

The Tox MUDA 2023 i

or customer of the Franchised Businesses to be developed hereunder or of other franchisees in the System to any competitor, by direct or indirect inducement or otherwise; or (ii) participate as an owner, partner, director, officer, employee, consultant or agent or serve in any other capacity in any Competitive Business within twenty-five (25) miles of the Territory or any The Tox outlet; (iii) do or perform, directly or indirectly, any other act injurious or prejudicial to the goodwill associated with the Marks and the System or (iv) in any manner interfere with, disturb, disrupt, decrease or otherwise jeopardize the business of the Franchisor or any The Tox franchisees.

8.4.   <u>Reasonableness of Restrictions</u>.  Developer acknowledges and agrees that the covenants not to compete set forth in this Agreement are fair and reasonable and will not impose any undue hardship on Developer since Developer has other considerable skills, experience and education which afford Developer the opportunity to derive income from other endeavors.

8.5.   <u>Reduction of Time or Scope</u>.  If the period of time or the geographic scope specified above, should be adjudged unreasonable in any proceeding, then the period of time will be reduced by such number of months or the geographic scope will be reduced by the elimination of such portion thereof, or both, so that such restrictions may be enforced for such time and scope as are adjudged to be reasonable.  In addition, Franchisor shall have the right, in its sole discretion, to reduce the scope of any covenant set forth in this Article 8 or any portion thereof, without Developer's consent, effective immediately upon receipt by Developer of written notice thereof, and Developer agrees to forthwith comply with any covenant as so modified.

8.6.   <u>Injunctive Relief</u>.  Developer acknowledges that a violation of the covenants not to compete contained in this Agreement would result in immediate and irreparable injury to Franchisor for which no adequate remedy at law will be available.  Accordingly, Developer hereby consents to the entry of an injunction prohibiting any conduct by Developer in violation of the terms of the covenants not to compete set forth in this Agreement.

8.7.   <u>No Defense</u>.  Developer expressly agrees that the existence of any claims he or she may have against Franchisor, whether or not arising from this Agreement, shall not constitute a defense to the enforcement by Franchisor of the covenants in this Section.

12

The Tox MUDA 2023 i

**9. INDEMNIFICATION.** TO THE FULLEST EXTENT PERMITTED BY LAW, DEVELOPER AGREES TO EXONERATE AND INDEMNIFY AND HOLD HARMLESS THE TOX FRANCHISING GROUP, LLC, THE TOX HOLDINGS, LLC, THE TOX IP, LLC, AND ANY OF THEIR PARENT COMPANY, SUBSIDIARIES, DIVISIONS, AFFILIATES, SUCCESSORS, ASSIGNS AND DESIGNEES (COLLECTIVELY REFERRED TO AS THE "TOX INDEMNITEES") AS WELL AS THE TOX INDEMNITEES' DIRECTORS, OFFICERS, EMPLOYEES, AGENTS, SHAREHOLDERS, SUCCESSORS, DESIGNEES AND REPRESENTATIVES, FROM ALL CLAIMS BASED UPONARISING OUT OF, OR IN ANY WAY RELATED TO THE DEVELOPMENT, OPERATION, CONDITION, OR ANY PART OF ANY OF DEVELOPER'S FRANCHISED BUSINESSES TO BE DEVELOPED HEREUNDER, THE PRODUCTS, THE PREMISES, OR ANY ASPECT OF THE REAL ESTATE CONNECTED TO ANY OF SUCH FRANCHISED BUSINESSES, WHETHER CAUSED BY DEVELOPER'S AGENTS OR EMPLOYEES, OR ARISING FROM DEVELOPER'S ADVERTISING OR BUSINESS PRACTICES, REGARDLESS OF WHETHER THE ALLEGED INJURY OR LIABILITY IS CAUSED IN WHOLE OR IN PART BY ANY NEGLIGENT ACT OR OMISSION OF THE TOX INDEMNITEES. DEVELOPER AGREES TO PAY FOR ALL THE TOX INDEMNITEES' LOSSES, EXPENSES (INCLUDING, BUT NOT LIMITED TO ATTORNEYS' FEES) OR CONCURRENT OR CONTRIBUTING LIABILITY INCURRED IN CONNECTION WITH ANY ACTION, SUIT, PROCEEDING, INQUIRY (REGARDLESS OF WHETHER THE SAME IS REDUCED TO JUDGMENT OR DETERMINATION), OR ANY SETTLEMENT THEREOF FOR THE INDEMNIFICATION GRANTED BY DEVELOPER HEREUNDER. THE TOX INDEMNITEES SHALL HAVE THE RIGHT TO SELECT AND APPOINT INDEPENDENT COUNSEL TO REPRESENT ANY OF THE TOX INDEMNITEES IN ANY ACTION OR PROCEEDING COVERED BY THIS INDEMNITY. DEVELOPER AGREES THAT TO HOLD THE TOX INDEMNITEES HARMLESS, DEVELOPER WILL REIMBURSE THE TOX INDEMNITEES AS THE COSTS AND EXPENSES ARE INCURRED BY THE TOX INDEMNITEES.

‾‾‾‾‾
Initial

**10. DISPUTE RESOLUTION**

10.1. <u>Internal Dispute Resolution</u>.  Developer shall first bring any claim, controversy or dispute arising out of or relating to this Agreement, the Attachments hereto or the relationship created by this Agreement to Franchisor's president and/or chief executive officer for resolution.  After providing notice as set forth in Section 12.7 below. Developer must exhaust this internal dispute resolution procedure before Developer may bring Developer's dispute before a third party. This agreement to first attempt resolution of disputes internally shall survive termination or expiration of this Agreement.

10.2. <u>Mediation</u>. At Franchisor's option, any claim, controversy or dispute that is not resolved pursuant to Section 10.1 hereof shall be submitted to non-binding mediation. Developer shall provide Franchisor with written notice of Developer's intent to pursue any unresolved claim, controversy or dispute, specifying in sufficient detail the nature thereof, prior to commencing any legal action. Franchisor shall have thirty (30) days

13

The Tox MUDA 2023 i

following receipt of Developer's notice to exercise Franchisor's option to submit such claim, controversy or dispute to mediation. Mediation shall be conducted through a mediator or mediators in accordance with the American Arbitration Association Commercial Mediation Rules. Such mediation shall take place in the then-current location of Franchisor's corporate headquarters. The costs and expenses of mediation, including compensation and expenses of the mediator (and except for the attorneys' fees incurred by either party), shall be borne by the parties equally. Franchisor may specifically enforce Franchisor's rights to mediation, as set forth herein.

10.3. <u>Governing Law and Venue</u>.  This Agreement is made in and shall be substantially performed in the State of Florida.  Any claims, controversies, disputes or actions arising out of this Agreement shall be governed, enforced and interpreted pursuant to the laws of the State of Florida.  Developer and its Principals, except where specifically prohibited by law, hereby irrevocably submit themselves to the sole and exclusive jurisdiction of the state and federal courts in Florida.  Developer and its Principals, hereby waive all questions of personal jurisdiction for the purpose of carrying out this provision.

10.4. <u>Mutual Benefit</u>.  Developer and Franchisor acknowledge that the parties' agreement regarding applicable state law and forum set forth in Section 10.5 provide each of the parties with the mutual benefit of uniform interpretation of this Agreement and any dispute arising hereunder. Each of Developer and Franchisor further acknowledge the receipt and sufficiency of mutual consideration for such benefit and that each party's agreement regarding applicable state law and choice of forum have been negotiated in good faith and are part of the benefit of the bargain reflected by this Agreement.

10.5. <u>Waiver of Jury Trial and Certain Damages</u>.  Developer hereby waives, to the fullest extent permitted by law, any right to or claim for (i) a trial by jury in any action, proceeding or counterclaim brought by or against Franchisor, and (ii) any punitive, exemplary, incidental, indirect, special, consequential or other damages (including, without limitation, loss of profits) against Franchisor, its affiliates, and their respective officers, directors, shareholders, partners, agents, representatives, independent contractors, servants and employees, in their corporate and individual capacities, arising out of any cause whatsoever.  Each of Developer agrees that in the event of a dispute, Developer shall be limited to the recovery of any actual damages sustained.

10.6. <u>Injunctive Relief</u>. Nothing herein contained (including, without limitation, Sections 10.1 through 10.3 above) shall bar Franchisor from the right to obtain immediate injunctive relief from a court of competent jurisdiction against threatened conduct by Franchisee that may cause Franchisor loss or damage, under the usual equity rules, including the applicable rules for obtaining specific performance, restraining orders and preliminary injunctions.

10.7. <u>Limitations of Claims</u>.  Any and all claims by Developer arising out of or relating to this Agreement or the relationship among the parties will be barred unless a proceeding for relief is commenced within one (1) year from the date on which Developer knew or should have known of the facts giving rise to such claims.

14

The Tox MUDA 2023 i

10.8. <u>Survival</u>. The provisions of this Article 10 shall continue in full force and effect notwithstanding the expiration or termination of this Agreement or a transfer by Franchisee or any Principal of their respective interests in this Agreement.

## 11. WAIVER AND RELEASE OF CERTAIN CLAIMS

11.1. <u>Waiver of Claim for Lack of Business Success.</u> Developer acknowledges that Developer has conducted an independent investigation of all aspects relating to the financial, operational and other aspects of the business of developing and operating Franchised Businesses. Developer further acknowledges that no representations of performance (financial or otherwise) for the Franchised Businesses provided for in this Agreement has been made to Developer by Franchisor and Developer hereby waives any claim against Franchisor for any business failure Developer may experience as a developer under this Agreement.

_____
Initial

11.2. <u>Release of Prior Claims</u>. BY EXECUTING THIS AGREEMENT, DEVELOPER INDIVIDUALLY AND ON BEHALF OF DEVELOPER'S HEIRS, LEGAL REPRESENTATIVES, SUCCESSORS AND ASSIGNS, HEREBY FOREVER RELEASE AND DISCHARGE THE TOX FRANCHISING GROUP, LLC, THE TOX HOLDINGS, LLC, THE TOX IP, LLC, THE TOX INDEMNITEES, AND ALL OF THEIR OFFICERS, DIRECTORS, SHAREHOLDERS, AGENTS AND SUCCESSORS AND ASSIGNS FROM ANY AND ALL CLAIMS, DEMANDS AND JUDGMENTS RELATING TO OR ARISING UNDER THE STATEMENTS, CONDUCT, CLAIMS OR ANY OTHER AGREEMENT BETWEEN THE PARTIES EXECUTED PRIOR TO THE DATE OF THIS AGREEMENT, INCLUDING, BUT NOT LIMITED TO, ANY AND ALL CLAIMS, WHETHER PRESENTLY KNOWN OR UNKNOWN, SUSPECTED OR UNSUSPECTED, ARISING UNDER THE FRANCHISE, SECURITIES, TAX OR ANTITRUST LAWS OF THE UNITED STATES OR OF ANY STATE OR TERRITORY THEREOF.

_____
Initial

## 12. GENERAL

12.1. <u>Independent Licensee</u>. Developer is and shall be an independent licensee under this Agreement, and no partnership shall exist between Developer and Franchisor. This Agreement does not constitute Developer as an agent, legal representative, or employee of Franchisor for any purpose whatsoever, and Developer is not granted any right or authority to assume or create any obligation for or on behalf of, or in the name of, or in any way to bind Franchisor. Developer agrees not to incur or contract any debt or obligation on behalf of Franchisor or commit any act, make any representation or advertise in any manner which may adversely affect any right of Franchisor or be detrimental to Franchisor or other developers or franchisees of Franchisor. Pursuant to the above, Developer agrees to indemnify Franchisor and hold Franchisor harmless from any and all liability, loss, attorney's fees, or damage Franchisor may suffer as a result of claims, demands, taxes, costs

15

The Tox MUDA 2023 i

or judgments against Franchisor arising out of the relationship hereby established which specifically, but not exclusively, includes costs, losses, expenses, attorneys fees relative to assignment or the transfer of right to develop and transactional costs relative thereto, defaults under any leases, subleases, notes, receipt of revenues or any other relationships arising directly or indirectly out of the development and operation of the Franchised Businesses.

12.2. Successors.  This Agreement shall bind and inure to the benefit of the successors and assigns of Franchisor and shall be personally binding on and inure to the benefit of Developer and his or her respective heirs, executors, administrators and successors or assigns; provided, however, the foregoing provision shall not be construed to allow a transfer of any interest of Developer in this Agreement, except in accordance with Article 6 hereof.

12.3. Invalidity of Part of Agreement.  Should any provisions in this Agreement, for any reason, be declared invalid, then such provision shall be invalid only to the extent of the prohibition without in any way invalidating or altering any other provision of this Agreement.

12.4. Entire Agreement.  This Agreement, including all attachments, is the entire agreement of the parties, superseding all prior written or oral agreements of the parties concerning the same subject matter, and superseding all prior written or oral representations made to Developer, except that nothing in this Agreement or in any related agreement is intended to disclaim the representations Franchisor made to Developer in Franchisor's Franchise Disclosure Document.  No agreement of any kind relating to the matters covered by this Agreement and no amendment of the provisions hereof shall be binding upon either party unless and until the same has been made in writing and executed by all interested parties.

12.5. Construction.  All terms and words used in this Agreement, regardless of the number and gender in which they are used, shall be deemed and construed to include any other number, singular or plural, and any other gender, masculine, feminine or neuter, as the context or sense of this Agreement or any provision herein may require, as if such words had been fully and properly written in the appropriate number and gender.  All covenants, agreements and obligations assumed herein by Developer shall be deemed to be joint and several covenants, agreements and obligations of each of the persons named as Developer, if more than one person is so named.

12.6. Captions.  Captions and section headings are used herein for convenience only.  They are not part of this Agreement and shall not be used in construing it.

12.7. Notices. Whenever notice is required or permitted to be given under the terms of this Agreement, it shall be given in writing, and be delivered personally or by certified or registered mail, postage prepaid, addressed to the party for whom intended, and shall be deemed given on the date of delivery or delivery is refused.  All such notices shall be addressed to the party to be notified at their respective addresses as first above written,

16

The Tox MUDA 2023 i

DocuSign Envelope ID: FC868933-7613-4774-00BF-7AB1F57B12C1

or at such other address or addresses as the parties may from time to time designate in writing.

12.8. <u>Effect of Waivers</u> No waiver, delay, omission or forbearance on the part of Franchisor to exercise any right, option, duty or power arising from any default or breach by Developer shall affect or impair the rights of Franchisor with respect to any subsequent default of the same or of a different kind.

12.9. <u>Remedies Cumulative</u>.  All rights and remedies of the parties to this Agreement shall be cumulative and not alternative, in addition to and not exclusive of any other rights or remedies that are provided for herein or that may be available at law or in equity in case of any breach, failure or default or threatened breach, failure or default of any term, provision or condition of this Agreement or any other agreement between Developer or any of its affiliates and Franchisor or any of its affiliates.  The rights and remedies of the parties to this Agreement shall be continuing and shall not be exhausted by any one or more uses thereof, and may be exercised at any time or from time to time as often as may be expedient; and any option or election to enforce any such right or remedy may be exercised or taken at any time and from time to time.  The expiration, earlier termination or exercise of Franchisor's rights pursuant to Article 7 shall not discharge or release Developer from any liability or obligation then accrued, or any liability or obligation continuing beyond, or arising out of, the expiration, the earlier termination or the exercise of such rights under this Agreement.

12.10. <u>Consent to Do Business Electronically</u>. The parties to this Agreement hereby consent to do business electronically. Pursuant to the Uniform Electronic Transactions Act as adopted by the State of Florida, the parties hereby affirm to each other that they agree with the terms of this Agreement, and by attaching their signature electronically to this Agreement, they are executing the document and intending to attach their electronic signature to it. Furthermore, the parties acknowledge that the other parties to this Agreement can rely on an electronic signature as the respective party's signature.

12.11. <u>Counterparts</u>.  This Agreement may be executed in multiple counterparts, each of which when so executed shall be an original, and all of which shall constitute one and the same instrument.

12.10. <u>Survival</u>.   Any obligation of Developer that contemplates performance of such obligation after termination, expiration or transfer of this Agreement shall be deemed to survive such termination, expiration or transfer.

The Tox MUDA 2023 i

The parties hereto have executed this Multi-Unit Development Agreement on the day and year first above written.

FRANCHISOR:

THE TOX FRANCHISING GROUP, LLC

By:_____

Courtney Yeager_____, President_____
        (Print Name, Title)

DEVELOPER:

_____

_____

        (Print Name, Title)

PRINCIPAL:

_____

_____

        (Print Name)

18

DocuSign Envelope ID: FC868933-7613-4774-00BF-7AB1F57B12C1

19

The Tox MUDA 2023 i

DocuSign Envelope ID: FC868933-7613-4774-00BF-7AB1F57B12C1

**ATTACHMENT 1**

Marks –

# THE TOX

The Tox MUDA 2023 i

## ATTACHMENT 2

## DEVELOPMENT AREA DESCRIPTION

(insert map and/or define by zip codes):

The Tox MUDA 2023 i

**EXHIBIT D**

**<u>FINANCIAL STATEMENTS</u>**

<u>The Tox Franchising Group, LLC</u>

# THE TOX FRANCHISING GROUP LLC

FINANCIAL STATEMENT

February 28, 2022

DocuSign Envelope ID: FC868933-7613-4774-00BF-7AB1F57B12C1

**TABLE OF CONTENTS**

| | Page Number |
|---|---|
| INDEPENDENT AUDITOR'S REPORT | 1-2 |
| Balance Sheet | 3 |
| Statements of Income and Changes in Members' Equity | 4 |
| Statement of Cash Flows | 5 |
| Notes to Financial Statements | 6-8 |

DocuSign Envelope ID: FC868933-7613-4774-90BF-7AB1F57B12C1

**GTL, LLP** Certified Public Accountants and Business Consultants

*Member of American Institute of Certified Public Accountants and California Society of Public Accountants*

*Participant in Quality Review Program of AICPA*

## INDEPENDENT AUDITOR'S REPORT

To the Management
The Tox Franchising Group LLC
Calabasas, California

### Opinion

We have audited the accompanying financial statements of The Tox Franchising Group LLC ("the Company"), a California limited liability company, which comprises the balance sheet as of February 28, 2022, and the related statements of income and members' equity, and cash flows for the year then ended, and the related notes to financial statements.

In our opinion, the financial statements referred to above present fairly, in all material respects, the financial position of the Company as of February 28, 2022, and the results of its operations and its cash flows for the year then ended in accordance with accounting principles generally accepted in the United States of America.

### Basis for Opinion

We conducted our audit in accordance with auditing standards generally accepted in the United States of America. Our responsibilities under those standards are further described in the Auditor's Responsibilities for the Audit of the Financial Statement section of our report. We are required to be independent of The Tox Franchising Group LLC and to meet our other ethical responsibilities in accordance with the relevant ethical requirements relating to our audit. We believe that the audit evidence we have obtained is sufficient and appropriate to provide a basis for our audit opinion.

### Emphasis of Matter

As discussed in Note 3 to these financial statements, on March 11, 2020, the World Health Organization declared the novel strain of coronavirus (COVID-19) a global pandemic and recommended containment and mitigation measures worldwide. The ultimate financial impact and duration of these events cannot be reasonably estimated at this time. Our opinion is not modified with respect to that matter.

### Responsibilities of Management for the Financial Statements

Management is responsible for the preparation and fair presentation of the financial statements in accordance with accounting principles generally accepted in the United States of America, and for the design, implementation, and maintenance of internal control relevant to the preparation and fair presentation of financial statements that is free from material misstatement, whether due to fraud or error.

In preparing the financial statements, management is required to evaluate whether there are conditions or events, considered in the aggregate, that raise substantial doubt about the Company's ability to continue as a going concern within one year after the date that the financial statements are available to be issued.

---

15315 Magnolia Blvd, Suite 110 • Sherman Oaks, CA 91403 • Phone (818) 509-0066 • Fax (818) 508-0142 • www.gtlcpa.com

DocuSign Envelope ID: FC868933-7613-4774-90BF-7AB1F57B12C1

## INDEPENDENT AUDITOR'S REPORT (CONT'D)

**Auditor's Responsibilities for the Audit of the Financial Statements**

Our objectives are to obtain reasonable assurance about whether the financial statements as a whole are free from material misstatement, whether due to fraud or error, and to issue an auditor's report that includes our opinion. Reasonable assurance is a high level of assurance but is not absolute assurance and therefore is not a guarantee that an audit conducted in accordance with generally accepted auditing standards will always detect a material misstatement when it exists. The risk of not detecting a material misstatement resulting from fraud is higher than for one resulting from error, as fraud may involve collusion, forgery, intentional omissions, misrepresentations, or the override of internal control. Misstatements are considered material if there is a substantial likelihood that, individually or in the aggregate, they would influence the judgment made by a reasonable user based on the financial statements.

**In performing an audit in accordance with generally accepted auditing standards, we:**

Exercise professional judgment and maintain professional skepticism throughout the audit.

Identify and assess the risks of material misstatement of the financial statements, whether due to fraud or error, and design and perform audit procedures responsive to those risks. Such procedures include examining, on a test basis, evidence regarding the amounts and disclosures in the financial statements.

Obtain an understanding of internal control relevant to the audit in order to design audit procedures that are appropriate in the circumstances, but not for the purpose of expressing an opinion on the effectiveness of the Company's internal control. Accordingly, no such opinion is expressed.

Evaluate the appropriateness of accounting policies used and the reasonableness of significant accounting estimates made by management, as well as evaluate the overall presentation of the financial statements.

Conclude whether, in our judgment, there are conditions or events, considered in the aggregate, that raise substantial doubt about The Tox Franchising Group LLC's ability to continue as a going concern for a reasonable period of time.

We are required to communicate with those charged with governance regarding, among other matters, the planned scope and timing of the audit, significant audit findings, and certain internal control related matters that we identified during the audit.

*GT4LLP*

Certified Public Accountants
Sherman Oaks, California
July 25, 2022

2

**The Tox Franchising Group LLC**

**Balance Sheet**

**February 28, 2022**

ASSETS

| | | |
|---|---|---|
| Cash | $ | 174,601 |
| | | |
| Total Assets | $ | 174,601 |

LIABILITIES AND MEMBERS' EQUITY

| | | |
|---|---|---|
| Current liabilities | | |
| Current portion of deferred franchise fees | $ | 6,136 |
| Total current liabilities | | 6,136 |
| Deferred franchise fees, net of current portion | | 68,864 |
| Total liabilities | | 75,000 |
| Members' equity | | 99,601 |
| Liabilities and Members' equity | $ | 174,601 |

The accompanying notes are an integral part of these financial statements

3

DocuSign Envelope ID: FC868933-7613-4774-00BF-7AB1F57B12C1

**The Tox Franchising Group LLC**
**Statement of Income  and Changes in Members' Equity**
**For the Year Ended February 28, 2022**

| | | |
|---|---|---:|
| Revenues | | |
| Licensing fees | $ | 74,338 |
| Services income | | 3,095 |
| Marketing income | | 1,000 |
| Other | | 920 |
| Total revenues | | 79,353 |
| Operating expenses | | 12,752 |
| Net income | | 66,601 |
| Members' equity, beginning of period | | 50,000 |
| Member distributions | | (17,000) |
| Members' equity (deficit), end of period | $ | 99,601 |

The accompanying notes are an integral part of these financial statements

4

**The Tox Franchising Group LLC**
**Statement of Cash Flows**
**For the Year Ended February 28, 2022**

| | | |
|---|---|---:|
| Cash flows from operating activities | | |
| Net income | $ | 66,601 |
| Adjustments to reconcile net income to net cash | | |
| provided by operating activities | | |
| Changes in operating assets and liabilities | | |
| Deferred franchise fees | | 75,000 |
| Net cash provided by operating activities | | 141,601 |
| | | |
| Cash flows from financing activities | | |
| Member distributions | | (17,000) |
| Net cash (used-in) financing activities | | (17,000) |
| | | |
| Net change in cash | | 124,601 |
| | | |
| Cash, beginning of the year | | 50,000 |
| | | |
| Cash, end of year | $ | 174,601 |

The accompanying notes are an integral part of these financial statements

5

DocuSign Envelope ID: FC868933-7613-4774-90BF-7AB1F57B12C1

**The Tox Franchising Group LLC**
**Notes to Financial Statements**
**February 28, 2022**

1.  **NATURE OF OPERATIONS**

The Tox Franchising Group LLC ("the Company") is a California limited liability company that will offer franchise opportunities under "THE TOX" brand. The Tox Technique is a unique blend of massage that detoxifies the body and mind. Since its inception the Company has sold one franchise which is not yet opened.

2.  **SUMMARY OF SIGNIFICANT ACCOUNTING POLICIES**

Fiscal year

The Company's fiscal year-end is February 28.

Basis of accounting and financial statement presentation

The Company's balance sheet has been prepared in accordance with accounting principles generally accepted in the United States of America.

Use of estimates

Management uses estimates and assumptions in preparing these financial statements. Those estimates and assumptions affect the reported amounts of assets and liabilities, the disclosure of contingent assets and liabilities and the reported revenues and expenses. Actual results could differ from these estimates.

Cash and cash equivalents

The Company considers financial instruments with original maturity of 90 days or less to be cash equivalents. There were no cash equivalents at February 24, 2021.

Income taxes

The Company, as a limited liability company, is treated as a partnership for tax purposes and thus the Company has no income tax liability. Rather, the income or loss of the Company is passed through to its members who report those results on their individual income tax returns.

The Company's federal and state income tax returns are subject to examination by the Internal Revenue Service and applicable state taxing authorities for three (3) and four (4) years after each filing, respectively.

DocuSign Envelope ID: FC868933-7613-4774-90BF-7AB1F57B12C1

**The Tox Franchising Group LLC**
**Notes to Financial Statements**
**February 28, 2022**

**2. SUMMARY OF SIGNIFICANT ACCOUNTING POLICIES** - (Continued)

Concentrations

From time to time the Company's bank balances may exceed the FDIC insured limits. The Company has not experienced and does not anticipate any losses related to these balances. All licensing fees were received from one licensee.

Revenue recognition

On February 24, 2021, the Company adopted the revenue recognition policy in accordance with the Financial Accounting Standards Board ("FASB") issued Accounting Standards Update ("ASU") 2014-9, *Revenue from Contracts with Customers* (Topic 606) (codified as ASC 606). ASC 606 is based upon the principle that revenue is recognized to depict the contractual transfer of goods or services to customers in an amount that reflects the consideration to which the entity expects to be entitled in exchange for those goods and services utilizing a new five-step revenue recognition model, which steps include (i) identify the contract(s) with a customer, (ii) identify the performance obligations in the contract, (iii) determine the transaction price, (iv) allocate the transaction price to the performance obligations in the contract; and (v) recognize revenue when (or as) the entity satisfies a performance obligation. There was no financial impact to the Company's financial statements when implementing ASC 606.

Deferred commissions for sales of franchises are recorded at the time of sale and recognized as commission expense over the term of the franchise agreement.

Franchise fees are deferred until the particular franchisee commences operations and franchise fee income is recognized pro-rata over the term of the agreement. Pre-opening costs incurred will be netted with the deferred franchise fees and will be recognized when the franchisee commences operations.

Licensing fees represent fees earned from each of the independent licensees using THE TOX trademark. The licensing fee rate is 10 percent of monthly net sales of each licensee operated by each independent location. Licensing fee income from independent operators is recognized in the period earned and is paid the first of every month.

DocuSign Envelope ID: FC868933-7613-4774-00BF-7AB1F57B12C1

**The Tox Franchising Group LLC**
**Notes to Financial Statements**
**February 28, 2022**

### 3.   SUBSEQUENT EVENTS

The Company has evaluated events through July 25, 2022, to assess the need for potential recognition or disclosure in the financial statement. Based on this evaluation, it was determined no events occurred that require recognition or additional disclosure in these financial statements.

On March 11, 2020, the World Health Organization declared the novel strain of coronavirus (COVID-19) a global pandemic and recommended containment and mitigation measures worldwide. The ultimate financial impact and duration of these events and the potential impact on the Company can not be reasonably estimated at this time. Management believes that the nature of the virus may also increase the demand for the services provided by the franchisees of the Company.

### 4.   MEMBERS' EQUITY

As per the Company's operating agreement, all capital transactions and profits and losses are passed through to its members. Profit and loss and capital transactions are to be allocated in accordance with each member's ownership percentage.

**EXHIBIT E**

**THE TOX OPERATIONS MANUAL**

**TABLE OF CONTENTS**

# The Tox Franchise Operations Manual

# Table of Contents

## SECTION A: INTRODUCTION

WELCOME LETTER ................................................................ 1

HISTORY OF THE TOX ......................................................... 2

THE TOX VALUES AND PHILOSOPHY ................................. 3

SERVICES PROVIDED TO THE TOX FRANCHISEE ............. 4

    Advertising Materials and Sales Aids ◄ ................... 4

    Approved Suppliers ◄ ............................................... 4

    Corporate Website ◄ ................................................. 4

    Design Assistance ◄ ................................................. 5

    Franchisee Councils ◄ .............................................. 5

    Initial Management Training & Opening

      Assistance ◄ ...................................................... 5

    Ongoing Research and Development ◄ .................... 5

    Ongoing Training and Support ◄ .............................. 5

    Site Selection Assistance ◄ ..................................... 6

    Software ◄ ................................................................ 6

    Use of Trademarks ◄ ............................................... 6

RESPONSIBILITIES OF THE TOX FRANCHISEE ................. 7

    Responsibilities to Clients ◄ .................................... 7

    Responsibilities to Your Team ◄ .............................. 8

    Responsibilities to Your Fellow Franchisees ◄ ....... 8

    Responsibilities to the Franchisor ◄ ....................... 9

VISITS FROM THE CORPORATE OFFICE ......................... 10

PAYING OTHER FEES......................................................... 11

    Additional Training ◄ .............................................. 11

    Attorneys' Fees ◄ ................................................... 11

    Audit ◄ ..................................................................... 11

    Evaluation of Suppliers ◄ ....................................... 11

    Indemnification ◄ .................................................... 11

    Initial Training .......................................................... 12

    Insurance Reimbursement Fee ◄ ........................... 12

    Interest ◄ ................................................................ 12

    Interim Management Support Fee ◄ ....................... 12

    Late Charge ............................................................. 12

    Noncompliance Fee.................................................. 12

    Nonsufficient Funds Fee ◄ ...................................... 13

    Operations Manual Replacement Fee...................... 13

    Quality Review Services ◄ ....................................... 13

    Remedial Training ◄ ................................................ 13

    Renewal Fee ............................................................ 13

    Taxes ....................................................................... 13

    Technology Fee ◄ .................................................... 14

    Transfer Fee ◄ ........................................................ 14

## SECTION B: PRE-OPENING PROCEDURES

PRE-OPENING CHECKLIST .................................................. 1

    Pre-Opening Checklist ◄ ........................................... 1

    Development Cost Summary Sheet ◄ ....................... 4

ESTABLISHMENT OF BUSINESS FORM............................... 5

DEVELOPING YOUR LOCATION.......................................... 6

    Site Selection Process ◄ ........................................... 6

    Site Selection Criteria ◄............................................ 6

    Market Analysis ◄ ..................................................... 7

    Gaining Site Selection Acceptance ◄ ....................... 9

    Lease Considerations ◄ ............................................ 9

    Negotiating a Lease ◄ ............................................. 10

    Gaining Lease Acceptance ◄ .................................. 12

    Working with an Architect ◄ ................................... 12

    Selecting a Contractor ◄ ........................................ 12

    Design Specifications ◄ .......................................... 13

    Building Out the Facility ◄ ...................................... 14

LIST OF REQUIRED EQUIPMENT AND SUPPLIES ............. 17

TECHNOLOGY REQUIREMENTS ........................................ 20

INITIAL INVENTORY OF SUPPLIES .................................... 21

    Retail Inventory ◄ .................................................... 21

SIGNAGE AND LOGO SPECIFICATIONS ............................ 22

    Interior and Exterior Signage ◄ .............................. 22

CONTRACTING WITH REQUIRED UTILITIES AND

    SERVICES ................................................................ 23

OBTAINING REQUIRED LICENSES, CERTIFICATIONS,

    AND PERMITS......................................................... 25

SETTING UP BANK ACCOUNTS.......................................... 27

PROCURING REQUIRED INSURANCE POLICIES ............... 28

MEETING YOUR TAX OBLIGATIONS ................................. 30

    Employer Identification Number ◄ .......................... 30

    Federal Taxes ◄........................................................ 30

    State Taxes ◄ ........................................................... 31

CONDUCTING A GRAND OPENING ................................... 32

    Planning ◄ ................................................................ 33

# The Tox Franchise Operations Manual

# Table of Contents

## SECTION C: HUMAN RESOURCES

HELPFUL LINKS/RESOURCES.............................................. 1

EEOC GUIDELINES .......................................................... 3

    Employers Covered by EEOC-Enforced Laws ◄ ....... 3

    How Employees Are Counted ◄................................. 4

    Record Keeping Requirements ◄ ............................. 4

    Reporting Requirements ◄ ...................................... 5

    Charge Processing Procedures ◄............................. 5

    Mediation ◄ .......................................................... 6

    Remedies ◄ .......................................................... 6

    Regulatory Enforcement Fairness Act ◄................... 6

    Technical Assistance ◄............................................ 7

    Informal Guidance ◄ .............................................. 7

    Publications ◄ ....................................................... 7

WAGE AND LABOR LAWS................................................. 8

    Fair Labor Standards Act ◄ .................................... 8

    What the FLSA Requires ◄ ...................................... 9

    What the FLSA Does Not Require ◄ ........................ 11

    FLSA Minimum Wage Poster ◄ .............................. 11

    Other Mandatory Labor Law Posters ◄ .................. 12

LAWS REGARDING HARASSMENT..................................... 13

    Sexual Harassment ◄ ........................................... 13

    Racial and Ethnic Harassment ◄ ........................... 13

    Pregnancy Discrimination ◄ .................................. 14

    Religious Accommodation ◄ .................................. 14

IMMIGRATION REFORM/CONTROL ACT ............................ 15

AMERICANS WITH DISABILITIES ACT (ADA) ..................... 16

    Who Is Protected? ◄ ............................................. 16

    What Is Covered? ◄ .............................................. 16

    Ensuring Compliance ◄ ......................................... 17

    ADA Survey and Enhancements ◄........................... 17

    ADA Resources ◄................................................... 17

PROFILE OF THE IDEAL THE TOX EMPLOYEE ................... 18

RECRUITING EMPLOYEES ............................................... 19

    Generating Applicants ◄ ....................................... 20

JOB DESCRIPTIONS....................................................... 22

    Tox Therapist ◄ ................................................... 22

    Front Desk ◄ ....................................................... 23

THE INTERVIEW PROCESS .............................................. 25

    Remote/Video Screening ◄.................................... 28

    Conducting Interviews ◄ ......................................... 28

    Wrapping Up the Interview ◄ ................................... 33

    Reference Checks ◄ ............................................... 33

    Background Checks ◄ ............................................. 34

    Job Offer ◄ .......................................................... 34

HIRING ON A TRIAL PERIOD............................................ 36

ORIENTING NEW EMPLOYEES.......................................... 37

    Establishing Personnel File ◄ ................................. 37

    Overview of the Operation ◄ ................................... 38

TRAINING EMPLOYEES.................................................... 40

    Training Tips ◄ ..................................................... 40

    Initial Training ◄ .................................................. 41

    Ongoing Training ◄ ............................................... 42

CREATING PERSONNEL POLICIES FOR YOUR
EMPLOYEES .............................................................. 44

TIME TRACKING PROCEDURES........................................ 49

UNIFORM AND DRESS CODE .......................................... 50

CONDUCTING PERFORMANCE EVALUATIONS ................. 51

    Preparation ◄........................................................ 53

    Procedure ◄ ......................................................... 54

    Review Meeting ◄ ................................................. 54

PROGRESSIVE DISCIPLINE PROCEDURES....................... 56

TERMINATION/SEPARATION PROCEDURES ..................... 59

    Termination ◄ ...................................................... 59

    Separation ◄ ........................................................ 60

## SECTION D: DAILY OPERATING PROCEDURES

SUGGESTED HOURS OF OPERATION................................ 1

DAILY TASKS ............................................................... 2

    Daily Duties ◄ ...................................................... 2

    Room Checks ◄ ..................................................... 4

    Manager Specific Duties ◄ ..................................... 4

CLIENT SERVICE PROCEDURES....................................... 6

    Service Philosophy ◄ ............................................. 6

    Answering the Phone ◄ .......................................... 7

    Gaining Feedback ◄ .............................................. 7

    Handling Complaints ◄ .......................................... 8

THE TOX SERVICE OFFERINGS........................................ 9

CREATING THE RIGHT ENVIRONMENT............................. 11

    Lighting ◄............................................................. 11

# The Tox Franchise Operations Manual

## Table of Contents

Temperature ◄ .......................................................... 11

Music ◄ ................................................................... 11

SCHEDULING APPOINTMENTS........................................ 12

Sharing Policies ◄ ................................................... 13

Confirming Appointments ◄ ..................................... 13

Cancellations and Rescheduling ◄ ......................... 14

PROVIDING THE TOX CLIENT EXPERIENCE ..................... 15

Front Desk Best Practices ◄ ................................... 15

Client Arrival ◄......................................................... 16

Therapist Greeting ◄ ............................................... 17

Setting Expectations ◄............................................ 17

The Tox Technique ◄ ............................................... 19

Retail Recommendations ◄ ..................................... 19

Departure and Rebooking ◄ .................................... 20

Before and After Photos ◄....................................... 20

Post Service Text ◄ ................................................. 21

FREQUENTLY ASKED QUESTIONS.................................. 22

CONTRADICTIONS ......................................................... 25

THE TOX PRODUCTS...................................................... 27

Merchandising ◄ ..................................................... 29

Transacting Sales / Purchasing ◄ .......................... 29

INVENTORY MANAGEMENT............................................ 31

Tracking Inventory ◄ ............................................... 31

Ordering Procedures ◄ ............................................ 31

Using Designated and Approved Sources of
Supply ◄ .......................................................... 32

Receiving Procedures ◄ .......................................... 33

OPERATIONAL REPORTING............................................ 34

End of Shift Report ◄ .............................................. 34

FRANCHISE REPORTING REQUIREMENTS........................ 36

Royalty Payment ◄ .................................................. 36

Advertising Contributions ◄ ................................... 36

Electronic Funds Transfer ◄.................................... 37

Financial Statements ◄ ........................................... 37

REQUIRED CLEANING AND MAINTENANCE....................... 38

Laundry ◄ ............................................................... 39

Monthly Cleaning Duties ◄ ..................................... 39

Equipment and Facility Maintenance ◄ ................. 40

SAFETY AND SECURITY .................................................. 42

Orientation ◄........................................................... 43

Robbery ◄ ............................................................. 43

Burglary ◄ ............................................................. 44

Handling/Reporting Accidents ◄ ............................ 45

Workers' Compensation Issues ◄ .......................... 46

Fire Safety Plan ◄ .................................................. 47

SECTION E: MARKETING AND ADVERTISING

THE TOX BRAND GUIDE .................................................. 1

The Essence of Our Brand ◄ .................................... 1

Positioning The Tox Brand ◄.................................... 2

Brand Colors and Typography ◄.............................. 3

Role as Brand Steward ◄ ......................................... 3

USE OF A MARKETING PLAN........................................... 4

Developing your Marketing Plan ◄ .......................... 5

PROMOTING THE TOX IN YOUR AREA.............................. 6

Eblasts ◄ ................................................................ 7

Identifying Similar Businesses ◄ ............................ 8

Traditional Media ◄ ................................................ 9

USING REFERRALS TO BUILD BUSINESS ........................ 12

PUBLIC RELATIONS AND COMMUNITY INVOLVEMENT... 13

Community Involvement ◄ ...................................... 13

GUIDELINES FOR USING THE TOX MARKS ..................... 15

REQUIRED ADVERTISING EXPENDITURES....................... 16

Brand Fund Contribution ◄ ..................................... 16

Local Advertising Requirement ◄ ........................... 16

Regional Cooperative Advertising ◄ ....................... 16

Grand Opening Advertising Requirement ◄ ........... 17

OBTAINING ADVERTISING APPROVAL ............................ 18

## APPENDICES:

BRAND STANDARDS GUIDE

FORMS AND SAMPLES

SAMPLE SCRIPTS

EXHIBIT F

## FRANCHISED OUTLETS AS OF FEBRUARY 28, 2023

Alexis Montano
Lymph Bizkit, LLC
480-799-2331
7119 E. Shea Blvd. Ste. 113
Scottsdale, AZ 85254

## Franchise Agreements Signed But Outlet Not Open as of February 28, 2023

Jordyn Woods
jordynwoods1@yahoo.com
TBD in Atlanta, GA

## Former Franchisees

that had an outlet terminated, canceled, not renewed, or otherwise voluntarily or involuntarily ceased to do business under the Franchise Agreement during the most recently completed fiscal year or has not communicated with the franchisor within the 10 weeks preceding the Issuance Date of this Disclosure Document:

None.

57

## EXHIBIT G

**\*Not for use in California**

### <u>FRANCHISEE ACKNOWLEDGMENT STATEMENT</u>

**Do not sign this Acknowledgement if you are a resident of Maryland or the franchise is to be operated in Maryland.**

<u>**NOT FOR USE IN CALIFORNIA**</u>

Acknowledgment of the truthfulness of the statements below are an inducement for the Franchisor to enter into a Franchise Agreement (or Multi-Unit Development Agreement). Notify Franchisor immediately, prior to acknowledgment, if any statement below is incomplete or incorrect.

**No statement, questionnaire, or acknowledgment signed or agreed to by a franchisee (or developer) in connection with the commencement of the franchise relationship shall have the effect of (i) waiving any claims under any applicable state franchise law, including fraud in the inducement, or (ii) disclaiming reliance on any statement made by any franchisor, franchise seller or other person acting on behalf of the Franchisor. This provision supersedes any other term of any document executed in connection with the franchise.**

Franchisee (or Developer) hereby acknowledges the following:

1.  Franchisee (or Developer) has conducted an independent investigation of all aspects relating to the financial, operational, and other aspects of the business of operating the Franchised Business. Franchisee (or Developer) further acknowledges that, except as may be set forth in Franchisor's Disclosure Document, no representations of performance (financial or otherwise) for the Franchised Business provided for in the Franchise Agreement (or Development Agreement) has been made to Franchisee (or Developer) by Franchisor and Franchisee (or Developer) and any and all Principals hereby waive any claim against Franchisor for any business failure Franchisee (or Developer) may experience as a franchisee under the Franchise Agreement (or Development Agreement).

    _____
    Initial

2.  Franchisee (or Developer) has conducted an independent investigation of the business contemplated by the Franchise Agreement (or Development Agreement) and understands and acknowledges that the business contemplated by the Franchise Agreement (or Development Agreement) involves business risks making the success of the venture largely dependent upon the business abilities and participation of Franchisee (or Developer) and its efforts as an independent business operation.

    _____
    Initial

3.  Franchisee (or Developer) agrees that no claims of success or failure have been made to it or him or her prior to signing the Franchise Agreement (or Development Agreement) and that it/she/he understands all the terms and conditions of the Franchise Agreement (or Development Agreement). Franchisee (or Developer) further acknowledges that the Franchise Agreement (or Development Agreement) contains all oral and written agreements, representations, and arrangements between the parties hereto, and any rights which the

58

respective parties hereto may have had under any other previous contracts are hereby cancelled and terminated, and that the Franchise Agreement (or Development Agreement) cannot be changed or terminated orally.

_____
Initial

4.  Franchisee (or Developer) has no knowledge of any representations by Franchisor or its officers, directors, shareholders, employees, sales representatives, agents or servants, about the business contemplated by the Franchise Agreement (or Development Agreement) that are contrary to the terms of the Franchise Agreement (or Development Agreement) or the documents incorporated therein.  Franchisee (or Developer) acknowledges that no representations or warranties are made or implied, except as specifically set forth in the Franchise Agreement (or Development Agreement).  Franchisee (or Developer) represents, as an inducement to Franchisor's entry into the Franchise Agreement (or Development Agreement), that it has made no misrepresentations in obtaining the Franchise Agreement (or Development Agreement).

_____
Initial

5.  Franchisor expressly disclaims the making of, and Franchisee (or Developer) acknowledges that it has not received or relied upon, any warranty or guarantee, express or implied, as to the potential volume, profits or success of the business venture contemplated by the Franchise Agreement (or Development Agreement).

_____
Initial

6.  Franchisee (or Developer) acknowledges that Franchisor's approval or acceptance of Franchisee's business location(s) does not constitute a warranty, recommendation, or endorsement of the location for the Franchised Business(es), nor any assurance by Franchisor that the operation of the Franchised Business(es) at the premises will be successful or profitable.

_____
Initial

7.  Franchisee (or Developer) acknowledges that it has received the The Tox Franchise Group, LLC Franchise Disclosure Document with a complete copy of the Franchise Agreement (and Development Agreement) and all related Attachments and agreements at least fourteen (14) calendar days prior to the date on which the Franchise Agreement (or Development Agreement) was executed. Franchisee  (or Developer) further acknowledges that Franchisee (or Developer) has read such Franchise Disclosure Document and understands its contents.

_____
Initial

8.  Franchisee (or Developer) acknowledges that it has had ample opportunity to consult with its own attorneys, accountants, and other advisors and that the attorneys for Franchisor have

59

not advised or represented Franchisee (or Developer) with respect to the Franchise Agreement (or Development Agreement) or the relationship thereby created.

\_\_\_\_\_
Initial

9. Franchisee (or Developer), together with Franchisee's (or Developer's) advisers, has sufficient knowledge and experience in financial and business matters to make an informed investment decision with respect to the Franchise granted by the Franchise Agreement (or the rights granted by the Development Agreement).

\_\_\_\_\_
Initial

10. Franchisee (or Developer) is aware of the fact that other present or future franchisees (or developers) of Franchisor may operate under different forms of agreement(s), and consequently that Franchisor's obligations and rights with respect to its various franchisees (or developers) may differ materially in certain circumstances.

\_\_\_\_\_
Initial

11. It is recognized by the parties that Franchisor (or an affiliate) is also (or may become) a manufacturer or distributor of certain products under the Marks licensed herein; and it is understood that Franchisor does not warrant that such products will not be sold within the Franchisee's Territory (or Developer's Development Area) by others who may have purchased such products from Franchisor.

\_\_\_\_\_
Initial

12. BY EXECUTING THE FRANCHISE AGREEMENT (OR DEVELOPMENT AGREEMENT), FRANCHISEE (OR DEVELOPER) AND ANY PRINCIPAL, INDIVIDUALLY AND ON BEHALF OF FRANCHISEE'S (OR DEVELOPER'S) AND SUCH PRINCIPAL'S HEIRS, LEGAL REPRESENTATIVES, SUCCESSORS AND ASSIGNS, HEREBY FOREVER RELEASE AND DISCHARGE THE TOX FRANCHISING GROUP, LLC, THE TOX IP, LLC, THE TOX FRANCHISE HOLDINGS CORP., AND ANY OF EITHER'S PARENT COMPANY, SUBSIDIARIES, DIVISIONS, AFFILIATES, SUCCESSORS, ASSIGNS AND DESIGNEES, AND THE FOREGOING ENTITIES' DIRECTORS, OFFICERS, EMPLOYEES, AGENTS, SHAREHOLDERS, SUCCESSORS, DESIGNEES AND REPRESENTATIVES FROM ANY AND ALL CLAIMS, DEMANDS AND JUDGMENTS RELATING TO OR ARISING UNDER THE STATEMENTS, CONDUCT, CLAIMS OR ANY OTHER AGREEMENT BETWEEN THE PARTIES EXECUTED PRIOR TO THE DATE OF THE FRANCHISE AGREEMENT (OR DEVELOPMENT AGREEMENT), INCLUDING, BUT NOT LIMITED TO, ANY AND ALL CLAIMS, WHETHER PRESENTLY KNOWN OR UNKNOWN, SUSPECTED OR UNSUSPECTED, ARISING UNDER THE FRANCHISE, SECURITIES, TAX OR ANTITRUST LAWS OF THE UNITED STATES OR OF ANY STATE OR TERRITORY THEREOF. THIS RELEASE SHALL NOT APPLY TO ANY CLAIMS ARISING FROM REPRESENTATIONS MADE BY FRANCHISOR IN FRANCHISOR'S FRANCHISE DISCLOSURE DOCUMENT RECEIVED BY FRANCHISEE (OR DEVELOPER).

\_\_\_\_\_
Initial

***Signature Page to Follow***

FRANCHISEE (DEVELOPER):

PRINCIPAL:

By:

(Print Name)

,

(Print Name, Title)

Date:

Date:

PRINCIPAL:

(Print Name)

Date:

**EXHIBIT H**

## <u>STATE ADDENDA</u>

## ADDENDUM TO THE FRANCHISE DISCLOSURE DOCUMENT, FRANCHISE AGREEMENT, AND MULTI-UNIT DEVELOPMENT AGREEMENT
## REQUIRED BY THE STATE OF CALIFORNIA

The Department of Financial Protection and Innovation for the State of California requires that certain provisions contained in franchise documents be amended to be consistent with California Franchise Investment Law, Cal. Corp. Code Section 31000 et seq., and of the Rules and Regulations promulgated thereunder. To the extent that this Disclosure Document contains provisions that are inconsistent with the following, such provisions are hereby amended.

1.   THE CALIFORNIA FRANCHISE INVESTMENT LAW REQUIRES THAT A COPY OF ALL PROPOSED AGREEMENTS RELATING TO THE SALE OF THE FRANCHISE BE DELIVERED TOGETHER WITH THE DISCLOSURE DOCUMENT.

2.   OUR WEBSITE HAS NOT BEEN REVIEWED OR APPROVED BY THE CALIFORNIA DEPARTMENT OF FINANCIAL PROTECTION AND INNOVATION.  ANY COMPLAINTS CONCERNING THE CONTENT OF THIS WEBSITE MAY BE DIRECTED TO THE CALIFORNIA DEPARTMENT OF FINANCIAL PROTECTION AND INNOVATION AT www.dfpi.ca.gov.

3.   Item 3 is amended to add:

Neither Franchisor nor any person described in Item 2 of the Disclosure Document is subject to any currently effective order of any national securities association or national securities exchange, as defined in the Securities Exchange Act of 1934, 15 U.S.C. 8.78(a) et seq. suspending or expelling such persons from membership in such association or exchange.

4.   Item 17 is amended to state:

(a)   The Franchise Agreement provides for termination upon bankruptcy. This provision may not be enforceable under federal bankruptcy law (11 U.S.C.A. § 101 et seq.).

(b)   The Franchise Agreement contains a covenant not to compete which extends beyond the termination of the franchise. This provision may not be enforceable under California law.

(c)   The franchise agreement contains a liquidated damages clause. Under California Civil Code section 1671, certain liquidated damages clauses are unenforceable.

(d)   The Franchise Agreement requires application of the laws of Pennsylvania. This provision may not be enforceable under California law.

5.   California Business and Professions Code sections 20000 through 20043 provide rights to the franchisee concerning termination, transfer or non-renewal of a franchise. If the franchise agreement contains a provision that is inconsistent with the law, the law will control.

6.   Section 31125 of the California Corporation Code requires the franchisor to provide you with a disclosure document before asking you to agree to a material modification of an existing franchise.

7.   You must sign a general release if you renew or transfer your franchise. California Corporations Code §31512 voids a waiver of your rights under the Franchise Investment Law (California Corporations Code §§31000 through 31516). Business and Professions Code §20010 voids a waiver of your rights under the Franchise Relations Act (Business and Professions Code

DocuSign Envelope ID: FC868933-7613-4774-00BF-7AB1F57B12C1

§§20000 through 20043).

8.      No statement, questionnaire, or acknowledgement signed or agreed to by a franchisee in connection with the commencement of the franchise relationship shall have the effect of (i) waiving any claims under any applicable state franchise law, including fraud in the inducement, or (ii) disclaiming reliance on any statement made by any franchisor, franchise seller, or other person acting on behalf of the franchisor. This provision supersedes any other term of any document executed in connection with the franchise.

**ADDENDUM TO THE FRANCHISE DISCLOSURE DOCUMENT
PURSUANT TO THE ILLINOIS FRANCHISE DISCLOSURE ACT**

Illinois law shall apply to and govern the Franchise Agreement.

In conformance with Section 4 of the Illinois Franchise Disclosure Act, any provision in a franchise agreement that designates jurisdiction and venue in a forum outside of the State of Illinois is void. However, a franchise agreement may provide for arbitration to take place outside of Illinois.

Franchisee's right upon Termination and Non-Renewal are set forth in sections 19 and 20 of the Illinois Franchise Disclosure Act.

In conformance with section 41 of the Illinois Franchise Disclosure Act, any condition, stipulation or provision purporting to bind any person acquiring any franchise to waive compliance with the Illinois Franchise Disclosure Act or any other law is void.

No statement, questionnaire or acknowledgement signed or agreed to by a franchisee in connection with the commencement of the franchise relationship shall have the effect of: (i) waiving any claims under any applicable state franchise law, including fraud in the inducement, or (ii) disclaiming reliance on behalf of the Franchisor. This provision supersedes any other term of any document executed in connection with the franchise.

DocuSign Envelope ID: FC868933-7613-4774-00BF-7AB1F57B12C1

## AMENDMENT TO THE TOX FRANCHISING GROUP, LLC FRANCHISE AGREEMENT & MULTI-UNIT DEVELOPMENT AGREEMENT REQUIRED BY THE STATE OF ILLINOIS

In recognition of the requirements of the Illinois Franchise Disclosure Act, 815 ILCS §§ 705/1 et seq. (1987) (the "Act"), which govern the attached Board and Brush Creative Studio Franchise Agreement (the "Franchise Agreement"), the parties thereto agree as follows:

1.      To the extent of any inconsistences, the Franchise Agreement is hereby amended to further state:

"Section 4 of the Act provides that no franchisee shall be required to litigate any cause of action, with the exception of arbitration proceedings, arising under the Franchise Agreement or the Act outside of the State of Illinois."

2.      To the extent of any inconsistences, the Franchise Agreement is hereby amended to further state:

"Illinois law governs the terms of this Franchise Agreement."

3.      To the extent of any inconsistencies, the Franchise Agreement is hereby amended to further state:

"Section 41 of the Act provides that any condition, stipulation, or provision purporting to bind Franchisee to waive compliance with any provision of the Act, or any other Illinois law is void.  The foregoing requirement, however, shall not prevent Franchisee from entering into a settlement agreement or executing a general release regarding a potential or actual lawsuit filed under any of the provisions of the Act, and shall not prevent the arbitration of any claim pursuant to the provisions of Title 9 of the United States Code."

4.      To the extent of any inconsistencies, the Franchise Agreement is hereby amended to further state:

"To the extent any provision regarding termination or renewal of the Franchise Agreement is inconsistent with the Illinois Franchise Disclosure Act §§ 815 ILCS §§ 705/19 and 705/20, the provisions of these sections of the Act will control."

5.      Each provision of this Amendment shall be effective only to the extent, with respect to such provision, that the jurisdictional requirements of the Act are met independently without reference to this Amendment.

6.      No statement, questionnaire or acknowledgement signed or agreed to by a franchisee in connection with the commencement of the franchise relationship shall have the effect of: (i) waiving any claims under any applicable state franchise law, including fraud in the inducement, or (ii) disclaiming reliance on behalf of the Franchisor. This provision supersedes any other term of any document executed in connection with the franchise.

-Remainder of Page Intentionally Blank-

The parties hereto have duly executed this Illinois Amendment to the Franchise Agreement on the same date as that on which the Franchise Agreement was executed.

FRANCHISOR:

The Tox Franchising Group, LLC

By: _____

_____,_____
(Print Name, Title)

FRANCHISEE:

_____

By: _____

_____,_____
(Print Name, Title)

PRINCIPAL:

_____

_____
(Print Name)

PRINCIPAL:

_____

_____
(Print Name)

## ADDENDUM TO THE FRANCHISE DISCLOSURE DOCUMENT PURSUANT TO THE INDIANA FRANCHISE DISCLOSURE LAW AND THE INDIANA DECEPTIVE FRANCHISE PRACTICES ACT

The Indiana Securities Commissioner requires that certain provisions contained in franchise documents be amended to be consistent with Indiana law, including the Indiana Franchises Act, Ind. Code Ann. §§ 1 - 51 (1994) and the Indiana Deceptive Franchise Practices Act, Ind. Code Ann. § 23-2-2.7 (1985) (collectively referred to as the "Acts"). To the extent that (a) the jurisdictional requirements of the Acts are met and (b) this Franchise Disclosure Document and Franchise Agreement contain provisions that are inconsistent with the following, such provisions are hereby amended:

(a)    To the extent the Franchise Agreement contains provisions allowing the establishment of franchisor-owned outlets that are inconsistent with the Indiana Deceptive Franchise Practices Act § 23-2-2.7(2), the requirements of this section of the Indiana Act will control.

(b)  The franchisor may not make any substantial modification of the Franchise Agreement without the franchisee's written consent.

(c)  To the extent any provision regarding renewal or termination of the Franchise Agreement is inconsistent with the Indiana Deceptive Franchise Practices Act §§ 23-2-2.7(7) and (8), the provisions of these sections of the Indiana Act will control.

(d)  Any requirement in the Franchise Agreement that requires the franchisee to prospectively assent to a release, assignment, novation, wavier or estoppel shall not relieve any person from liability arising under the Acts.

(e)  To the extent the covenants not to compete upon expiration or termination of the Franchise Agreement are inconsistent with the Indiana Deceptive Franchise Practices Act § 23-2-2.7(9), the provisions of this section of the Indiana Act will control.

(f)  To the extent that any provision of the Franchise Agreement would be deemed unenforceable pursuant to the Indiana Deceptive Franchise Practices Act § 23-2-2.7(10), as this section of the Indiana Act is interpreted and applied, such provision of the Franchise Agreement shall be so deleted therefrom.

## ADDENDUM TO THE FRANCHISE DISCLOSURE DOCUMENT
## REQUIRED BY THE STATE OF MARYLAND

The Office of Attorney General for the State of Maryland requires that certain provisions contained in franchise documents be amended to be consistent with Maryland Franchise Registration and Disclosure Law, Md. Code Ann., Bus. Reg. § 14-201 et seq., and of the Rules and Regulations promulgated under the Act (collectively the "Maryland Franchise Law"). To the extent that this Disclosure Document or Franchise Agreement contains provisions that are inconsistent with the following, such provisions are hereby amended:

1.      No requirement that you agree to any release, assignment, novation, estoppel or waiver of liability as a condition to your purchasing a The Tox franchise shall act as a release, estoppel or waiver of any liability under the Maryland Franchise Law.

2.      Item 17 is amended to state:

        (a)      Any claims arising under the Maryland Franchise Law must be brought within three (3) years after the grant of the franchise.

        (b)      Any general release required by the terms and conditions of the Franchise Agreement as a condition of renewal, assignment or transfer shall not apply to any liability under the Maryland Franchise Law.

        (c)      Our right to terminate you upon your bankruptcy may not be enforceable under federal bankruptcy law (11 U.S.C. §101 *et. seq.*).

        (d)      Nothing herein shall waive your right to file a lawsuit alleging a cause of action arising under the Maryland Franchise Law in any court of competent jurisdiction in the State of Maryland.

3.      No statement, questionnaire, or acknowledgement signed or agreed to by a franchisee in connection with the commencement of the franchise relationship shall have the effect of (i) waiving any claims under any applicable state franchise law, including fraud in the inducement, or (ii) disclaiming reliance on any statement made by any franchisor, franchise seller, or other person acting on behalf of the franchisor. This provision supersedes any other term of any document executed in connection with the franchise.

4.      Item 5 is hereby amended to state:

        Based upon the franchisor's financial condition, the Maryland Securities Commissioner has required a financial assurance. Therefore, all initial fees and payments owed by franchisees shall be deferred until the franchisor completes its pre-opening obligations under the franchise agreement. In addition, all development fees and initial payments by area developers shall be deferred until the first franchise under the development agreement opens.

        **THE REGISTRATION OF THIS FRANCHISE DISCLOSURE DOCUMENT WITH MARYLAND SECURITIES DIVISION OF THE OFFICE OF ATTORNEY GENERAL DOES NOT CONSTITUTE APPROVAL, RECOMMENDATION, OR ENDORSEMENT BY THE SECURITIES COMMISSIONER.**

DocuSign Envelope ID: FC868933-7613-4774-00BF-7AB1F57B12C1

## AMENDMENT TO THE TOX FRANCHISE AGREEMENT REQUIRED BY THE STATE OF MARYLAND

In recognition of the requirements of the Maryland Franchise Registration and Disclosure Law, Md. Code Ann., Bus. Reg. § 14-201 et seq., and of the Rules and Regulations promulgated thereunder, the parties to the attached The Tox Franchise Agreement (the "Franchise Agreement") agree as follows:

1.      The Maryland Franchise Registration and Disclosure Law prohibits a franchisor from requiring a franchisee's assent to a release of liability under that Law as a condition for the sale, renewal, assignment or transfer of the franchise.  To the extent of any inconsistencies with the Maryland Franchise Registration and Disclosure Law contained in Article 5 or Section 16.3 of the Franchise Agreement, such inconsistent provisions are hereby deleted.

2.      To the extent of any inconsistencies, Section 17.1 of the Franchise Agreement is hereby amended to further state:

> "Our right to terminate you upon your bankruptcy, however, may not be enforceable under federal bankruptcy law (11 U.S.C. §101 *et. seq.*)."

3.      To the extent of any inconsistencies, Section 20.3 of the Franchise Agreement is hereby amended to further state:

> "Nothing herein shall waive your right to file a lawsuit alleging a cause of action arising under the Maryland Franchise Law in any court of competent jurisdiction in the State of Maryland."

4.      To the extent of any inconsistencies, Section 20.6 of the Franchise Agreement is hereby amended to further state:

> "Any claims arising under the Maryland Franchise Law must be brought within three (3) years after the grant of the franchise."

5.      All representations requiring prospective franchisees to assent to a release, estoppel or waiver of liability are not intended to nor shall they act as a release, estoppel or waiver of any liability incurred under the Maryland Franchise Registration and Disclosure Law.

6.      Each provision of this Amendment shall be effective only to the extent, with respect to such provision, that the jurisdictional requirements of the Maryland Franchise Registration and Disclosure Law, Md. Code Ann., Bus. Reg. § 14-201 et seq., are met independently without reference to this Amendment.

7.      No statement, questionnaire, or acknowledgement signed or agreed to by a franchisee in connection with the commencement of the franchise relationship shall have the effect of (i) waiving any claims under any applicable state franchise law, including fraud in the inducement, or (ii) disclaiming reliance on any statement made by any franchisor, franchise seller, or other person acting on behalf of the franchisor. This provision supersedes any other term of any document executed in connection with the franchise.

8.      Based upon the franchisor's financial condition, the Maryland Securities Commissioner has required a financial assurance. Therefore, all initial fees and payments owed by franchisees shall be

DocuSign Envelope ID: FC868933-7613-4774-00BF-7AB1F57B12C1

deferred until the franchisor completes its pre-opening obligations under the franchise agreement. In addition, all development fees and initial payments by area developers shall be deferred until the first franchise under the development agreement opens.

The parties hereto have duly executed this Maryland Amendment to the Franchise Agreement on the same date as that on which the Franchise Agreement was executed.

FRANCHISOR:

The Tox Franchising Group, LLC

By: _____

_____,_____
(Print Name, Title)

FRANCHISEE:

_____

By: _____

_____,_____
(Print Name, Title)

PRINCIPAL:

_____

_____
(Print Name)

PRINCIPAL:

_____

_____
(Print Name)

71

DocuSign Envelope ID: FC868933-7613-4774-00BF-7AB1F57B12C1

**ADDENDUM TO THE**
**THE TOX FRANCHISING GROUP, LLC**
**FRANCHISE DISCLOSURE DOCUMENT**
**REQUIRED BY THE STATE OF RHODE ISLAND**

In recognition of the requirements of the Rhode Island Franchise Investment Act, the Franchise Disclosure Document of The Tox Franchising Group, LLC ("we," "us," or "our") for use in the State of Rhode Island shall be amended to include the following:

1.      Items 17v. and 17w., under the provisions entitled "Choice of law" and "Choice of forum," shall be supplemented with the following language:

> However, you may sue us in Rhode Island for claims arising under the Rhode Island Franchise Investment Act.

2.      Item 17 shall be supplemented by the addition of the following language at the end of Item 17:

> Section 19-28.1-14 of the Rhode Island Franchise Investment Act provides that "A provision in a franchise agreement restricting jurisdiction or venue to a forum outside this state or requiring the application of the laws of another state is void with respect to a claim otherwise enforceable under this Act."

3.      Each provision of this Addendum to the Disclosure Document shall be effective only to the extent, with respect to such provision, that the jurisdictional requirements of the Rhode Island Franchise Investment Act are met independently without reference to this Addendum to the Disclosure Document.

[REMAINDER OF THIS PAGE INTENTIONALLY LEFT BLANK]

## AMENDMENT TO THE
## THE TOX FRANCHISING GROUP, LLC FRANCHISE AGREEMENT REQUIRED BY THE STATE OF RHODE ISLAND

In recognition of the requirements of the Rhode Island Franchise Investment Act, the parties to the attached The Tox Franchising Group, LLC Franchise Agreement (the "Franchise Agreement") agree as follows:

1.      The following language shall be added at the end of Section 20.3 of the Franchise Agreement:

> Notwithstanding the above, Rhode Island franchisees are permitted to bring a lawsuit in Rhode Island for claims arising under the Rhode Island Franchise Investment Act.

2.      Each provision of this Amendment shall be effective only to the extent, with respect to such provision, that the jurisdictional requirements of the Rhode Island Franchise Investment Act are met independently without reference to this Amendment.

-Remainder of Page Intentionally Blank-

73

The parties hereto have duly executed this Rhode Island Amendment to the Franchise Agreement on the same date as that on which the Franchise Agreement was executed.

FRANCHISOR:

The Tox Franchising Group, LLC

By:_____

_____,_____
            (Print Name, Title)

FRANCHISEE:

_____

By:_____

_____,_____
            (Print Name, Title)

PRINCIPAL:

_____

_____
            (Print Name)

PRINCIPAL:

_____

_____
            (Print Name)

## <u>VIRGINIA ADDENDUM TO FRANCHISE DISCLOSURE DOCUMENT</u>

The following statements are added to Item 17.h.

Pursuant to Section 13.1-564 of the Virginia Retail Franchising Act, it is unlawful for a franchisor to cancel a franchise without reasonable cause. If any grounds for default or termination stated in the franchise agreement does not constitute "reasonable cause," as that term may be defined in the Virginia Retail Franchising Act or the laws of Virginia, that provision may not be enforceable.

Pursuant to Section 13.1-564 of the Virginia Retail Franchising Act, it is unlawful for a Franchisor to use undue influence to induce a franchisee to surrender any right given to him under the franchise. If any provision of the Franchise Agreement involves the use of undue influence by the franchisor to induce a franchisee to surrender any rights given to him under the franchise, that provision may not be enforceable.

DocuSign Envelope ID: FC868933-7613-4774-00BF-7AB1F57B12C1

## ADDENDUM TO THE FRANCHISE DISCLOSURE DOCUMENT
## REQUIRED BY THE STATE OF WASHINGTON

In the event of a conflict of laws, the provisions of the Washington Franchise Investment Protection Act, Chapter 19.100 RCW will prevail.

RCW 19.100.180 may supersede the franchise agreement in your relationship with the franchisor including the areas of termination and renewal of your franchise. There may also be court decisions which may supersede the franchise agreement in your relationship with the franchisor including the areas of termination and renewal of your franchise.

In any arbitration or mediation involving a franchise purchased in Washington, the arbitration or mediation site will be either in the state of Washington, or in a place mutually agreed upon at the time of the arbitration or mediation, or as determined by the arbitrator or mediator at the time of arbitration or mediation. In addition, if litigation is not precluded by the franchise agreement, a franchisee may bring an action or proceeding arising out of or in connection with the sale of franchises, or a violation of the Washington Franchise Investment Protection Act, in Washington.

A release or waiver of rights executed by a franchisee may not include rights under the Washington Franchise Investment Protection Act or any rule or order thereunder except when executed pursuant to a negotiated settlement after the agreement is in effect and where the parties are represented by independent counsel. Provisions such as those which unreasonably restrict or limit the statute of limitations period for claims under the Act, or rights or remedies under the Act such as a right to a jury trial, may not be enforceable

Transfer fees are collectable to the extent that they reflect the franchisor's reasonable estimated or actual costs in effecting a transfer.

Pursuant to RCW 49.62.020, a noncompetition covenant is void and unenforceable against an employee, including an employee of a franchisee, unless the employee's earnings from the party seeking enforcement, when annualized, exceed $100,000 per year (an amount that will be adjusted annually for inflation). In addition, a noncompetition covenant is void and unenforceable against an independent contractor of a franchisee under RCW 49.62.030 unless the independent contractor's earnings from the party seeking enforcement, when annualized, exceed $250,000 per year (an amount that will be adjusted annually for inflation). As a result, any provisions contained in the franchise agreement or elsewhere that conflict with these limitations are void and unenforceable in Washington.

RCW 49.62.060 prohibits a franchisor from restricting, restraining, or prohibiting a franchisee from (i) soliciting or hiring any employee of a franchisee of the same franchisor or (ii) soliciting or hiring any employee of the franchisor. As a result, any such provisions contained in the franchise agreement or elsewhere are void and unenforceable in Washington.

## AMENDMENT TO THE
## THE TOX FRANCHISING GROUP, LLC
## FRANCHISE AGREEMENT REQUIRED BY THE STATE OF WASHINGTON

In the event of a conflict of laws, the provisions of the Washington Franchise Investment Protection Act, Chapter 19.100 RCW will prevail.

RCW 19.100.180 may supersede the franchise agreement in your relationship with the franchisor including the areas of termination and renewal of your franchise. There may also be court decisions which may supersede the franchise agreement in your relationship with the franchisor including the areas of termination and renewal of your franchise.

In any arbitration or mediation involving a franchise purchased in Washington, the arbitration or mediation site will be either in the state of Washington, or in a place mutually agreed upon at the time of the arbitration or mediation, or as determined by the arbitrator or mediator at the time of arbitration or mediation. In addition, if litigation is not precluded by the franchise agreement, a franchisee may bring an action or proceeding arising out of or in connection with the sale of franchises, or a violation of the Washington Franchise Investment Protection Act, in Washington.

A release or waiver of rights executed by a franchisee may not include rights under the Washington Franchise Investment Protection Act or any rule or order thereunder except when executed pursuant to a negotiated settlement after the agreement is in effect and where the parties are represented by independent counsel. Provisions such as those which unreasonably restrict or limit the statute of limitations period for claims under the Act, or rights or remedies under the Act such as a right to a jury trial, may not be enforceable

Transfer fees are collectable to the extent that they reflect the franchisor's reasonable estimated or actual costs in effecting a transfer.

Pursuant to RCW 49.62.020, a noncompetition covenant is void and unenforceable against an employee, including an employee of a franchisee, unless the employee's earnings from the party seeking enforcement, when annualized, exceed $100,000 per year (an amount that will be adjusted annually for inflation). In addition, a noncompetition covenant is void and unenforceable against an independent contractor of a franchisee under RCW 49.62.030 unless the independent contractor's earnings from the party seeking enforcement, when annualized, exceed $250,000 per year (an amount that will be adjusted annually for inflation). As a result, any provisions contained in the franchise agreement or elsewhere that conflict with these limitations are void and unenforceable in Washington.

RCW 49.62.060 prohibits a franchisor from restricting, restraining, or prohibiting a franchisee from (i) soliciting or hiring any employee of a franchisee of the same franchisor or (ii) soliciting or hiring any employee of the franchisor. As a result, any such provisions contained in the franchise agreement or elsewhere are void and unenforceable in Washington.

DocuSign Envelope ID: FC868933-7613-4774-90BF-7AB1F57B12C1

The parties hereto have duly executed this Washington Amendment to the Franchise Agreement on the same date as that on which the Franchise Agreement was executed.

FRANCHISOR:

The Tox Franchising Group, LLC

By:_____

_____,_____
(Print Name, Title)

FRANCHISEE:

_____

By:_____

_____,_____
(Print Name, Title)

PRINCIPAL:

_____

_____
(Print Name)

PRINCIPAL:

_____

_____
(Print Name)

## STATE EFFECTIVE DATES – 2023

The following states require that the Franchise Disclosure Document be registered or filed with the state, or be exempt from registration:  California, Hawaii, Illinois, Indiana, Maryland, Michigan, Minnesota, New York, North Dakota, Rhode Island, South Dakota, Virginia, Washington and Wisconsin.

This document is effective and may be used in the following states, where the document is filed, registered or exempt from registration, as of the Effective Date stated below:

| STATE | EFFECTIVE DATE |
|-------|----------------|
| CA | November 17, 2023 |
| IL | PENDING |
| IN | October 10, 2023 |
| MD | PENDING |
| MI | September 20, 2023 |
| MN | PENDING |
| NY | PENDING |
| RI | October 2, 2023 |
| VA | PENDING |
| WA | PENDING |
| WI | October 11, 2023 |

In all other states that do not require registration, the effective date of this Disclosure Document is the issuance date of August 17, 2023.

## EXHIBIT I

## RECEIPT OF FRANCHISE DISCLOSURE DOCUMENT OF THE TOX FRANCHISING, LLC

This Franchise Disclosure Document summarizes certain provisions of the Franchise Agreement and other information in plain language. Read this Franchise Disclosure Document and all exhibits carefully.

If The Tox Franchising Group, LLC offers you a franchise, it must provide this Disclosure Document to you 14 calendar-days before you sign a binding agreement with, or make a payment to, the franchisor or an affiliate in connection with the proposed franchise sale.

New York requires you to receive this Franchise Disclosure Document at the earlier of the first personal meeting or 10 business days before the execution of the franchise or other agreement or the payment of any consideration that relates to the franchise relationship.

If The Tox Franchising Group, LLC does not deliver this Disclosure Document on time or if it contains a false or misleading statement, or a material omission, a violation of federal and state law may have occurred and should be reported to the Federal Trade Commission, Washington, DC 20580 and to your state authority listed on Exhibit A.

The name and principal business address and telephone number of each franchise seller offering the franchise is:

| | | |
|---|---|---|
| Courtney Yeager<br>2145 Sanford Ct.<br>Vero Beach, FL 32963<br>772-253-1403 | Ryan Yeager<br>2145 Sanford Ct.<br>Vero Beach, FL 32963<br>772-253-1403 | |

Issuance Date: **August 17, 2023**

I received a Disclosure Document dated <u>August 17, 2023</u>, that included the following Exhibits:

EXHIBIT A: List of State Franchise Administrators and Agents for Service of Process
EXHIBIT B: Franchise Agreement with Attachments
EXHIBIT C: Multi-Unit Development Agreement with Attachments
EXHIBIT D: Financial Statements of The Tox Franchising, LLC
EXHIBIT E: Operations Manual Table of Contents
EXHIBIT F: Outlets as of the date of this Disclosure Document
EXHIBIT G: Franchisee Acknowledgment Statement
EXHIBIT H: State Addenda
State Effective Dates
EXHIBIT I: Receipt

Date Received: _____          DATE:_____
(If other than date signed)

Print Name:_____

Print Address: _____

City, State: _____


_____
(Signature of recipient)

Please return signed receipt to The Tox Franchising, LLC
2145 Sanford Court
Vero Beach, FL 32963

## EXHIBIT I

## RECEIPT OF FRANCHISE DISCLOSURE DOCUMENT OF THE TOX FRANCHISING, LLC

This Franchise Disclosure Document summarizes certain provisions of the Franchise Agreement and other information in plain language. Read this Franchise Disclosure Document and all exhibits carefully.

If The Tox Franchising Group, LLC offers you a franchise, it must provide this Disclosure Document to you 14 calendar-days before you sign a binding agreement with, or make a payment to, the franchisor or an affiliate in connection with the proposed franchise sale.

New York requires you to receive this Franchise Disclosure Document at the earlier of the first personal meeting or 10 business days before the execution of the franchise or other agreement or the payment of any consideration that relates to the franchise relationship.

If The Tox Franchising Group, LLC does not deliver this Disclosure Document on time or if it contains a false or misleading statement, or a material omission, a violation of federal and state law may have occurred and should be reported to the Federal Trade Commission, Washington, DC 20580 and to your state authority listed on Exhibit A.

The name and principal business address and telephone number of each franchise seller offering the franchise is:

| Courtney Yeager<br>2145 Sanford Ct.<br>Vero Beach, FL 32963<br>772-253-1403 | Ryan Yeager<br>2145 Sanford Ct.<br>Vero Beach, FL 32963<br>772-253-1403 | Amie Hawk, Hannah Miller, Hope Krajnak, Jessica Staats, Alicia Harnage, Gabby Sacco & Jessica McLean – 531-333-3278 – 14301 First National Parkway, Suite 312, Omaha, NE 68154 |

Issuance Date: **August 17, 2023**

I received a Disclosure Document dated <u>August 17, 2023</u>, that included the following Exhibits:

EXHIBIT A: List of State Franchise Administrators and Agents for Service of Process
EXHIBIT B: Franchise Agreement with Attachments
EXHIBIT C: Multi-Unit Development Agreement with Attachments
EXHIBIT D: Financial Statements of The Tox Franchising, LLC
EXHIBIT E: Operations Manual Table of Contents
EXHIBIT F: Outlets as of the date of this Disclosure Document
EXHIBIT G: Franchisee Acknowledgment Statement
EXHIBIT H: State Addenda
State Effective Dates
EXHIBIT I: Receipt

Date Received: 3/27/2024 | 8:08 PDT
(If other than date signed)

DATE: 3/27/2024 | 8:08 PDT

Print Name: Jess Hoggatt

Print Address: 4703 Prairie Ridge Drive

City, State: Fort Collins, CO

DocuSigned by:

(Signature of recipient)

## KEEP FOR YOUR RECORDS

**DocuSign**

## Certificate Of Completion

| | | |
|---|---|---|
| Envelope Id: FC8689337613477490BF7AB1F57B12C1 | | Status: Completed |
| Subject: 2023 The Tox - Multi-State, CA, IN, MI, RI & WI | | |
| Source Envelope: | | |
| Document Pages: 183 | Signatures: 1 | Envelope Originator: |
| Certificate Pages: 5 | Initials: 0 | Jessica Staats |
| AutoNav: Enabled | | 16934 Frances Street |
| EnvelopeId Stamping: Enabled | | Suite 105 |
| Time Zone: (UTC-06:00) Central Time (US & Canada) | | Omaha, NE  68130 |
| | | jstaats@franchisefastlane.com |
| | | IP Address: 68.107.232.162 |

## Record Tracking

| | | |
|---|---|---|
| Status: Original | Holder: Jessica Staats | Location: DocuSign |
| 3/21/2024 8:20:43 AM | jstaats@franchisefastlane.com | |

| Signer Events | Signature | Timestamp |
|---|---|---|
| Jess Hoggatt<br>jessmoor7@gmail.com<br>Security Level: Email, Account Authentication (None) | *[signed]* 9B31DE830778452...<br><br>Signature Adoption: Drawn on Device<br>Using IP Address: 98.245.148.111<br>Signed using mobile | Sent: 3/21/2024 8:21:13 AM<br>Viewed: 3/21/2024 11:49:12 AM<br>Signed: 3/27/2024 10:08:23 AM |
| **Electronic Record and Signature Disclosure:**<br>Accepted: 3/21/2024 11:49:12 AM<br>ID: e97690d6-b26f-46db-bea8-0471f7ec99fb | | |

| In Person Signer Events | Signature | Timestamp |
|---|---|---|

| Editor Delivery Events | Status | Timestamp |
|---|---|---|

| Agent Delivery Events | Status | Timestamp |
|---|---|---|

| Intermediary Delivery Events | Status | Timestamp |
|---|---|---|

| Certified Delivery Events | Status | Timestamp |
|---|---|---|

| Carbon Copy Events | Status | Timestamp |
|---|---|---|
| Amie Hawk<br>ahawk@franchisefastlane.com<br>Compliance Manager<br>Franchise FastLane<br>Security Level: Email, Account Authentication (None) | **COPIED** | Sent: 3/27/2024 10:08:25 AM |
| **Electronic Record and Signature Disclosure:**<br>Not Offered via DocuSign | | |
| Alicia Harnage<br>aharnage@franchisefastlane.com<br>Security Level: Email, Account Authentication (None) | **COPIED** | Sent: 3/27/2024 10:08:25 AM |
| **Electronic Record and Signature Disclosure:**<br>Accepted: 11/7/2023 2:43:43 PM<br>ID: 487508c4-e721-4a8b-8e55-18ff7e2cfe8a | | |

| Carbon Copy Events | Status | Timestamp |
|---|---|---|
| Hannah Miller<br>hmiller@franchisefastlane.com<br>Compliance Specialist<br>Franchise FastLane<br>Security Level: Email, Account Authentication (None)<br>**Electronic Record and Signature Disclosure:**<br>   Not Offered via DocuSign | COPIED | Sent: 3/27/2024 10:08:25 AM |
| Hope Krajnak<br>hkrajnak@franchisefastlane.com<br>Compliance Specialist<br>Franchise FastLane<br>Security Level: Email, Account Authentication (None)<br>**Electronic Record and Signature Disclosure:**<br>   Not Offered via DocuSign | COPIED | Sent: 3/27/2024 10:08:25 AM |
| Jessica Staats<br>jstaats@franchisefastlane.com<br>Compliance Specialist<br>Franchise FastLane<br>Security Level: Email, Account Authentication (None)<br>**Electronic Record and Signature Disclosure:**<br>   Not Offered via DocuSign | COPIED | Sent: 3/27/2024 10:08:25 AM<br>Resent: 3/27/2024 10:08:29 AM<br>Viewed: 3/27/2024 10:09:00 AM |

| Witness Events | Signature | Timestamp |
|---|---|---|

| Notary Events | Signature | Timestamp |
|---|---|---|

| Envelope Summary Events | Status | Timestamps |
|---|---|---|
| Envelope Sent | Hashed/Encrypted | 3/21/2024 8:21:13 AM |
| Certified Delivered | Security Checked | 3/21/2024 11:49:12 AM |
| Signing Complete | Security Checked | 3/27/2024 10:08:23 AM |
| Completed | Security Checked | 3/27/2024 10:08:26 AM |

| Payment Events | Status | Timestamps |
|---|---|---|

**Electronic Record and Signature Disclosure**

Electronic Record and Signature Disclosure created on: 4/4/2019 11:28:41 AM
Parties agreed to: Jess Hoggatt, Alicia Harnage

**ELECTRONIC RECORD AND SIGNATURE DISCLOSURE**

From time to time, Franchise FastLane (we, us or Company) may be required by law to provide to you certain written notices or disclosures. Described below are the terms and conditions for providing to you such notices and disclosures electronically through the DocuSign system. Please read the information below carefully and thoroughly, and if you can access this information electronically to your satisfaction and agree to this Electronic Record and Signature Disclosure (ERSD), please confirm your agreement by selecting the check-box next to 'I agree to use electronic records and signatures' before clicking 'CONTINUE' within the DocuSign system.

**Getting paper copies**

At any time, you may request from us a paper copy of any record provided or made available electronically to you by us. You will have the ability to download and print documents we send to you through the DocuSign system during and immediately after the signing session and, if you elect to create a DocuSign account, you may access the documents for a limited period of time (usually 30 days) after such documents are first sent to you. After such time, if you wish for us to send you paper copies of any such documents from our office to you, you will be charged a $0.00 per-page fee. You may request delivery of such paper copies from us by following the procedure described below.

**Withdrawing your consent**

If you decide to receive notices and disclosures from us electronically, you may at any time change your mind and tell us that thereafter you want to receive required notices and disclosures only in paper format. How you must inform us of your decision to receive future notices and disclosure in paper format and withdraw your consent to receive notices and disclosures electronically is described below.

**Consequences of changing your mind**

If you elect to receive required notices and disclosures only in paper format, it will slow the speed at which we can complete certain steps in transactions with you and delivering services to you because we will need first to send the required notices or disclosures to you in paper format, and then wait until we receive back from you your acknowledgment of your receipt of such paper notices or disclosures. Further, you will no longer be able to use the DocuSign system to receive required notices and consents electronically from us or to sign electronically documents from us.

**All notices and disclosures will be sent to you electronically**

Unless you tell us otherwise in accordance with the procedures described herein, we will provide electronically to you through the DocuSign system all required notices, disclosures, authorizations, acknowledgements, and other documents that are required to be provided or made available to you during the course of our relationship with you. To reduce the chance of you inadvertently not receiving any notice or disclosure, we prefer to provide all of the required notices and disclosures to you by the same method and to the same address that you have given us. Thus, you can receive all the disclosures and notices electronically or in paper format through the paper mail delivery system. If you do not agree with this process, please let us know as described below. Please also see the paragraph immediately above that describes the consequences of your electing not to receive delivery of the notices and disclosures electronically from us.

**How to contact Franchise FastLane:**

You may contact us to let us know of your changes as to how we may contact you electronically, to request paper copies of certain information from us, and to withdraw your prior consent to receive notices and disclosures electronically as follows:
To contact us by email send messages to: ahawk@franchisefastlane.com

**To advise Franchise FastLane of your new email address**

To let us know of a change in your email address where we should send notices and disclosures electronically to you, you must send an email message to us at ahawk@franchisefastlane.com and in the body of such request you must state: your previous email address, your new email address.  We do not require any other information from you to change your email address.

If you created a DocuSign account, you may update it with your new email address through your account preferences.

**To request paper copies from Franchise FastLane**

To request delivery from us of paper copies of the notices and disclosures previously provided by us to you electronically, you must send us an email to ahawk@franchisefastlane.com and in the body of such request you must state your email address, full name, mailing address, and telephone number. We will bill you for any fees at that time, if any.

**To withdraw your consent with Franchise FastLane**

To inform us that you no longer wish to receive future notices and disclosures in electronic format you may:

i. decline to sign a document from within your signing session, and on the subsequent page, select the check-box indicating you wish to withdraw your consent, or you may;

ii. send us an email to ahawk@franchisefastlane.com and in the body of such request you must state your email, full name, mailing address, and telephone number. We do not need any other information from you to withdraw consent.. The consequences of your withdrawing consent for online documents will be that transactions may take a longer time to process..

**Required hardware and software**

The minimum system requirements for using the DocuSign system may change over time. The current system requirements are found here: https://support.docusign.com/guides/signer-guide-signing-system-requirements.

**Acknowledging your access and consent to receive and sign documents electronically**

To confirm to us that you can access this information electronically, which will be similar to other electronic notices and disclosures that we will provide to you, please confirm that you have read this ERSD, and (i) that you are able to print on paper or electronically save this ERSD for your future reference and access; or (ii) that you are able to email this ERSD to an email address where you will be able to print on paper or save it for your future reference and access. Further, if you consent to receiving notices and disclosures exclusively in electronic format as described herein, then select the check-box next to 'I agree to use electronic records and signatures' before clicking 'CONTINUE' within the DocuSign system.

By selecting the check-box next to 'I agree to use electronic records and signatures', you confirm that:

- You can access and read this Electronic Record and Signature Disclosure; and
- You can print on paper this Electronic Record and Signature Disclosure, or save or send this Electronic Record and Disclosure to a location where you can print it, for future reference and access; and
- Until or unless you notify Franchise FastLane as described above, you consent to receive exclusively through electronic means all notices, disclosures, authorizations, acknowledgements, and other documents that are required to be provided or made available to you by Franchise FastLane during the course of your relationship with Franchise FastLane.