**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF FLORIDA**
**FORT PIERCE DIVISION**

**CASE NO. 2:25-cv-14261-CANNON-MAYNARD**

| | |
|---|---|
| **THE TOX FRANCHISING GROUP, LLC**, a Florida limited liability company, | ) ) ) ) |
| Plaintiff, Counter-Defendant, | ) ) |
| **THE TOX IP, LLC**, a Florida limited liability company, | ) ) ) |
| Plaintiff, | ) ) |
| v. | ) ) |
| **DARBY HOGGATT**, an individual; **JESSICA HOGGATT**, an individual; and **GENX HOLDINGS, LLC**, a Colorado limited liability company, | ) ) ) ) ) |
| Defendants, Counter-Plaintiffs, | ) ) |
| v. | ) ) |
| **FRANCHISE FASTLANE, LLC**, a Nebraska limited liability company, | ) |
| Additional Counter-Defendant. | |

**RESPONSE IN OPPOSITION TO COUNTER-DEFENDANTS' MOTION TO DISMISS**

In their Amended Counterclaim (the "Counterclaim"), Counter-Plaintiffs Jess and Darby Hoggatt and GenX Holdings, LLC (together, the "Hoggatts") have properly alleged their causes of action—clearly and in sufficient detail. The Hoggatts took seriously the Court's Order (Doc. No. 73) and conducted a good-faith analysis of their own pleading to address the Court's concerns. The Counterclaim (Doc. No. 75) reflects this good-faith analysis and satisfies all applicable

1

pleading requirements. It provides Counter-Defendants with more than fair notice of the claims and the grounds upon which they rest.

Counter-Defendants' Motion to Dismiss (the "Motion") (Doc. No. 78), on the other hand, does not appear to be seriously engaging with the Counterclaim or, for that matter, the law. Counter-Defendants are on notice of the claims against them. They have every right to raise *legal* arguments as to those claims. But, respectfully, Counter-Defendants' Motion does not and, instead, engages in a host of bizarre and unserious tactics that do not constitute viable legal argument.

The most glaring is Counter-Defendants' efforts, even now, to continue to attempt to wield the proclamation of "shotgun pleading" as a get-out-of-jail-free card, and, while doing this, they do not properly articulate, in any way, how the Counterclaim is a "shotgun pleading." For example, they make broad statements and then do not cite support for the statement. For those citations to the Counterclaim that they do provide, they misstate what is in the Counterclaim. At times, they show a shocking lack of understanding of basic principles of the law—when, for example, they complain that the Hoggatts have brought both a claim for fraud and, in the alternative, breach of contract, (*see* Doc. No. 78, p. 7 n.3), despite the fact that pleading in the alternative and/or pleading inconsistently is found in Rule 8! They pretend that they did not raise arguments in their prior motions to dismiss, so they can try and win cheap, irrelevant points by, for example, noting that the Hoggatts discuss a "separate litigation." (*See* Doc. No. 78, p. 3).[1] (These are, unfortunately,

---

[1] Counter-Defendant Franchise Fastlane, LLC ("FFL") previously argued it was not subject to personal jurisdiction in Florida, (*see* Doc. No. 69), despite the fact that it took the complete opposite position in a case pending in the U.S. District Court for the Middle District of Florida. Because FFL challenged personal jurisdiction here, the Hoggatts alleged additional jurisdictional facts in amending their Counterclaim, which included sworn statements from FFL that were, indeed, made in that separate litigation. (Doc. No. 75, ¶¶ 6-11). Now, FFL accuses the Hoggatts of citing to an irrelevant "separate litigation." (Doc. No. 78, p. 3). Such litigation provided sworn jurisdictional facts from FFL that clearly made it subject to personal jurisdiction in Florida, which

just a few examples). In the end, Counter-Defendants' Motion, respectfully, appears designed to waste time and money. It is not well-taken and should be denied.

## STANDARD OF REVIEW

"'At the pleading stage,' all a plaintiff must do is provide . . . 'a short and plain statement of the claim showing that the pleader is entitled to relief.'" *Caterpillar Fin. Servs. Corp. v. Venequip Mach. Sales Corp.*, 147 F.4th 1341, 1348 (11th Cir. 2025) (citing *Ramirez v. Paradies Shops, LLC*, 69 F.4th 1213, 1217 (11th Cir. 2023) (quoting Fed. R. Civ. P. 8(a)(2)). "Put another way, 'we do not require heightened fact pleading of specifics, but only enough facts to state a claim to relief that is plausible on its face.'" *Id.* (quoting *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007)). "A claim has facial plausibility when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009). "Rule 8 marks a notable and generous departure from the hypertechnical, code-pleading regime of a prior era. . . ." *MacIntyre v. City of Palm Bay*, 2025 WL 722856, at *1 (M.D. Fla. Mar. 6, 2025) (quoting *Ashcroft*, 556 U.S. at 678–79))."A motion to dismiss a complaint should not be granted if the factual allegations are 'enough to raise a right to relief above the speculative level.'" *Graves v. Plaza Med. Ctrs., Corp.*, 2015 U.S. Dist. LEXIS 184691, at *8 (S.D. Fla. Apr. 1, 2015) (quoting *Twombly*, 550 U.S. at 555). "A complaint will survive a motion to dismiss 'even if it appears that a recovery is very remote and unlikely.'" *Id.* (quoting *Twombly*, 550 U.S. at 556); *see also Day v. Taylor*, 400 F.3d 1272, 1275 (11th Cir. 2005) ("The district court may only grant a Rule 12(b)(6) motion to dismiss where it is demonstrated 'beyond doubt that the plaintiff can prove no set of facts in support of his claim which would entitle

---

is why the Hoggatts included those allegations, and FFL is no longer contesting personal jurisdiction.

him to relief.'"). The "threshold is 'exceedingly low' for a complaint to survive a motion to dismiss for failure to state a claim." *Id.* (quoting *Ancata v. Prison Health Services, Inc.*, 769 F.2d 700, 703 (11th Cir. 1985)).

> **I.      The Counterclaim is not a shotgun pleading.**

Yet again, Counter-Defendants make the argument that the Counterclaim is a "shotgun pleading." It is not. Last time, Counter-Defendants had one "gotcha" that stuck—the fact that the Hoggatts had mistakenly incorporated by reference certain paragraphs. Here, they have no such gotcha, and their flimsy "argument" reflects as much.

As noted above, Counter-Defendants make a host of statements with either no citation at all or, else, no specific citation that would allow the Hoggatts to know what Counter-Defendants are talking about. (*See* Doc. No. 78, pp. 3-4). The Hoggatts count approximately *eight* broad and general statements with no specific citations followed by a string cite of references to ten different paragraphs in the Counterclaim. (*Id.*, p. 4). But it is unclear what broad proclamation from the Counter-Defendants is purportedly supported by which paragraph in the Counterclaim. For instance, Counter-Defendants mention that the Hoggatts use the word "cut" to refer to the portion of the franchise fee taken by FFL. (*Id.*, p. 3). That appears at Paragraph 34 of the Counterclaim, (Doc. No. 75), and yet it is unclear how or why the use of the word "cut" is problematic. That is, Counter-Defendants cite no case law that says the Hoggatts cannot use the word "cut" in a pleading. Indeed, FFL previously argued that the Hoggatts' unjust enrichment claim against it should fail because the Hoggatts had allegedly not stated that a benefit was conferred on FFL (as opposed to The Tox). (Doc. No. 69, p. 15). Here, the Hoggatts specifically allege that FFL took a cut of the franchise fees, and FFL complains that saying that is, for an unspecified reason, subject to rebuke? That makes no sense.

Relatedly, they complain that the Hoggatts reference "ongoing issues" they experienced before contracting to start their franchise. (*See* Doc. No. 78, p. 3). The Hoggatts do not know what Counter-Defendants are referring to because there does not appear to be a relevant citation in their string cite of Counterclaim paragraphs. Even if there was, it is unclear why it is problematic *from a pleading perspective* to have mentioned "issues" before executing the contract. Fraudulent statements, for example, come *before* the contract that the fraudulent statements are inducing. To the extent Counter-Defendants are arguing that if ever, at any point in time, an extraneous fact is referenced in a pleading, that means the pleading is a "shotgun" pleading and should be dismissed, then that notion is absurd.

Counter-Defendants further mention "personal issues" with The Tox's counsel, (*id.*), and, again, the Hoggatts do not know to what they are referring. The Hoggatts do mention The Tox's heavy-handed efforts to use the threat of oppressive litigation to have them sign a release (Doc. No. 75, ¶¶ 106-12), which is a fact relevant to their claims for fraud (and everything else). As mentioned above, Counter-Defendants also complain about discussing "separate litigation," (Doc. No. 78, p. 3), when, if one were to apply common sense, it was apparent that the Hoggatts were alleging *jurisdictional* facts that included sworn statements made by FFL in a separate lawsuit in federal court in Florida related directly to FFL's contacts with Florida, as the Hoggatts included those facts in the "Jurisdiction and Venue" section of their Counterclaim. (Doc. No. 75, ¶¶ 6-11).

Perhaps more insidious, Counter-Defendants state, at one point, that the Hoggatts "concede[d]" that they "cannot argue that FFL acts as The Tox's [a]gent," while citing to Paragraph 10 of the Counterclaim. (*See* Doc. No. 78, p. 3). The Hoggatts have conceded no such thing. Paragraph 10 of the Counterclaim actually states that the Hoggatts do not have enough information—because the case has just started!—to determine whether FFL is The Tox's agent

(even though, FFL probably (or almost certainly) was acting as The Tox's agent when it was making fraudulent statements to the Hoggatts):

> To the extent FFL acts as The Tox's agent (and the Hoggatts do not have enough information to make that determination at this time), "[t]he law is clear that an agent, as well as his principal, is liable for fraud perpetrated by the agent within the course and scope of his agency." *Mannish v. Lacayo*, 496 So. 2d 242, 243 (Fla. Dist. Ct. App. 1986).

(Doc. No. 75, ¶ 10); *see also Woodley v. Royal Caribbean Cruises, Ltd.*, 472 F. Supp. 3d 1194, 1207 (S.D. Fla. 2020) ("T]he question of whether an agency relationship exists is a question of fact . . . 'which cannot be decided on a motion to dismiss.'") (quotation omitted). It is inconceivable how Counter-Defendants could have come to a conclusion that the Hoggatts had "conceded" anything based on this allegation. Their contention otherwise is nonsense. And, finally, after all of this, Counter-Defendants spend another approximately one-hundred-and-eighty words making broad statements <u>without a single citation to anything</u>. (*See* Doc. No. 78, p. 4). Such arguments are hardly sufficient to establish "beyond doubt" that the Hoggatts' can prove no set of facts in support of their claims to entitle them to relief. *See Day*, 400 F.3d at 1275.

II.     **To the extent it applies to Counts I, II, III, V, VII, and VIII, Counter-Plaintiffs have more than adequately met the particularity requirement.**

Counter-Defendants argue that Counter-Plaintiffs failed to plead Counts I, II, III, V, VII, and VIII with particularity. As an initial matter, not all of these counts are necessarily subject to the particularity requirement; only those claims that "sound in fraud" are. *See* Federal Rule of Civil Procedure 9(b) ("*In alleging fraud* or mistake, a party must state with particularity the circumstances constituting fraud or mistake.") (emphasis added); *Apex Toxicology, LLC v. United Healthcare Servs.*, 2020 U.S. Dist. LEXIS 120460, at *9 (S.D. Fla. July 6, 2020) ("A claim 'sounds in fraud' when a plaintiff alleges a unified course of fraudulent conduct and relies entirely on that course of conduct as the basis of that claim.") (citation modified). Counter-Defendants cite to no

case law to support their assertion that Rule 9(b) necessarily applies to the Florida Franchise Act. (Doc. No. 78, p. 25). Nor do Counter-Defendants acknowledge there is a split in Florida district courts as to whether Rule 9(b) applies to FDUTPA claims. *E.g., Fitzpatrick v. Vital Pharm., Inc.*, 2021 U.S. Dist. LEXIS 106402, at *6 (S.D. Fla. June 4, 2021) (citing *Weiss v. General Motors LLC*, 418 F. Supp. 3d 1173, 1184-85 (S.D. Fla. 2019) (collecting cases) ("[T]here is a split of authority within the Southern District as to whether Rule 9(b) applies" to FDUTPA"); *Altamonte Pediatric Assocs., P.A. v. Greenway Health, LLC*, 2020 U.S. Dist. LEXIS 161735, at *8 & n.2 (M.D. Fla. Sep. 4, 2020) ("Courts in this District are split as to whether a claim for relief under FDUTPA must also meet Rule 9(b)'s heightened pleading standard. . . . Courts in other districts in Florida are similarly split.") (citing cases). To the extent the Hoggatts' counts are subject to the particularity requirement, however, they go above and beyond such requirements for the reasons detailed in this section.

The purpose of the particularity rule is merely to "'eliminate fraud actions in which all of the facts are learned through discovery after the complaint is filed.'" *Arral Indus. v. Touch Entm't, Inc.*, 2000 U.S. Dist. LEXIS 2306, at *8-9 (S.D. Fla. Jan. 18, 2000) (quoting *Friedlander v. Nims*, 755 F.2d 810, 813 n.3 (11th Cir. 1985)). "Thus, Rule 9(b) is satisfied when the complaint alleges fraud with sufficient particularity to permit the person charged with fraud to have a reasonable opportunity to answer the complaint and adequate information to frame a response." *Id.* (citation modified) (holding claim of fraud "plainly comports with the requirements of Rule 9(b)" where the plaintiff "exhaustively sets forth the factual background of th[e] case" and "sets forth nine individual claims for relief, each specifically incorporating the background allegations"); *see also Future Tech Int'l v. Tae Il Media*, 944 F. Supp. 1538, 1571 (S.D. Fla. 1996) ("Particularity is satisfied when the plaintiff's allegations are "accompanied by 'some delineation of the underlying

acts and transactions which are asserted to constitute fraud.'") (quoting *Merrill Lynch, etc. v. Del Valle*, 528 F. Supp. 147, 149 (S.D. Fla. 1981)).

Importantly, "[t]he application of the [particularity] rule . . . *must not abrogate the concept of notice pleading.*" *Durham v. Bus. Mgmt. Assocs.*, 847 F.2d 1505, 1511 (11th Cir. 1988) (emphasis added). Instead, "Rule 9(b) must be read in conjunction with Rule 8(a) of the Federal Rules of Civil Procedure, which requires the plaintiff to plead only a short, plain statement of the grounds upon which he is entitled to relief." *Brooks v. Blue Cross & Blue Shield of Fla., Inc.*, 116 F.3d 1364, 1370–71 (11th Cir. 1997) (citation modified); *see also Colonial Penn Ins. Co. v. Value Rent-A-Car Inc.*, 814 F. Supp. 1084, 1092 (S.D. Fla. 1992) ("Rule 9(b) must be read in conjunction with Rule 8, Fed. R. Civ. P., and thus, must not abrogate the concept of notice pleading."). Thus, "[w]hen considering a motion to dismiss under Rule 9(b), courts are required to consider the notice pleading requirement of Rule 8(a) . . . [and] be careful to harmonize the directives of Fed. R. Civ. P. 9(b) with the broader policy of notice pleading." *Graves v. Plaza Med. Ctrs., Corp.,* 2015 U.S. Dist. LEXIS 184691, at *6 (S.D. Fla. Apr. 1, 2015) (citation modified).

There are multiple ways the particularity requirement may be satisfied. Counter-Defendants point to four factors (Doc. No. 78 at 5-6),[2] which the Hoggatts have more than properly met here. However, "[t]hese factors are not exclusive." *SIG, Inc. v. AT&T Digital Life, Inc.*, 971 F. Supp. 2d 1178, 1187 (S.D. Fla. 2013). "Although other circuits have placed more stringent pleading requirements upon plaintiffs alleging fraud, . . . [Florida district courts are] compelled to

---

[2] The four factors are that the allegations set forth "(1) precisely what statements were made in what documents or oral representations or what omissions were made, and (2) the time and place of each such statement and the person responsible for making (or, in the case of omissions, not making) same, and (3) the content of such statements and the manner in which they misled the plaintiff, and (4) what the defendants obtained as a consequence of the fraud." (*See id.*) (quoting *Sovereign Bonds Exch. LLC v. Fed. Republic of Germany*, 899 F. Supp. 2d 1304, 1316 (S.D. Fla. 2010)) (emphasis removed).

follow the Eleventh Circuit, as stated in *Durham*." *Colonial Penn Ins. Co. v. Value Rent–A–Car, Inc.,* 814 F. Supp. 1084, 1093 (S.D. Fla. 1992). In *Durham*, the Eleventh Circuit cited *Seville*, a case from the Third Circuit, with approval for the principle that "alternative means are also available to satisfy" Rule 9(b). *See Durham,* 847 F.2d at 1512; *see also Brooks v. Blue Cross & Blue Shield of Fla., Inc.,* 116 F.3d 1364, 1371 (11th Cir. 1997) (citing *Seville Indus. Machinery Corp. v. Southmost Machinery Corp.*, 742 F.2d 786, 791 (3d Cir. 1984)). In *Seville*, the Third Circuit concluded that the fraud-based offenses were pleaded with sufficient particularity where the complaint set forth "the nature of the alleged misrepresentations[,] and while it does not describe the precise words used, each allegation of fraud adequately describes the nature and subject of the alleged misrepresentation." *Seville*, 742 F.2d at 791.

> Similarly, applying *Durham*, the Southern District of Florida in *Colonial Penn* held:

> [W]hile Colonial's allegations of fraud are far from a model of particularity, the allegations do state who made the fraudulent allegations; the reasons why the representations were fraudulent; and that the representations were made to further the scheme to defraud. The complaint also alleged the general time frame in which the misrepresentations were allegedly made . . . and it describes the alleged scheme in considerable detail. . . . Under these circumstances, this Court cannot conclude that Colonial has failed to plead fraud with sufficient particularity."

814 F. Supp. at 1093. Florida district courts have further noted that "[p]laintiffs are not expected" under Rule 9(b) "to specify the exact time and the particular place of each factual omission or misrepresentation." *Flamenbaum v. Orient Lines, Inc.*, 2004 WL 1773207, at *6 (S.D. Fla. July 20, 2004). Instead, "they must provide a sufficiently narrow time frame from which defendants could derive notice as to when the misrepresentations were made." *Id.*

Counter-Defendants' conclusory assertions that the Hoggatts have somehow not met the above standard for particularity is, respectfully, divorced from reality. Throughout their Motion, Counter-Defendants continually assert, without support, that the Hoggatts "improperly

commingled" "all" of their allegations against both The Tox and FFL, (*See* Doc. No. 78, pp. 4, 6, 12, 21, 24), such that it is "impossible for either Counter-Defendant to ascertain which representations Counter-Plaintiffs rely on to support their fraud cause of action" (*Id.*, p. 6). Counter-Defendants provide no cogent explanation as to how Counter-Plaintiffs' fifty-eight-page Counterclaim, which is organized with clear headings identifying various categories of fraudulent statements, provides specific dates, includes screenshots and direct quotations, and explains how each category of misrepresentation induced the Hoggatts to become The Tox franchisees, still somehow does not afford Counter-Defendants with "a reasonable opportunity to answer the complaint and adequate information to frame a response," *Arral Indus. v. Touch Entm't, Inc.*, 2000 U.S. Dist. LEXIS 2306, at *8-9 (S.D. Fla. Jan. 18, 2000), which is all the Counterclaim must do.

That argument is further belied by the fact that the gravamen of the Hoggatts' Counterclaim is that The Tox *partnered with* FFL in a conspiracy to sell The Tox to the Hoggatts through false representations: The Tox engaged FFL as a sales representative to sell its franchise and paid FFL commissions based on sales. (*E.g.*, Doc. No. 75, ¶¶ 7-8, 18, 150). Naturally, then, there will be overlap in the Hoggatts' allegations as to actions by The Tox and FFL, because the parties acted in concert together in committing the act with the common goal of selling The Tox franchises. The parties are not somehow exonerated from fraud because they both committed fraudulent acts. Further, the Hoggatts organized their Counterclaim using headings that specifically outline the various categories of fraudulent statements made by Counter-Defendants as they worked and conspired together to fraudulently induce the Hoggatts to become The Tox franchisees. (*See, e.g.,* Doc. No. 75, Countercl., ¶ 18 ("False Statements Related to the Number of Other Franchisees in Existence); ¶ 36 ("False Statements Related to Turnkey Marketing and Junk Fees"); ¶ 54 ("False Statements Related to Low Build-Out Costs")).

Even within those categories, the Hoggatts outlined in detail the many fraudulent misrepresentations *specifically made by FFL and The Tox*, including through direct quotations and screenshots indicating the relevant dates of the misrepresentations. (*See e.g., id.*, ¶ 19 ("One of the first false statements FFL pitched aggressively to the Hoggatts was that The Tox had a large franchisee base."); ¶ 21 (screenshot of FFL presentation "sent to Ms. Hoggatt by Ms. Sacco [Director of Franchise Development at FFL] on February 27, 2024" falsely stating that The Tox had thirty franchise locations open in February 2024); ¶¶ 20-24 (noting statements by FFL employee Ms. Sacco that The Tox began selling franchises in 2021 and that The Tox had 30 franchise locations open in February 2024 were "falsely represented" based on The Tox's FDDs); ¶ 27 (screenshot containing quote of Ms. Sacco during the same time period falsely stating that validation calls with pre-existing franchisees could take place despite the fact that virtually no pre-existing franchisees existed); ¶¶ 33-36 (describing that The Tox CEO and founder Ms. Yeager told the Hoggatts she would only work with "multi-unit" buyers, even though The Tox was not multi-unit); ¶ 35 (The Tox fraudulently sells "exclusive territor[ies]" by zip code); ¶ 38 (quotation of FFL CEO Carey Gille falsely claiming that The Tox "drives all the marketing efforts" on behalf of its franchisees); ¶ 39 (five additional screenshots of presentations and social media posts by FFL making, among other representations, false "turnkey" marketing statements); ¶ 40 (quotation of Ms. Sacco falsely claiming marketing would be individualized to each franchisee's local market); ¶ 41 (screenshot of FFL social media post where FFL falsely claims The Tox's social media "has historically driven 95% of revenue"); ¶ 42 (screenshot of The Tox similarly falsely claiming "our social media management platform that brings in 95% of our business is handled entirely by corporate") (emphasis original); ¶ 55 (describing how Ms. Sacco falsely promised low build-out costs and misrepresented a budget of $297,600 as realistic for one unit); ¶ 56 (The Tox

falsely referred to its corporate-owned Texas location as a "franchise" location); ¶ 57 (The Tox continues to falsely advertise membership program even though it does not exist). Neither The Tox nor FFL address any of the foregoing allegations *at all*, let alone show how these allegations do not satisfy the applicable pleading standard.[3]

Next, Counter-Defendants argue that the Hoggatts "failed to plead . . . which 'material' false statements the Hoggatts relied upon" and which misrepresentations The Tox made with the intent of inducing the Hoggatts to act. (Doc. No. 8, p. 7). Obviously, every misrepresentation alleged by the Hoggatts was material in the Hoggatts' decision to invest in The Tox. As the Hoggatts note throughout their allegations, the *purpose* of these misrepresentations was to induce Counter-Plaintiffs to invest in the franchise. (*E.g.*, Doc. No. 75, Countercl., ¶ 43 ("Again, these statements . . . were designed to do just that"—i.e., induce the Hoggatts to invest in The Tox); ¶ 25 (The Tox's statements "were designed to convince the Hoggatts (and other prospective franchisees) that they would not be alone, that The Tox had a history with franchisees, and had systems in place to assist a large number of franchisees in being successful.")).

The Hoggatts would not have invested in The Tox had Counter-Defendants provided them with true, accurate information. (*Id.*, ¶ 25 (the "statements that The Tox had a number of different franchises already open were material in convincing the Hoggatts to sign up for The Tox."); ¶¶ 42-43 (false statements that the Tox's "'social media management platform that brings in 95% of our

---

[3] Counter-Defendants also argue that the Hoggatts failed to show that the Tox "**intentionally**" made these misrepresentations. (Doc. No. 78, p. 25) (emphasis original). But "Fed. R. Civ. P. 9(b) provides that intent may be averred generally." *Colonial Penn,* 814 F. Supp. at 1091; *see also* Fed. R. Civ. P. 9(b) ("In alleging fraud or mistake, a party must state with particularity the circumstances constituting fraud or mistake. Malice, intent, knowledge, and other conditions of a person's mind may be alleged generally."). Given the circumstances constituting the fraud as alleged, the Hoggatts have more than adequately alleged Counter-Defendants' intent in making these misrepresentations.

business is handled entirely by corporate'" . . . . were pivotal in inducing the Hoggatts to sign up for The Tox franchise"); ¶ 55 ("Yet another false statement that was a material inducement to the Hoggatts' decision to invest in The Tox was the supposedly low build-out costs.")). Any suggestion from The Tox that the Hoggatts did not make such abundantly clear in their Counterclaim is unsupported.

Further, Counter-Defendants blanketly assert that the Hoggatts' claims are barred because of provisions in the FDD that "directly refute[] their claims." (Doc. No. 78, p. 6). As an initial matter, whether or not the FDD "directly refutes" anything is a fact-based argument inappropriate for resolution at the motion to dismiss stage. *See Galette v. Goodell*, 2023 U.S. App. LEXIS 29727, at *9 (11th Cir. Nov. 8, 2023) ("At the motion-to-dismiss stage, the district court does not evaluate any evidence or determine whether there is a factual dispute between the parties . . . . Instead, both the defendant moving to dismiss and the district court accept the plaintiff's factual allegations in the complaint as true, and the district court merely determines whether those allegations are sufficient to state a claim for relief.").

As to the merits, Counter-Defendants' position that any representations made by The Tox or FFL are somehow not actionable even if those representations were contrary to the FDD is wrong. Representations by FFL and The Tox—both within the FDD and outside it—made prior to the execution of the Franchise Agreement are material to the Hoggatts' causes of action. For example, as explained further in the FDUTPA section below, it *is an unfair or deceptive act* to "[m]ake any claim or representation, orally, visually, or in writing, that contradicts the information required to be disclosed" by the FDD, 16 C.F.R. § 436.9(a), which is exactly what the Hoggatts allege Counter-Defendants did. Further, Attachment 10 of the parties' Franchise Agreement,

conspiciously omitted by Counter-Defendants' Motion, even explicitly contemplates the possibility such claims:

> **No statement, questionnaire, or acknowledgment signed or agreed to by a franchisee (or developer) in connection with the commencement of the franchise relationship shall have the effect of (i) waiving any claims under any applicable state franchise law, including fraud in the inducement, or (ii) disclaiming reliance on any statement made by any franchisor, franchise seller or other person acting on behalf of the Franchisor. This provision supersedes any other term of any document executed in connection with the franchise.**

(Doc. 1-2, at Attachment 10 (Page 70 of 76)) (emphasis original).

Regardless, many of the representations Counter-Plaintiffs allege were fraudulent *appeared in the FDD itself.* (Doc. No. 75, ¶¶ 46-47 (FDD contained false statement regarding "Technology Fee"); ¶¶ 55-56 (FDD contained false statements regarding investment costs); ¶ 59 (FDD falsely represented $110,000 maximum build-out costs); ¶ 61 (FDD falsely represented "Leasehold Improvements" would cost between $50,000 to $110,000)). Counter-Defendants argue that such investment costs were "**estimates** based on prior experience." (Doc. No. 78, p. 6) (emphasis original). But that defense is hardly dispositive. Under Florida law, "projections, opinions or representations of future profits or business success when made by a party with superior or exclusive knowledge of the underlying facts can constitute fraud when the 'defendant knew or should have known, that the facts in his possession invalidated the opinion which he expressed." *Varnum v. Nu-Car Carriers, Inc.*, 804 F.2d 638, 642 (11th Cir. 1986) (quoting *Bissett v. Ply-Gem Indus. Inc.*, 533 F.2d 142, 146 (5th Cir. 1976) (applying Florida law to allegedly false statements made to induce plaintiff to enter franchise agreement)). The Hoggatts' allegations that the estimates in the FDD were "false," "gross[ly] understated," and "not remotely tailored" to their market (Doc. No. 75, p. 31) fall squarely within this rule.

14

In the end, the Hoggatts' claims sounding in fraud have been adequately alleged. The Motion should be denied.

### III.   Counter-Plaintiffs have stated a claim for aiding and abetting fraud against FFL.

As to Count II, FFL argues first that the Hoggatts did not plead with particularity. They have. (*Supra*, pp. 6-14). FFL then makes the additional argument that the Hoggatts "failed to show that FFL knew the alleged false statements were actually false." (Doc. No. 78, p. 9). While it is true that "[t]o survive a motion to dismiss, a claim of aiding and abetting must allege that the defendant had actual knowledge of the underlying wrong," the "element of actual knowledge may be alleged generally." *Hippocrates Health Inst., Inc. v. Bank of Am., N.A*, 2025 U.S. Dist. LEXIS 132323, at \*12 (S.D. Fla. July 10, 2025). General allegations are sufficient if they are accompanied by "allegations of specific facts that given rise to a strong inference of actual knowledge regarding the underlying fraud." *Rosenfeld Gallery, LLC v. Truist Bank*, 719 F. Supp. 3d 1270, 1277 (S.D. Fla. 2024). Additionally, actual knowledge may be established circumstantially. *Gilbert & Caddy, P.A. v. JP Morgan Chase Bank, N.A.*, 2015 U.S. Dist. LEXIS 194142, at \*10-11 (S.D. Fla. Aug. 19, 2015). The Hoggatts have met this standard and adequately alleged actual knowledge.

The Hoggatts' Counterclaim alleges (citing to a sworn statement by FFL), that FFL "works closely with franchisors to understand their unique needs[,] and tailors its development strategies" to each franchisor, including, as applicable here, The Tox. (Doc. No. 75, ¶ 9). The Tox hired FFL to sell its franchise to prospective franchisees and paid FFL a commission to do so. (*Id.*, ¶¶ 7-8). Given that FFL's business purpose is to market and sell franchises, FFL should be aware of, and adhere to, applicable laws in Florida regulating the same. Among the myriad other allegations described above, the Hoggatts alleged that FFL made statements to the Hoggatts in effort to sell The Tox franchise that were *contrary to the* FDD. Making statements contrary to the FDD is not

15

only fraudulent, but, as described further below, is a violation of both FTC regulations and FDUTPA.

As a few examples, the Hoggatts alleged (1) that FFL stated The Tox "started franchising" in 2021, when, according to the 2023 FDD, The Tox did not sell a single franchise until 2023 (*Id.*, ¶ 22); (2) that FFL stated The Tox had "thirty" franchise locations open in February 2024, even though The Tox FDD as of February 2024 indicates only **one** franchise location was open (*Id.*, ¶¶ 21, 23); (3) that FFL stated franchisees could have calls with "pre-existing franchisees," when such franchisees did not exist according to the FDDs (*Id.*, ¶ 27); and (4) that FFL stated The Tox handles "all the marketing efforts," (*Id.*, ¶ 38) which, Counter-Defendants themselves assert is contrary to the FDD! (Doc. No. 78, p. 6). The allegation that FFL made such representations, despite being contrary to the FDDs, absolutely gives, at a minimum, "rise to a strong inference of actual knowledge regarding the underlying fraud." *See Rosenfeld Gallery,* 719 F. Supp. 3d at 1277. The Hoggatts clearly met this element of aiding and abetting fraud, and the Motion fails.

**IV.   Counter-Plaintiffs have stated a claim under FDUTPA against The Tox and FFL.**

To state a claim under the Florida Deceptive and Unfair Trade Practices Act (FDUTPA), the plaintiff must plead "(1) a deceptive act or unfair practice; (2) causation; and (3) actual damages." *Virgilio v. Ryland Group, Inc.*, 680 F.3d 1329, 1338 (11th Cir. 2012). In their Motion, Counter-Defendants take issue with the first and third elements. As to the first, Counter-Defendants again claim without justification that Counter-Plaintiffs did not identify "any specific methods, acts, or practices" that Counter-Defendants committed in marketing and selling The Tox franchise that violated the FDUTPA. (Doc. No. 78, p. 11). As to the third, Counter-Defendants assert that the Counter-Plaintiffs have not pleaded actual damages caused by the violation. (*Id.*, pp. 11-12). As to either of these two points, Counter-Defendants perform no further analysis. (*Id.*).

Regarding the first element, FDUTPA "sweeps far more broadly" than fraud and misrepresentation. *See Visonic Sys. v. Digital Life (In re SIG, Inc.)*, 971 F. Supp. 2d 1178, 1195 (S.D. Fla. 2013) (noting FDUTPA claims can be based on FTC regulatory violations, including failure to adhere to franchise-disclosure requirements); *see also FTC v. Alcoholism Cure Corp.*, 2011 U.S. Dist. LEXIS 155574, *17 (M.D. Fla. Dec. 5, 2011) ("The FDUTPA makes clear that conduct which constitutes a 'deceptive act or practice,' 'an unfair act or practice,' or 'false advertising' under the FTC Act is a violation of the FDUTPA."). By statute, FDUTPA "shall be construed liberally" in order to, among other things, "protect the consuming public and legitimate business enterprises from those who engage in unfair methods of competition, or unconscionable, deceptive, or unfair acts or practices in the conduct of any trade or commerce." Fla. State. § 501.202(2).

The FTC Act, which FDUTPA specifically demands should be given "due consideration and great weight," Fla. Stat. Ann. § 501.204(2), likewise, defines "unfair or deceptive act or practice" to include, *inter alia*, the following:

> **(a)** Make any claim or representation, orally, visually, or in writing, that contradicts the information required to be disclosed by this part.
> **(b)** Misrepresent that any person:
> > **(1)** Purchased a franchise from the franchisor or operated a franchise of the type offered by the franchisor.
> > **(2)** Can provide an independent and reliable report about the franchise or the experiences of any current or former franchisees.
> **(c)** Disseminate any financial performance representations to prospective franchisees unless the franchisor has a reasonable basis and written substantiation for the representation at the time the representation is made, and the representation is included in Item 19 (§ 436.5(s)) of the franchisor's disclosure document. . . .

16 C.F.R. § 436.9.

The Hoggatts' allegations against Counter-Defendants align with these examples of unfair or deceptive acts. That is, the Hoggatts alleged that The Tox and FFL (1) made representations

17

that contradicted those in the FDD; (2) misrepresented that franchisees purchased and operated franchises that they had not, and could provide an independent and reliable report about the franchise; and (3) disseminated financial performance representations without a reasonable basis or written substantiation for the representations. (*See supra*, pp. 11-12, 14-16).

In a factually analogous case to here, the plaintiff alleged that the defendants had represented their vacuum cleaners were "(a) dependable vacuum steam cleaners; (b) suitable for ordinary use; and (c) of good workmanship, materials, and design, and free of material defects." *Hill v. Hoover Co.*, 899 F. Supp. 2d 1259, 1264 (N.D. Fla. 2012). The plaintiff had further pleaded that, "these representations were false based on her actual experience since the [vacuum cleaner] was defective and failed to perform properly." *Id.* On these facts the Florida district court held, "[T]he [p]laintiff has pleaded sufficient facts to support a claim for a violation of the FDUTPA and survive a Rule 12(b)(6) challenge," and denied the defendant's motion to dismiss. *Id.* at 1265. Here, as described in detail above, the Hoggatts similarly alleged, robustly, that Counter-Defendants each made certain representations about the quality and characteristics of a The Tox franchise, which, the Hoggatts later realized based on personal experience and other data, were false. (*E.g.*, Doc. No. 75, ¶¶ 26, 44-54, 56, 70-93). Those actions constitute unfair and deceptive acts. Counter-Defendants made no effort to address how any of the myriad false and misleading statements the Hoggatts allege they made are somehow not unfair or deceptive. Instead, Counter-Defendants simply claim they have no idea what acts or practices they did at all. (Doc. No. 78, p. 11). That is not a tenable argument.

Regarding the third element, "[a]ctual damages may be measured in two ways under FDUTPA: "(1) the value between what was promised and what was delivered; or (2) the total price paid for a valueless good or service." *Harrison v. Lee Auto Holdings, Inc.*, 295 So. 3d 857, 864

(Fla. 1st DCA 2020) (quoting *Waste Pro USA v. Vision Constr. ENT, Inc.*, 282 So. 3d 911, 920 (Fla. 1st DCA 2019)); *see also Fort Lauderdale Lincoln Mercury v. Corgnati*, 715 So. 2d 311, 314 (Fla. Ct. App. 1998) (same). The Hoggatts described in detail that they were promised a franchise system with a number of different qualities and support, and what was actually delivered was something with no such qualities and support and of significantly lesser value. (*Supra*, pp. 11-12, 14-16; *infra*, pp. 19-23). As such, the Hoggatts have certainly alleged a difference in market value of what was promised versus what was delivered. *See Carter v. Ford Motor Co.*, 2021 U.S. Dist. LEXIS 57934, at \*50 (S.D. Fla. Mar. 26, 2021) ("The delta, then, between what the average consumer was willing to pay for the truck he thought he was getting—aesthetics included—and the truck he actually got is, of course, the amount by which that average consumer was 'deceived.'"); *Farmer v. Humana, Inc.*, 582 F. Supp. 3d 1176, 1191 (M.D. Fla. 2022). Counter-Defendants have not come close to showing, taking the Hoggatts' allegations as true as the Court must do at this stage of the proceedings, and construing FDUTPA liberally as required by statute, that the Hoggatts have not stated a cognizable claim for violation of the FDUTPA.

V.   **The Hoggatts have more than adequately alleged a claim for breach of contract and breach of the duty of good faith and fair dealing against The Tox.**

To prevail on a claim for breach of contract, a plaintiff must prove (1) the existence of a valid contract, (2) a material breach of the contract, and (3) damages resulting from that breach. *Infinity Gen. Constr. Servs., Inc. v. Argonaut Ins. Co.*, 781 F. Supp. 3d 1291, 1294 (M.D. Fla. 2025), *appeal dismissed*, No. 25-11851, 2025 WL 3496652 (11th Cir. Dec. 5, 2025). In this case, Counter-Plaintiffs have adequately alleged all the elements necessary to state a claim for breach of contract.

The Tox's argument centers primarily on the notion that the Hoggatts "mischaracterize and misquote the Franchise Agreement's terms to try and tie them to their conclusory breach of

19

contract claims." (Doc. 78, p. 13). The Hoggatts, for their part, identified *numerous* provisions of the Franchise Agreement that were breached by the Tox and have pleaded those allegations in detail. (Doc. 75, ¶¶ 133-136). The contract was also made a part of the pleading through The Tox's Complaint, which allows for the Court to review the specific provisions independently. As for the assertion the claims are conclusory, that is simply not the case. For instance, with respect to the promises to provide turnkey marketings and social media support, the Hoggatts listed over half a dozen numbered paragraphs of factual allegations, replete with screenshots and descriptions of the various promises and subsequent breaches made by The Tox. (*Id.*, ¶¶ 19-27, 37-56). Accordingly, the argument that the Hoggatts' breach of contract allegations are too vague or conclusory fails.

The Tox's argument essentially asserts that the Hoggatts' claims for breach of contract mischaracterize its contents and fail to identify the precise provisions that were breached. (*See* Doc. No. 78, pp. 13–14). As detailed below, the Hoggatts have adequately identified the specific provisions at issue here, but, even if they had not, the Federal Rules of Civil Procedure impose no such requirement, as the case law clearly demonstrates. In *Caterpillar*, the Eleventh Circuit considered the defendant's argument on a motion to dismiss that the plaintiff had failed to "identify the inventory loan agreement provision(s) that [defendant] allegedly breached." *Caterpillar Fin. Servs. Corp. v. Venequip Mach. Sales Corp.*, 147 F.4th 1341, 1348 (11th Cir. 2025). The Eleventh Circuit explained that the Rules did not impose "this kind of heightened pleading obligation on a breach of contract plaintiff." *Id.* Rather, to state a claim for breach of contract, the claim must merely "make plausible allegation[s] that the defendant did not perform as promised. It need not allege anything with particularity." *Id.*

Here, the Counterclaim identifies numerous contractual provisions in the Franchise Agreement the Hoggatts allege The Tox breached. In fact, the Hoggatts listed nineteen contractual

20

provisions in the Franchise Agreement that were breached by The Tox. Additionally, the Counterclaim listed various actions taken by The Tox and explained how they violated the pertinent sections of the Franchise Agreement, *i.e.*, with respect to promises that the Tox would assist the Hoggatts in local advertising and provide advertising that would not detract from the Marks or System (§§ 10.6, 12.1.9, 13.1, 13.2.3. 13.3.4, 13.4); The Tox would provide social media influencers to assist with marketing (§ 13.2.4); and that The Tox would not require the Hoggatts to pay the social media management fee during the first two months of operations (§ 13.5). (Doc. No. 75, ¶ 133).

In addition, Paragraph 133 of the Counterclaim asserts the following violations of the Franchise Agreement by The Tox:

> [P]romising to provide a proprietary system to operate the franchise, (see Franchise Agreement, p. 1, ¶ 2), when a functioning system does not exist and no such functioning proprietary system was provided, and by promising to provide trade secrets, (¶¶ 14.1.1, 19.2), to help Individual Counter-Plaintiffs operate the franchise when no such trade secrets existed and what was provided did not help Individual Counter-Plaintiffs operate the franchise. The Tox further breached the Franchise Agreement with Individual Counter-Plaintiffs through representations that The Tox would provide "turnkey marketing," which never occurred, and with respect to the total investment amount The Tox represented would be required for Individual Counter-Plaintiffs to get their franchise locations operational. (See FDD, as well as Attachment 10 to the Franchise Agreement and the "Relationship Disclosure Form for Franchisees").

(*Id.*). The Counterclaim then goes on to list the various provisions of the Franchise Agreement The Tox breached by these failures, including Sections 7.6, 10.6, 12.1.9, 13.1 and 13.5, among others. (*Id.*, ¶ 133-136). Simply put, the Hoggatts' claim for breach of the Franchise Agreement is more than adequately pleaded. The Hoggatts identify the contract at issue. They then identify specific material breaches of that contract and how it caused damages to them. Indeed, the Counterclaim goes far beyond what is required by identifying *specific provisions* that were breached by The Tox.

21

Otherwise, The Tox actually appears to be attempting to explain *why* its actions should not be determined to have breached the Franchise Agreement, but those arguments are inappropriate at the Rule 12 stage, where the Court must "accept all factual allegations in the complaint as true," *Quail Cruises Ship Mgmt., Ltd. v. Agencia de Viagens CVC Tur Limitada*, 847 F. Supp. 2d 1333, 1338 (S.D. Fla. 2012) (*quoting Tellabs, Inc. v. Makor Issues & Rts., Ltd.*, 551 U.S. 308 (2007)), because any such arguments inevitably require the Court to engage in extensive contract analysis. *See Geter v. Galardi S. Enters., Inc.*, 43 F. Supp. 3d 1322, 1328 (S.D. Fla. 2014) ("[T]he Court may not engage in contract interpretation at the motion to dismiss stage, as these arguments are more appropriate for summary judgment.") (internal quotation omitted); *see also John M. Floyd & Assocs., Inc. v. First Fla. Credit Union*, 443 Fed. Appx. 396, 398 (11th Cir. 2011) (per curiam) (applying Florida law). The Tox's arguments seek for the Court to not only read the contractual provisions at issue, but also to construe the provisions in light of the facts and circumstances. Doing so is not appropriate at this juncture. Instead, the Court should respectfully deny the Motion with respect to this claim (as well as the remaining claims) and allow the parties to address any issues of contract analysis at a later stage in the proceedings. *See Geter,* 43 F. Supp. 3d at 1328.

Similarly, the Counterclaim states a claim for breach of the implied covenant of good faith and fair dealing. The Tox accurately recites the elements for such a claim in its Motion but then incorrectly concludes that "Counter-Plaintiffs' have not pleaded any facts supporting each of the elements for this cause of action . . . ." (Doc. No. 78, p. 19). As previously explained, the Counterclaim identified nearly twenty specific provisions of the Franchise Agreement that The Tox breached. At the same time, the Hoggatts specifically differentiated actions which constituted a breach of the duty of good faith and fair dealing. (*See, e.g.*, Doc. No. 75, ¶¶ 133-136).  Many of those actions which constituted breaches related to discretionary decisions by The Tox, including,

for example, the failures with respect to the advertising and marketing campaigns, which would not necessarily be covered by an express provision of the parties' Agreement.

The Tox again complains that the Counterclaim for breach of the implied covenant of good faith and fair dealing fails because "Counter-Plaintiffs misconstrue and mischaracterize" the various provisions of the Franchise Agreement. (Doc. No. 78, p. 20). As explained, however, "the Court may not engage in contract interpretation at the motion to dismiss stage, as these arguments are more appropriate for summary judgment." *Geter*, 43 F. Supp. 3d at 1328. Accordingly, The Tox's Motion with respect to the claims for breach of contract and breach of the covenant of good faith and fair dealing should both be denied.

### VI. Counter-Plaintiffs have stated a claim against The Tox and FFL for negligent misrepresentation.

Counter-Defendants assert the Hoggatts did not plead their allegations with particularity. They did. (*Supra*, pp. 6-14). Counter-Defendants additionally assert a separate throwaway argument as to this claim that the Hoggatts failed to plead justifiable reliance. Of course, justifiable reliance is a question of fact that is, again, not appropriate on a motion to dismiss. *See Point Blank Sols., Inc. v. Toyobo Am., Inc.*N, 2010 U.S. Dist. LEXIS 117477, at *13-14 (S.D. Fla. Nov. 3, 2010) (denying motion to dismiss where plaintiffs pleaded they relied on defendants' representations when making a purchase, because justifiably reliance "is a matter for summary judgment or trial, not a motion to dismiss."). Thus, Counter-Defendants' argument fails.

### VII. Counter-Plaintiffs have stated a claim for unjust enrichment against The Tox and FFL.

Without citing any legal authority in support, Counter-Defendants first argue that the Hoggatts did not differentiate from whom they are seeking to recover the fees at issue. (Doc. No. 78, p. 22). Obviously, this is not required at this stage of the proceedings or in a situation in which both Counter-Defendants are being sued for conspiracy and are, thus, jointly and severally liable.

23

*See Gov't Emps. Ins. Co. v. Gomez-Cortes*, 2022 WL 820377, at *3 (S.D. Fla. Jan. 20, 2022), *report and recommendation adopted*, 2022 WL 2817961 (S.D. Fla. July 19, 2022) (holding defendants jointly and severally liable under a claim for unjust enrichment). But, at the same time, the Hoggatts did not explicitly differentiate because the Hoggatts do not know the payment arrangement between The Tox and FFL. The Hoggatts presume, as they have explicitly alleged, (Doc. No. 75, ¶ 34), that FFL takes a large cut of the franchise fees, but they do not know the precise calculation. Counter-Defendants' position appears to be that a party must allege hyper-specific damage differentiations based on facts it does not know in order to comply with the "liberal" notice pleading standard. That is wrong.

Counter-Defendants' second argument is that the Hoggatts' claim for unjust enrichment is barred because the Hoggatts had a contract with The Tox. That is also wrong. As the Eleventh Circuit recently highlighted, "Rule 8(d) of the Federal Rules of Civil Procedure expressly permits the pleading of both alternative and inconsistent claims . . . . So [plaintiff's] complaint is not subject to dismissal merely because it alleged multiple theories of default." *Caterpillar Fin. Servs. Corp.*, 147 F.4th 1348–50. It is true that "unjust enrichment may only be pleaded in the alternative where one of the parties asserts that the contract governing the dispute is invalid." *Martorella v. Deutsche Bank Nat. Tr. Co.*, 931 F. Supp. 2d 1218, 1227–28 (S.D. Fla. 2013). But, here, of course, the Hoggatts have done so, as they have alleged that the Franchise Agreement was procured by fraud. (Doc. No. 75, Countercl., ¶¶ 115-121). So, the Hoggatts have adequately alleged the claim against The Tox. Further, as Counter-Defendants note, there is no contract between FFL and the Hoggatts. (Doc. No. 78, p. 22). FFL has no basis under Florida law to somehow shield itself from liability based on the *purported existence of a contract between The Tox and the Hoggatts*, to which FFL is not even a party, and the enforceability of which is actively disputed. Florida courts consistently

24

hold that if there is an existence of an express contract between two parties, such contract *does not* bar an unjust enrichment claim against a third party who is not a party to the contract. *See Pharmacy Corp. of Am. v. Royal Meridian Mgmt. Co., LLC*, 2024 Dist. LEXIS 230195, at *12 (S.D. Fla. Oct. 17, 2024) (existence of contract between parties did not preclude unjust enrichment claim against non-party); *Commer. Repairs & Sales, Ltd. Liab. Co. v. Signet Jewelers Ltd.*, 2018 U.S. Dist. LEXIS 154141, at *11 (M.D. Fla. Feb. 20, 2018) (same).

**VIII.   Counter-Plaintiffs have stated a claim for civil conspiracy against The Tox and FFL.**

Again, as to this claim, Counter-Defendants assert that the Hoggatts did not plead fraud with particularity. (Doc. No. 78, p. 23). They have. (*Supra*, pp. 6-14). Counter-Defendants argue that the Hoggatts did not establish an unlawful agreement. (Doc. No. 78, p. 23). They have. (Doc. No. 75, ¶¶ 7-10, 18, 150; *supra* pp. 10-12). Counter-Defendants argue that the Hoggatts did not identify any overt acts in furtherance of the conspiracy. (Doc. No. 78, p. 24). They have. (Doc. No. 75, ¶¶ 17-56). Finally, Counter-Defendants argue that the Hoggatts did not establish an underlying wrong (fraud). (Doc. No. 78, p. 24). They have. (*Supra*, pp. 6-14). Accordingly, Counter-Defendants' arguments as to this cause of action fail.

**VIII. Counter-Plaintiffs have stated a claim for violation of the Florida Franchise Act against The Tox.**

As to the Florida Franchise Act claim, Counter-Defendants raise an additional argument that Counter-Plaintiffs failed to plead facts that The Tox "intentionally failed to disclose efforts to sell or establish more franchises or distributorships than is reasonable to expect for the franchise to sustain," which Counter-Defendants incorrectly assert is "required to sustain a cause of action." (Doc. No. 78, pp. 25-26). Not only did Counter-Plaintiffs in fact allege that (Doc. No. 75, ¶¶ 19-27; 33-36), Counter-Defendants ignore that the Florida Franchise Act also makes it unlawful to

25

intentionally "misrepresent the prospects or chances for success of a proposed or existing franchise or distributorship" or to intentionally "misrepresent, by failure to disclose or otherwise, the known required total investment for such franchise or distributorship," Fla. Stat. Ann. § 817.416(2)(a), which Counter-Plaintiffs also alleged in their Counterclaim, and are each by themselves sufficient to sustain a cause of action under the Florida Franchise Act. (*See e.g.,* Doc. No. 75, ¶¶ 25-26; 36; 55-56; 117; 125; 129; 150; 156).

**IX.    GenX has stated a claim for tortious interference with contract against The Tox.**

The claim of tortious interference with a business relationship "recognizes that economic relations are entitled to freedom from unreasonable interference." *United Yacht Brokers, Inc. v. Gillespie*, 377 So. 2d 668, 672 (Fla. 1979). The goal of a business relationship is to advance the interests of the parties involved. Tortious interference protects the interests of parties to an agreement against interference by outsiders, who would not be liable otherwise for breach. *Palm Beach County Health Care Dist. v. Prof'l Med. Educ., Inc.*, 13 So. 3d 1090, 1095 (Fla. Ct. App. 2009). The essential elements of a claim for tortious interference in Florida are: (1) the existence of a business relationship not necessarily evidenced by an enforceable contract under which the plaintiff has rights; (2) the defendant's knowledge of the relationship; (3) an intentional and unjustified interference with the relationship by the defendant; and (4) damage to the plaintiff as a resulting from the interference. *Cafesjian v. Armenian Assembly of Am., Inc.*, 2011 U.S. Dist. LEXIS 145149, *14 (S.D. Fla. 2011).

In this instance, The Tox was not a party to GenX's contract with the landlord for the Boulder studio and is not the party that is liable if it is breached. As The Tox was well aware, however, under the lease agreement the studio space was not permitted to be used for any other purpose than as a The Tox franchise location. (Doc. No. 75 ¶¶ 69, 114, 162). And, by finding the

Hoggatts in default of the Franchise Agreement based on pretextual causes, The Tox knowingly and intentionally interfered with GenX's business relationship with its landlord. (*Id.*, ¶¶ 113-114, 162). This is precisely the type of conduct this cause of action was meant to protect against, and the allegations in this matter have been sufficiently pleaded.

Additionally, the argument that the pleadings fail to allege the Boulder lease was breached is nonsensical. The argument appears to hinge on the use of the word "purportedly" in Paragraph 114 of the Counterclaim. However, the use of the word "purported" here is only because an active and ongoing dispute exists between GenX and the landlord. But GenX makes clear that, due to The Tox's intentional and improper pretextual termination of the Hoggatts' franchise, it was prevented from complying with the clause of its contract with the landlord requiring the space to be used for a The Tox franchise for the provision of health and wellness services, related product sales, and "no other purpose whatsoever." (*See* Doc. No. 75 ¶ 114). This is sufficient to state a claim for tortious interference.

Finally, The Tox's claim that it has a financial and supervisory interest in the lease and therefore cannot be liable for interfering with it is wrong. In the case relied on by The Tox, *Burger King Corp. v. Berry*, the court held that the franchisor could not be liable for tortious interference for refusing to approve the *sale* of one of its locations, because the franchisor was the source of the business opportunity itself. 2020 U.S. Dist. LEXIS 256918, at *36-37 (S.D. Fla 2020). In this case, The Tox's approval was required before the Hoggatts could enter into the lease agreement at the Boulder location. After that approval was given, GenX and the landlord executed the lease. Unlike the franchisor in *Berry*, however, The Tox then employed improper means to intentionally prevent GenX from fulfilling its obligations under the lease by pretextually terminating the Hoggatts' Franchise Agreement.

In *Babson Bros. Co. v. Allison*, the Florida Court of Appeals held that one who has a financial interest in the business of another is privileged to cause him not to perform a contract if the actor *does not employ improper means*. *Babson Bros. Co. v. Allison*, 337 So. 2d 848, 850 (Fla. Ct. App. 1976). This has been the law in Florida for at least the last half century. The Hoggatts have alleged that The Tox interfered with GenX's lease through the use of improper means, *i.e.,* their pretextual and retaliatory termination of the Franchise Agreement. (Doc. No. 75 ¶ 162). The Tox's claimed financial interest in the lease is no defense. Accordingly, the claim is adequately pleaded and the Motion as to the claim for tortious interference should be denied.

## X.       GenX has stated a claim against The Tox for indemnity.

The Tox attempts to move the goal posts on GenX's indemnity claim by citing the elements of common-law indemnity claim. (Doc. No. 78, p. 29). GenX's claim for indemnity, however, is based on the injuries it suffered as a result of The Tox's actions. Accordingly, to state a claim for indemnity, GenX must allege: (1) that there existed a special duty running from the indemnitor to the indemnitee; (2) that the indemnitor breached that duty; (3) that the plaintiff's injuries resulted from the breach; and (4) that the indemnitee can be held liable for the injuries resulting to the plaintiff from the indemnitor's acts. *Rabon v. Automatic Fasteners, Inc.*, 672 F.2d 1231, 1235 (5th Cir. 1982) (applying Florida law). GenX has made such allegations here.

At Paragraphs 167 through 170 of the Counterclaim, the Hoggatts alleged that The Tox's wrongdoing vis-à-vis its pretextual termination of their Franchise Agreement caused GenX to incur costs and obligations that it would not otherwise have been required to pay. (Doc. No. 75 ¶¶ 167-170). The Tox recognizes that it held a "financial and supervisory interest in the Boulder lease." (Doc. No. 78, p. 28). As such, the Tox had a duty to deal with the Hoggatts in good faith and breached that duty by pretextually terminating the Franchise Agreement. The Tox's actions

28

resulted in a dispute between GenX and the landlord, which has caused GenX to incur expenses in defending itself. The Tox is liable for those damages. Accordingly, the claim for indemnity is sufficiently pled and the Motion should be denied as to this claim.

## CONCLUSION

For the many reasons articulated above, the Hoggatts respectfully request that the Court deny Counter-Defendants' Motion.

**CERTIFICATE OF SERVICE**

I hereby certify that on March 13, 2026, I served the foregoing documents upon the following persons through the Court's CM/ECF and Electronic Mail.

Bryan J. Mazzola
Matthew D. Wolf
BOYD RICHARDS PARKER & COLONNELLI, P.L.
100 S.E. 2nd Street, Suite 2600
Miami, Florida 33131
bmazzola@boydlawgroup.com
mpereira@boydlawgroup.com
mwolf@boydlawgroup.com
dmorales@boydlawgroup.com

Matthew Margolis
700 Rosemary Avenue, #204
West Palm Beach, Florida 33401
matthew@margolispllc.com

Evan M. Goldman
Thomas D. Emmons
225 Wilmington West Chester Pike, Suite 200
Chadds Ford, Pennsylvania 19317
evan@thefranchisefirm.com
***Counsel for Counter-Defendants, The Tox Franchising Group, LLC, and The Tox IP, LLC***

Andrew Dymowski, Esq.
Capri Trigo, Esq.
GORDON REES SCULLY MANSUKHANI
100 S.E. Second Street, Suite 3900
Miami, Florida 33131
Emails: ctrigo@grsm.com; ddymowski@grsm.com
***Counsel for Franchise Fastlane, LLC***

*/s/Crystal Broughan*
Crystal T. Broughan, Esquire
Florida Bar No.: 863343
Logan K. McEwen, Esquire
Florida Bar No.: 98683
**MARKS GRAY, P.A.**
Post Office Box 447
Jacksonville, Florida 32201
Telephone: (904) 398-0900
Facsimile: (904) 399-8440

30

Email:  cbroughan@marksgray.com

Stuart A. Burkhalter (TN BPR#029078)
Riley & Jacobson, PLC
*Admitted Pro Hac Vice*
1906 West End Avenue
Nashville, Tennessee 37203
Telephone: (615) 320-3700
Facsimile: (615) 320-3737
sburkhalter@rjfirm.com
***Attorneys for Defendants/Counter-Plaintiffs***

31